**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: BOSTON UNIVERSITY COVID-19 REFUND LITIGATION | MASTER FILE NO. 1:20-cv-10827-RGS |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**LOCAL RULE 56.1 STATEMENT OF**
**UNDISPUTED MATRERIAL FACTS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Plaintiffs Julia Dutra ("Dutra"), Gabriella Dube ("Dube"), Shakura Cox ("Cox"), Olivia Bornstein ("Bornstein"), Venus Tran ("Tran"), Natalie Silulu (collectively, "Plaintiffs"), respectfully submit this statement of undisputed material facts, on behalf of themselves and the proposed Class in support of Plaintiffs' Motion for Partial Summary Judgment:

## I. Plaintiffs and the Class Contracted with BU For an On-Campus Experience

### A. BU Offers, and Distinguishes Between, On-Campus and Online Experiences

1. Defendant Trustees of Boston University ("Defendant," the "University," or "BU") is a large, multi-school, research university offering more than 300 programs to both undergraduate and graduate students. Ex. 1, Brown Dep. 26:5-22; *id.* 31:14-32:3; Ex. 2 Nicksa 30(b)(6) Dep. 127:1.

2. BU's program offerings included "On-Campus Experiences," in which students would have the opportunity to register for in-person courses and have access to BU's campus facilities and events, and "Online Experiences" in which students would have the opportunity to register only for online courses and would not have the campus facilities and events access. As

University President Robert A. Brown[1] testified, "[t]he preponderance of all the programs [BU] offer[s] are on-campus programs." Ex. 1 Brown Dep. 26:15-16. BU administers these on-campus programs across its three primary campuses in the Boston area: the Charles River Campus (the "CRC"), which is the "major" campus and where all fulltime undergraduate students take their courses; the medical school campus (the "Boston University Medical Campus" or "BUMC"); and the Fenway Campus. Ex. 1, Brown Dep. 102:3-10; Ex. 2, Nicksa 30(b)(6) Dep. 87:15-19. Although as of Spring 2020, BU primarily offered in-person, on-campus programs in the form of its On-Campus Experiences, BU offered some Online Experiences, as well, which were primarily administered through BU's Metropolitan College. Ex. 1, Brown Dep. 26:23-27:1; Ex. 3, Morrison 30(b)(6) Dep. 26:18-21. Metropolitan College offices are on BU's CRC, however, as explained by BU's Senior Vice President for Financial Affairs, CFO, and Treasurer Gary Nicksa,[2] "[m]uch, if not the majority, of its offerings are online." Ex. 2, Nicksa 30(b)(6) Dep. 23:12-15; *id.* 198:18-23. BU's Online Experience offerings include an online undergraduate degree completion program and a limited number of online graduate and certificate programs. Ex. 5, RPRFA No. 4 (p. 5-6).

3. BU recognizes that its Online Experience and On-Campus Experience target different populations as prospective students. For example, in BU's September 13, 2019 Self-Study Report submitted to BU's accrediting agency, the New England Commission of Higher

---

[1] In his role, President Brown was: "responsible for BU's decision to transition in-person classes to remote learning during the Spring 2020 semester," Ex.4, RPI No. 2 (p.4); "responsible for the decision of whether or not to refund tuition and fees for the Spring 2020 semester," Ex.4, RPI No. 3 (p.5); and "responsible for the financial operations of BU during the Spring 2020 semester," Ex.4, RPI No. 4, (p.5).

[2] BU's Rule 30(b)(6) designee Gary Nicksa "w[as] responsible for the financial operations of BU during the Spring 2020 semester." Ex. 4, RPI No. 4 (p. 5).

Education, *available at* https://www.bu.edu/accreditation/files/2019/09/Boston-University-2019-NECHE-Self-Study-for-website.pdf and attached as Ex. 31 ("Self-Study Report"), BU wrote concerning its graduate programs: "BU recognizes that not all students can attend full-time or study on our Boston campuses." Ex. 31, Self-Study Report at 31. Nevertheless, BU goes at great length to explain to its accrediting agency in the Self-Study Report that its Online Experiences provide the "same high-quality academic experiences" as BU's On-Campus Experiences. *See, e.g., id.* at 38; *see also id.* at 34; *id.* at 37. So, BU offers access to BU educational programming to such students by targeting them with online and hybrid degree programs, *i.e.*, Online Experiences. *Id.*at 31. Plaintiffs and the proposed Class are not students participating in BU's online and hybrid degree programs, however.

4. Notwithstanding BU's demonstrated capability of offering both Online Experiences and On-Campus Experiences, BU did not offer Online Experiences for all of the degrees BU confers. For example, BU has admitted that it did not, as of Spring 2020, offer a fulltime, Online Experience for undergraduate students or for students in its Graduate Medical Sciences Division Program. *See* Exhibit 2 to Paal Aff.; *see also* BUSOF ¶20 ("BU does not offer an online undergraduate degree program or an online Graduate Medical Sciences Division program.").

5. In addition to the clear distinction between BU's programs that offer either an Online Experience or an On-Campus Experience, BU distinguishes clearly between the individual components of the Online Experience and On-Campus Experience at various points and in various ways, both through affirmative representations and past conduct of BU and students. For example, BU admits that its online courses and in-person courses are distinct offerings. Ex. 2, Nicksa 30(b)(6) Dep. 77:5-14 ("[C]ourses are either residential or online, but

not both."); *id.* 60:19-61:2 ("Our courses are structured as either in person or online."). BU's online-only courses "were and have always been taught online." Ex. 5, RPRFA No. 5 (p. 6). Meanwhile, BU's in-person courses were scheduled and expected to be administered "on-campus" for the Spring 2020 semester. Ex. 1, Brown Dep. 26:15-16.

6. BU has admitted that in-person instruction is different from, and "not a substitute" for, remote instruction. Ex. 6, Exhibit 4 to the Nicksa 30(b)(6) Deposition Transcript, at 3 (explaining that "that online delivery is not a substitute for living and learning in [the BU] academic community"). Implicit in that admission made to all students are two critical points: (1) students enrolled in in-person programs and in-person courses must have had a reasonable expectation that BU would provide an On-Campus Experience if online delivery is not a substitute for "living and learning in [the BU] academic community"; and, (2) BU recognizes that students in its in-person programs and enrolled in its in-person courses would not accept an Online Experience as a suitable replacement for the On-Campus Experience BU promised them. For example, BU President Brown testified that his "belief is that living and learning in the academic community is distinctively different than a remote learning experience" and that "virtual technology is not the same as being in the classroom." Ex. 1, Brown Dep. 90:5-8; 91:21-92:7. *See also* Ex. 6, Exhibit 4 to the Nicksa 30(b)(6) Deposition Transcript, at 4 (acknowledging that remote instruction is "not [] the same" as in-person).

7. BU further distinguishes between components of the Online Experiences and On-Campus Experiences that BU offers by making certain opportunities—such as study abroad programs and in-person tutoring and career services—available only to students enrolled in BU's On-Campus Experiences. Ex. 3, Morrison 30(b)(6) Dep. 93:19-94:11 (explaining that online students "would not have access" to in-person tutoring and in-person career services); Ex. 1,

Brown Dep. 129:2-130:11 (explaining that "[t]here were no online students" enrolled in BU's study abroad programs).

8. In BU's various strategic planning materials, BU repeatedly emphasizes its understanding that the in-person services that make up its On Campus Experience, including courses, extracurricular and cocurricular events and programs, and access to in-person facilities both at BU and as part of BU's integration with the City of Boston, are critical components of BU student experiences and important for BU to provide to remain competitive with other universities and attract the best students:

a. In BU's Institutional Master Plan for the 2013-2023 Period ("IMP") (Jan. 17, 2013) (attached as Ex. 32), that BU submitted to the Boston Redevelopment Authority,[3] BU stated that "upgrading the physical infrastructure of the campus is essential, not only enhancing the University's reputation, but for … retaining the best … students." Ex. 32, IMP at 1-3, available at https://www.bu.edu/community/files/2012/09/BU-IMP-1-17-13.pdf.

b. In BU's Strategic Plan (Nov. 19, 2007), available at https://www.bu.edu/hub/files/2018/03/Strategic-Plan.pdf (attached as Ex. 33) ("Strategic Plan"), BU emphasized various "commitments" and "goals" that reflect the importance students and BU place on BU's physical campus. For example, BU included the following commitments and goals:

   i. Committing "[t]o enhance the residential campus and student life experience for our undergraduate students in the special urban environment of Boston." *Id.* at 6.

   ii. "For many of our applicants, Boston University is Boston, and vice versa. Our host city is a powerful draw. And when students enroll here, they are not disappointed. More than any other university, we are woven into the fabric of Boston, and Boston is woven into our fabric." *Id.* at 16.

   iii. Committing to "expanding and enriching the residential campus and programmatic experiences for [BU's] students." *Id.* at 24.

---

[3] Article 80D of the Zoning Code requires BU to submit a comprehensive development plan to the Boston Redevelopment Authority every 10 years. Ex.32, IMP at 1-4.

iv. Committing to improving its "bricks and mortar" facilities and in-person programs such as extracurricular and cocurricular opportunities because doing so is "a competitive necessity because students enroll where they believe they will have the most satisfying experience" and because it "presents powerful educational opportunities" to do so. *Id.*

v. Establishing a goal to "[s]trengthen[] the student residential community and the student experience" including by improving dining facilities, creating technology-rich classrooms as well as formal and informal gathering places for students, while also developing more extracurricular and cocurricular programs. *Id.* at 27.

c. And in the document created by the BU-created "Task Force" to develop BU's Strategic Plan ("OneBU", available at https://www.bu.edu/strategicreport/report/pdf/bu-strategic-report.pdf, attached as Ex. 34), the Task Force also recognized the importance to students of in-person interactions and relatedly BU's physical campus facilities:

i. "Intellectual and personal development is rooted in the face-to-face exchange of ideas among individuals both within and outside the curricular context." *Id.* at 13.

ii. Recommending that "BU students should be helped to develop a sense of connectedness to individuals (through clubs, discussion groups, debating teams, internships, volunteer or research work, athletics, and recreation) and to Boston University itself." *Id.*

iii. BU "should strive to provide students with educational, social, intellectual, and athletic experiences that will last them a lifetime." *Id.*

iv. Referring to the fact that within a few years of writing the OneBU document, BU would have 85% of undergraduates living on campus, the Task Force noted that BU has a "deliberate residential character." *Id.*

v. In recognizing that BU "need[s] to support" student activities, both recreational and intellectual, to enhance BU students' experience, the Task Force considered that: (1) the "student life experience is already shaped by a large and growing base of student organizations that plan and implement more than 5,000 programs and activities each year"; and (2) BU students' interaction with the City Boston can "unite students' intellectual lives," because "[a] sense of dual citizenship in BU and the surrounding community should inform and enrich students' time here, ensuring that they have meaningful, engaged experiences." *Id.*

vi. To further the Task Force's articulated goals in the OneBU document, the Task Force suggested that BU should:

- "Increase support for student organizations to plan and implement campus programs…."
- "Develop and maintain student … learning spaces that reflect commitments to intellectual development, community engagement, the environment, and personal health and wellness." and;
- "[M]ake investments in [BU's] built environment that better define and integrate the campuses, facilitate informal gatherings, and make the campus neighborhoods pedestrian friendly."

*Id.* at 14.

vii. And the Task Force suggested ways that BU should organize its built environment, including location-based services, to improve student service delivery. *Id.*; *see also id.* at 16 (suggesting renovating and modernizing libraries, renovating and expanding classroom and public spaces, increasing the number of spaces in or near academic units where undergraduate, graduate, and professional students can meet and study in an informal setting).

