# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------x

IN RE: BOSTON UNIVERSITY COVID-19
REFUND LITIGATION Master File No.
No. 1:20-cv-10827-RGS

----------------------------------x

THIS DOCUMENT RELATES TO:
ALL ACTIONS

----------------------------------x

C O N F I D E N T I A L

REMOTE VIDEOTAPED DEPOSITION of
ROBERT A. BROWN, Ph.D.
Boston, Massachusetts

Reporter: MaryJo O'Connor, RDR, RMR
Job No: 5205322

Friday, May 6, 2022

10:06 a.m. EDT

REMOTE VIDEOTAPED DEPOSITION of ROBERT A. BROWN, Ph.D., held via Zoom videoconference in Boston, Massachusetts, pursuant to notice, before MaryJo O'Connor, Registered Diplomat Reporter, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts.

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF:

(Attending remotely)

HECHT PARTNERS LLP

125 Park Avenue, 25th Floor

New York, New York 10017

(212) 851-6821

BY: THEO BRUENING, ESQ.

tbruening@hechtpartners.com

CONOR BREW McDONOUGH, Ph.D., ESQ.

cmcdonough@hechtpartners.com

KATHRYN LEE BOYD, ESQ.

lboyd@hechtpartners.com

- and -

(Attending remotely)

BURSOR & FISHER, P.A.

1990 N. California Blvd., Suite 940

Walnut Creek, California 94596

(925) 300-4455

BY: SARAH N. WESTCOT, ESQ. (Miami)

swestcot@bursor.com

A P P E A R A N C E S, Continued

- and -

(Attending remotely)

ANASTOPOULO LAW FIRM, LLC

32 Ann Street

Charleston, South Carolina 29403

(843) 614-8888

BY: PAUL DOOLITTLE, ESQ.

pauld@akimlawfirm.com

ATTORNEYS FOR DEFENDANT:

(Attending remotely)

QUINN EMANUEL URQUHART & SULLIVAN LLP

865 S. Figueroa Street, 10th Floor

Los Angeles, California 90017

(213) 443-3000

BY: CRYSTAL NIX-HINES, ESQ.

crystalnixhines@quinnemanuel.com

MARINA LEV, ESQ.

marinalev@quinnemanuel.com

A P P E A R A N C E S, Continued

ALSO PRESENT:

Shawn Budd, Video Technician

Lisa Tenerowicz, Esq., Boston University

Erika Geetter, Esq., Boston University

budget. In other words, what our inflation rate is within the operations of the university.

So those three factors are in the -- on the table as we finalize the budget and as we set tuition.

Q. With whom do you work most closely during the day-to-day activities?

MS. NIX-HINES: Objection. Vague.

A. Do I answer now?

Q. You can answer, yes, sir.

A. Okay. It depends very much on what function you're talking about. So a significant part of my time is spent on development and alumni relations, which in those cases I would work with the senior vice president of development and alumni relations.

If I'm working on the oversight of academic matters, I'm working mainly with the provost, Jean -- university provost, Jean Morrison.

If I'm working on government relations, I'm working with our executive vice president for External Affairs, Steve Burgay.

My days have many different facets to them, and so there is not a single person that I work with as my conduit for all things in the university.

Q. Taking you back to the spring 2020 term, can you generally describe the programs offered by Boston University at that time?

MS. NIX-HINES: Objection. Vague.

Q. You may answer.

A. Okay. We offer a large range of programs any semester that are both on campus and, through our School of Continuing Education, some remote programs, online programs.

The preponderance of all the programs we offer are on-campus programs. And there are a full range of programs across professional schools, graduate and undergraduate, as well as -- well, graduate and undergraduate professional schools, as well as a liberal arts and sciences undergraduate program.

Q. You mentioned the online program. Is that the Metropolitan College?

A. That is.

Q. Were you president at the time that the online program was established?

A. It predates me.

Q. Has it changed since you've been president over the years in any way?

A. The online programs in Metropolitan College serve an alternative learner community. They're directed at what I would call professional students who are not in the position in their life to do residential programs. And the programs themselves are structured around the demands of those kinds of learners. They are taught, for the most part, by adjunct professors with a very small full-time faculty that organizes the programs.

Q. Do the online Metropolitan College students have on-campus access to the facilities at the Charles River Campus?

A. I'm not sure I can answer that question. Because, for the most part, those online students are not locally in Massachusetts. I'm not sure -- I'm not sure from an ID point of view, since we use a swipe

system, whether or not they have IDs that would give them access.

Q. You don't know one way or the other if they have the student ID that are given to the on-campus students?

A. I do not know.

Q. Who would know?

A. Certainly the dean of Metropolitan College would now. Tanya Zlateva would know.

Q. Are you aware of the tuition and fee structure for the online students for the spring 2020 term?

A. I know what I call generally what the tuition and fee structure is, not specifically program by program, because it varies.

