# Exhibit 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------x

IN RE: BOSTON UNIVERSITY COVID-19

REFUND LITIGATION                    Master File No.

No. 1:20-cv-10827-RGS

-----------------------------------x

THIS DOCUMENT RELATES TO:

ALL ACTIONS

-----------------------------------x

C O N F I D E N T I A L

REMOTE VIDEOTAPED DEPOSITION of

TRUSTEES OF BOSTON UNIVERSITY, pursuant to

Rule 30(b)(6), with designee GARY W. NICKSA

Boston, Massachusetts

Reporter: MaryJo O'Connor, RDR, RMR

Monday, May 2, 2022

10:06 a.m. EDT

REMOTE VIDEOTAPED DEPOSITION of TRUSTEES OF BOSTON UNIVERSITY, pursuant to Rule 30(b)(6), with designee GARY W. NICKSA, held via Zoom videoconference in Boston, Massachusetts, pursuant to notice, before MaryJo O'Connor, Registered Diplomat Reporter, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts.

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF:

(Attending remotely)

HECHT PARTNERS LLP

125 Park Avenue, 25th Floor

New York, New York 10017

(212) 851-6821

BY: THEO BRUENING, ESQ.

tbruening@hechtpartners.com

CONOR BREW McDONOUGH, Ph.D., ESQ.

cmcdonough@hechtpartners.com

KATHRYN LEE BOYD, ESQ.

lboyd@hechtpartners.com

ATTORNEYS FOR DEFENDANT:

(Attending remotely)

QUINN EMANUEL URQUHART & SULLIVAN LLP

865 S. Figueroa Street, 10th Floor

Los Angeles, California 90017

(213) 443-3000

BY: MARINA LEV, ESQ.

marinalev@quinnemanuel.com

A P P E A R A N C E S, Continued

ALSO PRESENT:

Geoff C. Bassett, Video Technician

Lisa Tenerowicz, Esq., Boston University

A. I do not.
Q. All right. Where were you born?
A. Hartford, Connecticut.
Q. And how old are you now?
A. 64.
Q. And where do you currently live?
A. Wellesley, Massachusetts.
Q. And what degrees do you hold, if any?
A. I have a bachelor's of science in business administration, and a master's in science in taxation.
Q. All right. And where and when did you obtain those degrees?
A. Bachelor's degree was from the University of Vermont in 1980. The master's degree was from Bentley University in approximately 1988.
Q. Okay. Do you hold any certifications? I think you said that you are a CPA, right?
A. I am a certified public accountant. In --
Q. And any other -- sorry, go on.

A. In Massachusetts.
Q. Do you hold any other certifications?
A. I do not.
Q. Were you ever subject to disciplinary or criminal proceedings?
A. No.
Q. Were you ever be a part -- sorry.
Were you ever a part of any civil action?
A. No.
Q. What is your current employment?
A. I am currently the senior vice president for financial affairs, treasurer and chief financial officer of Boston University.
Q. Can you give me a quick rundown of your responsibilities, please.
A. I oversee the financial accounting and reporting and financial systems of the university.
Q. Okay. And have you held any other positions at Boston University?
A. Before this current position, I was the senior vice president for operations.

Q. All right. And what were your responsibilities there?
A. I oversaw the business affairs of the university.
Q. Okay. Prior to that position, did you have another position at BU?
A. My title when I first started at BU was vice president for operations, and then I became senior vice president for operations.
Q. All right. And before that, were you also at BU?
A. No. I joined BU as vice president of operations.
Q. Okay. Currently, to whom do you report?
A. President Robert Brown.
Q. Okay. And how many direct reports do you have?
A. Seven.
Q. Okay. Prior to BU, where were you?
A. I worked for an insurance organization called the Chickering Group.
Q. And what was your job title there?

MS. LEV: Objection.
Q. -- that fair to say?
MS. LEV: I'm sorry, Counsel.
Objection. Asked and answered.
Q. The witness can answer.
A. The planning was put into place for the change to remote teaching during the course of that week.
Q. Over the course of that week, how many meetings were there in person or by conference call, video call, any other means, on that topic?
A. Meetings that I participated in or --
Q. No. Meetings pertaining to this topic.
A. Planning. I was not involved with the planning that was being done for teaching. But this -- it's not an area that I work in directly.
I am aware that they were -- there was a constant effort over the course of that week for my colleagues and the academic leadership to prepare for that change.

Q. Is it fair to say that the same people that you mentioned earlier who were involved in the decision-making process were also involved in the creation of this plan?

A. President Brown and Provost Morrison were leading that planning, yes.

Q. Who else was involved in the creation of this plan?

A. There are a number of people in the provost's office, as well as the schools and colleges themselves, that were all involved in putting the planning in place.

Q. And excuse me a moment. It's been a long time since I've been at university. What does a provost do again?

A. A provost is the chief academic officer. The deans report to the provost at Boston University.

Q. Can you tell us what the plan entailed in as much specificity as you recall?

A. The essence of the plan was that though all students could return to campus, all classes would switch from in person to remote for those four weeks. That was the original

announcement.

The courses would all meet at the regularly scheduled times. They would all be taught by their regular professors, regular instructors, but just via Zoom instead of in person.

Q. Was there an estimation arrived at on how much this plan would cost the school?

A. Not at that time.

Q. All right. Was an estimation arrived at at a later point?

A. The spring semester, there was only eight weeks remaining in that. So that the actual costs -- by the time the semester ended, we had a sense of the financial implications. But, no, it wasn't a financial decision or based on a cost estimate to continue teaching all the classes remotely.

Q. I appreciate the answer. And not to be aggressive here, the question was not whether the decision was influenced by cost factors. My question was: Was there an estimation, a projection made, at any point of how much this plan, this transition, would cost

response? I'm trying to get at the quality of the response.

MS. LEV: Counsel, I'll object to the extent that this is outside the scope of what I assume is your intention to ask him with respect to Topic 1. Is that the topic you're intending to ask about, or is there some other topic you can point me to?

MR. BRUENING: Objection noted. The witness can answer.

A. I'm sorry, I'll need you to repeat the question.

MR. BRUENING: Could we have it read back, please.

(Record read as requested.)

MS. LEV: Objection. Compound, please restate.

Q. You can answer.

MS. LEV: Objection. Vague. That's like five questions, Mr. Bruening. Which one would you like him to answer?

Q. All right. Did the in-person

faculty, the faculties that teach in-person courses, express concerns about teaching remotely?

MS. LEV: Objection. Vague. To whom?

Q. To the -- to management and the administration that published this plan.

MR. BRUENING: And, Counsel, again, if there is a question the witness -- that the witness has to my question, he can put it. Otherwise, I would ask you to stop with the speaking objection. Thank you.