Individually and collectively, these three strategic planning documents reflect that BU knew and understood the market value that its students who enroll in On-Campus Experiences place on attending BU in-person in Boston; that, to attract these students, BU needed to invest in its campus and built environment as well as the provision of in-person services and opportunities. BU cannot reasonably express surprise that the students BU deliberately enticed to attend BU with in-person amenities, services and facilities would expect to receive access to these in-person amenities, services and facilities as part of an On-Campus Experience, including, without limitation, learning opportunities, access to campus facilities, and opportunities to meet and interact with students in-person and on-campus.

9. Given their many differences, the cost of attendance for BU's Online Experiences and On-Campus Experiences are different. *E.g.*, Ex. 2, Nicksa 30(b)(6) Dep. 184:1-3 ("The tuition -- the online programs and the residential programs are different, and the tuition rates are also different."). And BU discloses tuition and fees for Online Experiences separately from On-Campus Experiences. *See, e.g.*, Ex. 8, Exhibit 10 to Nicksa 30(b)(6) Deposition ("Online

students who study on a part-time basis each semester … are charged the University's online per-credit tuition and fee charges as noted."); Ex. 21, Exhibit 6 to Nicksa 30(b)(6) Deposition (listing fees charged to students without reference to online students and which are different from those listed in Ex. 8); Ex. 7, Exhibit 11 to Nicksa 30(b)(6) Deposition (listing tuition rates for all programs and explicitly delineating "EXCEPTIONS" which expressly identify online variations, *e.g.*, the "On-line Graduate Tax Program" in the School of Law, "All on-line courses" in the College of Fine Arts, "On-line MSW courses" in the School of Social Work, as well as an "ON-LINE PROGRAM TECHNOLOGY FEE" that was not charged to Plaintiffs and the proposed Class). Specifically, BU admits that its tuition for online courses is lower per credit than tuition for BU's in-person courses. Ex. 5, RPRFA No. 10 (p. 8-9) (admitting that BU charges a lower tuition per credit for its online-only courses compared to in-person courses). *See also* Ex. 1, Brown Dep. 28:13-22 (explaining that, for online students in the Spring 2020 semester, tuition was "lower on a per-credit basis").[4]

---

[4] BU has since claimed that the online-only programs and in-person programs are not "equivalent" for purposes of determining damages. *See* Motion for Reconsideration, ECF No. 112. Irrespective of whether BU's part time programs (*e.g.*, its online undergraduate degree completion program) is "equivalent" to BU's full time, in-person programs (*e.g.*, its fulltime undergraduate program), the undisputed fact remains that these programs carry different listed tuition amounts such that, if—to use the undergraduate example—BU charged the online undergraduate program rate, it would be clear to BU and the student that the student had elected the Online Experience; and if BU charged the fulltime undergraduate rate, it would be clear to BU and the student that the student had elected the On-Campus Experience. In short, it is undisputed that BU charged different tuition rates to undergraduate students depending on whether those students were enrolled in the Online Experience for undergraduates or the On-Campus Experience for undergraduates, such that the tuition rate charged is indicative of a meeting of the minds as between BU and the student which experience the student was registering for.

10. BU also charges different types of (and amounts in) fees, depending on whether a student enrolls in BU's On-Campus Experiences or Online Experiences. Ex. 2, Nicksa 30(b)(6) Dep. 70:14-18 (explaining that Metropolitan College "has a very specific fee structure for its programs").

11. For a full-time undergraduate student enrolled in in-person courses for the Spring 2020 semester at the CRC, BU assessed the following mandatory fees (and amounts):

| **Fee**[5] | **Amount** |
|---|---|
| Community Service Fee | $60[6] |
| Health & Wellness Fee | $219[7] |
| Student Services Fee | $307[8] |

For students in BU's undergraduate Online Experience, BU charged only a $60 Student Services Fee. *See, e.g.*, Ex.8, Exhibit 10 to the Nicksa 30(b)(6) Deposition Transcript (setting forth the fees for the Metropolitan College Undergraduate Degree Completion and the Undergraduate Genetics Courses in the Graduate Medical School). Thus, when BU charges undergraduate students a Health & Wellness Fee, a Community Service Fee, and a $307 Student Services Fee

---

[5] Ex. 7, Exhibit 11 to the Nicksa 30(b)(6) Deposition Transcript, at 3; Ex. 27, Exhibit 40 to the Paal Deposition Transcript, at 3; Ex. 3, Morrison 30(b)(6) Dep. 70:7-21 (explaining that these were mandatory fees for Spring 2020).

[6] This amount was charged of full-time undergraduate students at the CRC. Ex. 7, Exhibit 11 to the Nicksa 30(b)(6) Deposition Transcript, at 3; Ex. 27, Exhibit 40 to the Paal Deposition Transcript, at 3. Graduate students did not pay this fee.

[7] This amount was charged of both full-time undergraduate and graduate students at the CRC and BUMC. Ex. 7, Exhibit 11 to the Nicksa 30(b)(6) Deposition Transcript.

[8] This amount was charged of full-time undergraduate students at the "Charles River Campus Only." Ex. 7, Exhibit 11 to the Nicksa 30(b)(6) Deposition Transcript, at 3. Full-time graduate students at the "Charles River Campus Only" paid a Student Services Fee of $172.

(and not a $60 Student Services Fee), BU makes clear to the undergraduate student that the undergraduate student is contracting for BU's On-Campus Experience and not BU's Online Experience for undergraduates.

12. In addition to these mandatory fees, students enrolling in a BU On-Campus Experience were often charged a variety of other fees for the Spring 2020 semester. *See generally* Ex. 21, Exhibit 6 to the Nicksa 30(b)(6) Deposition Transcript (explaining, for example, that a Lab Fee "is a required fee for some courses for the use of facilities and/or materials in conjunction with coursework").

13. In addition to undergraduate students, graduate students who registered for BU's online courses in BU's Online Experiences were not charged the same fees as graduate students who enrolled in BU's On-Campus Experiences. BU's 30(b)(6) designee[9] for the determination of fees for online-only programs testified that he "do[es] not know" which fees BU charges its online students.[10] As BU's designee to testify as to "Defendant's analysis and determination of tuition and fees for online-only educational programs," BU's designee's ignorance of the fees charged bars BU from introducing evidence to dispute Plaintiffs' well-supported factual contention. *See, e.g.*, *QBE Ins. Corp. v. Jorda Enter., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) ("[A] corporation which provides a 30(b)(6) designee who testifies that the corporation does not

---

[9] Nicksa was designated to testify regarding "Defendant's analysis and determination of tuition and fees for online-only educational programs." Ex. 11, Exhibit 1 to the Nicksa 30(b)(6) Deposition Transcript, at 7.

[10] Ex. 2, Nicksa Dep. 150:8-10 ("I cannot recall off the top of my head if an online student pays a health and wellness fee."); *id.* at 127:16-21 (Nicksa admitting that he "do[es] not know" whether online students pay the Community Service/Program Fee); *id.* at 151:16-19 (same); *id.* 150:15-18 (same, discussing Applied Music Fee); *id.* at 151:6-15 (same, discussing Community Service Fee); *id.* at 153:16-24 (same, discussing Lab Fee); *id.* at 154:22-155:2 (same, discussing Student Services Fee).

know the answers to questions 'will not be allowed to effectively change its answers by introducing evidence at trial.'" (emphasis added)); *id.* at 698 (holding that a corporation "will not be able to take a position at trial—including the introduction of testimony and exhibits—on the topics . . . on which [its corporate representative] did not provide 30(b)(6) testimony"); *Wausau Underwriters Ins. Co. v. Danfoss, LLC*, 310 F.R.D. 683, 687 (S.D. Fla. 2015), report and recommendation aff'd, 310 F.R.D. 689 (S.D. Fla. 2015) (holding that a corporate representative's "'I-don't-know'" answers" are "deemed fully binding" and corporation "may not proffer any testimonial evidence regarding [its] collective position on the notice topics contrary to or in addition to what [its 30(b)(6) designee] answered on [its] behalf"). In any event, according to BU's own website, for the Spring 2020 semester, across its various online programs, BU charged online students only one fee: a $60 Student Services Fee. Ex. 8, Exhibit 10 to the Nicksa 30(b)(6) Deposition Transcript, at 1-3 (setting out the $60 Student Service Fee for all Online Experience programs on BU's website for online programs). In other words, graduate students who enrolled in BU's Online Experience were charged a Student Services Fee that was a fraction of that paid by graduate students enrolled in BU's On-Campus Experiences, and were not charged a Health & Wellness Fee, a Community Service Fee, nor other fees, such as the Lab Fees. Thus, when BU issued invoices to students, the invoice made clear that the student had registered for either BU's On-Campus Experience (with the tuition and fees specific to that experience) or the Online Experience (with the tuition and fees specific to that experience).

14. In addition, there are important logistical differences between BU's Online Experiences and On-Campus Experiences relating to the timing of payments and registration. For instance, for the Spring 2020 semester, "BU admits that students enrolled in its online-only

graduate degree and online completion programs had different payment and scheduling deadlines than the students enrolled in its other programs." Ex. 5, RPRFA No. 9 (p. 8). Thus, the timing of students' registration and payments of tuition and fees, in addition to the foregoing, evidence a meeting of the minds between BU and students as to whether the student was electing, and BU agreeing to provide an On-Campus Experience or an Online Experience.

15. Moreover, BU admits that it applies both tuition and fees income received from students to the provision of access to in-person amenities, services, facilities, and events. Specifically, BU derives its general revenue that is used for general university expenses from the tuition and all mandatory fees (other than the Community Service Fee), and treats such revenue as an unrestricted fund that it can use to fund any university expense. Nicksa Tr. 104:16-105:2, 118:16-119:11, 141:12-142:1, 146:1-24, 148:1-13; Brown Tr. 30:10-31:1.

### B. By Registering and Paying Corresponding Tuition and Fees for In-Person Courses for the Spring 2020 Semester, Plaintiffs Contracted with BU for On-Campus Experiences

16. A BU student becomes "officially registered" after they (1) register for classes and (2) pay their corresponding tuition and fees. Ex. 12, Exhibit 14 to the Morrison 30(b)(6) Deposition Transcript, at 1 ("An officially registered student is one who is registered for classes and who has settled all charges with Student Accounting Services."). *See also* Ex. 1, Brown Dep. 71:3-16.

17. Each Plaintiff and each member of the Class enrolled in programs BU represented and marketed as providing an On-Campus Experience. Indeed, each undergraduate in the Class (including Plaintiffs Silulu, Dube, Dutra, and Bornstein), necessarily enrolled in BU's On-Campus Experience for undergraduates because, as BU admits, BU did not offer a fulltime Online Experience to undergraduates. *See, e.g.*, *supra* ¶4. Likewise, BU did not offer members of the Class and Plaintiff Tran who were enrolled in BU's Graduate Medical Sciences Division

program an Online Experience. And BU also clearly delineated between its Online Experience and On-Campus Experiences for social work baking BU's and Cox's (as well as other graduate social work students') meeting of the minds as to the students accepting BU's offer of an On-Campus Experience upon enrollment clear. *See, e.g.*, Exhibit 2 to Paal Aff. (offering distinct online, in-person, and hybrid offerings for social work students). Similarly, BU offered its Law and Medicine programs, as well as myriad other graduate programs exclusively as On-Campus Experiences as of Spring 2020. *Id.* BU offered relatively few programs that were similar whether taken by students as On-Campus Experiences or Online Experiences prior to the Spring 2020 semester, and even those were distinguished by BU and students as set forth herein.