Q. In general, how would it compare to the tuition and fee structure for the on-campus students?

A. It would be lower on a per-credit basis, given the kind of student that we're trying to attract in those programs.

That's a general statement. I think there are programs, I'm not precisely

sure, that are comparable in cost as well.

Q. And when you say "the kind of students you're trying to attract," are you talking about attract for the online program?

A. Yes.

Q. And do you know -- strike that.

Have there been any new facilities that have been built on campus during your tenure?

A. Yes.

Q. Which ones are those?

A. We built a classroom building and refurbished the law school. We have built a center for student services where all of our student service people on the undergraduate side are housed. It's called the Yawkey Center.

We have built a research laboratory building on this campus, which is called Kilachand Hall, which is for life science and engineering research.

We built a medical campus residence for medical students. We have built one large dormitory, really apartment

residence, that's mainly for upper class graduate students. It's called 33 Agganis Way. It doesn't have a name associated with it. And we're in the process of building -- it hasn't opened yet -- a large computing and data science building on campus. It will open in -- excuse me -- will open in December -- or actually January of '23. It's been under construction for a number of years.

Q. The cost for those buildings and facilities, how are those covered?

MS. NIX-HINES: Objection. Vague.

Q. You may answer.

A. Okay. The cost of our facilities, our capital budget, comes from three sources: From gifts from people. It comes from borrowing debt, which is financed through the university. And it comes from allocations from our reserves that come from our operations.

Q. Are tuition revenues a part of what fund these new facilities?

A. Yes. Because they are a part of the budget. Tuition and fees is part of the budget, so reserves are generated partially by

tuition and fees.

Q. Are these new facilities at the time they're being built or after, are they used in advertising materials to attract students to apply to BU?

MS. NIX-HINES: Objection. Vague. Compound.

Q. You may answer.

A. Well, we certainly in advertising material show pictures of facilities. I don't know, I have never really gauged, to see if there is a bias toward them. I wouldn't be surprised there is.

Q. As president of the university, what would you say sets Boston University apart from similar universities, private universities?

MS. NIX-HINES: Would you repeat the whole question, please?

(Record read as requested.)

MS. NIX-HINES: Objection. Vague.

A. Once you say "similar," then I have to say we're in a group of universities, once you say "similar," for which we are not

highly differentiated. They would be large, multi-school college, urban university, research universities.

Q. Would you say that group are your competitors in the market for new student applications?

A. When you think about competitors, you have to go into the specific discipline you're talking about. If you think about general undergraduate education, the answer is pretty much yes. Those would be our peers.

If you're thinking about specific graduate education, your peers depend on the quality of your graduate program and who else offers programs of similar quality.

Q. Well, let's take the undergraduate program. What do you say sets BU apart in this group of competitors?

A. When I think about at the undergraduate program, that there is a handful of similar universities, large urban private research universities, for which we have a hard time, or they have a hard time, being very distinctive within that group.

MS. NIX-HINES: Objection.
Misstates what the document says.
A. We have cases where students have not paid everything at a point, but we have a path to their payment. And those students are fully registered in our system. We don't say that on the bulletin, because we don't want to have a lot of students resolving their payment over a long period of time.
Q. Is what you just stated inconsistent with this first paragraph "who is registered for classes and who has settled all charges"?
Is settling also a path, you know, creating a path for payment?
MS. NIX-HINES: Objection. First of all, I would like to have the last question read back and his response.
(Record read as requested.)
Q. Let's let him answer that question. Thank you.
A. The preponderance of cases are cases where the word "settled" would mean they have paid. But there are cases in which the

word "settled" would mean there is a path to payment.

Q. Looking at the last paragraph before the bold "Related Bulletin Pages," I'll read it.

"Official registration is complete when Student Accounting Services receives full payment. Students registering after the published Registrar dates may be subject to additional fees."

Is that your understanding of when official registration is complete?

A. Official registration would be complete when someone's bill is fully resolved. And so full payment does that.

MS. BOYD: Okay. We're done with that exhibit and going to put up another one, Tab 6. That's not for you guys. We'll give you the number. It will be Exhibit Number 26.

(Document marked for identification as Brown Exhibit 26)

A. (Document review.) Okay.

Q. Do you recognize this Web page?
A. Not precise, no. I have not seen this Web page.
Q. Does it look familiar to you in any way?
A. The only thing that looks familiar is the labeling of "Back2BU," which was branding we used as COVID started, once the pandemic had started.
Q. Is it your understanding that the BU website has a description of the tuition and fees on it?
A. Yes.
Q. Have you ever seen that description on the BU website?
A. I have in many years have not gone to look at it precisely.
Q. Do you have a general understanding and awareness that BU published on its website a description of the tuition and fees?
A. Yes.
MS. NIX-HINES: Asked and answered.