MS. LEV: It's a vague objection, Counsel. You can answer.

A. The faculty, the residential faculty who had to change to remote construction, had not done it before and expressed their concerns with understanding what to do. It was a change. It was different.

Q. Do you know how many students were involved in the development of this plan?

A. I do not know.

MS. LEV: Counsel, we've been going for approximately an hour. It might be a good time for a break, if you'd like. And for the witness as well.

MR. BRUENING: I mean, five more minutes might be good, because I'm nearing the end of one particular topic. So let me -- you're more than welcome to take a --

MS. LEV: For your indulgence, Counsel, it would be --

MR. BRUENING: All right. One more question, then.

MS. LEV: To this nursing mother to go off the record for just five minutes, if that would be all right.

MR. BRUENING: One more question, then, before we go off the record.

BY MR. BRUENING:

Q. Mr. Nicksa, about the concerns from the faculty, can you give us all the concerns that the faculty had? You mentioned that it was new or different for them. What

Q. Okay. Now, before we took a break, we were discussing the feedback that was received from the faculty in response to the plan we've been discussing.

And who at BU would have more knowledge about the contents of that feedback?

MS. LEV: Counsel, by way of quick objection, to the extent that you are asking questions outside the scope of the topics of Mr. Nicksa's 30(b)(6) deposition, just as a reminder, he is testifying in his individual capacity and not on behalf of BU.

Q. You can answer.

A. Jean Morrison, as the university provost and the person who sent that memo that you were referring to, the Remote Teaching Readiness Plan, would be the person.

Q. All right. Do you know if this feedback has been produced to us, to the extent it was produced in writing?

A. I would have no way of knowing that.

MR. BRUENING: Okay. To the

extent it hasn't been produced, we're asking for it.

Q. Okay. Mr. Nicksa, do you know what the student response was to this plan?

MS. LEV: Objection. Lacks foundation.

Q. All right. Mr. Nicksa, do you know if there was a student response to this plan?

A. I do not know of any specific student response to the plan.

Q. Who would?

A. Jean Morrison, as university provost.

MR. BRUENING: To the extent any student responses to the plan had been received, we ask for the production of the same.

Q. Mr. Nicksa, prior to the COVID-19 pandemic, did students engaged in the in-person study at BU ever have the option of switching to an online course in mid-semester?

A. Our courses are structured as either in person or online, and that option

would not have been available before the pandemic.

Q. All right. Moving on.

You mentioned that back in March of 2020, BU did not have any projection in terms of the cost impact of COVID-19 or the implementation of the plan; is that correct?

A. I believe what I said was in leading up to the decision to go remote, that we announced on March 11th, or between when the return from spring break, March 16th to April 13th I believe, for the four-week period, we had not done any cost estimating of incremental cost for that period of time.

Q. Did there come a time at any point at which such a cost ascertainment occurred?

A. With regard to the Spring 2020 semester or after Spring 2020?

Q. Spring 2020. Let's do the Spring 2020.

A. What we determined for Spring 2020 was the cost; it was actually the refund of room and board and the cancellation of events and conferences and other things that could no

Q. Sure. So let's talk a little bit more about the summer program. Is it true that the summer program -- well, withdrawn.

Who attends typically the summer program at BU? Is it students?

MS. LEV: Counsel, objection to the extent that's outside of scope. You can answer.

Q. You can answer.

A. There are both Boston University, and other students who are not matriculated at Boston University, will take summer classes at BU.

Q. And did those -- I will call them attendees. Those attendees, did they put down deposits for this summer course, summer program?

A. Yes. All students pay for their summer courses.

Q. And did they also pay for tuition?

A. The summer fees are specifically identified for it's not the same as the fall or spring tuition.

Q. But they do pay money in exchange

for education; is that fair?
A. Yes, there is a tuition or fee for every summer class.
Q. All right. Do they pay for room and board?
A. Only students who live on campus, and it is not a requirement to attend a summer session.
Q. In terms of the fee or tuition that the attendees pay, how does it differ from the tuition for the in-person classes that are offered during the semester time to matriculated students?
A. Our summer program is primarily offered by Metropolitan College, which has a set of programs that are both full-time and part-time. So it has a very specific fee structure for its programs.
Q. Do you know if it's higher or lower than the tuition per class or per credit than the full-time, in-semester courses?
A. It depends upon the program and the student's full-time or part-time status.
Q. Okay. Of the attendees of the

summer programs, the ones that pay for room and board, were their room and board payments refunded in full or in part?

A. On March 17th when we announced that we were going to be fully remote for the remainder of the semester and all students needed to leave campus by that, five days later, it was March 22nd, the only students who remained on campus in the summer, in the spring of 2020 and the summer of 2020, were roughly 400 students that we had specifically allowed to stay for public health and personal reasons.

So there were no other students staying on campus, because we were offering fully remote instruction that summer.

Q. So is it fair to say that the question of room and board refund for summer attendees did not arise because everybody had vacated before that payment issue; is that what you're saying?

A. We were fully remote and did not have anyone moving in for the summer because we were fully remote.

Q. Did BU offer refunds on deposits

Metropolitan College program.
Q. And do you know in the spring of 2020 what the cost to BU for each of -- of that course was, on average?
A. I would need to check our accounting records in order to determine that.
MR. BRUENING: Okay. I'd ask that we leave a blank in the transcript that you can fill in later once you have reviewed the information.
MS. LEV: Counsel, I'm not sure what you mean by blank in the transcript once you've referred to the information. If you have any requests --
MR. BRUENING: Counsel. Is that not an objection, Counsel?
MS. LEV: I'm sorry, please let me finish. Thank you.
To the extent that you have any document requests for BU, Counsel, I remind you, I'll ask you to make them in writing.
MR. BRUENING: We ask for all documents related to that as well, and

leave a blank in the transcript for the witness to fill in.

MS. LEV: Please do so in writing.

BY MR. BRUENING:

Q. Please, do you know -- Mr. Nicksa, do you know of any in-person course that transition to an online course at BU? Has that happened?

A. Are you asking if an in-person course outside of the pandemic transitioned to online --

Q. Correct. Correct.

A. It's my understanding that courses are either residential or online, but not both.

MR. BRUENING: Colon, could you put up Tab 95, please.

MR. McDONOUGH: Sorry, Tab 9?

MR. BRUENING: Nine five.

MR. McDONOUGH: 95.

Q. Do you see it?

A. Yes. "Message from President Brown, COVID-19 Update," dated March 17, 2020.

MS. LEV: Counsel, is this --

Q. Do you recognize this?

MS. LEV: -- Exhibit 4? I'm sorry. Is this Exhibit 4?