18. And, as discussed further herein, for the Spring 2020 semester, each student, including each Plaintiff registered for courses using BU's online registration portal, StudentLink. *See, e.g.,* Ex. 13, Declaration of Natalie Silulu ("Silulu Dec.") ¶ 4; Ex. 14, Declaration of Olivia Bornstein ("Bornstein Dec.") ¶ 4; Ex. 15, Declaration of Shakura Cox ("Cox Dec.") ¶ 4; Ex. 25, Declaration of Venus Tran ("Tran Dec.") ¶ 4; Ex. 26, Declaration of Julia Dutra ("Dutra Dec.") ¶ 4; Ex. 16, SRDRFA No. 2 (p. 5).

19. Indeed, BU admits that the Plaintiffs "enrolled at BU for Spring Semester 2020." Ex. 5, RPRFA No. 1 (p. 4). And each Class member necessarily enrolled at BU for the Spring 2020 semester as well.

20. Moreover, and as also discussed herein, each Plaintiff thereafter paid their corresponding tuition and fees (net of any BU-provided financial aid grants) for the Spring 2020 semester, a fact BU admits. RPRFA No. 2 (p. 5) ("BU admits that all named plaintiffs in this litigation paid all tuition and mandatory student fees that they were billed for the Spring Semester 2020."). *See also* Ex. 13, Silulu Dec. ¶¶ 7-8; Ex. 14, Bornstein Dec. ¶¶ 7-8; Ex. 25,

Tran Dec. ¶¶ 7-8; Ex. 26, Dutra Dec. ¶¶ 7-8; Ex. 9, Silulu000026. Necessarily, each Class member also paid their corresponding tuition and fees, net of any BU-provided financial aid grants, for the Spring 2020 semester.

21. By registering and paying the tuition and fees BU demanded for the Spring 2020 semester, Plaintiffs (and the Class) became "officially registered" and each entered a valid contract with BU for that semester. BU previously argued that the mere fact that students could withdraw, or add or drop classes through February precludes finding that a contract existed for the semester, ECF No. 109 at 10, Plaintiffs note that it is not uncommon for contracts to have rights of recission or to change particular provisions. Such is the case here. BU and students all understood that BU's policies allowed for students to add or drop courses and for various other events or circumstances to affect the rights of BU and students. However, what the evidence cited herein indisputably reflects—*see, e.g.*, *infra* ¶¶51-60—BU did not reserve for itself the right to convert students who had enrolled in On-Campus Experiences to an Online Experience without providing refunds to make such students whole for BU's failure to deliver what BU promised.

### i. In-Person Instruction Was a Term of This Contract

#### 1. Student Plaintiffs Registered for Courses That BU Had Represented Would be Held In Person

22. The registration process for the Spring 2020 semester began in November 2019, and closed by early December 2019. Ex. 1, Brown Dep.140:18-141; Ex. 17, Paal Dep. Tr. 17:6-7

23. Most students,[11] whether enrolling in in-person or online courses, registered for the Spring 2020 semester using BU's online portal, Student Link, with the registration process referred to as "web reg." Ex. 17, Paal Dep. 19:4-20:16; *id.* at 22:15-23:20; Ex. 3, Morrison 30(b)(6) Dep. 26:16-27:3; Ex. 13, Silulu Decl. ¶ 4; Ex. 14, Bornstein Decl. ¶ 4; Ex. 15, Cox Decl. ¶ 4; Ex. 25, Tran Decl. ¶ 4; Ex. 26, Dutra Decl. ¶ 4.

24. To register, BU students logged into Student Link through the internet, using their student ID. Ex. 3, Morrison 30(b)(6) Dep. 26:3-11. As explained by BU's Provost Jean Morrison,[12] BU's Rule 30(b)(6) designee, from there, students selected their courses. *Id.* at 14:7-10; *id.* at 25:11-23.

25. BU admits that, when viewing course options while registering in Student Link for the Spring 2020 semester, students were presented with information on each available course, including—for in-person courses—the course's building location and classroom number. RPRFA No. 11 (p. 9) ("BU admits that the WebReg tool listed **planned classroom locations**...") (emphasis added). *See also* Ex. 17, Paal Dep. 37:20-39:16; *id.* a 42:1-16; Ex. 13, Silulu Dec. ¶¶ 5-6; Ex. 14, Bornstein Dec. ¶¶ 5-6; Ex. 15, Cox Dec. ¶¶ 5-6; Ex. 25, Tran Dec. ¶¶ 5-6; Ex. 26, Dutra Dec. ¶¶ 5-6.

26. In addition to the information provided in Student Link, BU concedes that it communicated additional details about its course offerings to students through the Bulletin. Ex. 3, Morrison 30(b)(6) Dep. 142:18-21 ("Q. And the bulletin is the way that BU communicates its

---

[11] Select schools within BU, such as the medical school, opt to have staff manually register students, rather than have the students register on their own. Ex. 17, Paal Dep. 19:4-20:16.

[12] Morrison was: "responsible for BU's decision to transition in-person classes to remote learning during the Spring 2020 semester," Ex. 4, RPI No. 2 (p. 4); and "responsible for the financial operations of BU during the Spring 2020 semester," Ex. 4, RPI No. 4 (p. 5).

course offerings to students; is that correct? A. Correct."); *id.* at 96:22-97:1 ("Q. BU provides descriptions of its courses in what you call the bulletin; is that correct? A. Yes."). *See also* Ex. 13, Silulu Dec. ¶ 5; Ex. 14, Bornstein Dec. ¶ 5; Ex. 15, Cox Dec. ¶ 5; Ex. 25, Tran Dec. ¶ 5; Ex. 26, Dutra Dec. ¶ 5.

27. Through the Bulletin, BU made further representations to indicate that certain Spring 2020 courses would be administered on-campus. For example, via the Bulletin, BU communicated that students who enrolled in-person in the College of Arts and Sciences could participate in "a full calendar of cultural and social events **on campus**, excursions in Boston and beyond." Ex. 18, Exhibit 16 to the Morrison 30(b)(6) Deposition Transcript (emphasis added). Moreover, the Bulletin stated that the Masters of Social Work program would involve "two years of full-time study **on the Charles River Campus in Boston**." Ex. 19, Exhibit 17 to the Morrison 30(b)(6) Deposition Transcript (emphasis added).

28. For the Spring 2020 semester, Plaintiffs registered for courses using BU's online registration portal. *See* Ex. 13, Silulu Dec. ¶¶4-6; Ex. 14, Bornstein Dec. ¶¶4-6; Ex. 15, Cox Dec. ¶¶4-6; Ex. 25, Tran Dec. ¶¶4-6; Ex. 26, Dutra Dec. ¶¶4-6; Ex. 16, SRDRFA No. 2 (p. 5). BU's course listings for the courses that Plaintiffs and the Class selected including planned classroom locations, thus indicating BU's intent and expectation (as further described herein, *e.g.*, ¶¶25, 35, 41) that such courses that BU had represented would be held in-person, in physical locations on BU's campuses.

### 2. Plaintiffs Paid Tuition and Fees for an On-Campus Experience

29. BU admits that, after registering for their in-person courses, students are issued bills for tuition (and fees), which is specific to the courses for which they have registered. Ex. 2,

Nicksa 30(b)(6) Dep. 224:19-21 ("You enroll first. And then based on your enrollment, the tuition is calculated.").

30. Thus, after Plaintiffs registered for in-person courses for the Spring 2020 semester, they were charged tuition that corresponded to those courses. Ex. 12, Exhibit 14 to the Morrison 30(b)(6) Deposition Transcript, at 1 ("The student's account is charged tuition and fees based on the student's status and class selection."). *See also* Ex. 13, Silulu Dec. ¶ 7; Ex. 14, Bornstein Dec. ¶ 7; Ex. 15, Cox Dec. ¶ 7; Ex. 25, Tran Dec. ¶ 7; Ex. 26, Dutra Dec. ¶ 7.

31. As BU concedes, Plaintiffs paid tuition and fees for the Spring 2020 semester. Ex. 5, RPRFA No. 2 (p. 5) ("BU admits that all named plaintiffs in this litigation paid all tuition and mandatory student fees that they were billed for the Spring Semester 2020."). *See also* Ex. 27, Exhibit 40 to the Paal Deposition Transcript; Ex. 9, Silulu000026 (showing that Plaintiff Silulu paid $27,360 in tuition for the Spring 2020 semester); Ex. 10, TRAN_000005 (same re: Plaintiff Tran); Ex. 13, Silulu Dec. ¶ 8; Ex. 14, Bornstein Dec. ¶ 8; Ex. 25, Tran Dec. ¶ 8; Ex. 26, Dutra Dec. ¶ 8.

32. In addition to tuition, BU charges fees based on the specific courses in which a student registers. Ex. 2, Nicksa 30(b)(6) Dep. 144:8-10 ("It's the fees are based on what the student enrolls in and how the bill reflects their enrollment."); Ex. 12, Exhibit 14 to the Morrison 30(b)(6) Deposition Transcript, at 1 ("The student's account is charged tuition and fees based on the student's status and class selection.").

33. Thus, after Plaintiffs registered for courses indicating their election of an On-Campus Experience for the Spring 2020 semester, BU charged them fees that corresponded to that On-Campus Experience. Ex. 12, Exhibit 14 to the Morrison 30(b)(6) Deposition Transcript, at 1 ("The student's account is charged tuition and fees based on the student's status and class

selection."); Ex. 13, Silulu Dec. ¶ 7; Ex. 14, Bornstein Dec. ¶ 7; Ex. 15, Cox Dec. ¶ 7; Ex. 25, Tran Dec. ¶ 7; Ex. 26, Dutra Dec. ¶ 7.

34. As BU admits, Plaintiffs paid mandatory fees for the Spring 2020 semester. RPRFA No. 2 (p. 5) ("BU admits that all named plaintiffs in this litigation paid all tuition and mandatory student fees that they were billed for the Spring Semester 2020."). *See also* Ex. 27, Exhibit 40 to the Paal Deposition Transcript, at 3 (showing that Plaintiff Dutra paid a Community Service Fee, Student Services Fee, and Health & Wellness Fee for the Spring 2020 semester); Ex. 9, Silulu000026 (showing that Plaintiff N. Silulu a Community Service Fee, Student Services Fee, and Health & Wellness Fee for the Spring 2020 semester); Ex. 13, Silulu Dec. ¶¶ 7-8; Ex. 14, Bornstein Dec. ¶¶ 7-8; Ex. 25, Tran Dec. ¶¶ 7-8; Ex. 26, Dutra Dec. ¶¶ 7-8.

**3. BU Admits That Student Plaintiffs Expected an On-Campus Experience**

35. BU has repeatedly conceded that it understood—and, indeed, intended—that when students who, like Plaintiffs, registered and paid tuition for courses for Spring 2020 that BU had represented, through Student Link and the Bulletin, to be in person by listing planned classroom locations, those students would expect that those courses would, in fact, be administered in person. Ex. 3, Morrison 30(b)(6) Dep. 48:21-49:2 ("Q. So the student viewing this [Student Link] page would understand the classes for that semester would be at the dates, times, and locations indicated, correct? … A. Correct.").

36. BU further admitted that, consistent with the intended reasonable expectation of in-person instruction, BU expected to administer—and, moreover, for students to attend—"in person classes" in person:

> Q. For students who were enrolled in the spring semester of 2020 for in-person classes, were they expected to attend that class in person?
>
> A. Yes.

> Q. Was that attendance a condition of their receiving course credit?
>
> A. It varies from class to class how the professor -- how the professor might explicitly count attendance. But, yes, **the expectation is that it is in person that a student attends class**.