Q. You can answer.
A. Yes.
Q. Does that website look like -- does it look like a description of the tuition and fees --
MS. NIX-HINES: Objection. Calls for -- go ahead, sorry. I need to object, but go ahead and complete your question.
Q. I forgot my question. I'm going to withdraw it and I'm going to say it again.
Does this website that you're looking at appear to be the description of tuition and fees on the BU website?
MS. NIX-HINES: Objection. Lack of foundation. Calls for speculation.
A. The tabs, those blue tabs, appear to be click-downs to descriptions of tuition and fees, but they just appear that way.
Q. Have you in the past gone to those blue tabs and clicked on them at any time?
A. Not in this version of the website.
Q. In another version of the website?

A. Many years ago.
Q. I'm going to read from the second sentence at the top:
"Tuition and fees will not be refunded in the event the mode of instruction changes for any part of the academic year."
Were you aware that that sentence was published on the BU website?
A. I was not aware of where it was published. I was aware that we were going to make that statement.
Q. When did you become aware?
A. I cannot remember precisely.
Q. Was it after the spring 2020 closure?
A. I believe it was in the summer of 2020.
Q. Were you part of the discussions of adding this sentence to the website?
A. I was aware, not in a -- did not make the decision to add the sentence to the website.
Q. Did you tacitly approve that

decision when you were made aware?
MS. NIX-HINES: Objection. Vague.
A. I don't think in the frame of the discussion I was asked to approve or disapprove adding the sentence.
Q. Would you have the authority to disapprove adding the sentence if you had wished to?
A. If I thought it was inconsistent with things the university was doing, I might have been -- if people had thought -- please strike that.
If people had thought it was inconsistent with things the university was doing, it would have been probably brought more to my attention.
Q. What people?
A. People that run the website.
Q. Do you have any person in mind that you would have paid attention to if they had brought that to your attention?
A. The website -- admissions reports, as does the Registrar, to Christine McGuire, the vice president of enrollment and student

group, but they weren't relevant to that decision.

Q. Do you remember about how many days this group discussed the transition to remote?

A. This is something we had seen as a potential going back a number of weeks because --

Q. During the -- I'm sorry, I didn't mean to interrupt.

A. No, that's fine.

Q. During that time when you were considering going remote, what factors were considered?

A. When I say "a number of weeks," we started the remote planning group several weeks before that as we saw the disease evolving rapidly into this country.

Q. Did you consider other options besides going remote at that time?

A. The only other option we have was to stay as a residential campus, and we believed that that was going to become unavailable to us because of state edicts that

we believe would come.

Q. Did the students who were enrolled and registered in spring 2020 at the time they registered, did they have access to all the on-campus facilities?

A. So that would be you're asking about in January and February. Yes, of course.

Q. During this first decision to go remote, you mentioned that the only other option that was considered was to remain residential. Was there any other option that you considered?

MS. NIX-HINES: Objection. Asked and answered.

A. Not that I can recall.

Q. What factors were discussed when determining how BU would offer remote instruction for on-campus programs?

A. The primary factors were getting out in front of this transition to be able to offer a synchronous modality for teaching our students using the same faculty we have, giving them the tools for that synchronous teaching, and trying to recreate the inner connections

that occur in a classroom using the technology.
That was what the remote learning group focused on bringing us up to the week of Spring Break.
Q. Did this group go through each program offered to assess its ability to offer its program online?
A. I don't recall whether they did or not. I was not a member of that group.
Q. Did you have any discussions with anyone during this time about the relative differences in the programs vis-à-vis their transition to remote learning?
MS. NIX-HINES: Objection. Vague.
A. There were discussions that I did not lead talking about the relative use of remote learning across all of our programs.
Q. At this first announcement on the 16th of March, was it your belief at that time that this closure would be temporary?
A. Yes. Well, I -- I'm going to modify and say that I was not prepared and did not think the evidence was there that we should make it permanent at that time.

Q. What, if any, student reactions did you receive at your office during this time of the first decision after March 16?

A. I receive through an e-mail, president@bu.edu, many different e-mails at any one time. I receive e-mails with -- as one would think would occur with e-mails that were wondering about all kinds of issues relative to how -- excuse me, my voice is going -- how other decisions were going to be made.

We fielded many e-mails on things like dining and housing, all the way ranging to whether we were going to have a commencement, et cetera. I mean, there is a blizzard of incoming questions that we had to form out and get answers to.

Q. You made this first announcement on March 16 --

A. The announcement was made on March, I think, 11th. The announcement was to close -- to go remote on the 16th.

Q. Thank you for clarifying. After the first announcement on March 11 to close on March 16th, after that announcement, did you

receive e-mails specifically asking for prorated or reduced or refund of tuition or fees?

A. I received e-mails asking for reduced tuition. I am not sure whether they came between that -- after that announcement or the subsequent announcement where I made the announcement we were going to stay remote for the duration of the semester. I can't recall.

Q. Do you remember when that second announcement was?

A. I want to say the 17th or 18th. In that window. I don't have it right in front of me, obviously.

Q. If you remember, were the students still on Spring Break when that message came out?

A. No, no. Our students came back on Monday, the 16th. They came back over the weekend, and would have been -- if they were coming back, they would have been on campus.