MR. BRUENING: This will now be Exhibit 4, that's correct.

(Document marked for identification as Nicksa Exhibit 4)

MR. BRUENING: Okay, can everybody see it?

MS. LEV: Yes.

BY MR. BRUENING:

Q. Mr. Nicksa, do you recognize this document?

A. I do.

Q. What is it?

A. This is the March 17th communication from President Brown to all students, faculty, and staff, announcing that due to the extended duration of the pandemic, all classes and examinations would be online for the remainder of the spring semester. And that residential students are going to have to leave campus, unless they were specifically allowed to stay, by Sunday, March 22nd.

Q. If you could go to page 5 of 8, do

you see that's the page numbers at the bottom right?

A. I do.

Q. And do you see the first paragraph deals with "Exceptions to Leaving Housing"?

Do you see it?

A. I do.

Q. All right. And the last two sentences there read:

"Students who seek to remain should be aware that they will likely be asked to move to a different residence hall. Also, campus services, activities, and interactions will be severely limited."

Did I read that all correctly?

A. You did.

Q. When it says that students remaining at campus would have to move to a different residence hall, why was that required of them?

A. We normally have 11,700 undergraduates on campus in 170 different buildings. In order to protect the safety of

I mean, if you need to guess, if you need to hazard a guess, let us know. I mean, do you have some sense of what this refers to?

MS. LEV: Don't speculate.

A. The only response I think I can give to you to that is we had just closed our residential campus to all activities in person. So that what we were doing was changing to remote teaching and remote services. For example, telemedicine instead of in-person visits at our student health center.

Q. Do you have any other services that you could refer to -- that you could explain and talk about?

A. All of our in-person services were transitioned to remote services at that point in time.

Q. All right. What about activities, do you know what that refers to?

A. Student activities are in two general areas: One is Student Activities Office in the Dean of Students, which has over 500 clubs, which also went to remote meetings.

And then general university-sponsored activities, such as our Fitness and Recreation Center, which had to be closed due to the governor's order, but also went to remote wellness and programs, so online programs, at the same time.

Q. All right. And then it says under "Refunds":

"Room-and-board costs will be prorated for the remainder of the semester for all students leaving campus. Additional information calculating and processing credits or refunds will be forthcoming."

Did I read that all correctly?

A. You did.

Q. All right. Bear with me.

Was there any communication to students prior to this pandemic that services would go online?

MS. LEV: I'm sorry, could you read that back, please?

Q. Was there any -- well, let's have it read back.

(Record read as requested.)

MS. LEV: Objection. Vague. Are you saying prior to the pandemic had there been any such messages to students?

MR. BRUENING: Yes.

MS. LEV: Okay. To that extent, Counsel, I will object citing, among other things, Judge Stearns's order, Docket Number 86 of February the 15th, in which he plainly cabins discovery to the Spring 2020 term. And will advise you that, pursuant to our objections in responses, this witness is only being offered for Spring 2020. And, therefore, any responses he gives you outside of that will, of course, be limited to his individual capacity.

Q. You can answer.

A. Other than our pandemic-related communications, I'm not aware of any communication where we announced that we were changing from residential to remote services.

Q. As to these services, how are they

MR. McDONOUGH: It should be just refreshing now.

A. I have document 10.

Q. All right. And I'll represent to you this is what the same website from Boston University displayed in January of 2020. All right?

A. I'm sorry, you're stipulating that this was from --

Q. No. I'm representing to you that this is what the -- the same website on the Boston University displayed in January of 2020.

MS. LEV: And for Tab 9, Counsel, is that --

MR. BRUENING: Tab 9 is the website as it appears today.

MS. LEV: And you're representing that for both documents?

MR. BRUENING: Tab 9 is how it is today. Tab 10 is how it appeared in January of 2020.

MS. LEV: Thank you.

BY MR. BRUENING:

Q. Now, on Tab 9, if you could go to

the second page of the exhibit, please.
A. On Tab 9.
Q. Sorry, for Tab 10. Excuse me.
A. All right. Tab 10. And the second page?
Q. Yes.
A. Okay.
Q. Now, it says under "Community Service Fee" that:

"This mandatory fee is charged to full-time Undergraduate students on the Charles River Campus."

Did I read that all correctly?
A. That's correct.
Q. What is the Charles River Campus?
A. It is one of three campuses that Boston University has in Boston, and it is where all undergraduate students take their courses.
Q. Okay. So, does this apply to all undergraduate students that take courses on that campus; is that fair?
A. That is correct. It's a mandatory fee.

Q. And then the next sentence reads:
"Under the direction of the Dean of Students, 100% of revenue collected through this fee is allocated directly to support student programs, which foster and engage the community."
Did I read that all correctly?
A. Yes.
Q. What's the community that's talked about here?
A. If you continue with that paragraph, it talks about the Student Allocations Board, Programming Council, and Residence Hall Association/Student Government, and the 500 student groups and organizations. So it is focused on undergraduate students.
MR. BRUENING: Can we just go off the record very quickly. My colleague has a difficulty getting into the Zoom call, so let's fix that real quick.
VIDEO TECHNICIAN: All right. The time is 12:06 p.m. and --
COURT REPORTER: Oh, she's here now. Kathryn? Are you talking about

MR. BRUENING: Sure. Is that correct, Ms. Court Reporter, please, that 9 is which one?
COURT REPORTER: As she said, Tab 9 is Exhibit 5. Tab 10 is Exhibit 6.
(Discussion off the record)
A. Is it all right for me to make a note as you're assigning exhibit numbers because I can't --
Q. Please do.
A. -- I can only see the PDF number.
Q. Please do. The reason why I use tab numbers is for your convenience. I'll just use both going forward.
So on Tab 9, Exhibit 5, could you turn to page 5, please. I apologize. I meant Tab 10, Exhibit 6, and that would be page 3. My apologies.
A. So I'm on page 5 of 9.
Q. Can you go to page 3 of 9 on Tab 10, Exhibit 6?
A. I'm on page 3 of 9, yes.
Q. And just read to yourself the

"Health & Wellness Fee" that goes over to page 4 of 9, and let me know when you're done.

A. (Document review.) I'm done.

Q. All right. On page 3 of 9, it makes reference to the Student Health Services clinic at 881 Commonwealth Avenue.

Do you see that?

A. I do.

Q. Is that on the Boston campus?

A. It is. It's on the Charles River Campus.

Q. And was that shut down? Excuse me. Was that shut down in spring of 2020?

A. It was temporarily converted to telemedicine, and then reopened in the middle of April of 2020 for in-person visits.

Q. And the Fitness and Recreation Center is also referenced in the last line.

Do you see that?