Ex. 3, Morrison 30(b)(6) Dep. 62:17-63:4 (emphasis added). *See also* Ex. 5, RPRFA No. 14 (p. 11) ("BU admits that some courses held during Spring Semester 2020 referenced personal attendance requirements…"); Ex. 30, Silulu000016, at 1 ("Students are expected to attend each class session unless they have a valid reason for being absent. Students may be required at any time to account for undue irregularity in attendance, either by personal explanation to their faculty advisor or dean or by written statement from a parent or another authority. Any student who has been excessively absent from a course may be required to withdraw from that course without credit. Students who expect to be absent from class for more than five days should notify their dean promptly. Students absent from classes more than two days for illness should be under a doctor's care."). Thus, BU expected to administer its in-person courses on-campus, expected students enrolled in such courses to attend them on-campus, and fully intended for students to share these expectations.

37. Further demonstrating BU's intended and shared expectation that it would provide an in-person, On-Campus Experience to students like Plaintiffs, BU President Brown testified that students who had enrolled in clinics with a "face-to-face" component would expect to participate in face-to-face sessions. Ex. 1, Brown Dep. 139:18-140:5. ("Q. For the portions that would have been in in-person with patients of the social work students, would they have expected to be part of those face-to-face sessions for the spring 2020 when they enrolled for those clinics?... A. If there was -- if there was a component that had been programed to be face-to-face, then **they would have expected that to be there**.") (emphasis added).

38. BU President Brown further conceded that at least come Master of Fine Arts ("MFA") candidates who registered for in-person courses for the Spring 2020 semester would expect to take their classes in art studios. Ex. 1, Brown Dep. 149:24-150:15 ("Q. When the MFA candidates applied for their masters of fine arts classes in the fall of 2019 to be taken in 2020 spring, did they expect to be taking some of those classes in art studios? … A. Okay. They would have -- yes, they would have. Some of them would have, not all.").

39. Additionally, further demonstrating BU's intention that students who enrolled in courses for the Spring 2020 semester in On-Campus Experiences would expect those courses to be held in person, BU's Rule 30(b)(6) designee, Provost Jean Morrison, admitted that students in courses that had a lab requirement would have expected and "anticipated" to be able to participate in labs and experiments:

> Q. So for students who are enrolled in the spring 2020 semester for courses that have a lab requirement and offered that semester, they would have expected to be able to participate as part of getting their degree, correct?
>
> A. Yes. And, in fact, they would have participated. The labs and classes were held **as anticipated** for the first half of the spring 2020 semester. So the students did, in fact, get much of **the laboratory experiences that were anticipated**…

Ex. 3, Morrison 30(b)(6) Dep. 138:11-17 (emphasis added).

40. In light of BU's many representations, Plaintiffs and the Class expected to receive an On-Campus Experience with in-person instruction for the duration of the Spring 2020 semester. *See, e.g.,* Ex. 13, Silulu Dec. ¶¶ 9, 13; Ex. 14, Bornstein Dec. ¶¶ 9, 13; Ex. 15, Cox Dec. ¶¶ 8, 12; Ex. 25, Tran Dec. ¶¶ 9, 13; Ex. 26, Dutra Dec. ¶¶ 9, 13.

41. In addition to BU's admissions that students selecting courses represented to be in-person by virtue of the designation of a planned physical classroom location (among the other representations cited herein), BU admitted that BU also intended to create the expectation that

students would have access to BU's campus facilities as part of the On-Campus Experience. One of the ways BU represented to students that they could expect to have access to campus facilities was in the descriptions of BU's mandatory fees, uniquely charged to students electing an On-Campus Experience. BU's Rule 30(b)(6) designee, Provost Jean Morrison admitted that BU communicates information about mandatory fees on its website. Ex. 3, Morrison 30(b)(6) Dep. 69:16-70:1.

42. For the Spring 2020 semester, BU described the three mandatory fees uniquely paid by students enrolled in in-person courses as follows:[13]

| **Fee** | **Purpose of Fee** |
|---|---|
| Community Service Fee | "This mandatory fee is charged to full-time Undergraduate students **on the Charles River Campus**. Under the direction of the Dean of Students, 100% of revenue collected through this fee is allocated directly to support student programs, which foster and engage the community. The Student Allocations Board, Programming Council and Residence Hall Associations/Student Government distribute the majority of these funds to approximately 500 student groups and organizations. Any student program funds not used by the end of a current fiscal year may be carried over to the subsequent year with the approval of the Dean of Students."[14] |
| Health & Wellness Fee | "Proceeds from this mandatory fee help offset the cost of student Health Services clinic at 881 Commonwealth Avenue as well as the Fitness & Recreation Center and their satellite operations. Wellness & prevention services promote physical and emotional well-being among students through comprehensive programming, peer health support, connection to resources, sharing accurate and relevant health information, and providing consultation and care for students struggling with substance misuse. Holistic services provided minimize the risk of illness, injury, and harm all while establishing a foundation for students to optimize their capacity to learn, reach their potential, and achieve their goals both inside and outside of the classroom."[15] |

[13] The BU website's description of these fees has since changed in some notable ways. For example, the description of the "Community Service Fee" (1) no longer specifies that this fee is charged only to students "on the Charles River Campus" and (2) mentions "both online and in-person programs." Ex. 20, Exhibit 5 to the Nicksa 30(b)(6) Deposition Transcript, at 3.

[14] Ex. 21, Exhibit 6 to the Nicksa 30(b)(6) Deposition Transcript, at 2 (emphasis in original).

[15] *Id.* at 3-4.

| | |
|---|---|
| Student Services Fee | "Proceeds from this mandatory fee are allocated to support student service operations and technology resources across campus including, but not limited to, services at the George Sherman Union, East Campus Student Service Center, Residence Halls and other such student support spaces as well as campus network services."[16] |

43. BU concedes that the facilities and services supported by each of these fees are located on BU's physical campuses:

- Student programs take place, and BU's approximately 500 student groups meet, in facilities on BU's campuses. Ex. 3, Morrison 30(b)(6) Dep. 79:6-80:22.

- The Health Services clinic at 881 Commonwealth Ave is located on-campus. Ex. 3, Morrison 30(b)(6) Dep. 83:17-24 (explaining that 881 Commonwealth Ave is "the location where the university's student health, the aggregate of the entities that comprise student health, are physically located").

- The Fitness & Recreation Center, which is "essentially the university's gym," is located on-campus. Ex. 3, Morrison 30(b)(6) Dep. 84:15-20.

- The George Sherman Union, East Campus Student Service Center, and Residence Halls are all buildings located on BU's campuses, and provide "programs that are in support of [] student experiences," such as in-person tutoring and spaces for clubs. Ex. 3, Morrison 30(b)(6) Dep. 89:15-91:16. *See also* Ex. 2, Nicksa 30(b)(6) Dep. 103:10-21 (explaining that the George Sherman Union, East Campus Student Service Center, and Residence Halls are located on BU's campuses).

44. In light of BU's representations, Plaintiffs expected to have access to campus facilities and resources for the Spring 2020 semester. *See* Ex. 13, Silulu Dec. ¶¶ 10-12, 14; Ex. 14, Bornstein Dec. ¶¶ 10-12, 14; Ex. 15, Cox Dec. ¶¶ 9-11, 13; Ex. 25, Tran Dec. ¶¶ 10-12, 14; Ex. 26, Dutra Dec. ¶¶ 10-12, 14.

#### 4. For The First Half of the Semester, Student Plaintiffs Received an On-Campus Experience

45. Consistent with the shared reasonable expectation that BU would administer courses in person that were represented to be in person, Plaintiffs and other students enrolled in

[16] *Id.* at 7.

BU's On-Campus Experiences for the Spring 2020 semester attended their courses in person on BU's physical campuses for roughly the first half of the semester. Ex. 2, Nicksa 30(b)(6) Dep. 89:16-18 ("The semester began in person through spring break for the first eight weeks..."). *See also* Ex. 13, Silulu Dec. ¶ 18; Ex. 14, Bornstein Dec. ¶ 18; Ex. 15, Cox Dec. ¶ 17; Ex. 25, Tran Dec. ¶ 18; Ex. 26, Dutra Dec. ¶ 18.

46. For example, for the first half of that semester, students enrolled in courses with labs engaged in experiments on-campus, while students enrolled in fine arts courses attended class in classrooms and studios on BU's campuses. Ex. 1, Brown Dep. 141:17-142:3; *id.* at 125:11-126:6.

47. Similarly, BU admits, and cannot reasonably dispute that for the first half of the Spring 2020 semester, students who contracted for an On-Campus Experience had access to BU's campus facilities and in-person events. As BU President Brown testified, for the first half of the Spring 2020 semester, the Plaintiffs and other students who had enrolled in an On-Campus Experience, having paid the corresponding tuition and mandatory fees "of course" had access to the on-campus facilities and resources supported by those tuition and fees:

> Q. Did the students who were enrolled and registered in spring 2020 at the time they registered, did they have access to all the on-campus facilities?
>
> A. So that would be you're asking about in January and February. Yes, **of course**.

Ex. 1, Brown Dep. 81:2-7 (emphasis added). *See also* Ex. 13, Silulu Dec. ¶ 19; Ex. 14, Bornstein Dec. ¶ 19; Ex. 15, Cox Dec. ¶ 18; Ex. 25, Tran Dec. ¶ 19; Ex. 26, Dutra Dec. ¶ 19.

48. For the first half of the Spring 2020 semester, Plaintiffs and other students who had enrolled in On-Campus Experiences and paid their tuition and the On-Campus Experience version of the Student Service Fee ($307) had access to the associated student services on BU campuses. Ex. 2, Nicksa 30(b)(6) Dep. 103:22-104:12 (discussing the Student Service Fee and

explaining that, "in the spring of 2020, we offered student services in multiple locations on all of our campuses").

49. For the first half of the Spring 2020 semester, Plaintiffs and other students who had enrolled in On-Campus Experiences at BU and paid their tuition and Community Service Fee had access to the associated student groups that met on campus. Ex. 2, Nicksa 30(b)(6) Dep. 159:6-160:19 (discussing the Community Service Fee and explaining that student groups "met on campus before the pandemic" and "did meet, before the students went away on spring break, during the first half of the semester").

50. For the first half of the Spring 2020 semester, Plaintiffs and other students who had enrolled in On-Campus Experiences at BU and paid their tuition and the Health & Wellness Fee had access to the health services building and could obtain the services supported by the fee. Ex. 3, Morrison 30(b)(6) Dep. 84:1-9 (discussing the Health & Wellness Fee, and agreeing that students enrolled in the Spring 2020 semester "would have been able to go physically to th[e] health services building" and "to obtain services that are supported by the health and wellness fee").

### 5. BU Did Nothing to Create a Reasonable Expectation in Students That BU Might Suspend the On-Campus Experiences Yet Retain Students' Full Tuition and Mandatory Fee Payments

51. At the time that Plaintiffs registered and paid for the Spring 2020 semester, BU did not inform students that, under any circumstance, BU could transition its courses represented to be delivered in person to online-only formats without providing any refund of tuition:[17]

---

[17] *After* the Spring 2020 semester, BU added language to the "Tuition & Fees" page of its website, stating that "[t]uition and fees will not be refunded in the event the mode of instruction

> Q: Did BU ever communicate to the students enrolled in the spring 2020 semester that the classes and the courses and degree programs that we've been talking about in these excerpts, that those could be transitioned online and full tuition would still be required?
>
> A. There is no rational reason why we -- why we would have done that.
>
> Q. So no?
>
> A. There is no rational reason why we would have done that. So, no.

Ex. 3, Morrison 30(b)(6) Dep. 148:20-149:12. *See also* Ex. 1, Brown Dep. 93:8-94:3 (explaining that BU did not communicate to students enrolled in Spring 2020 courses that, in return for their full tuition payments, they might be switched to Zoom or other "synchronous" remote instruction); Ex. 13, Silulu Dec. ¶ 15; Ex. 14, Bornstein Dec. ¶ 15; Ex. 15, Cox Dec. ¶ 14; Ex. 25, Tran Dec. ¶ 15; Ex. 26, Dutra Dec. ¶ 15.