Q. Do you remember any of your responses to these e-mails requesting a reduction in tuition?

A. I remember when we did respond. I don't know the time scale -- I don't know the time scale when we responded. But the response was we were not reducing tuition.

MS. BOYD: I'm sorry, could you read back that last answer.

(Record read as requested.)

Q. You say you remember when you did respond. What do you remember? What was that date?

A. I do not remember when we started responding to that question, whether it was -- I don't know when the question first arrived -- arose, and I don't know when we actually started responding to it. I believe it's after the 17th, but that's just my belief.

Q. And when you say "we" responding, who would that be? Your office or somebody else?

MS. NIX-HINES: Objection. Compound.

Q. You can answer.

A. It would be my office.

Q. Were you getting forwarded from

other academic administrators in the university requests for refunds that were not directed to you but were directed to them?

A. Most of the requests came to my office. There were a few that came to other schools and colleges.

Q. Were those forwarded to your attention?

A. Yes. The ones I know. I don't know if all were, obviously. But there were ones forwarded to my attention.

Q. Did you have a policy in place or did you put one in place about which body of administration or leadership would be responding to those requests for refunds?

A. I did. I asked if they come to my office and let us respond.

Q. What was the mechanism by which they were -- those requests were made?

MS. NIX-HINES: Objection. Vague.

A. There is an -- I can only speak to the ones that came directly to the president. The majority of them came to the website that's president@bu.edu -- website, the e-mail address

the 11th. This is the one the following week on the 17th.

Q. At this time, had you and your leadership group decided not to issue refunds?

A. At this time, we were silent on it. I do not think we had made a decision.

Q. Directing your attention to the first paragraph, third sentence, you state [As read]:

"Knowing that online delivery is not a substitute for living and learning in our academic community, we have held the hope that we might be able to safely return to in-person instruction in the second half of April."

Did you draft that statement?

A. Either -- it was either drafted by me or my chief of staff. I don't know sentence by sentence which ones I drafted.

Q. Fair enough. Did you approve this to be --

A. Yes.

Q. -- your statement?

A. Yes.

Q. And is it your belief that online delivery is no substitute -- is not a substitute or living and learning in the academic community?

A. My belief is that living and learning in the academic community is distinctively different than a remote learning experience. And that what I was doing in this paragraph, and many paragraphs after this, is empathizing with our on-campus mainly undergraduate students who were, you know, what do you say, how to say, who were losing that online -- that in-person experience in the residential community. And I was empathizing with them through that paragraph.

Q. You're talking about the on-campus undergraduate students that paid tuition for spring 2020?

A. I'm talking about our --

MS. NIX-HINES: Objection. Excuse me one second. Objection. Misstates his testimony.

A. I'm talking about our residential undergraduate students.

Q. Going to the next page, the first full paragraph -- well, technically the first full paragraph is the sentence "more details are discussed below."

So the second full paragraph that has multiple sentences, I'll direct your attention there to the third sentence. I'll read it out:

"Our hope is that our virtual technology will allow us to stay connected as we study and interact remotely, but I know it will not be the same."

Did you draft or approve that draft of the statement?

A. I approved that draft of the statement.

Q. It is your belief sitting here today that virtual technology is not the same as living and learning on campus?

A. I believe the virtual technology is not the same as being in the classroom. I do believe that the synchronous version that we developed that started being implemented only

the day before this letter was written, was the first time we implemented it, duplicated the learning experiences for our students, the classroom learning experiences. And that the interconnection of our students actually turned out to be very, very strong during that experience using the technology.

Is it the same? No. The question is, is the value of it in terms of delivering an education, meeting educational goals and objectives and advancing people's degrees, I think we did a wonderful job.

Q. Did you give the students, on-campus students enrolled in 2020, a choice at the time they enrolled to go remote as part of their education?

MS. NIX-HINES: Objection. Vague.

A. When they would have enrolled, which would have been in the fall of '19, the answer is no.

Q. You've mentioned the word "synchronous virgin" or "synchronous learning." I may have misstated it.

What do you mean by that term?

A. I mean that the preponderance of the lectures and interactions were done using the technology synchronously as we're holding this meeting. And I'm differentiating that from asynchronous.

Q. Can you be more specific on that distinction?

A. Asynchronous would be that if you went and I gave you material that you reviewed outside the classroom setting, that's asynchronous material.

Q. Can you give me an example?

A. Reading a Kindle book, and then coming to the Zoom class to talk about it. The Zoom piece is asynchronous. The Kindle class is synchronous. I mean, the Zoom piece is synchronous. The Kindle piece is asynchronous.

Q. Did BU ever communicate to the students who were enrolled in 2020 spring that this experience of synchronous learning could be implemented in return for their full tuition payment?

MS. NIX-HINES: Objection. Calls for speculation.