A. I do.

Q. Is that also on the Boston campus?

A. It is.

Q. And was that shut down during the pandemic?

A. Yes. All of the facilities were shut down in accordance with the governor's mandate.

Q. And that is also true for the satellite operations that is referred to here; is that correct?

A. "As well as the Fitness & Recreation Center and their satellite operations."

I'm not exactly sure what satellite operations are being referred to here. They can be outside the United States, and definitely outside of Massachusetts. So each one would have been subject to the local jurisdictions and ordinances in their location.

Q. All right. On Tab 10, Exhibit 6, let's stay there for now. Please go to page 6 and look at the "Sports Pass."

A. Okay. I see it.

Q. All right. And it says here in the first paragraph that:

"The Sports Pass will automatically be charged to your Student Account if you are a full-time

undergraduate or graduate student at
Boston University. The Sports Pass will
allow you admission to all home events
for ice hockey, basketball, lacrosse,
and soccer - over 70 games and a value
of over $600."
Did I read that all correctly?
A. You did.
Q. Okay. And then at the last paragraph of the page, it reads in the second sentence:
"To cancel your Sports Pass after
September 1, please bring your BU ID
card to the Agganis Arena Ticketing
Office to ensure your Sports Pass has
not been used."
Did I read that all correctly?
MS. LEV: Same objection as to scope and time.
Q. Did I read that all correctly?
A. You did.
Q. Okay. The Agganis Ticketing Office, where is that?
A. It's located adjacent to the

Fitness and Recreation Center.

Q. Okay. So fair to say that to cancel the sports pass, one would actually have to go to this physical office?

MS. LEV: Same objection.

A. What you are referring to is after September 1st, the person would have to go there. Before September 1st, they could cancel the sports pass by going to the student link, which is their online billing and payment and registration systems.

Q. Is it true that sports and ticket use were suspended during the pandemic at BU?

A. March 17th when we went to fully remote, the winter season was over, the spring season was mostly over. And so when we cancelled it on March 17th, there remained only a handful of ticketed events that the sports pass would apply to.

Q. And those ticketed events, did they take place?

A. No. There were, I believe, five men's and five women's lacrosse games that had to be cancelled due to the pandemic.

Q. Was it ever communicated to students prior to the pandemic that the sports pass fee would be charged even when the sports would be cancelled?

MS. LEV: Objection. Scope. Time.

A. The sports pass communication would be consistent with this website that said it was a fee charged to all students, which they could waive by going to the student link and opting out of it.

Q. Okay. Could you turn to Tab 9, Exhibit 5, please. And there go to page 7.

A. It begins with "Sports Pass" on the top of the page?

Q. That's right. And is it true that the first paragraph there -- well, the first paragraph that we saw and read out is missing from this description, as well as the last paragraph that outlines how to cancel the ticket; and those two are no longer there?

MS. LEV: Objection. Compound.

Q. Please answer.

A. The first paragraph -- I'm sorry,

removed?
MS. LEV: Objection. Lacks foundation. I think he would have to confirm that something is missing in order to explain why --
Q. You can answer.
A. I do not know why those two paragraphs would be different in these two documents.
Q. Do you know when they were removed?
A. I don't --
MS. LEV: Objection. Lacks foundation.
A. No. I was not aware of this change.
Q. Do you know if students were -- had the ability to waive the fee mid-semester?
A. Students would have the ability after September 1st to go to the Agganis Arena and request a refund based on their usage of the sports pass.
Q. How would they do that during the pandemic?

MS. LEV: I'm sorry, read that back, please.
(Record read as requested.)
A. They would have had to contact the arena ticket office by e-mail or telephone, since the state mandate did not allow people to travel and to do those things in person.
Q. And were students alerted to the fact that they would have to contact the office by those means?
MS. LEV: Objection. Vague. Time? When you say "during the pandemic," Counsel, do you mean Spring 2020 or do you mean something else?
MR. BRUENING: The witness can answer.
A. I'm not aware of a communication in the spring of 2020 concerning cancelling the sports passes because of -- online instead of in person because of the pandemic.
Q. Did students receive refunds for the sports passes after March 2020?
A. No --
MS. LEV: Objection. Vague. Do

you mean for Spring 2020?
MR. BRUENING: The witness can answer.
MS. LEV: If you understand the question.
A. For Spring 2020, refunds would not have been issued since all of our fees that are charged at the beginning of the semester are not refundable, according to our refund policy, after the first day of classes. The sports pass is an exception that students are allowed to cancel the sports pass.
Q. On Tab 10, Exhibit 6, can you turn to page 7 of 9, please.
A. You said Tab 10?
Q. Tab 10, Exhibit 6.
A. And which page?
Q. 7 of 9. Mr. Nicksa, do you see it?
A. I do.
Q. And it says there under "Student Services Fee":
"Proceeds from this mandatory fee are allocated to support student service

the sole source of support. It's general revenues of the university.

Q. Right. So fair to say that, for example, the George Sherman Union building gets some support from the student services fee, but it's not the only source of support for the George Sherman Union; is that correct? Is that what you're saying?

A. That is correct. The cost of the services is, in part, funded by fees but not exclusively.

Q. But does the fee go to anything other than what is listed here?

A. The student services fee would be for all student services. It's without regard to location. I'm not sure what your question is. I should have asked for clarification.

Q. Well, let me put it this way. Do you think this description is correct in terms of when it says that this fee supports student services "across campus including, but not limited to" some enumerated services?

A. The statement that we are looking at is correct.

Q. Okay. Now, the fees were not refunded to students who have to transition from in-person studying to remote studying; is that correct?

MS. LEV: Objection. Vague. Time?

MR. BRUENING: Spring 2020.

A. The student service fees for Spring 2020 were not refunded because the services were transitioned from in-person to online learning.

Q. Prior to March 2020, was it ever communicated to students that their fees or services would be nonrefundable even if they could not come to campus?

MS. LEV: Objection. Vague, as to time. Are you referring to before Spring 2020?

MR. BRUENING: The witness can answer.

A. The university reserves the right in its bulletins, all of its academic bulletins, to change our policies and our programs as a general reservation of rights for

all of our programs.

Q. What's the policy that changed in this regard?

A. The policy?

Q. Well, you just said that the university reserves the right in the bulletin to change policies. So what is the policy that was changed?

MS. LEV: Objection. Lacks foundation. He didn't say that one was changed. He said they reserve the right.