52. Moreover, BU did not inform students registering for in-person courses for the Spring 2020 semester that should study abroad programs and on-campus cultural and social events become unavailable, the students would still have to pay full tuition. Ex. 3, Morrison 30(b)(6) Dep. 105:19-107:10.

53. BU did not communicate to College of Fine Art students that, if their art studios closed during the Spring 2020 semester, they would still have to pay full tuition. Ex. 1, Brown Dep. 126:7-17.

54. BU did not communicate to students studying abroad during the Spring 2020 Semester that they would receive no tuition refund if their study abroad programs were

---

changes for any part of the academic year." Ex. 29, Exhibit 26 to the Brown Deposition Transcript, at 4. *See also* Brown Dep. 74:2-18 (testifying that this language was added to the website "in the summer of 2020").

suspended, and the students had to return home, midway through the semester. Ex. 1, Brown Dep. 134:16-9.

55. In fact, BU did nothing to create a reasonable expectation among Plaintiffs and other students enrolled in in-person courses that there was any possibility that, halfway through the semester, their courses would switch to online instruction *at all*. Ex. 3, Morrison 30(b)(6) Dep. 52:1-15 ("Q…At the time the students registered for classes who were enrolled in the spring of 2020, do you have any reason to believe that this registration page would have shown -- would have informed them that the courses would be moved online?…A. No."); Ex. 1, Brown Dep. 92:13-20 ("Q. Did you give the students, on-campus students enrolled in 2020, a choice at the time they enrolled to go remote as part of their education?…A. When they would have enrolled, which would have been in the fall of '19, the answer is no.").

56. Indeed, BU had never before allowed (much less forced) students to switch their format of courses from in-person to remote in the middle of the semester:

> Q. Mr. Nicksa, prior to the COVID-19 pandemic, did students engaged in the in-person study at BU ever have the option of switching to an online course in mid-semester?
>
> A. Our courses are structured as either in person or online, and that option would not have been available before the pandemic.

Ex. 2, Nicksa 30(b)(6) Dep. 60:19-61:2. *See also* Ex. 13, Silulu Dec. ¶ 13; Ex. 14, Bornstein Dec. ¶ 13; Ex. 15, Cox Dec. ¶ 12; Ex. 25, Tran Dec. ¶ 13; Ex. 26, Dutra Dec. ¶ 13.

57. BU further acknowledges that, at the time that Plaintiffs and Class members registered for the Spring 2020 semester, BU did not inform students that, under any circumstance, BU could close its campuses without providing any refund of tuition or fees:

> Q.…[D]id BU ever communicate during the course registration process for students who were enrolled in the spring 2020 semester that if the campus were to

> transition to online-only learning that the fees, the mandatory fees that we just discussed, would still be charged in full?
>
> …
>
> A. We did not envision moving in-person classes to remote before the beginning of the fall 2019 semester. The global pandemic was -- **the subsequent closure of campus was not something that had framed our communications to our students**.
>
> Q…Effectively that is a no, BU did not communicate during the course registration process for students enrolled in the spring 2020 semester that the tuition -- excuse me, the fees that we just mentioned would be charged in full even though the school would be transitioned to online-only learning, right?
>
> …
>
> A. No…

Ex. 3, Morrison 30(b)(6) Dep. 94:14-95:23 (emphasis added).

58. Regarding specific mandatory fees, BU admits that it did not communicate to students that they would receive no refund of those fees if BU closed campus causing students to lose access to the on-campus facilities and services for which the students had paid tuition and fees. Ex. 1, Brown Dep. 169:14-170:10 (explaining that, at the time of enrollment for the Spring 2020 semester, BU did not communicate to students that if campus closed and students could not access facilities, the Community Service Fee would not be refunded); Ex. 2, Nicksa 30(b)(6) Dep. 158:17-159:5 (similar); *id.* at 112:10-114:16 (similar, for Student Service Fee); Ex. 13, Silulu Dec. ¶ 16; Ex. 14, Bornstein Dec. ¶ 16; Ex. 15, Cox Dec. ¶ 15; Ex. 25, Tran Dec. ¶ 16; Ex. 26, Dutra Dec. ¶ 16.

59. Further, for course-specific fees, BU concedes that it did not communicate to students, at the time that they registered for the Spring 2020 semester, that if BU closed campus causing students to lose access to course-specific facilities, technology, and other resources, the students who had paid those fees would not receive any refund of those fees. *See, e.g.*, Ex. 2,

Nicksa 30(b)(6) Dep. 132:15-133:7 (Lab Fees); *id.* 133:8-13 (Continuing Student Fee); *id.* 134:1-15 (Applied Music Fee); *id.* 140:1-9 (Technology Fee).

60. In fact, BU admits that it did nothing to create the reasonable expectation among Plaintiffs or other students registered for Spring 2020 in-person courses that, halfway through the semester, BU might close its campuses and shift entirely to online delivery of services *at all*.

> Q…Was there any communication to students prior to this pandemic that services would go online?...
>
> A. Other than our pandemic-related communications, I'm not aware of any communication where we announced that we were changing from residential to remote services.

Ex. 2, Nicksa 30(b)(6) Dep. 82:18-83:23.

## II. Halfway Through the Spring 2020 Semester, BU Suspended In-Person Instruction and Closed Campus Facilities

61. On March 11, 2020, "BU President Robert Brown and University Provost Jean Morrison sent a letter to all students, faculty, and staff…, notifying them of changes to campus operations that would be in effect from March 16, 2020 until April 13, 2020." Ex. 4, RPI No. 5 (p. 6).

62. Specifically, in this first letter, BU announced that students could return to campus following spring break, but classes "would switch from in person to remote" for four weeks, beginning on March 16, 2020. Ex. 2, Nicksa. 30(b)(6) Dep. 37:19-38:6; Ex. 1, Brown Dep. 83:17-21 (explaining that the first announcement, which came on March 11, 2020, was to close on March 16, 2020).

63. However, and as BU admits, on March 17, 2020, "[a] second letter was sent to the students and the entire community by email," in which BU announced that, **for the full remainder of the Spring 2020 semester**, BU would "transition to remote instruction and []

effectively close the campus." Ex. 4, RPI No. 5 (p. 6); Ex. 5, RPRFA No. 3 (p. 5); Ex. 2, Nicksa 30(b)(6) Dep. 78:15-23.

64. In this March 17, 2020 announcement, BU President Brown directed on-campus students to "begin the move-out process immediately," and further announced, among other details, that:

- "[a]ll classes and examinations for the remainder of the spring semester will be held remotely";
- "[a]ll branches of the University Libraries' system on the Charles River Campus" would close effective March 18, 2020;
- "[t]he winter and spring seasons for all [BU] athletic programs, no matter their conference affiliation, have been canceled. No instruction, practices, or workouts will be occurring on campus, and all athletic facilities are closed until further notice"; and
- the "Fitness & Recreation Center (FitRec) will be closed for informal fitness and recreational activities for the remainder of the semester."

Ex. 6, Exhibit 4 to the Nicksa 30(b)(6) Deposition Transcript, at 3-5.

65. The transition to entirely remote instruction without campus access, i.e., from an On-Campus Experience to an Online Experience, was as BU admits "a change." Ex. 2, Nicksa 30(b)(6) Dep. 55:16-21 ("The faculty, the residential faculty who had to change to remote construction, had not done it before and expressed their concerns with understanding what to do. It was a change. It was different.").

66. In addition to being forced into remote instruction, Plaintiffs and other students also lost access to many of the facilities and resources that had been available to them when instruction had been in person, as anticipated. For example, MFA students could no longer enter and use BU's art studios, nor access a wide range of facilities and tools necessary for their studies. Ex. 1, Brown Dep. 154:2-10. In a letter to President Brown (and Dean Harvey Young), a group of MFA candidates at BU'S School of Visual Arts included *a two-page-long* "partial list

of resources, equipment, facilities, and opportunities" to which they lost access following the campus shut-down, including, for example: studios, projectors, lumber, binding equipment, welding equipment, laser printers, letterpress machines, pottery wheels, kilns, printmaking presses and chemicals, etching presses and materials, and exhibition spaces. Ex. 22, Exhibit 30 to the Brown Deposition Transcript, at 9-11.

67. Across disciplines, BU admits that "academic and research buildings were closed," which "include[d] laboratories in the academic and research buildings." Ex. 2, Nicksa 30(b)(6) Dep. 132:5-14.

68. Students in clinics and other experiential courses also lost out on valuable experiences. For example, as one Physician Assistant student explained in a letter to President Brown, following the transition to remote learning, she and her peers "[were] not provided…any sort of medical based learning that [their] clinical rotations would have offered." Ex. 23, Exhibit 35 to the Brown Deposition Transcript, at 9-11.

69. As BU admits, the effective closure of BU's campuses also meant that Plaintiffs and the Class could no longer access recreational facilities, attend in-person events, nor participate in in-person activities. Ex. 4, RPI No. 5 (p. 6).

70. As BU's Rule 30(b)(6) designee Gary Nicksa testified, student organizations and groups "change[d] from in-person to remote programs, Zoom meetings." Ex. 2, Nicksa 30(b)(6) Dep. 121:2-20.

71. The Fitness and Recreation Center—home to BU's "exercise equipment, classroom locations for athletic -- athletic classes, the pool," Ex. 3, Morrison 30(b)(6) Dep. 84:15-20—shut down. Ex. 2, Nicksa 30(b)(6) Dep. 94:17-95:3.

72. Moreover, the remainder of ticketed sporting events for the remainder of the Spring 2020 semester were canceled, meaning that Student Plaintiffs and other students could not attend—nor participate in—such events. Ex. 2, Nicksa 30(b)(6) Dep. 97:12-24.

73. All told, "campus services, activities, and interactions [became] severely limited," Ex. 6, Exhibit 4 to the Nicksa 30(b)(6) Deposition Transcript, with BU's campuses being "effectively close[d]" for roughly half of the Spring 2020 semester. Ex. 4, RPI No. 5 (p. 6).

74. Thus, Plaintiffs and the Class lost access to the (1) in-person instruction (beginning on March 16, 2020) and (2) access to campus facilities and resources (beginning on March 17, 2020) that BU had led them to expect to receive for the entire Spring 2020 semester. *See* Ex. 13, Silulu Dec. ¶¶ 20-21; Ex. 14, Bornstein Dec. ¶¶ 20-21; Ex. 15, Cox Dec. ¶¶ 19-20; Ex. 25, Tran Dec. ¶¶ 20-21; Ex. 26, Dutra Dec. ¶¶ 20-21. In short, BU forced Plaintiffs and the Class from the On-Campus Experience for which they contracted (as discussed *supra*) to an Online Experience.

75. For the Spring 2020 semester at BU, courses were scheduled to begin on January 21, 2020, with exams scheduled to conclude on May 9, 2020. Ex. 30, Silulu000016, at 3. Thus, when BU suspended in-person instruction beginning on March 16, 2020, there were 54 days left in the 109-day semester (meaning that Student Plaintiffs had received the contracted-for instruction for 55 days), and when BU announced that campus facilities and services would begin closing on March 17, 2020, there were 53 days left in the 109-day semester (meaning that Student Plaintiffs had received the contracted-for campus access for 56 days).

## III. Despite Ceasing to Provide the Promised On-Campus Experience, BU Refused to Issue Refunds for Any Portion of Plaintiffs' or the Class's Tuition and Fees

76. On April 3, 2020, in a communication from University Provost Jean Morrison, BU announced to students that BU would not be issuing any refunds or credits for tuition and

fees for the Spring 2020 semester. Morrison Ex. 23 at 4 ("Since classes are continuing for the remainder of the semester via remote instruction, there will be no credits to student accounts related to spring 2020 tuition charges…There will be no adjustments or account credits for mandatory fees.").[18] *See also* Ex. 2, Nicksa 30(b)(6) Dep. 106:1-11 (admitting that BU did not issue refunds for the Student Services Fee).