A. We did not say that specifically. But by not refunding the tuition, we're basically saying that we are doing that.

Q. I want to direct your attention to the next page --

A. Same document?

Q. Yes, sir.

A. Okay.

Q. -- to the section that says "Refunds." And there is two sentences there:

"Room and board costs will be prorated for the remainder of the semester for all students leaving campus. Additional information on calculating and processing credits or refunds will be forthcoming."

So I want to take one sentence at a time there. "Room and board costs will be prorated for the remainder of the semester," how did you come to that decision that's reflected in this first line to the community?

A. We believed that the room and board, board being the food that we supply

through meals, and the board being the use of the room where they would sleep, had been taken away from them totally. And we believe that that should be reimbursed on a prorated basis.

And you have to remember this memo, which comes out following the second memo from the governor which limits gathering size, basically made it impossible for us to continue in a dormitory or residential living environment and an eating environment at that point in time.

And so this memo, when it came out, was telling students they either should not come back to the residences or they should leave, which is --

Q. Can -- I'm sorry, continue.

A. No. No.

Q. That's me jumping the gun. I apologize.

Was there any other factor other than they would not be receiving housing or board totally for -- was there any other decision -- any other factor considered other than that factor that you mentioned for

refunding prorated housing?

MS. NIX-HINES: Objection. Vague.

A. Not that I recall.

Q. The second sentence of this paragraph under "Refunds" that I read, what were you referring to there when you said "Additional information on calculating and processing credits or refunds will be forthcoming"?

A. That second sentence is connected to the first. It is basically implying that how you are going to process credits or refunds for that room and board.

Q. It did not refer to credits or refunds of other payments, such as tuition and fees?

A. That was not the intent.

Q. Is there some reason why the heading says "Refunds" and not "Refunds for housing and dining" or "room and board"?

A. Not intentional. The first sentence is very clear what it says.

Q. The second sentence, did you get information from students or parents that they

were waiting on additional information regarding tuition and fee credits or refunds?

MS. NIX-HINES: Objection. Vague.

A. I cannot recall having a parent or a student questioning what that second sentence referred to.

Q. On March 17, on or about, were you getting requests from students or parents for information about refunding tuition and fees?

A. In that time span of between, let's say, March 16th and March 30th, yes. I can't remember exactly -- exactly when different things were coming in.

Q. Did you consider addressing those requests for tuition and fee refunds in this letter?

A. Not those requests. What we considered addressing was whether or not we would speak to tuition and fees in this letter.

Q. And what was that -- tell me about that discussion, please.

A. The decision was that only one day -- this goes out on the 17th. It's written the weekend of the 15th and the 16th. We had

not actually, when this letter was finished, actually offered a remote learning class, because they started on the 16th. We wanted to see how things launched.

Q. Were there any other factors you discussed as to why you weren't going to discuss or mention tuition and fee refunds in this letter?

A. Not that I recall.

Q. After March 17, did you continue to meet with your leadership group regarding the decision to refund tuition and fees?

A. I continued -- we met biweekly with the leadership group all through April. There were not on the agenda discussions of refunding tuition and fees.

Q. I'm going to direct your attention back to March 17 when this letter came out, the one you have in front of you. At that time, were you actively meeting with your leadership group to discuss tuition and fees refunds?

MS. NIX-HINES: Asked and answered.

A. I was actively meeting with my

questioning, do you want to take the lunch break?

MS. BOYD: I was thinking along those lines, yeah.

MS. NIX-HINES: Okay.

MS. BOYD: About ten more minutes.

MS. NIX-HINES: Okay.

Q. Let me know, Dr. Brown, when you have reviewed.

A. (Document review.) I have.

Q. Do you recognize the contents of this exhibit?

A. I believe so.

Q. What do you recognize it to be?

A. It's a follow-on memo, I'm not sure who put it out exactly, doing the details around the campus closing that was announced in that e-mail -- in that memo that we just reviewed, the 17th memo.

Q. Direct your attention down to the first bullet under the heading "Starting Monday, March 23, 2020," it states, "All Charles River and Fenway non-residential buildings will be locked."

What is the Fenway non-residential buildings?
A. We have three campuses in the Boston area, the Charles River Campus, which is our major campus; the medical school campus, which has the medical school, dental school and the hospital; and the Fenway campus is a separate campus about a half mile from our Charles River Campus that has residences and classrooms.
Q. Classrooms for what programs?
A. They are not used for a specific program. Actually, we house a number of centers and institutes, research things there, and the classrooms are used broadly for a number of different functions.
Q. How large are these three campuses, approximate measurements?
MS. NIX-HINES: Objection. Vague.
A. The Charles River Campus stretches about a mile and a half. The Fenway campus is, I don't know how many acres it is. The Fenway campus is much, much smaller. It's five acres, four acres. And the medical campus is three

city blocks.
Q. Three city blocks you said?
A. Yes.
MR. BOYD: Okay. I'm done with that exhibit. This might be a good stopping point for lunch.
THE WITNESS: Okay.
MS. BOYD: How much time do you need or want?
MS. NIX-HINES: 45 minutes?
MS. BOYD: Okay. That would put us back here at Eastern 1:40. Is my watch right?
THE WITNESS: That's fine.
MS. BOYD: 1:45. I'm sorry.
MS. NIX-HINES: 1:45, yeah.
MS. BOYD: 2 o'clock more or less.
MS. NIX-HINES: More or less.
MS. BOYD: Okay. 1:45 we'll reconvene.
MS. NIX-HINES: And could I get how much time we've had on the record, please?
VIDEO TECHNICIAN: Do you want to

MS. NIX-HINES: Objection. Lack of foundation. Calls for speculation. He's already indicated he has no personal knowledge of the website.