Q. Well, okay. The witness can answer.

A. I would like to have you pull up the disclaimer if we'd like to discuss how it allows to the situation.

Q. No. No. Your response wasn't that. It was that the university reserves the right to change the policy.

Do you know of any policy with regard to any fee, or just with regard to the student services fee, that was changed?

A. I can be more specific. The

Q. I mean, you're saying it's described that way in the documents we've been looking at. So if you could pull up Exhibit 6 or 5, Tabs 9 or 10.

A. Exhibit 6, document number 10, page 2 of 9 with the heading of -- under the heading of "Community Service Fee."

Q. Mm-hmm.

A. The second paragraph reads:

"Under the direction of the Dean of Students, 100 percent of revenue collected through this fee is allocated directly to support student programs, which foster and engage the community."

The last sentence of that community reads:

"Any student program funds not used by the end of current fiscal year may be carried over to the subsequent year with the approval of the Dean of Students."

Q. What program is this particularly?

A. I'm sorry, would you repeat that?

Q. Which programs are you talking to?

Which -- can you identify any?
A. The community service fee programs are described in general terms as the programs that are done by the student allocations board, programing council, and the resident hall associations and student government. These are the approximately 500 student groups and organizations on the Charles River Campus.
Q. Did these programs remain open during the -- after March 2020?
A. They change from in-person to remote programs, Zoom meetings.
Q. Were there any that required physical attendance, like sports programs?
A. The sports programs would be separate. Those were -- these programs, I believe with the exception of -- no, actually, these programs are all community student organizations and student groups. All of them would have -- could be conducted remotely.
Q. What communications to students prior to March 2020 existed that would alert you to the fact that fees would be charged even if the campus was closed?

MS. LEV: Could you read that back, please.

(Record read as requested.)

MS. LEV: Objection. Vague as to, among other things, "alert you." Also as to scope.

Q. Answer.

MS. LEV: If you understand.

A. Communications before March of 2020 that fees would continue to be charged if the university had to go from in-person to remote is not, to the best of my knowledge, specifically addressed because it's just a change of modality. Its service continued.

Q. Now, it says here that [As read]:

"Under the direction of the Dean of Students, 100 percent of revenue collected through this fee is allocated directly to the student" -- not directly, excuse me -- to support student programs and support."

Are you aware of the fact that the part of that sentence that reads "100 percent of revenue collected" was

Do you see it?

A. I do.

Q. And the second sentence there reads:

"A portion of this fee is allocated to the student's individual school/college for sponsored activities and services that contribute to the enrichment and spirit of college life."

Did I read that all correctly?

A. Yes.

Q. Is that an accurate statement?

A. It is what is written there. I'm not sure what your question is.

Q. Is this description of the community service/program fee accurate?

A. The community service fee is charged to undergraduate students.

The community service/program fee is a different fee. And I am trying to remember what the difference is, if it's graduate program. I would have to know more about the specific community service -- the way this is written, there are various program

fees. We have over 300 programs. There are different program fees.

The difference between all of these fees and the undergraduate community service fee is they don't carry over from year to year. The community service fee, if not spent, is carried over to be spent on those specific programs in a subsequent year. The rest are general revenue.

Q. Can you answer my question of whether this description that you see in front of you concerning the community service/program fee is accurate?

A. To the best of my knowledge, it is.

Q. Is this fee that we're discussing, is it charged to students taking online courses at Boston University?

A. I do not know. I cannot remember what specifically this fee or group of fees BU is referring to.

Q. Okay. Let's have a look at the "Continuing Student Fee," which is the next one. And there it says:

"This fee is assessed to graduate students who have completed their course requirements, while they are completing other degree requirements such as examinations, research, and thesis or dissertation work. Payment of this fee entitles the student to appropriate access to University libraries, research laboratories, academic staff, and other academic facilities for the purpose of completing degree requirements."

Did I read that all correctly?

A. Yes.

Q. The university libraries, laboratories, discussed herein, were those closed as of March 2020?

MS. LEV: Objection. Scope. Time. This is a document you represented as being the current BU website. For ease of reference, Counsel, for the rest of this deposition, any reference to this particular document I will object to the scope and time.

all the texts in these libraries became available online?

MS. LEV: Objection. Vague. When?

Q. The witness can answer.

A. The program that was put into place included contacting a librarian to have materials sent to students if they were not available online.

Q. Next is turn to on page 6, where it starts with the "Lab Fee."

Do you see it?

A. Yes.

Q. And this reads:

"This is a required fee for some courses for the use of facilities and/or materials in conjunction with coursework. Charges vary, and all questions should be directed to the individual schools."

Did I read that correctly?

A. You did.

Q. All right. Do you know what facilities are referred to herein?

MS. LEV: What?

Q. What facilities are referred to?

MS. LEV: Objection. Time. Scope. This is beyond Spring 2020.

A. In the spring of 2020, our academic and research buildings were closed based on the state order, and that would include laboratories in the academic and research buildings.

Q. And those facilities, those would be laboratories; is that what you're saying?

A. The Boston University teaching and research buildings are where the laboratories would be located, yes.

Q. Were there any communications to students made that this fee would not be refunded if the campus closed prior to March 2020?

A. Our tuition and fee refund policy states that no fees will be refunded after the first day of the semester.

Q. Other than the refund policy you referred to, were there any communications to students that made it clear that no refund for

this fee would apply if the facilities closed down?

MS. LEV: Objection. Time. Scope.

A. In March of 2020, there was no specific communication to students made about laboratory fees.

Q. And is the same true for the continuing student fee?

A. In March of 2020, I'm not aware of graduate students being told that the continuing student fee would be refunded or not.

Q. And is the same true for the community service/program fee?

A. I believe I've said I'm not familiar with the details of what those fees or program fees are, and I don't know specifically what it's referring to.

Q. Are you aware of any communications concerning that?

A. I do not understand what the fee that is being referred to, so I wouldn't know if communications were done.

Q. Do you know if any such communications took place with regard to the applied music fee?
A. In March of 2020, I am not aware of any communications concerning the applied music fee.
Q. Or prior to March 2020.
A. I'm not aware of any --
MS. LEV: I'm sorry, give me a beat to object. Objection. Lacks foundation. He indicated he doesn't have a detailed knowledge of that fee.
A. I'm not aware of any communication concerning the applied music fee that was done before March of 2020.
Q. Let's go to Exhibit 6, Tab 10, please.
A. Document 6, Tab 10. Okay. Exhibit 6.
Q. Do you have it in front of you?
A. I do.
MR. BRUENING: Okay. And I think I'll say for the record that the fees which are discussed in here, the applied

music fee, the community service/program fee, continuing student fee, convenience points, are identical to the ones that exist in Exhibit 5, which is today's website. I'm just making that point for the record. All right. Let's keep going.