77. BU, primarily through the office of President Brown, received numerous communications from students and families, seeking reductions or refunds in tuition and fees. Ex. 1, Brown Dep. 83:22-84:9; *id.* 85:25-86:11; *id.* 97:7-13.

78. For instance, one student emailed President Brown "ask[ing] for a partial tuition reimbursement for the spring semester for all undergraduates," given that such students "are not able to access resources that are part of the reason why [they] elected to attend such a prestigious and expensive private university," including "hands-on learning in the classroom" and "extensive labs and resources." Ex. 28, Exhibit 33 to the Brown Deposition Transcript, at 2.

79. Additionally, in their letter discussed above, *see infra* ¶ 67, MFA candidates in the School of Visual Arts "implore[d] the university to present a plan for financial reimbursement," seeing as "Boston University's [School of Visual Arts] can no longer deliver its own fundamental pedagogical promises." Ex. 22, Exhibit 30 to the Brown Deposition Transcript, at 5-6.

80. In the face of such requests, and despite its failure to provide the in-person instruction and campus access for which Plaintiffs and other students had contracted for the

[18] BU did, however, provide prorated refunds for room and board. Ex. 24, Exhibit 23 to the Morrison 30(b)(6) Deposition Transcript, at 3-4; Ex. 1, Brown Dep. 94:4-95:4; Ex. 2, Nicksa 30(b)(6) Dep. 211:11-18.

entire Spring 2020 semester, BU still has not issued refunds for tuition or most fees for that semester. Ex. 5, RPRFA No. 17 (p. 13) (admitting that "[BU] ha[s] never provided any refunds of tuition and mandatory student fees (other than partial refunds of student housing fees) charged to student accounts for Spring Semester 2020."). *See also* Ex. 13, Silulu Dec. ¶ 22; Ex. 14, Bornstein Dec. ¶ 22; Ex. 15, Cox Dec. ¶ 21; Ex. 25, Tran Dec. ¶ 22; Ex. 26, Dutra Dec. ¶ 22.

## IV. In Forcing Plaintiffs and the Class from the Promised On-Campus Experience to an Online Experience, BU Caused Plaintiffs and the Class Injury and Damages

### A. Plaintiffs' Expert Dr. Hal Singer's Testimony

81. Plaintiffs retained Hal J. Singer, Ph.D. to evaluate whether and to what extent BU's conduct at issue in this case caused BU students injury. *See* Report of Hal J. Singer, Ph.D. (Nov. 18, 2022), attached as Ex. 35 (the "Singer Report").

82. Dr. Singer performed a choice-based-conjoint ("CBC") analysis in order to estimate what, if any, discount students would require if forced from an On-Campus Experience to an Online Experience. *See, e.g.*, Singer Report ¶9; *see also* Ex.36, Transcript of Deposition of Dr. Hal. J. Singer, Ph.D. ("Singer Dep. Tr.") 32:10-35:12.

83. Economists have used CBC analyses for decades to study and to empirically quantify consumer preferences. Ex. 35, Singer Rpt. ¶19. CBC analyses have been widely used by economists to study markets for differentiated consumer products and services. *Id.* And CBC analyses have been widely adopted for use in the private sector. *Id.* ¶20 (noting a 2005 study of the conjoint analysis usage estimated that there are tens of thousands of such uses annually (citing Bryan K, Orme, Getting Started with Conjoint Analysis: Strategies for Pricing Research (2d Ed. 2005)). In particular, one of the vendors commonly used by economists to assist in performing CBC analyses—in fact the one Dr. Singer used—Qualtrics, lists a university among its customers. *See* Ex.40, Regis University + Qualtrics, https://www.qualtrics.com/customers/

regis-university. That university, Regis University, used Qualtrics-assisted conjoint analyses to "better understand and segment its consumer market, and to prioritize new programming and marketing initiatives." *Id.*; *see also id.* ("[I]n a follow-up Conjoint study, administrators were able to understand the relative importance of those features [prospective students value most in an MBA program] in driving enrollment, which made it easy to prioritize changes and initiatives."). In addition, economists have used CBC analyses to gain insights into student preferences in their academic publications. *See, e.g.,* Ex. 35, Singer Report ¶¶23-27 (discussing Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) J. OF HIGHER EDUC. MGMT., 35-43 (2020); Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) J. OF EDUC. FINANCE 232-52 (2019)).

84. Similarly, courts have accepted CBC analysis for purposes of calculating the difference in value between the product as represented at the time of purchase and the value of the product actually delivered. *See, e.g.*, *id.* at n.18 (citing *In re MacBook Keyboard Litig.*, 2021 WL 1250378, at *5-6, 14 (N.D. Cal. Mar. 8, 2021); *In re Juul Labs, Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*, 2022 WL 2343268, at *15-21, 48-56 (N.D. Cal. June 28, 2022)); *see also In re Dial Complete Mktg. and Sales Practices Litig.,* 320 F.R.D. 326, (D.N.H. 2017) (finding that conjoint analysis was sufficiently reliable to calculate class-wide damages); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 575-78, 587 (N.D. Cal. 2020) (same); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103-10 (N.D. Cal. 2018) (same); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018) (same).

85. Dr. Singer's CBC analysis here was modeled after the approaches taken by Dr. Singer in the *MacBook Keyboard Litigation* and the *Juul Labs* case as well as the approaches in the academic articles cited by Dr. Singer in his report, Ex. 35 ¶¶23-26; *see also id.* ¶27.

86. Dr. Singer developed a conjoint survey that first screened potential respondents to determine whether they fit BU's admission criteria. *Id.* ¶¶29-34. Dr. Singer specified two surveys, one for undergraduates and one for graduate students. *Id.* ¶31. He did so because, by definition, the undergraduate and graduate student populations cannot overlap. *Id.*

87. Once respondents' qualifications were established, Dr. Singer described to respondents the "attributes" that the CBC analysis was studying, specifically drawing language from BU's descriptions of its in-person and online course offerings (the "Class Modality" attribute) and access to campus facilities and events (the "Campus Facilities Access" attribute). *Id.* ¶¶35-36, 41-42. In addition to these key attributes, Dr. Singer also used two "decoy" attributes (concerning career services and tutoring services) so that respondents could not determine what the purpose of the survey was. *Id.* ¶¶37, 45-46. And Dr. Singer also introduced a semester cost attribute so that he could assign a dollar value to each respondent's individual utilities (or the extent of their preferences) for the attributes. *Id.* ¶38. The semester cost attribute was based on the amount of tuition and fees charged to undergraduates in the undergraduate survey, *id.* ¶43, and based on the average tuition and fees charged to graduate students in four core BU graduate programs (general graduate, MBA, Law, and Medicine), *id.* ¶44. In setting the "levels" (or values) shown to respondents for the semester cost attribute, Dr. Singer set a maximum value of 150% of base tuition and fees and a minimum value of 50%. *See id.* ¶¶43-44. As a result, the maximum discount that respondents could select to receive their non-preferred of either an On-Campus Experience or an Online Experience was 50%. When evaluating the

semester packages and the attendant semester costs, Dr. Singer instructed respondents to "assume that they had the same access to financial aid or scholarships they actually received in real life (or anticipated receiving in the case of a prospective student" in order to "ensure that respondents would view the Tuition and Fee as charges in the same way that students did in real life[,]" so that the respondents "would internally factor in any financial aid when making their choice." *Id.* ¶38.

88. Dr. Singer summarized these attributes and the options or "levels" of such attributes in Tables 1 and 2 of his report:

TABLE 1: UNDERGRADUATE SURVEY CBC ATTRIBUTES

| Feature | Description | Levels |
|---|---|---|
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus<br>Online |
| (2) Campus Facilities Access | If students have access to BU's campus, campus facilities, and in-person events. | Access<br>No Access |
| (3) Tutoring Services | If students have access to tutoring through BU's Educational Resource Center. | Available<br>Not Available |
| (4) Career Services and Events | If students have access to career services and events through BU's Center for Career Development. | Available<br>Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $41,801 |
| | 125% of Base Price | $34,834 |
| | Base Price | $27,868 |
| | 75% of Base Price | $20,901 |
| | 50% of Base Price | $13,934 |

TABLE 2: GRADUATE SURVEY CBC ATTRIBUTES

| Feature | Description | Levels |
|---|---|---|
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus<br>Online |
| (2) Campus Facilities Access | If students have access to BU's campus, campus facilities, and in-person events. | Access<br>No Access |
| (3) Tutoring Services | If students have access to tutoring through BU's Educational Resource Center. | Available<br>Not Available |
| (4) Career Services and Events | If students have access to career services and events through BU's Center for Career Development. | Available<br>Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $43,642 |
| | 125% of Base Price | $36,368 |
| | Base Price | $29,095 |
| | 75% of Base Price | $21,821 |
| | 50% of Base Price | $14,547 |

89. Having established the attributes and respondents' understanding of them, Dr. Singer's conjoint surveys then asked respondents to select between semester packages with randomized combinations of the levels available within each attribute. *Id.* ¶47. In other words, respondents were offered three "choice sets" of alternative semester offerings, and asked to select the semester offering that the respondent would purchase if those were the only offerings available. *Id.* In each choice set, the respondent also was given the option not to purchase any of the three semester offerings. *Id.* By including this "no buy" option, Dr. Singer was able to identify the willingness to pay (or "WTP") of the marginal consumer, *i.e.*, the price at which the marginal consumer is indifferent between purchasing the semester offering and not purchasing it. *Id.* This is important because, in standard economic theory, the marginal consumer is the last

person willing to enter the market and consume the good (or service) at that price, so the WTP of the marginal consumer for a theoretical product represents the market price for that product. *Id.*

90. Using Dr. Singer's CBC analysis, he shows that all Class members would have been charged lower tuition and fees by BU in a "but-for" world in which students and BU knew that half the semester would be delivered as an Online Experience rather than the promised On-Campus Experience. *Id.* ¶9.

91. Broadly, the results of Dr. Singer's CBC analysis shows that students are highly sensitive to the two key attributes—the Class Modality and Campus Facilities Access attributes. *Id.* ¶50. Specifically, 80 percent of the 524 survey respondents in the undergraduate survey expressed a preference for an On-Campus Experience over an Online Experience.[19] *Id.* And more than half of respondents would have required a higher discount than the highest discount in the survey; meaning that more than half of respondents would have required a discount of more than 50% in tuition and fees in order to accept an Online Experience in lieu of an On-Campus Experience. *Id.* The results were similar for Dr. Singer's graduate survey, which found that approximately 74% of respondents expressed a preference for the On-Campus Experience relative to the Online Experience with approximately half requiring a discount that would have exceeded the 50% maximum discount. *Id.* ¶51. These findings are consistent with the academic literature on which Dr. Singer relied in developing his CBC analysis. *See id.* ¶¶50-51 (citing Singer Rpt. ¶¶23-27); *see also id.* ¶24 (noting one academic conjoint study found that "course

[19] As Dr. Singer explained in his report, he found it unsurprising that there was "some number of respondents who express[ed] preferences counter to initial expectations," here having a preference for an Online Experience. Ex. 35, Singer Rpt. ¶52.

delivery is the most important criteria"); *id.* ¶25 (noting another academic conjoint study found that students expressed a preference for "a traditional face-to-face class over an online class").