Q. Do you understand the question?

A. I do.

The university, as we developed our remote synchronous learning platforms within each school and college and each program, worked to develop methodologies to have the same equivalent teaching outcomes.

I am not aware of exactly what was done in the visual arts program that this student is writing about. But each program developed its own use of remote learning, synchronous remote learning, to fulfill their degree requirements and get the same learning outcomes.

So that would be what I would say.

Q. Does "CFA" stand for -- well, let me ask you. What does "CFA" stand for?

A. College of Fine Arts.

Q. And do the students of the CFA in spring 2020, are they on-campus program

enrollees?
A. They are an on-campus program.
Q. And do they pay -- do they pay tuition at the time of enrollment for the CFA --
A. Yes.
Q. -- program?
And do they pay studio fees to your knowledge?
A. I do not know.
Q. At the time they enroll, are they -- for an on-campus program, are CFA students taught in studios for fine arts that are located on the campus?
MS. NIX-HINES: Objection. Vague. Compound.
Q. You can answer.
A. They are taught in buildings. I'm not sure if they're taught in classrooms or studios. We have both.
Q. Where are your studios for the CFA students, or fine arts students, located?
A. They're in two different buildings on the Charles River Campus.

Q. And were the spring 2020 enrolled students taking classes in those studios before the closure in March 2020?

A. They would have been taking classes in the classrooms and studios in those two buildings.

Q. Was there any communication to CFA students that are enrolled in spring 2020, was there any communication to those students before they enrolled or at the time of enrollment that they would continue to pay full tuition if the studios were closed?

MS. NIX-HINES: Objection. Vague. Calls for speculation.

Q. You may answer.

A. Not to my knowledge.

Q. If you could look at the next page, and tell me if you see an answer to this question, "Healthy but compromised," that was asked on page 34.

MS. NIX-HINES: Objection. Vague. What are you asking exactly?

Q. Well, I'm asking if he knows if the university answered this question. That's

my question.

A. I do not know.

MS. NIX-HINES: Objection. He has already indicated he is not aware of this document. He was not involved in the website, so I'm not sure what you are possibly asking him.

MS. BOYD: That is inappropriate and you know it. You are literally talking for him, speaking for him, testifying for him, coaching him. Please stop using words.

MS. NIX-HINES: I am not coaching him. I am asking you to clarify what is the nature of your question. It's unclear.

MS. BOYD: You can object to the form of the question. You can't give long speeches about all these other things that he hasn't stated and you're stating he testified to. It is inappropriate wholeheartedly. I know you know that. But I am done talking about that. We are going to move on.

Q. I want you to look at page 35 and tell me if you see the box that says "Submit a Question" with "Name" and "E-mail" and "Comment."

Do you see that box?

A. I do.

Q. Does that appear to you to be the methodology by which questions were submitted on this website for current virus COVID-19 information?

A. It does appear that way.

Q. I'm going to direct your attention to page BU-000038. Let me know when you are there.

A. I am.

Q. This is one of the pages you were able to review on our first review. Do you see the middle of the page "Will Boston University Study Abroad programs for Summer 2020 happen?"

Do you see that?

A. Yes.

Q. Were study abroad programs offered to full-time students who were enrolled in spring 2020?

A. Yes, they were.

Q. Can you tell me a little bit about those study abroad programs, or what you know about them?

A. We have a sequence of programs where students go to facilities in different parts of the world and the United States and either take classes or do internships.

Q. Do you know about -- strike that.

What department runs these study abroad programs at BU?

A. There is a department called Global Programs that runs all the study abroad programs.

Q. Are you aware if those programs are offered to online-only students?

A. It depends on the time frame you're talking about, because in -- so what time frame are you talking about?

Q. For spring 2020 students who ended up being enrolled in spring 2020, were study abroad programs specific to the on-campus students, or were they also offered to the online-only students, if you know?

MS. NIX-HINES: Objection.
Compound.
A. The spring 2020 study abroad program started in January of 2020 with the students being at their sites where they chose to do study abroad.
Q. Are you aware if those programs were offered to online students enrolled for the spring 2020?
A. Not at the beginning of the semester. There were no online students.
Q. Do on-campus students -- did on-campus students enrolled in spring 2020 pay the same tuition as they would have paid if they were -- remained on campus in Boston?
MS. NIX-HINES: Objection. Vague.
A. I'm sorry, I don't think I understand that question.
Q. If a student decided to take an online -- I mean, excuse me.
If a student applied for and chose a study abroad program for spring 2021, would they be paying the listed BU tuition as all other students if they had remained on campus?