MS. LEV: Counsel, is that a representation?

MR. BRUENING: Yes, it's a representation.

Q. I'd like to talk about the -- pardon me. Page 7 of 9 on -- we're in Tab 10, Exhibit 6.

A. 7 of 9, okay.

Q. Yes. Do you see where it says "Student Health Charge"?

A. I do.

Q. And there it reads:

"Full-time Charles River Campus students can usually use facilities at Student Health Services at no cost. There is, however, a nominal charge for certain services and tests that are not

students after March 2020?

A. I believe that these technology fees have various applications, so not all of which was software. So that some of the technology, say, in an engineering class could have been in addition to that. And so you have different fees for different programs.

Q. All right. So it's fair to say that some part of this was required to access certain pieces of hardware required for certain courses; is that an accurate statement?

A. Some technology fees for courses offered in the residential mode were for physical technologies that then had to be pivoted to remote teaching when we went remote on March 17th.

Q. So some hardware aspects became unavailable after March 2020 to students; is that correct?

A. The specific pieces which were on campus were not accessible. And the faculty were asked to come up with a different way of treating the same academic program curriculum results using remote tools.

Q. Do you know if any students were made aware or alerted to the fact that a technology fee would not be refunded after the -- prior to March 2020 in the event of the closure of the campus?

A. The same answer as the other services, which is I'm not aware of any communications dealing with that situation before March of 2020.

MR. BRUENING: All right. This is a good time to break for lunch.

MS. LEV: Very good, Counsel. So how long should we say? 45 minutes?

MR. BRUENING: 45 minutes works for me. I mean, if somebody ends of being late, I don't think we'll hold it against them. But let's aim for 45.

VIDEO TECHNICIAN: The time is now 1:37 p.m., and we are off the record.

(Proceedings recessed at 1:37 p.m. for the lunch break.)

A F T E R N O O N  S E S S I O N

(Whereupon the proceedings resumed at 2:25 p.m.; appearances same as noted.)

VIDEO TECHNICIAN: The time is now 2:25, and we are on the record.

BY MR. BRUENING:

Q. Mr. Nicksa, I hope you had a good lunch. Over lunch, did you talk to your attorney?

A. I did.

Q. All right. Now, I'd like to go back to the statement that you made that most of these fees are, as you called them, general revenue fees.

Where is it communicated, if ever, to students, or if anywhere to students, that these fees are general revenue fees?

A. I think it is implicit in the fact that the only fee that we specifically identify as one that is carried forward, if it's not used in the current year, is the community service fee; that everything else is unrestricted revenue of the university.

Q. Does BU say anything else about the use of fees to the students other than what it has said on this part of the website?

MS. LEV: Objection. Very vague.

Q. Answer.

A. So this website is a summary of the type of tuition and fees that the university charges. The details are program-specific and in the bulletin.

So if I were going to describe what the university communicates to students, you would have to look well beyond just this one nine-page website.

Q. Does the -- does it say anywhere on the bulletin that these fees are general revenue fees, to your knowledge?

A. It's my knowledge it does not describe them in any specific way. It's tuition and lab fees, et cetera. With the exception of mandatory versus not mandatory.

Q. Does BU communicate anything else to students about what each fee pays for?

MS. LEV: Objection. Vague.

Time.

A. So the description of the fees are in general categories, and the specific description of fees for any one student's program is course by course. We have the general fees that applied to everyone, and then you have the course-specific fees.

But BU doesn't communicate in general terms. It's the fees are based on what the student enrolls in and how the bill reflects their enrollment.

Q. So let's take the "Lab Fee," for example, also on page 4 which says that:

"This is a required fee for some courses for the use of facilities and/or materials in conjunction with coursework. Charges vary, and all questions should be directed to the individual schools."

Where does it say here that this lab fee might in fact not pay for any facilities or materials?

A. I'm sorry, would you read -- would you read that question again, please?

MR. BRUENING: Let's have it

reread, please.

(Record read as requested.)

MS. LEV: Objection.

Mischaracterizes testimony.

A. So this statement says the fee is for the use of facilities and/or materials in conjunction with coursework. Read that simple English to say it's paying for expenses related to the use of facilities and the materials for the course.

I think it's also, as we were reading this, I want to clarify something, which was this was -- we talked before about the technology fee, which I conflated with this laboratory fee. When we were talking about the, I think, course-specific costs, the technology fee in March of 2020 applied only to the law school students for their LexisNexis/West type access. We had gotten rid of all other technology-specific fees years ago. And what I was thinking about is this lab fee, which is defined as use of facilities and materials that are in conjunction with the coursework.

and I'll use a different term for the students who had been moved to online instruction.

Does that make sense?

A. It does.

Q. Okay. Now, the enrolled online students, do they pay for -- do they pay a health and wellness fee?

A. All full-time undergraduate students pay --

Q. I see you're looking at your screen somewhere. What are you looking at?

A. I'm looking at document -- Exhibit 6, document 10, the health and wellness fee that we were just describing --

Q. Sure.

A. -- to see if it says it.

I don't believe students enrolled in online courses will pay a health and wellness fee unless they were full-time students.

Q. And by "full-time," what do you mean? Do you mean in residence, present on campus?

A. A full academic load. But I'm not

sure that's a question I can... I think someone like Jean Morrison would know more specifically.

Q. So let's be clear here. Do you or do you not know if an enrolled online student would or would not have to pay the health and wellness fee?

A. I cannot recall off the top of my head if an online student pays a health and wellness fee.

Q. You don't know one way or the other.

A. I have known it at some point in time, but I do not recall at this moment.

Q. All right. Do you know if any enrolled online student is required to pay the applied music fee?

A. I do not know.

Q. Do you know if any enrolled online student is required to pay the clinical affiliation fee?

A. I do not believe that any Sargent College course with clinical affiliation is offered online, since they are very distinct

programs.

Q. Why not?

A. It's not a question I can answer. It's an academic curriculum development, a pedagogical question.

Q. What about the community service fee, do you know if enrolled online students have to pay that?

A. I do not know. I think, again, I am not familiar with the details of the fee structure for online students. They're traditionally Metropolitan College. It's a completely different cohort of students. So I'm not sure exactly which fees they pay and which they do not.

Q. I'll just keep going. The community service/program fee, do you know if enrolled online students have to pay that?

A. I do not.

Q. Do you know if enrolled online students have to pay the continuing student fee?

A. The continuing student fee is as described in document 10, Exhibit 6, is for

graduate students who have completed their studies but need to complete their dissertation or other coursework. So that continuing student fee is very specific to graduate post-doctoral and doctoral students.