92. With these results, Dr. Singer then was able to calculate the percentage of tuition and fees that BU would have to rebate (or provide a discount for) in order to make students whole for the forced shift from an Online Experience rather than the promised On-Campus Experience. *Id.* ¶¶55-63. In particular, Dr. Singer calculated that undergraduate students at BU would require a 27.08% discount if forced to accept an Online Experience instead of an On-Campus Experience for a full semester and that graduate students would require a 21.21% discount for the same substitution. *Id.* ¶63 & Tbl.7. Dr. Singer then pro-rated that discount over the proportion of the semester (48.62%) for which BU actually forced students to accept an Online Experience in lieu of the contracted-for On-Campus Experience. *Id.* ¶70 & Tbls. 9-10. And Dr. Singer used the resultant discount, 13.17% for undergraduate students and 10.31% for graduate students, to determine aggregate damages; to do so Dr. Singer multiplied the required discount by the net tuition and fees, *i.e.*, the tuition and fees BU charged students and which students paid (net of any BU-provided financial aid grants). *See id.* ¶¶70-71 & Tbls. 9-10.

93. Dr. Singer's approach, in addition to calculating aggregate damages for the proposed Class, also provided a method and formula for calculating damages to each individual student, including Plaintiffs. *See id.* ¶71. Specifically, Dr. Singer shows that each individual student in the Class's damages (including each Plaintiff's damages) can be calculated by taking the net tuition and fees BU charged and such student paid and applying the appropriate discount rate for such student's program (undergraduate or graduate). *Id.*

**B. BU's Purported Expert Dr. Benjamin Wilner's Testimony**

94. To counter Dr. Singer's testimony, BU retained an economist, Dr. Benjamin Wilner. *See* Expert Report of Benjamin S. Wilner (Dec. 19, 2022) ("Wilner Report"), attached as Ex. 37.

95. At deposition, Wilner admitted his lack of expertise in conjoint analysis. *See generally* Deposition of Benjamin Wilner, attached as Ex. 38 ("Wilner Dep. Tr.") at 13:1-14:12, 15:3-14, 16:11-19, 16:20-17:10, 18:19-24, 20:1-17, 28:6-13 (repeatedly referencing how his experience included "components" of conjoint analysis, such as regressions, but never—despite repeated direct questioning—stating that he had any significant experience in conjoint analysis or analysis that puts all of the "components" together). While he professed his experience with various economic operations and analyses that conjoint relies on, *e.g.*, regression analyses, he admitted that he lacked expertise in conjoint analysis generally. *Id.* In fact, his sole experience with conjoint analysis was participating in a single conjoint analysis for one of his consulting firm clients, but even then, he was unaware of how, or even whether, the client found that conjoint work useful for any purpose whatsoever. *See id.* at 28:15-29:19 (describing the task); *see also id.* at 30:8-17 ("How [the client] went and used [my conjoint analysis], if they used it at all, I have no clue."). And despite having almost no experience whatsoever with CBC analyses or conjoint analyses generally, Wilner claims that it is his "belief" that the "same basic economic principles span all models" and thus apply to conjoint. *Id.* at 26:20-21. Nevertheless, Wilner admits that "obviously there are certain components and certain steps that are involved in one market research analysis which are not applied and applicable in another one." *Id.* at 26:22-25. Yet Wilner lacks any basis in the record for his possessing sufficient expertise to assert criticisms

based on rules and principles cited in the context of non-CBC analyses apply to CBC analysis generally or Dr. Singer's CBC analysis specifically.

96. Wilner's lack of experience was also evident in various of the criticisms he made of Dr. Singer's CBC analysis. For example, Wilner claimed that one of the papers that Dr. Singer cited in the Singer Report "stated that conjoint models could not be utilized to assess damages in matters like this one." Wilner Report at 30 (referring the Singer Report at n.30's citation to Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method*, 61 RESEARCH IN HIGHER EDUCATION 510-539 ("Czajkowski")). Wilner then includes a block quote from that article which Wilner claims stands for the proposition that "conjoint models" cannot be used for obtaining valid measures of economic value. *Id.* at 30-31 (quoting Czajkowski at 515). Likely due to Wilner's lack of expertise in conjoint analyses, Wilner fails to comprehend that there are multiple types of conjoint analysis, of which CBC analysis is just one. The "conjoint analysis" referred to in the block quote Wilner put in his report does not apply to choice-based-conjoint analysis, instead referring to ranked conjoint.[20] For example, the block quote Wilner includes in his report, Ex. 37 at 30, states both that it is referring to a conjoint "wherein respondents ***rate*** 'packages' of attributes or provide ***subjective attribute importance measures***" and that such sorts of conjoint "***are not discrete choice experiments***." Ex. 39, Czajkowski at 515 (emphasis added). Indeed, the Czajkowski article actually applies a "discrete choice experiment" and "random utility framework" that resembles the CBC analysis Dr. Singer performed. *Id.* at 517; *compare* Ex. 39,

[20] Plaintiffs attach Czajkowski as Ex. 39.

Czajkowski at 519, Tbl.2 (showing the sample "choice" card), *with* Ex. 35, Singer Report at App'x 4, pp.78-79 (samples of Dr. Singer's choice cards presented to undergraduates). The difference between ranked conjoint (referred to as inappropriate for measuring preferences in the article) and choice-based methods (like those performed by the authors and Dr. Singer) for purposes of establishing damages also makes intuitive sense. Consider: consumers do not go to the pasta aisle at the grocery store, take every option off the shelf, and then rank-order their preferences from favorite to least favorite (similar to the methodology Czajkowski condemns and Wilner cites); instead, they pick one pasta and buy it (similar to the methodologies Czajkowski and Dr. Singer perform). Choice-based conjoint and other discrete choice methods, the methods used by Czajkowski and Dr. Singer, simulate actual purchase behavior and not relative ratings or subjective importance of factors. Wilner's failure to recognize this distinction stems from his lack of expertise and relative unfamiliarity with conjoint analyses.

97. Despite Wilner's principal claim to expertise in conjoint analysis being his experience in running regressions—a function that Dr. Singer's vendor Qualtrics performed—Wilner does not contest the validity of the results or process used by Qualtrics for the regressions Qualtrics performed in connection with Dr. Singer's CBC analysis. *See generally* Ex. 37, Wilner Report. Wilner does not contend that any of Dr. Singer's calculations or arithmetic were performed incorrectly, instead merely disagreeing with the attribute descriptions in Dr. Singer's survey used. *Id.*; *see also* Ex. 38, Wilner Dep. Tr. at 209:9-211:17. Wilner does not argue that Dr. Singer's conclusion linking students WTP to fair market value, *e.g.*, Ex. 35, Singer Report at Pt.II.B-C, is flawed. Nor does Wilner discuss Dr. Singer's findings and calculations concerning the downward shift in aggregate demand—indeed Wilner almost completely ignores Dr. Singer's economic section discussing aggregate demand, Singer Report at Pt.II.B-C.

98. To the extent Wilner does address Dr. Singer's economic discussion of the shift in aggregate demand (Ex. 35, Singer Report at Pt.II.B-C), Wilner misunderstands it. For example, Wilner criticizes Dr. Singer's CBC analysis because "While some students received lesser value [than what they placed on an On-Campus Experience when forced to an Online Experience], individualized analyses on a student-by-student basis would be required to determine the extent and distribution of these allegedly lower values." Ex. 37, Wilner Report at 16; *see also id.* at 45 (arguing that individual students may have "individualized marginal utility"). Wilner's criticisms misunderstands the basic economic theory that he claims expertise in, namely that Dr. Singer was running a simulation to ascertain fair market values which looks to the behavior of the marginal consumer and preferences in the aggregate, and not individualized factors Wilner supposes should affect the analysis. As Dr. Singer wrote—and Wilner ignored:

> Fair market value, or the market price assuming all participants have complete information, occurs at the intersection of the demand curve and the supply curve… Thus, under the traditional CBC approach where the supply curve is fixed, the shift in the market price, or the change in fair market value, is exactly equal to the required discount. Moreover, this reduction in fair market value affects all students by the same percentage, because BU does not price discriminate and all students within a program are charged the same [list] Tuition and Fees. That is, in the Spring 2020 semester, all students (even the ones who may individually prefer an Online Experience) paid [the] price [they were actually charged]. However, had all students known at the point of purchase that they would receive the Online Experience instead, the prevailing market price would have been [the lower price based on the downward shift in aggregate demand]. Aggregate damages are thus borne by all students in the market, regardless of their own individual tolerance for any given price level, because they paid more than the market would have dictated had the market been fully informed.

Ex. 35, Singer Report ¶67 (internal citations and figures omitted).

99. At deposition, Wilner doubled down on his refusal to acknowledge the basic economic theory that all consumers of a product or service pay the market price, even if their personal preferences and utilities indicate that any particular consumer values the product or service at higher than market rates. *See, e.g.*, Ex. 38, Wilner Dep. Tr. at 129:1-132:18 (refusing

to acknowledge that if the market price of a hypothetical good was $8, that a consumer who valued that good at $10 would still prefer to pay $8; and instead claiming that such consumer might want to pay $10, $2 more than the market price such consumer could pay, because doing so might "signal" something about higher product quality). Wilner's apparent[21] failure to understand how market values and prices work under basic economic theory—as well-articulated by Dr. Singer in the Singer Report, further evidences his lack of qualifications or expertise to offer valid criticisms of the Singer Report.

100. Notwithstanding his lack of expertise concerning—and often understanding of—CBC analysis, Wilner still levied numerous other attacks on Dr. Singer's approach. Plaintiffs address the three most prominent such criticisms here, and incorporate Plaintiffs' response to BU's forthcoming motion for summary judgment as well.

a. First, Wilner contends that Dr. Singer improperly considered the tuition and fees that BU charged, and not the tuition and fees that students paid. *See, e.g.*, Ex. 37, Wilner Report at Pt.VI. Relatedly, Wilner faults Dr. Singer for considering students' Willingness to Pay ("WTP") and not the payors (often parents). *See, e.g., id.* at 22-23. Neither argument has merit. As to the first point, Wilner concedes that Dr. Singer applies the discount the CBC analysis finds appropriate for the shift from an On-Campus Experience to an Online Experience to the "net price," that is, the "list price" of tuition and fees less BU-provided financial aid. *Id.* at 28. Dr. Singer's approach explicitly instructed respondents to "assume that they had the same access to

---

[21] Wilner's subsequent testimony indicated that he did, in fact, agree that an individual who was willing to pay $10 would still prefer to pay an $8 market price (Ex. 38, Wilner Dep. Tr. at 130:5-11), tacitly acknowledging that his earlier refusal to acknowledge this basic economic theory was a litigation-driven position.

financial aid or scholarships they actually received in real life (or anticipated receiving in the case of a prospective student" in order to "ensure that respondents would view the Tuition and Fee as charges in the same way that students did in real life[,]" so that the respondents "would internally factor in any financial aid when making their choice." *See supra*, SOF ¶87 (citing Ex. 35, Singer Report ¶38); *see also* Ex. 36, Singer Dep. Tr. at 130:10-19 ("I certainly wanted [respondents] to recognize that they wouldn't have to pay … the full list price. That is, … whatever experience they have with respect to financial aid, that they ought to consider … that they would have the same access to financial aid as they would … in the real world. It's important, of course, that we did that, because we want to apply the discount to their net price, not to the … gross price."). Doing so results in respondents' internalizing their individual consideration of both university-supplied financial aid, and the availability of financing or other aid from third parties such as parents and scholarships. Wilner, however, apparently missed or otherwise ignored Dr. Singer's instruction, falsely asserting in his report that Dr. Singer told "respondents to ignore financial aid." Ex. 37, Wilner Rpt. at 40; *see also id.* at 35 ("Survey Respondents were wrongly told that they need not consider any financial aid, work-study, scholarships, or other forms of tuition support they might receive…."). In any event, Dr. Singer's approach ultimately accounts for the existence of third-party payors by instructing respondents to internalize and factor in such financial assistance when making their survey choices. When presented with Dr. Singer's actual instruction at deposition, Wilner testified that he "ha[d]n't even considered" how Dr. Singer's actual instruction could be modified to make it an accurate instruction. Ex. 38, Wilner Dep. Tr. at 169:19-23. Wilner's criticism also ignores that this is a breach of contract action, wherein students have a claim—not third-party payors—for such breach. Plaintiffs and the Class were the ones obligated to pay BU tuition and fees, not third-

party payors. Thus, to the extent students used third-party payors, that use is accounted for in their utilities, preferences, and the aggregate required discount.