Q. Did they continue their study abroad program as a remote program, or were they cancelled?

MS. NIX-HINES: Objection. Compound.

A. The students were offered the opportunity if they were doing internships or classes to continue those internships as a remote internship and the classes as a remote student.

Q. Let me see if I understand. The students who are living abroad, are they taking BU classes abroad with professors physically in a location abroad?

A. In some programs, yes. In some programs, they're taking classes in an international university abroad.

Q. In physical spaces?

A. I suspect. I haven't visited all the programs.

Q. Were some programs that were study abroad programs cancelled altogether as a result of the pandemic?

A. Not to my knowledge. I don't

believe that's true.
Q. To the best of your knowledge, all of the BU students studying abroad continued their education online. Is that your testimony?
A. No. What I was -- some BU students abroad stayed abroad essentially for the whole semester, depending on the location and how COVID was developing. Some did not come home right away. They stayed.
Q. My question is a little bit different. Were there any study abroad classes cancelled altogether for BU students in spring 2020 who were studying abroad?
A. I do not know of any.
Q. Did BU communicate to the students enrolled in 2021 that were studying abroad that they would receive no tuition refund if they had to leave their abroad and come home?
MS. NIX-HINES: Court Reporter, could you read the question back.
MS. BOYD: "Their abroad location," I should have said, "and come home."

MS. NIX-HINES: And you were asking about 2021 again?
Q. Dr. Brown, you can answer the question if you are able.
MS. NIX-HINES: Well, I'm going to lodge an objection as vague, relevance, given the time frame of 2021.
Q. If I misspeak and say 2021, because somehow that's gotten now nailed in my head, probably because of all of this colloquy, I apologize. I am locating my questions in 2020 spring when the pandemic hit. That's where I am.
MS. NIX-HINES: Understood, Counsel. But if you misstate --
MS. BOYD: I'm not talking to you.
MS. NIX-HINES: -- and say 2021, I'm going to get a clean record and I will lodge an objection.
MS. BOYD: I'm not talking to you. I'm not talking to you anymore.
BY MS. BOYD:
Q. Dr. Brown, do you understand the question or do you want it read back?

programs, just generally what does a clinical program entail?

A. It varies dramatically, depending on what field you're in. If you are in medicine or dental medicine, you are doing hands-on patient work, touching patients.

In other fields, such as clinical psychology, you may be conferring with a patient. And social work is somewhere -- I would put it more on that spectrum.

Q. For the students who were enrolled in 2020 spring, at the time they were enrolling in clinical programs, would they have expected to be physically in those clinics for spring 2020?

MS. NIX-HINES: Objection. Calls for speculation.

A. When you think of dental medicine and medicine, they would have expected to be in a place called the clinic. A social worker would not have expected to be in a place called a clinic.

Q. Where would they have expected to be when they are enrolled in a clinic for

social work?

A. In a practicum, they would be expected to be conferring in working with patients. Those patients may be in a clinical setting or they may be in a home setting. There are many different settings that they would be working with someone.

Q. Would these be face-to-face sessions in the City of Boston --

A. I'm sorry, I interrupted you.

Q. Would these be face-to-face sessions in the City of Boston or surrounding areas?

A. I actually don't know what the ratio of, prior to COVID, how much would be face-to-face, how much would be telephonic, and how much would be video. I do not know.

Q. For the portions that would have been in in-person with patients of the social work students, would they have expected to be part of those face-to-face sessions for the the spring 2020 when they enrolled for those clinics?

MS. NIX-HINES: Objection. Calls

for speculation. Compound.

A. If there was -- if there was a component that had been programed to be face-to-face, then they would have expected that to be there. I just don't know what the ratio is.

Q. I think you mentioned the dean of social work, who was that again?

A. Jorge Delva, D-e-l-v-a.

Q. Delva. Would Dean Delva have been the one who would have knowledge of what portion of the clinics are face-to-face or what others are telephonic or video for spring 2020?

A. Yeah. He has an associate dean that does the practicum placements, and that would be the two people that would have knowledge of it.

Q. When the students for spring 2020 were enrolling -- first of all, for students who ended up being enrolled for spring 2020, when would they have started their enrollment process, if you know?

A. The normal window for enrolling in the spring begins in November and closes in

early December of the previous fall.

Q. At that time are students, do they have course descriptions they're able to look at to make decisions on what classes they might want to take?

A. It -- the answer is they have course descriptions on all their courses. If they are in a professional subject, there may be a pretty prescriptive set of classes.

Q. And what do you mean by "prescriptive"?

A. Meaning, that to get accreditation in a particular discipline, you may have to take very specific classes.

Q. Let's take, for example, medical school. Would there have been enrollment for clinical -- clinical courses for spring 2020 for medical students to the best of your knowledge?