Q. Is that a no?

A. To the best of my knowledge, there are no online programs that would have those type of students in them.

Q. I think we spoke about the health and wellness fee, but I just want to be clear. I think you said you don't know if any enrolled online student pays that, is required to pay that. But please confirm if I missed it.

MS. LEV: Objection. Asked and answered.

A. So if we could check my response before, that would be good.

Q. Okay. I think we have your response on the record.

There is -- I'm here on page 4 of Exhibit 6, which is Tab 10, there is such a thing as a "Health Insurance Charge." Do you know if enrolled online students have to pay

that?

A. Under Massachusetts law, all full-time students, as defined by Mass. law, are required to have proof of health insurance. So if they meet the enrollment registration threshold, they have to either provide proof of insurance coverage or pay the health insurance charge, which is the insurance product that is offered through the university to meet that state requirement.

Q. Is that true even if the online enrolled student is in a different country?

A. That's a legal question about how the law is written in Massachusetts. I don't know the answer to that.

Q. Okay. Do you know if any online enrolled student has to pay the lab fee?

A. Has to pay a lab fee?

Q. Yeah.

A. I'd have to look at the Metropolitan College bulletin to determine that. I, off the top of my head, do not know the specific course there would have been a lab would have applied to for online courses.

Q. Would there be health insurance that was offered under the health insurance charge, is that a general expense or is that separate?

A. In terms of a -- what type -- are you saying a general expense?

Q. Well, I mean, let me clarify. You mentioned that these fees are paid into what you termed general revenue. Is this health insurance paid out of that general revenue?

A. It is. It's a -- it is not specifically identified as an expense that is funded by that fee. It's, again, general revenue; general expense.

Q. The sports pass. Do you know if any online enrolled student has to pay for a sports pass?

A. Again, I'm not familiar with the details of the online program in a way that would allow me to answer the fee questions. I don't know what fees apply to them.

Q. Is any online enrolled student required to pay the student services fee?

A. The same response. I'm not

familiar with the requirements for the online fee structure.

Q. Do you know if any online enrolled student is required to pay the technology fee?

A. The only students that pay the technology fee are law students.

Q. Do you know if the law school offers online programs?

A. To the best of my knowledge, they do not.

MR. BRUENING: Conor, can I have Tab 13, please. No, scratch that. Can I have Tab 15, please.

MR. McDONOUGH: That's one-five?

MR. BRUENING: Correct.

MR. McDONOUGH: All right. It should be up in a second.

Q. Mr. Nicksa, let me know once you see it in front of you.

A. Yes, I have it.

Q. All right. Do you recognize this document?

A. Yes, I do.

Q. Before we go on to this document,

which is a -- it's a very dynamic change from year to year in the various programs.

So it's based on the program requirements for that community service type program.

Q. Okay. So thank you for the answer. Let's break this up a little bit.

So you mentioned that one aspect of the calculation of this fee includes how much was charged last year; is that correct? In the prior year.

A. That is a starting point for what the fee should be for the current year, yes.

Q. Correct. And then the other aspects that go into this calculation involve the requirements of, you know, things that this fee supports, including the student programs; is that correct?

A. For the community service fee, because it's specifically designated and only expended on those programs, yes. But that fee is --

Q. And -- sorry, go on.

A. That fee is unique.

Q. All right. And it's also the only fee that carries over from year to year; is that right?
A. That's correct.
Q. So if not a lot of money was expended in the prior year, are you going -- would BU lower the fee in the following year?
A. Which fee?
Q. The community service fee.
A. So long as the funds that were available we thought were adequate to provide the support for those programs for the next year, then we would not need to -- we could lower our fee because we'd be using the carryover funds as well as the current funds for that one year.
Q. Okay. Were students enrolled in 2020 spring term told that the community service fee would not be refunded if the campus was closed?
MS. LEV: Objection. Asked and answered I think.
A. The communications before the pandemic would not have included any

description, because the only reason that the question would arise was because of the pandemic. So, no, they were not told that the fees would be refunded if we closed. We didn't anticipate closing.

Q. All right. These programs discussed herein, do they meet on campus?

A. They met on campus before the pandemic required us to go remote, and then they met virtually after that.

Q. Did any of them, any of these programs, require facilities for their meetings or their activities?

A. To the best of my knowledge, they did not. They could all be hosted remotely using Zoom.

Q. Okay. You don't know of a single program that would require any amount of facilities or hardware to conduct its activities?

MS. LEV: Objection. Vague. You are asking him about any number of programs, and it's not clear to me which ones you're referring to.

Q. Answer.
A. There are over 500 programs. We'd have to look at them individually to determine whether or not there is any specific requirements for them, and whether or not the requirements allowed them to come up with a different way of doing what they did using the remote tools that we provided.
Q. I don't mean to be rude, sometimes there is a break in one's speech, and I assumed that you were finished. So I didn't mean to interrupt you.
These programs prior to March 2020, did they meet in fact in person to your knowledge?
A. To the best of my knowledge, they did meet, before the students went away on spring break, during the first half of the semester.
Q. Now, leaving the community service fee, let's go on to one of the fees that is general revenue, for example. Let's take the lab fee as an example. How is a fee like that calculated, the amount charged for it?

Q. To be clear, we're talking about the online programs here. So -- all right. So the costs that the school incurs here are, you said, salaries and wages, benefits, and technological expenses. Any others?

A. There is always an overhead associated with running a program, so but those are salaries and wages, the offices that the faculty use, the offices that the school uses. So it's very similar to a residential program in the fact that you have people -- people working on this.

Q. What about campus facilities? Do the online program -- does the cost of tuition include use of campus facilities?

A. The cost -- the tuition revenue does support the facilities that are used by the faculty and the staff that support the academic program. So, yes, facility expenses are a part of all academic programs.

Q. Now, is it fair to say that the tuition rates for online programs are lower than those for in-person programs at Boston University?

A. The tuition -- the online programs and the residential programs are different, and the tuition rates are also different. As the programs, the external comparisons are -- it's apples and oranges to compare an online program to a residential program because of the external factors as well.

Q. What do you mean by "external factors"?

A. Other schools offering similar classes at a different rate. You can't offer the same -- a similar class, a competitive course, at a significantly higher rate if it's online.

So that's one of the factors that go into how an online program is priced. It is based on what similar programs are priced at.

Q. Why is that? Why are online programs -- withdrawn.

Let's go to Tab 78, please. And that will be Exhibit 11.

(Document marked for identification as Nicksa Exhibit 11)

Q. And this exhibit has been

designated confidential. So as long as we talk about this exhibit, we'll have to seal the record.

Mr. Nicksa, let me know once you see it, please.