And on the related point that Dr. Singer surveyed students and not their parents or third-party payors, Wilner has not shown that calculating parents' or other payors' WTP or preferences would differ in any way from that of the students for whom the payors are paying. Wilner, or an expert qualified in the application of CBC analysis, could have performed an analysis, such as another conjoint, that tested a difference between payors' WTP and students. Wilner did not do so and thus his supposition that it makes a difference is pure speculation. Instead, Wilner professes that Dr. Singer was required to disprove "well-established economic principles" regarding differences in utility between parents/payors and students as part of the CBC analysis. Ex. 38, Wilner Dep. Tr. at 178:18-179:20. But Wilner was unable to provide much support that such "well-established economic principles" even existed, much less applied to Dr. Singer's CBC analysis. *Id.* In fact, the lone support for this "well-established economic principle" was a website at https://educationaladvocates.com/the-parents-role-in-the-college-admission-process-2, which Wilner cited in footnote 109 of his report. *See* Ex. 37, Wilner Rpt. at n.109; Ex. 38 Wilner Dep. Tr. at 178:18-179:20; *see also* Ex. 41 (printout of the webpage). But that webpage does not refer to any "economic principles," any peer-reviewed articles, or any proper basis for saying that parents and students' WTPs are different. *See generally* Ex. 41. Instead, it states only that parents should communicate financial parameters to their offspring so that the students "can choose affordable options and have a clear understanding of how loans will affect their future lifestyle." *Id.* And Wilner relied on this web page instead of carrying out any analysis or study of his own to assess whether any differences exist in utility between parents/payors and students. Ex. 38, Wilner Dep. Tr. at 180:4-181:9 (finding no reason to test

whether this principle applied to BU students and their parents/payors at the time of enrollment in the Spring 2020 semester, given his reliance on the educationaladvocates.com web page). In other words, the sole citation Wilner provides for the supposed "well-accepted economic principles" suggests that (1) students and not parents are the ones who make the financial decisions on attending school, and (2) students likely understand their parents' capabilities of providing financing and are thus capable of internalizing their parents' capabilities when completing Dr. Singer's survey. Indeed, Wilner even conceded at deposition that a parent's utility could be a function of the student's utility. Ex. 38, Wilner Dep. Tr. at 185:15-23.

b. Second, Wilner contends that Dr. Singer should have measured students' WTP as of March 2020—at the time of breach—and thus should compared the On-Campus Experience in the presence of COVID with the Online Experience in the presence of COVID. *See, e.g.*, Ex. 37, Wilner Report at 18 (faulting Dr. Singer for "incorrectly ignor[ing]" the "benefit of improved health and safety" of an Online Experience during COVID); *id.* at 27 (contending Singer needed to inform survey respondents that the COVID-19 pandemic could affect the school's attributes and their decisions). Wilner's contention assumes a legal conclusion; namely that the relative fair market values of what was promised and provided should be calculated at breach as a matter of law.

In any event, Wilner offers no economic basis for his assertion that damages must be measured so as to coincide with the timing of the breach in a case like this. By contrast, Dr. Singer offers an economic basis for measuring damages at the time of contracting:

> If you think about what we're trying to do … is to figure out the discount that would be demanded in a voluntary transaction, under no duress, between a willing buyer and a willing seller, who's revealed a preference for the on-campus experience, … to what extent would they need to be compensated to move to some alternative experience … that was not their first choice, namely the online experience…

> From an economic matter, the right thing to do is to do what I've done, which is try to figure out the discount that would be demanded, whenever this contract was entered into, prior to the spring of 2020, such that a student would be made whole for moving from his or her first choice, the on-campus experience, to an online experience.

Ex. 36, Singer Dep. Tr. at 37:24-39:2; *see also id.* at 40:24-41:6 ("[I]n the real world, in the fall of 2020, there were no outside options involving an on-campus experience, because COVID, as you know, was still raging in the fall of 2020. And so, right off the bat, we're not replicating this bargaining environment … that we seek of a willing buyer and a willing seller not operating under duress…."). Dr. Singer further emphasized the importance, in evaluating fair market values for an On-Campus Experience relative to an Online Experience, that allowing the timing of the valuation—in the time COVID was raging—to influence the values distorts the relative bargaining power of students and universities. *See, e.g.,* Ex. 36, Singer Dep. Tr. at 41:9-17 ("[T]he student in that environment [in the presence of COVID] didn't have the same kind of bargaining power, as they would in alternative universe [such as prior to the Spring 2020 semester that Dr. Singer endeavored to model] in which these outside options were available. In other words, the choice set was so badly diminished [in the presence of COVID] that I don't think that you can get a good read on willingness to pay for in-person versus online, by virtue of what BU actually offered students, in the real world.").

Wilner, in fact, concedes the point in his report, stating first that "[t]o assess alleged damages, one needs to compare the actual economic position of each putative class member with what their economic position would have been 'but-for' the defendant's allegedly improper actions," and then that "[t]he 'but for' world asks what tuition and fees putative class members would have paid had they known in advance that remote education and reduced campus access were possible during the Spring 2020 semester." Ex. 37, Wilner Rpt. at 11. For Wilner's statements of the proper way to assess damages to be correct, one ***must*** determine the

valuations of the two experiences "in advance" of contracting. Otherwise, by calculating valuations at the time of breach due to COVID, Wilner would be assuming that students had accepted all of the risk that BU would not perform, something that BU did not contract for as discussed *supra*.

The same errors underlying Wilner's contentions about the need to consider the effect of COVID on the relative values of an On-Campus Experience vs. an Online Experience render Wilner's position that student behavior and revealed preferences in Fall 2020 presents an appropriate comparison for purposes of evaluating damages here. *See generally*, Ex. 37, Wilner Rpt. at 13-14. Specifically, because at the time of registration/contracting for the Fall 2020 semester, the relative values of an On-Campus Experience and Online Experience (and the bargaining power of students) were warped by the presence of COVID, the absence of vaccines, and limited choices for students, Fall 2020 is an inappropriate comparison.[22]

c. Third, Wilner charges that Dr. Singer's findings are invalid because BU, in fact, charges the same tuition and fees for On-Campus Experiences and Online Experiences. *See, e.g.*, Ex. 37, Wilner Report at Pt.IV.B. As Dr. Singer explained at deposition:

> [W]hen Boston University sets its online offering price, it must be careful … not to cannibalize its moneymaker, which is the on-campus package. You can imagine … if BU were to say, … we're going to give you basically the same education, excepting, of course, this modality change, for 1/20th of the price … of the on-campus experience, that might cause a giant sucking sound, and it could put downward pressure on the price BU is charging for … its in-person experience. And so for that reason, we don't have great data … on the pricing of online offerings … by the

[22] Wilner conceded this point at deposition. *See* Ex. 38, Wilner Dep. Tr. 249:12-250:10 (denying that students made the same choices when enrolling for the Fall of 2020 and enrolling for the Spring 2020); *id.* at 92:10-94:13 (acknowledging that in Fall of 2020, students would not have had the option to select another university to access a preferred educational modality).

> universities that are offering both, their primary product, which is the on-campus experience, and the online offering. I think that every university, not just BU … is concerned about cannibalization, when it's setting the price of its online offering.

Ex. 36, Singer Dep. Tr. at 68:22-69:17. Dr. Singer later expanded:

> My understanding is that the online offering for undergraduates at BU isn't really comparable to the on-campus offerings, in the sense it's only available for … folks that have already started somewhere else. I don't think that … it's a similar offering, in product terms[,] [i]t's sufficiently similar so that we could make apples to apples comparisons… [F]or the graduate programs, I don't think that there's an online offering with respect to what we call the moneymakers, you know, law and medicine… [T]here are some that … might be closer, for lesser – less important, in terms of money-generating graduate programs for BU. But finally, we've got this problem that I mentioned before, which so long as BU is in charge of, say, setting the online price of… say … an MBA, and also in charge of setting the in-person price of the MBA, … that BU is going to be very careful to make sure not to cannibalize, you know, the on-campus experience for the MBA, given how important it is for … revenue generation.

*Id.* at 186:13-187:17.

101. Dr. Wilner further asserts that Dr. Singer could have made myriad different choices in modeling damages here. *See generally* Ex. 37, Wilner Report Pt.VI. However, Wilner does not show that any of the different choices would have impacted Dr. Singer's results in any way. Instead, Wilner speculates that if Dr. Singer had phrased something differently, performed some different analysis, or used some different assumption, it could upset Dr. Singer's results. *Id.* However, Wilner did not perform his own CBC analysis—or any other original analysis—as part of his report and thus cannot show that any of these attacks, if credited, would change anything at all. Ex. 38, Wilner Dep. Tr. 169:19-170:12, 170:17-174:20, 178:7-17, 186:14-188:19, 204:22-205:13, 207:1-9, 230:23-231:16, 232:25-233:13, 244:8-17.

Respectfully submitted,

Date: February 23, 2023

/s/Patrick F. Madden
Patrick F. Madden*
pmadden@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215.875.3000

E. Michelle Drake*
emdrake@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
(612) 594-5933

HECHT PARTNERS LLP
Conor B. McDonough
cmcdonough@hechtpartners.com
Kathryn Lee Boyd*
lboyd@hechtpartners.com
125 Park Avenue, 25th Floor
New York, NY 10017
T. 212.851.6821

ANASTOPOULO LAW FIRM, LLC
Blake G. Abbott*
blake@akimlawfirm.com
Roy T. Willey IV*
roy@akimlawfirm.com
Eric M. Poulin*
eric@akimlawfirm.com
Paul Doolittle*
pauld@akimlawfirm.com
32 Ann Street
Charleston, SC 29403
T. 843.614.8888

STANZLER LEVINE, LLC
Richard E. Levine
rlevine@stanzlerlevine.com
65 William Street, Suite 205
Wellesley, MA 02481
T. 617.482.3198

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman*
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
T. 206.623.7292

Daniel J. Kurowski*
Whitney K. Siehl*
455 N Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
T. 708.628.4949
dank@hbsslaw.com
whitneys@hbsslaw.com

FORREST, LAMOTHE, MAZOW,
MCCULLOUGH, YASI & YASI, P.C.
Michael C. Forrest
mforrest@forrestlamothe.com
2 Salem Green, Suite 2
Salem MA 01970
T. 617.231.7829

BURSOR & FISHER, P.A.
Joseph I. Marchese*
jmarchese@bursor.com
888 Seventh Ave.
New York, NY 10019
T. 646.837.7150

L. Timothy Fisher*
ltfisher@bursor.com
1990 N California Blvd, Ste 940
Walnut Creek, CA 94596
T. 925.300.4455

Sarah N. Westcot*
701 Brickell Ave., Suite 1420
Miami FL 33121
T.305.330.5512

LICHTEN & LISS-RIORDAN, P.C.
Harold L. Lichten
hlichten@llrlaw.com
729 Boylston St., Suite 2000
Boston, MA 02116
T. 617.994.5800

*COUNSEL FOR PLAINTIFFS*

**pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document and its supporting exhibits were provided electronically to counsel of record (as identified on the Notice of Electronic Filing (NEF)) through the Court's CM/ECF system.

Date: February 23, 2023

/s/Patrick F. Madden
Patrick F. Madden