A. Yes. In the hospitals. And those never -- those never stopped.

Q. Did medical students continue to meet in person in those clinic settings throughout the semester 2020?

A. The answer to that is yes. And, in fact, the state -- this happened in many states in the country, they accelerated their completion, cut their clinics somewhat short, and licensed them as M.D.s about a month early, if I remember, in 2020, to get them into the hospitals as licensed M.D.s.

So their clinics, the accreditor and the state came together and just cut short the length of the clinics.

Q. At the time of enrollment into those clinics, the medical students in the fall of 2019, their expectation was they were going to be working with patients in those clinics throughout the whole semester of 2020; is that what you're saying?

A. Their --

MS. NIX-HINES: Objection. Calls for speculation.

Q. You can answer.

A. I don't know what they would have expected. Right?

Q. When they signed up for a clinic in 2019, and they enrolled in that clinic,

record.

COURT REPORTER: Thank you. I didn't get it, but now it's there. Do you want the record read back?

MS. NIX-HINES: Yes, please.

(Record read as requested.)

Q. Okay. You can answer. If you can answer, please answer.

A. We were confident in the quality of what we were doing. I believe making that statement at that point in time was too soon, and that we needed to watch the system work.

Q. You can put that exhibit away and go to -- and go to Exhibit 30.

(Document marked for identification as Brown Exhibit 30)

A. Oh, this is a bigger one.

(Document review.)

Q. Dr. Brown, have you had a chance to look at the e-mail exchange and attachments?

A. Yes, I have.

Q. Do you recognize them?

A. I do.

Q. What do you recognize them to be?

A. I recognize this is a letter addressed -- an e-mail addressed to me and to Dean Harvey Young of the College of Fine Arts from students in the master's of fine arts program.

Q. And just looking at the date here at the very top from you, your e-mail, on 3/30/2020 to Jennifer Horgan -- who is Jennifer Horgan?

A. Jennifer Horgan is one of my staff who is in charge of monitoring the president@bu.edu website, or e-mail address I should say.

Q. She works directly for you, under you?

A. She works for my chief of staff, Doug Sears.

Q. And is it my understanding that on March 30, 2020, approximately two weeks after the close of campus, there was still no official decision on the tuition and fees refund?

A. I believe that's accurate.

Q. When the students -- first of all,

what are MFA candidates?
A. Masters of fine arts.
Q. When the MFA candidates applied for their master's of fine arts classes in the fall of 2019 to be taken in 2020 spring, did they expect to be taking some of those classes in art studios?
MS. NIX-HINES: Objection. Calls for speculation.
A. I'm to answer?
MS. NIX-HINES: Yes.
Q. Yes, please.
A. Okay. They would have -- yes, they would have. Some of them would have, not all.
Q. Does BU campus have art studios for fine arts students?
A. Yes. And classrooms.
Q. Are master's of fine arts students considered on-campus students, degree students?
A. They are considered a residential program.
Q. I assume they are graduate students, these are not undergraduate students?

facilities?

MS. NIX-HINES: Asked and answered.

Q. You can answer.

A. As I said before, we did not anticipate a pandemic moving all of our education and extracurricular activities into a remote learning environment. So, no, we did not.

Q. Were there any other -- well, strike that.

Going to the second full paragraph under "Mandatory Fees," reading that paragraph, and I'm not going to read it out loud. I'll let you read it.

What was the reason given to the students that their mandatory community service fee would not be refunded for the portion which they could not access campus facilities?

A. So you're talking about the second paragraph that starts "Under the direction of the Dean of Students"?

Q. Yes.

A. I think that paragraph basically

speaks for itself in the sense that the parts of that fee that are used directly to support student organizations which couldn't use the funds were being rolled over into the next year, which is a typical thing we do with any reserve funds from that pool year by year.

And the second thing that was true is that many, many of our clubs and organizations continued to function through the pandemic using Zoom as a vehicle, but they couldn't -- they did not need the funding that they might need for events and other things. And so that really is a community service fee.

Q. At the time that the students enrolled and paid the community service fee for 2020 spring, were they -- did BU do anything to communicate to them that if the campus was closed to student organizations meeting on campus for programs, or services meeting on campus, that their mandatory fee would not be refunded for the part of the semester to which they could not access those facilities?

MS. NIX-HINES: Objection. Vague. Compound. Did I cut you off?

MS. BOYD: Yes.

MS. NIX-HINES: Okay. Do you want to finish?

Q. Was any communication like that made, Dr. Brown?

MS. NIX-HINES: Objection. Vague. Compound.

A. Because we did not anticipate a global pandemic, no communication like that was made.

Q. The paragraph under that starts with:

"Proceeds from the Student Services Fee and the Health & Wellness Fee are directly allocated to support student health services, wellness activities, student support services."

I'm not going to continue reading. It starts with that part. Do you see that paragraph?

A. Yes, I do.

Q. Was there any communication or action on the part of BU at the time that the students that were enrolled in the spring 2020