A. Yes, I have it.

Q. Okay. And this appears to be an e-mail dated March 18, 2019, from Joseph Grossi to Jorge Delva and Tiffany Tran; is that correct?

A. Yes.

Q. And if you go over to page -- well, do you know who these people are?

A. Joe Grossi I know. I do not know Tiffany Tran. I believe I know Jorge Delva.

Q. All right. And let's go over to page 2 of the attachment. Let me know when you see it.

A. I can see it.

MS. LEV: Counsel, objection. Before you ask him any questions about this, Mr. Nicksa is not on this document. Has he indicated that he knows what this is?

Q. Now, the second line in this document shows that the part-time per credit tuition in 2019 through '20 was $1,710.
Do you see that?
A. I'm sorry, I don't. Could you describe that again?
Q. Second line under "Academic Year Tuition Rates" right at the top.
A. Oh, okay. Before the word "Exceptions," the "Part-time (fall & spring)." Yes, I see that.
Q. Okay. My question to you is: What accounts for this difference in the per-credit tuition between 1,700 and those other rates, the 480, 905 and 710?
A. Metropolitan College is Boston University's extension school. So the programs it offers are similar to other extension programs at other institutions. And the courses numbered 100 to 599 are the entry-level to the mid-level courses. 600 to 999 are the more complex higher-level courses.
And extension schools have -- are very competitive on how they price their

offerings. So the reason for offering lower-priced programs would be because that's what the market price is for similar programs at other institutions.

Q. So for the 1,700 number, how is that calculated? How is that determined?

A. These are part-time classes in our other schools and colleges, since Metropolitan College has its own price structure for its extension classes.

And, again, for part-time students who are working full-time, have families and taking one or two classes, this is a competitive rate for those courses as compared to the Metropolitan College, which is a different course curriculum and different competition set with other schools.

Q. So to be clear, when you say the Metropolitan College is an extension school, where is it located?

A. Its offices are on the Charles River Campus in Boston. Much, if not the majority, of its offerings are online.

Q. Where are those classes streamed

from or recorded? Where are the presenting professors who present the online Metropolitan College courses?

A. Metropolitan College goes back a couple decades. And the courses are not -- are in realtime. They're not recorded and streamed. And they are offered using the tools similar to Zoom and other videoconferencing programs.

Q. I apologize, I may not have been clear. My question was the following: A professor giving an online lecture as part of Metropolitan College's offerings, where would he be or she be physically located? Can you answer that?

A. It could be in their office. Many of them are practicing professionals, such as lawyers who are teaching a single class in an area they practice in, and they might be in their office. Others may be -- choose to come to campus and use a classroom that's set up for online presentations.

Q. So is there any part of the Metropolitan College that is physically located

business calculator.

Q. One doesn't see a lot of these anymore.

All right. But going back to my earlier question, I didn't, respectfully, although I appreciate the answer, ask about last year's income, but on an average year. Is that a question you can answer?

A. It would be between 60 and 65 percent of our total revenue would be tuition and fees.

Q. And was that the case in the fiscal year ending June 30, 2020?

A. Yes.

Q. And was that also true for the fiscal year ending June 30, 2021?

A. Yes.

Q. What are other large sources of annual income for BU?

MS. LEV: Objection as to scope, to the extent it's outside this topic.

A. As a research university, the university has hundreds of millions of dollars of research support, sponsored research. We

also have other activities, such as housing, so room and board fees, which are another significant source of income.

Q. On average, how much is -- how big of a part of BU income that's room and board constitute?

A. It's roughly 10 percent of our income.

Q. And in 2020, did you refund unused portions of room and board?

A. We refunded on a pro rata basis the room and board for the period of time that we closed the dormitories as a result of the governor's emergency order. So it was just that for the number of days for the academic year that students were not allowed to be in the dormitories they received a pro rata refund.

Q. Did BU have any published policy in place prior to March 2020 for refunding rooming and board if the university shut down?

MS. LEV: Objection. Asked and answered. I believe he's already pointed you to the relevant policy.

Q. Answer.

A. Our refund policy is based on the start of the calendar, start of the fiscal -- excuse me, start of the semester. And then it is scaled each week for the first five weeks, and then there is zero refund after that.

Q. Did this policy change in any way in March of 2020?

A. The policy did not change. We chose to do the pro rata refunds, since it was beyond the students and the university's control to remain open, and the students had to go home. With the exception of the students who had -- it was unsafe to go home, and they stayed on campus, and they did not receive a refund since they were still living on campus and had a meal plan to support.

Q. So when BU granted this refund of room and board, was that a deviation from the refund policy?

A. Yes. It was an exception to the normal policy.

Q. Whose decision was it?

A. The president's.

That's what was -- a refund was not done, so therefore there was no discussion of using this money for anything other than its designated purpose, which is long-term endowment investment to support the university going forward.

Q. All right. We're on to page BU-685, please. And this is page 11 within the document at the bottom right.

A. Okay.

Q. And at the bottom, there are two tables, and which the line above it reads:

"The composition of net student tuition and fees revenue was as follows for the years ended June 30, 2020 and 2019, in thousands of dollars."

Did I read that correctly?

A. Yes.

Q. This shows that in 2020 BU received 1 billion 168 million dollars from tuition and fees revenue; is that correct?

A. That is net revenue, which is net of student financial aid.

Q. Okay. The paragraph above reads:

"Disbursements made directly to students for living or other costs are reported as an expense. Payments for student services are generally received prior to the commencement of each academic term and are reported as student deposits to the extent a student" -- excuse me -- "to the extent the services will be rendered in the following fiscal year."

Did I read that correctly?

A. Yes.

Q. And so paying for student services, is that education?

A. Yes.

Q. Okay. So, well, this makes sense. I mean, you have to pay tuition before you can enroll in the course, right?

A. No. You enroll first. And then based on your enrollment, the tuition is calculated.

Q. Right. But before -- sorry. Before you can register for a course, before you can actually commence the course, you have

to pay the money; is that right?
A. Tuition and fees are billed before the first day of classes, and students have to have settled their accounts in order to start the next semester, correct.
MR. BRUENING: Okay. Just give me a 30-second break.
(Pause in the proceedings)
BY MR. BRUENING:
Q. All right. Thank you for bearing with me. Can you hear me?
A. Yes.
Q. Mr. Nicksa, is there a policy that was published to students enrolled in Spring 2020 stating that there would be no exception to the refund policy?
MS. LEV: Objection. Vague. Are you asking whether there was a policy stating there wouldn't be a policy?
Q. Answer.
A. I recall in a communication from either Provost Morrison, or Provost Morrison and me, early in March the statement that we would not be issuing tuition refunds since