# Exhibit 35

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: BOSTON UNIVERSITY COVID-19 REFUND LITIGATION | MASTER FILE NO. 1:20-cv-10827-RGS<br><br>**Report of Hal J. Singer, Ph.D.**<br><br>**November 18, 2022** |

## TABLE OF CONTENTS

Introduction and Assignment ........ 3

Summary of Conclusions ........ 4

Qualifications ........ 9

I. Choice-Based Conjoint Analysis Can Be Used to Demonstrate Economic Injury and Assess Aggregate Damages Using Data and Methods Common to the Class ........ 11

- A. Choice-Based Conjoint Analysis Is a Standard Method Common to the Class ... 11
- B. CBC Analysis Enjoys Widespread Acceptance in the Education Literature ........ 13

II. My CBC Analysis Demonstrates Economic Injury to the Class ........ 15

- A. Design and Administration of CBC Survey ........ 15
- B. Calculation of Net Reduction in Value ........ 32
- C. Fair Market Value, Common Impact, and Aggregate Damages Using Traditional CBC Framework ........ 38

III. Incorporating More Complex Supply-Side Considerations ........ 44

- A. Evaluating Supply-Side Considerations in the Context of Higher Education ...... 44
- B. Aggregate Damages Using Linear Demand Approximation ........ 48

Conclusion ........ 51

Appendix 1 – Curriculum Vitae ........ 52

Appendix 2 – Materials Relied Upon ........ 64

Appendix 3 – Additional Tables ........ 71

Appendix 4 – Undergraduate CBC Survey ........ 72

Appendix 5 – Graduate CBC Survey ........ 80

## INTRODUCTION AND ASSIGNMENT

1. Plaintiffs in this case are undergraduate and graduate students who enrolled in in-person courses and programs at Boston University ("BU" or "Defendant") for the Spring 2020 semester.[1] Plaintiffs allege that approximately halfway through the Spring 2020 semester, BU transitioned all in-person classes to remote-only formats, ceased providing in-person instruction, and ceased providing access to its campus facilities and in-person resources.[2] Plaintiffs seek to represent a class of similarly situated students, all of whom attended BU's in-person programs and courses and had access to BU's campus facilities and resources for the first half of the Spring 2020 semester, and all of whom were denied those in-person classes and programs and access to campus (the "Class" or "Class Members").

2. Plaintiffs allege that they and members of the proposed Class entered into a contract with BU that obligated BU to provide in-person instruction and campus access, after Plaintiffs and Class Members had been accepted to BU's in-person programs, enrolled in in-person courses at BU, and paid BU the tuition and fees BU demanded to receive in-person instruction and access to BU's campus resources and facilities.[3] Plaintiffs met Plaintiffs' contractual obligation to BU by registering and paying for in-person courses.[4] Plaintiffs allege that BU did not met its contractual obligation to Plaintiffs and Class Members.[5]

---

1. The named plaintiffs are Julia Dutra, Gabriella Dube, Shakura Cox, Olivia Bornstein, Venus Tran, Natalie Silulu, and Valaauina Silulu. Second Consolidated Amended Class Action Complaint and Jury Demand, In re Boston University COVID-19 Refund Litigation, Master File No.: 1:20-cv-10827-RGS (D. Mass.), filed November 28, 2022 [hereafter *Complaint*], at 1.
2. *Id.* ¶2.
3. *Id.* ¶8, ¶12.
4. *See* BU's Responses to Plaintiffs' Requests for Admission ("RPRFA"), No. 2 (June 4, 2021) ("BU admits that all named plaintiffs in this litigation paid all tuition and mandatory student fees that they were billed for the Spring Semester 2020."); *see also, e.g.*, Declaration of Olivia Bornstein (June 2, 2022), ¶¶7-8; Declaration of Venus Tran (June 3, 2022), ¶¶7-8; Declaration of Natalie Silulu (June 2, 2022), ¶¶7-8; Declaration of Julia Dutra (June 3, 2022), ¶¶7-8; Dutra_000007; Silulu000026.
5. *Complaint at* ¶12.

3. The theory of harm in this matter, as alleged in the Complaint, is that BU failed to appropriately reimburse or otherwise compensate Class Members for failing to deliver "in-person instruction, and… related access, benefits, and services during the Spring 2020 semester due to the COVID-19 pandemic."[6] Plaintiffs' theory is that consumer injury (here, student injury) flows from the difference between what BU promised students in return for the student's tuition and mandatory fee payments—in-person instruction and access to campus facilities and in-person amenities and services—and what students actually received.

4. I understand that Plaintiffs will move to certify a Class of students who attended BU in person during the beginning of the Spring 2020 term whose classes were subsequently transitioned online.[7] I understand that BU charged the students in this Class both a tuition charge ("Tuition"), as well as various fee charges ("Fees").[8] I use the term "Tuition and Fees" when referring to these Class payments in aggregate.

5. Counsel for Plaintiffs has asked me to assess whether economic injury and aggregate damages to Class Members flowing from BU's conduct challenged in the Complaint (the "Challenged Conduct") can be reliably determined using data and methods common to the Class.

## SUMMARY OF CONCLUSIONS

6. There are two education "products" relevant to this case.[9] One product is an in-person university education provided through in-person classes and accompanied by access to a university campus, where students can participate in on-campus experiences and use on-campus

6. *Id.* ¶1.
7. *Id.* ¶147.
8. *Id.* ¶147.
9. Although education is arguably a service, the product/service distinction is not important in this matter. I will use the term "product" to refer to what Class Members purchased with their Spring 2020 Tuition and Fees.

facilities. For the remainder of the report, I term this bundle of in-person educational experiences the "On-campus Experience." The other product is a university education provided exclusively through online classes, videoconferencing, an online learning management system, and is *not* accompanied by access to campus events, in-person resources, or the use of on-campus facilities. I term this bundle of online educational experiences the "Online Experience." The purpose of this report is to quantify the loss in fair market value to Class Members following the involuntary "shift" from the On-campus Experience to the Online Experience at BU.

7. I conclude that economic injury and aggregate damages to the Class can be demonstrated under the theory of harm in this matter using Choice-Based Conjoint ("CBC") analysis. In **Part I**, I show that CBC is a common statistical research tool that can be used to objectively measure the fair market value of a service. In this case, CBC analysis can model Plaintiff's theory of harm using Class-wide data and methodologies. In **Part II**, I use a CBC analysis to objectively measure the difference in fair market value between the On-Campus Experience and the Online Experience. I calculate that the Online Experience has a fair market value that is 27.1 and 21.1 percent *less* than the On-Campus Experience for undergraduates and graduate students, respectively. I then calculate aggregate damages to the Class based on Spring 2020 tuition and the proportion of the Spring 2020 semester that was affected by the switch to Online. Damages to the Class sum to $60.45 million, composed of $41.68 million in damages to undergraduate Class Members and $18.77 million in damages to graduate Class Members. Finally, in **Part III**, I discuss alternative "supply side" considerations, namely whether the fair market values (and damages) I calculated based on student demand in Part II should be reduced by hypothetically allowing BU to reduce enrollment in a but-for world.

8. CBC analyses allow researchers to empirically measure the difference in people's

*valuation* of products with different features. (The term *valuation* is sometimes called "part worth," "utility", or "willingness to pay" in conjoint analysis.)[10] One powerful feature of CBC analysis is that it can value not only products, but also *individual product features* in isolation. That is, CBC can ascribe individual dollar valuations to product features that would normally not be priced in isolation. Because of this, CBC analysis is a standard economic approach that has been regularly employed to calculate damages to class members when class members purchase a product that has features that differ from those that were represented by a defendant to a purchaser at the point of purchase (*i.e.*, when a product has undisclosed attributes).[11] In this particular case, it can be used to measure the *difference* in students' valuation between the promised On-campus Experience and the Online Experience actually received. Importantly, by sampling from a population of students who *have already selected (or intend to select) an On-campus Experience in real life*, the CBC survey sample can be tailored to simulate the perspective of On-campus students at the time of enrollment for the Spring 2020 semester.

9. I designed and employed a CBC survey that determined the difference in value (in unitless "utils") between an On-Campus Experience and an Online Experience at BU. I convert

10. *See, e.g.*, Greg Allenby et al., *Calculating Reasonable Royalty Damages Using Conjoint Analysis*, 45(2) AIPLA QUARTERLY JOURNAL 223-254, 241 (2017) [hereafter Allenby] ("[T]he damages expert can then perform a statistical analysis—referred to as conjoint analysis—in which he uses each respondent's choices to determine how much each level of each attribute contributes to the respondent's overall valuation of the product. This contribution is referred to as the 'part-worth' of the attribute level… It should be noted that part-worths are measured in utils; in economic parlance, the term util is a measure of utility or value."). *See also* Lisa Cameron, Michael Cragg, and Daniel McFadden, *The Role of Conjoint Surveys in Reasonable Royalty Cases*, LAW360, 2 (2013) [hereafter McFadden et al. (2013)] ("We can then use these data points about each respondent's choices in a statistical analysis to determine how much each level of each product attribute contributes to customers' overall valuation of the product. This contribution is referred to as the "part-worth" of the attribute level. In the patent infringement context, the part-worths are a key input in the determination of the reasonable royalty. They are typically used to isolate the consumer's willingness to pay (WTP) for the patented level of the attribute."). N. GREGORY MANKIW, PRINCIPLES OF MICROECONOMICS 134 (8th ed. 2018) [hereafter MANKIW] ("A buyer's maximum is called her willingness to pay, and it measures how much that buyer values the good.").

11. *See, e.g.*, *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).

this value difference into a dollar percentage by calculating the discount from BU's base Tuition and Fees students would need to receive to be made whole following the shift to the Online Experience from the On-campus Experience (the "required discount"). The required discount can then be translated into the decline in fair market value following the shift. Class Member harm can then be measured using a standard "but-for world" damages model, which assesses the fair market value of what Class Members *would have* paid in Tuition and Fees in a "but-for" world where Class Members were fully informed of product they were purchasing during the Spring 2020 enrollment period.[12] Using this model, I show that in the "but-for" world, all Class Members would have been charged lower Tuition and Fees, and thus are commonly impacted.

10. I calculate aggregate damages to the Class under two methods. *First,* I calculate aggregate damages using the "traditional CBC framework," which assumes that supply of the product at issue (enrollment spots at BU) would have remained the same in the but-for world. That is to say: BU would *not* have reduced enrollment by *kicking out students or accepting fewer new students* in its programs in the face of a lower valuation by students following a switch to an Online Experience. In the context of this case, this assumption is reasonable. BU would not avoid significant expenses by reducing enrollment. A university's costs are largely fixed,[13] meaning

---

12. Theon van Dijk and Frank Verboven, *Quantification of Damages*, 3 ISSUES IN COMPETITION LAW AND POLICY 2331-2348, 2332 ABA Section of Antitrust Law (2008) ("The concept underlying most economic damages assessments is that of the "but-for" world. [T]he but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

13. S*ee, e.g.*, Deposition of Gary Nicksa (May 2, 2022) [hereafter Nicksa Dep.] at 74:6-75:18 (noting that BU's overall cost of operation is a budgeted annual increase, reflecting normal inflationary pressures, utility expenses, employee benefits, salaries and wages, and financial aid). *See also* Stephen Hoenack et. al., *The Marginal Costs Of Instruction*, 24(4) RESEARCH IN HIGHER EDUCATION 335-417, 409-410 (1986) ("This study has examined marginal instructional costs, particularly at the graduate level, in a large public research university. […] An administration is also concerned with ensuring that the costs incurred outside departments are covered, many of which are fixed over wide ranges of enrollments. These costs [] include libraries, maintenance of plant and equipment, and administrative overhead[.] The administration thus finds itself funding fixed costs with revenues that depend on enrollments. [..] [T]he expenses of maintaining core faculties [] do not vary much with enrollments and the relatively "fixed" costs incurred outside departments.").

individual students at the margin do not impose a variable cost to BU. Even if BU does incur a variable cost per student, and BU could have saved money in the short term by reducing enrollment while its services were strictly online, BU is a non-profit institution and its express educational mission does not permit it to engage in short-term profit-maximization at the expense of its educational one.[14] This means that BU would almost certainly have retained students even if it caused some sort of short-term loss. Furthermore, there is no evidence I am aware of that BU considered reducing enrollment in the actual world to save on costs, despite the fact that BU did pursue other cost-cutting measures during COVID.[15]

11. *Second*, although I do not believe it to be necessary or appropriate here, I show how damages can be calculated when accommodating a supply response using a linear demand assumption. This model accounts for the prospect that BU might *reduce its supply of enrollment slots* in response to the decline fair market value. Under this assumption, BU would have reduced enrollment by *kicking out students or accepting fewer new students* following a switch to an Online Experience. Typically, the prospect of reducing supply to counteract lower prices is an economic consideration for private sector firms selling products with a variable cost, which is not the case here. While I conservatively include this analysis for completeness (in the event BU claims and a factfinder believes that BU would reduce its enrollment in the but-for world), I do not believe it is the appropriate measure of damages in this matter because all available evidence suggests that the supply of enrollment slots for Spring 2020 would remain fixed.

12. I describe my methodologies, evidence, and analyses demonstrating each of my findings in detail below. All of the methodologies, evidence, and analyses I rely upon to reach

---

14. Nicksa Dep. at 206:24-209:3 (explaining that BU does not measure revenues in commercial terms, such as profits, nor does it have shares, shareholders or earnings per share).

15. *Complaint* at ¶4. (Showing that BU cut costs by freezing hiring, freezing salaries, cutting salaries, and laying off student employees.)

each of my conclusions are common to the Class as a whole. The opinions in this report reflect my review of evidence, data, and other relevant materials reviewed or analyzed to date. These materials are listed in Appendix 2 to this report. I reserve the right to supplement or amend my opinions should new materials or information become available to me.

## QUALIFICATIONS

13. I am a Managing Director at Econ One Research, Inc. ("Econ One"), an adjunct professor at the Georgetown University McDonough School of Business where I teach Advanced Pricing to MBA candidates, and am adjust professor at the University of Utah College of Social & Behavioral Science where I teach antitrust economics to graduate economic students and serve as executive director of the Utah Project on Antitrust and Consumer Protection.[16] My testifying experience has focused on antitrust and consumer protection matters, with a special emphasis in assessing common impact in class action litigation.

14. I am an applied microeconomist with an emphasis on industrial organization and regulation. In an academic capacity, I have published several books and book chapters, spanning a range of industries and topics, and my articles have appeared in dozens of legal and economic journals. My competition-related articles have appeared in multiple American Bar Association (ABA) Antitrust Section journals, and I have been a panelist at several ABA Antitrust events. In a consulting capacity, I have been nominated for antitrust practitioner of the year among economists by the American Antitrust Institute (AAI) for my work in *Tennis Channel v. Comcast*, and AAI named me as co-Honoree in the same category in 2018 for my work in *In Re Lidoderm Antitrust Litigation*.

---

16. *See Utah Project on Antitrust and Consumer Protection*, THE UNIVERSITY OF UTAH, *available at* https://utahproject.utah.edu/.

15. I have testified as an economic expert in state and federal courts, as well as before regulatory agencies. I also have testified before the House Judiciary Subcommittee on Antitrust and the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on the interplay between antitrust and sector-specific regulation. While I have served as expert for both plaintiffs seeking class certification and defendants opposing class certification, courts have relied on my work in certifying seven classes in antitrust matters,[17] and two classes in consumer protection matters.[18] In addition, with regard to consumer protection matters, I have specific experience and expertise using CBC to evaluate damages based on declines in consumer utility.

16. My full curriculum vitae appears as Appendix 1 to this report and reflects a full list of the cases in which I have served as a testifying expert since 2014 and a list of publications I have authored in the last ten years.

17. I have no financial stake in the outcome of this case. Econ One is being compensated for my work in this matter at my standard rate of $885 per hour whether Plaintiffs prevail or not.

17. *See Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) (Granting Plaintiffs' Motion for Class Certification); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008) (Granting Motion to Certify Class); *Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008) (Granting in Part Motion for Class Certification); *Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009) (Granting in Part Motion for Class Certification); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016) (Granting Motion to Certify Class); *In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) (Granting Motions for Class Certifications and Denying *Daubert* Motions); *Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781 (announcing the court's intention to grant the Plaintiffs' Motion for Class Certification). As of the time of this report, the court has not issued the written opinion certifying the class in *Zuffa*.

18. *See In re MacBook Keyboard Litigation*, Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021) (Granting Motion to Certify Class); *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal. Jun. 28, 2022) (Granting Motion For Class Certification and Denying *Daubert* Motions).

## I. CHOICE-BASED CONJOINT ANALYSIS CAN BE USED TO DEMONSTRATE ECONOMIC INJURY AND ASSESS AGGREGATE DAMAGES USING DATA AND METHODS COMMON TO THE CLASS

18. In this section, I demonstrate that CBC analysis can be used to calculate economic injury and assess aggregate damages using data and methods common to all Class Members. The two CBC studies I conduct in this report to evaluate Plaintiffs' theory of harm is consistent with the methodologies described below.[19]

### A. Choice-Based Conjoint Analysis Is a Standard Method Common to the Class

19. CBC analyses are a subset of Discrete-Choice Experiments ("DCE"), which are controlled survey-based experiments that objectively measure preferences through a series of "choice tasks".[20] Economists have used CBC analysis for decades to study and to empirically quantify consumer preferences. CBC analysis is grounded in economic modeling techniques pioneered by (among others) Nobel Prize-winning economist Daniel McFadden.[21] The economic modeling frameworks that provide the underpinning for CBC analysis have been widely used by economists to study markets for differentiated consumer products and services, in applications ranging from merger analysis to the competitive effects of introducing new products and services.[22]

20. Conjoint analysis has been widely adopted by the private sector. As of the early

---

19. CBC analysis can also be used to evaluate other theories of harm that Plaintiffs may pursue at summary judgment and/or trial.

20. A "choice task" asks respondent to select one of multiple alternative options. Typically, respondents choose between multiple products and a "no buy" option. *See, e.g.*, McFadden et al. (2013) at 2 ("Respondents to CBC surveys must typically perform between 12 and 20 "choice tasks," depending on the complexity of the product. In the cola example above, each choice task requires a respondent to choose his preferred alternative from among a "choice set" of four alternative product profiles. Each respondent choice provides a data point for the analysis. Hence, if 400 respondents take the survey and each respondent makes 20 choices, there will be 8,000 data points in the analysis.").

21. *See, e.g.,* Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) MARKETING SCIENCE 275-297 (1986); *see also* McFadden et al. (2013); Paul Green & V. Srinivasan *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice* 54 JOURNAL OF MARKETING 3-19 (1990).

22. *See, e.g.,* Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 RAND JOURNAL OF ECONOMICS (2000); *see also* Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) JOURNAL OF POLITICAL ECONOMY (2002).

1980s, one study determined that there were hundreds of commercial applications of conjoint analysis each year.[23] A 2005 study of the conjoint analysis usage estimated that there are tens of thousands of such applications annually.[24] Applied conjoint analysis frequently focuses on products and services marketed to a wide variety of consumers.[25]

21. CBC can be used to objectively quantify consumer "fair market valuations" of product features that are not priced separately.[26] CBC uses survey responses to quantify the tradeoffs that consumers reveal they are willing to make when selecting among different products comprised of different combinations of features.[27] The economic models underlying CBC analysis express the "utility," or unitless value, that a consumer derives from a particular product in terms of the salient features of that product. In other words, each product is expressed as a bundle of features, and each feature contributes something to the overall "net utility" that the consumer derives from the product. By selecting the most-preferred bundle of features among the choices

---

23. Green & Srinivasan, *supra*, at 3, citing Dick Wittnick & Phillippe Cattin, *Commercial Use of Conjoint Analysis: An Update* 53 JOURNAL OF MARKETING 91-96 (1989).

24. BRYAN K. ORME, GETTING STARTED WITH CONJOINT ANALYSIS: STRATEGIES FOR PRICING RESEARCH (2nd ed. Research Publishers 2005).

25. Green & Srinivasan, *supra*, at 3-4 ("Conjoint analysis continues to be popular….The large majority of conjoint studies pertain to consumer goods (59%) and industrial goods (18%)….New product/concept evaluation, repositioning, competitive analysis, pricing, and market segmentation are the principal types of applications."). *See also* VITHALA RAO APPLIED CONJOINT ANALYSIS, 133-136; 229-256. (Springer-Verlag 2014).

26. A "fair market value" is the value a consumer would assign a product provided they were *fully informed* about its characteristics and were free from undue pressure. *See, e.g.*, *Fair Market Value*, LII, CORNELL LAW SCHOOL (accessed Nov. 2022), *available at* https://www.law.cornell.edu/wex/fair_market_value, citing *United States v. Cartwright*, 411 U.S. 546 (May 7, 1973) ("[F]air market value (FMV) is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.").

27. Conjoint studies sometimes attempt to create "incentive alignment" mechanisms for their respondents by (for example), offering the respondent a positive probability that every stated choice will result in an actual transaction. However, as Professor McFadden has noted, experimental evidence is that people have difficulty understanding, accepting, and acting on the incentives in these mechanisms. Thus, it can be quite difficult in practice to ensure incentive alignment in a CBC, or to determine in the absence of strong incentives whether subjects are responding truthfully. Fortunately, there is also considerable evidence that while it is important to get subjects to pay attention and answer carefully, they are mostly honest in their responses irrespective of the incentives offered or how well they are understood." *See* Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis*, 10(1-2) FOUNDATIONS AND TRENDS IN ECONOMETRICS 1–144, 23-24 (2019).

presented to them—that is, the product that maximizes each survey respondent's net utility—respondents indirectly reveal the value they derive from individual features.[28] In this way, CBC enables the researcher to elicit consumers' valuation of an individual dimension of a multidimensional product. These unitless "util" valuations can then converted into dollar valuations using a price attribute, and from a dollar valuation into fair market value.[29]

22. CBC uses data and methods common to all class members, such as the students proposed as Class Members in this matter. The survey dataset that forms the basis for CBC analysis here is the same for all Class Members. The econometric techniques used to analyze the survey database here are likewise common to the proposed Class. Any data on supply-side factors here would likewise be common to all Class Members.

**B. CBC Analysis Enjoys Widespread Acceptance in the Education Literature**

23. Researchers regularly employ CBC analysis and broader DCE methodologies to investigate demand drivers for higher education specifically.[30] Below, I highlight two recent articles that informed the design, administration, and application of my CBC analysis described below: Duncan (2020)[31] and Manley *et al.* (2019).[32]

24. Duncan (2020) examined the effects of various levels of course delivery and cost

---

28. *See, e.g.*, Rao, *supra*, at 16-23.

29. McFadden et al. (2013). at 2 ("Conceptually, we can illustrate how a respondent's choices can be used to determine WTP using the cola example. Suppose that all features other than price and type of sweetener are fixed, and we observe that the respondent: (1) chooses (patented) artificial sweetener when it costs 25 cents more than cane sugar and (2) chooses cane sugar when artificial sweetener costs 50 cents more. From these results, we can infer that the respondent's WTP for artificial sweetener lies between 50 cents and 25 cents.").

30. *See* Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) JOURNAL OF HIGHER EDUCATION MANAGEMENT 35-43 (2020) [hereafter Duncan (2020)].; Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) JOURNAL OF EDUCATION FINANCE 232-252 (2019) [hereafter Manley et al. (2019)]; John T. Mann and Shida R. Henneberry, *Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes*, AAEA ANNUAL MEETING (2012); Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method*, 61 RESEARCH IN HIGHER EDUCATION 510-539 (2020).

31. *See, e.g.*, Duncan (2020) at 35-43.

32. *See* Manley et al. (2019) at 232-252.

attributes on consumers' preferences. The author determined student preferences associated with the following attributes: course delivery, tuition and fees, and federal CARES scholarship support. The study's results indicated that "course delivery is the most important criteria and face-to-face instruction is more important than CARES scholarship support and also as important as tuition and fees."[33]

25. Manley *et al.* (2019) surveyed the preferences of currently enrolled students "in a regional university in the southeastern U.S." regarding their valuation of online classes.[34] Using DCE analysis, the authors found that students expressed a preference for "a traditional face-to-face class over an online class."[35]

26. Both Duncan (2020) and Manley *et al* (2019) demonstrate that the results derived from a CBC or DCE survey can be applied to broader classes of individuals, as I will with the results of my own CBC methodology in this case.

27. My CBC analysis and product attribution descriptions are consistent with the survey methodologies described in these studies. My CBC attributes *Class Modality* and *Price per Semester* (described in further detail below) are consistent with the inclusion of the course delivery attribute and the tuition and fees attribute in Duncan (2020). My description of the *Campus Facilities Access* attribute (described below) is likewise consistent with several factors included in Manley *et al.* (2019), including "Less Interaction with instructor" and "Interaction with students."[36] For the foregoing reasons, my methodology is firmly tethered to the academic literature investigating demand for higher education, especially in the context of online learning.

---

33. Duncan (2020) at 41.
34. Manley et al. (2019) at 237.
35. *Id.* at 242.
36. *Id*. at 241.

## II. MY CBC ANALYSIS DEMONSTRATES ECONOMIC INJURY TO THE CLASS

28. In this section, I describe the two CBC surveys I conducted to quantify the impact of the Challenged Conduct on undergraduates and graduate Class Members. These surveys both took place in October 2022. I first describe the design and administration of the CBC survey. I explain how I use the CBC surveys to calculate the difference in each *individual* survey respondent's valuation of an On-campus Experience compared to an Online Experience. I show then how the *individual* differences in valuations among respondents can be aggregated to calculate the *net* difference in value between the On-campus Experience and the Online Experience. I then explain why this net difference in value calculated from the CBC survey is a reliable estimate of Class Members' net reduction in value in the Spring 2020 semester when they received the Online Experience for approximately the half a semester instead of the expected full semester of the On-campus Experience. Finally, I demonstrate how this reduction in value can be translated into fair market value, which can be used to calculate aggregate damages to Class Members.

### A. Design and Administration of CBC Survey

29. My surveys contain three distinct modules: The "Screener" module; the "Attributes" module; and the "Conjoint" module. The Screener filters survey respondents to ensure they are in the relevant target population. The Attributes module describes to eligible respondents the product—a "Semester Package"—as well as all of the possible features that compose it. The Conjoint module presents eligible respondents with random combinations of the attributes and elicited several selections to develop each respondent's "utility model," or their individual valuation of the attributes. The Screener and the Attribute modules are reproduced in the Appendix. A sample of the Conjoint module (as each question set is randomly determined) is also included in Appendix.

30. The first step of my CBC survey design was to define target populations from which to draw undergraduate and graduate representative samples. The Screener module in each survey filtered out respondents who did not belong to the target population through a series of population-validation questions. Although the promised On-campus Experience and the delivered Online Experiences were the same for both groups, I decided to sample undergraduate and graduates separately because by definition the undergraduate and graduate population cannot overlap. Graduate students must have already completed an undergraduate education to even be eligible for admission. Furthermore, the testing and admission requirements for graduate students and undergraduate students are different (high school GPA and SAT or ACT vs. undergraduate GPA and GMAT/LSAT/MCAT).

31. Within the undergraduate and graduate populations, the sample was designed to be limited to students who *had already selected (or intend to select) an On-campus Experience in real life.* This means that any respondents who have a revealed preference for an Online Experience from the outset are excluded from the sample. I did this to appropriately simulate the perspective of On-campus students at the beginning of enrollment in Spring 2020, since those students had already revealed that they preferred an On-campus Experience through their enrollment at BU's on-campus programs. In addition to filtering for respondents who have *already* enrolled in an On-campus Experience, I also allowed for respondents who say they *intend* to enroll in an On-campus Experience. This allows me to capture not only experienced students, but also those students who have no first-hand experience—similar to first year students in a program.

32. For undergraduates in this matter, I targeted eligible individuals who could

plausibly attend or have attended BU's in-person, on campus undergraduate program.[37] Respondents for this survey were individuals who:

- Have not recently taken a survey regarding online education;
- Reside within the United States;
- Have taken within the past five years, or plan to take within the next two years, undergraduate, in-person, on-campus courses at a college or university;
- Are between the ages of 18 and 30;[38]
- Have an unweighted high school GPA and SAT or ACT score consistent with BU's undergraduate admission criteria.[39]

33. For graduates in this matter, I targeted eligible individuals who could plausibly attend or have attended one of BU's in-person, on campus graduate programs. Respondents for this survey were individuals who:

- Have not recently taken a survey regarding online education;
- Reside within the United States;
- Enrolled within the past five years, or plan to enroll within the next two years, in an in-person, on-campus graduate program at a college or university;
- Are over the age of 18;
- Have an unweighted undergraduate GPA and standardized test scores on graduate admissions tests consistent with BU's graduate admissions criteria.[40]

---

37. I use data from Boston University's 2019-2020 submission to The Common Data Set (a collaboration data product in higher education supported by the College Board, Peterson's, and U.S. News & World Report, *see Common Dataset Initiative*, COMMON DATASET (accessed Nov. 2022), *available at* https://commondataset.org/. *See* Boston University Common Data Set 2019-2020, *available at* https://www.bu.edu/asir/files/2020/06/cds-2020.pdf [hereafter CDS]. I select the 2019-2020 CDS data as it covers the semester (Spring 2020) at issue in this case.

38. Qualtrics is unable to target respondents under 18 years of age. 99 percent of BU undergraduates are 25 or under. *See* CDS question F1. Five years after 25 equals 30. I therefore use an age range of 18 to 30.

39. 96 percent of all enrolled, degree-seeking, first-time, first-year (freshman) students at BU had a 3.25 or higher high school GPA. CDS question C11. BU accepted students who submitted either the SAT or ACT. 98 percent of students who submitted SAT scores scored 1200 or higher. CDS question C9. BU required students to take either the SAT or the ACT to apply. CDS question C8. BU accepted students who submitted either the SAT or ACT. 99 percent of students who submitted ACT scores scored 24 or higher. CDS question C9.

40. BU graduate schools typically require a 3.0 undergraduate GPA and do note require the GRE. *See, e.g.*, *BA/MS Program*, BU ARTS AND SCIENCES (accessed Nov. 2022), *available at* https://www.bu.edu/cs/undergraduate/academic-programs/bama-program/#:~:text=Application%3A,and%20cumulative%20GPA%20of%203.0 ("Students are eligible to apply if they are CS majors, have a major GPA of at least 3.5 and cumulative GPA of 3.0."); *How to Apply*, BOSTON UNIVERSITY COLLEGE OF HEALTH & REHABILITATION SCIENCES: SARGENT COLLEGE (accessed Nov. 2022), *available at* https://www.bu.edu/sargent/academics/departments-programs/health-sciences/master-of-science-in-human-

34. I phrased these population filters in way to conceal the specific topic of the survey until a respondent qualified.

35. Having qualified for the survey, respondents were moved to the Attributes Module, where I used language derived from BU's own marketing materials available to undergraduates and graduates in Spring 2020 to describe the university and the attributes the respondent would encounter in the survey. Respondents were first told that the topic of the survey was semester offerings at BU.[41] The language used to describe BU came directly from BU's "mission statement" as written on the university website.[42] The survey then explained the CBC product is a "Semester Package." The "Semester Package" includes all of a student's classes for the semester, in addition to different options and prices. Respondents were asked to assume that they were taking courses related to their major (or in the case of graduate students, their program).[43] Respondents were told how the survey would proceed, including that the upcoming module would ask them to "select the semester offerings that you would actually select in real life," or to select the option to purchase none of the offerings.[44] Respondents were then taken through the attributes of the semester

---

physiology/admission-requirements/ ("Minimum GPA for prerequisite coursework is a 3.0."). No further test results were required for masters and Ph.D. programs outside of those listed. For students pursuing an MBA, I required a GMAT score between 660 and 800. BU's current 25th percentile GMAT score is 660. *Boston University - Questrom School of Business*, THE PRINCETON REVIEW (accessed Nov. 2022), *available at* https://www.princetonreview.com/business/boston-university-questrom-school-business-1010974. For students pursuing a JD, I required an LSAT score between 160 and 180. BU's current 25th percentile LSAT score is 162. I round down to 160 to avoid tipping off the survey respondent that 163 may be a breakpoint. *Boston University - School of Law*, THE PRINCETON REVIEW (accessed Nov. 2022), *available at* https://www.princetonreview.com/law/boston-university-school-law-1035806. For students pursuing an MD I required a MCAT score between 515 and 528. BU's 2022 average MCAT score was 517. *Average GPA and MCAT Score for Every Medical School (2022)*, SHEMMASSIAN ACADEMIC CONSULTING (accessed Nov. 2022), *available at* https://www.shemmassianconsulting.com/blog/average-gpa-and-mcat-score-for-every-medical-school. This corresponds to the 94th percentile. I allow students of the 90th percentile and above to enter, which corresponds to a current score of 515. *Summary of MCAT Total and Section Scores*, AAMC (accessed Nov. 2022), *available at* https://students-residents.aamc.org/media/13381/download. Consistent with BU's admission practices for other programs, no further test results were required for masters and Ph.D. programs outside of those listed.

41. Appendix 4, Q11. Appendix 5, Q13.

42. *Mission Statement*, BOSTON UNIVERSITY (accessed Nov. 2022), *available at* https://www.bu.edu/about/mission-statement/.

43. Appendix 4, Q13-Q15. Appendix 5, Q15 and Q16.

44. Appendix 4, Q13. Appendix 5, Q15.

offerings available to them, beginning with the characteristics that, per BU's own marketing materials, BU offered its students during the Spring 2020 semester.

36. Respondents were then introduced to the two key attributes that would appear in the conjoint module: (1) Class Modality[45] and (2) Campus Facilities Access.[46] Class Modality and Campus Facilities Access are the two key attributes that, when combined, simulate either an On-campus Experience or an Online Experience in the conjoint. Recall that Plaintiffs allege that BU transitioned all in-person classes to remote-only formats and ceased providing access to its campus facilities, events, and in-person resources.[47] The Class Modality attribute captures the transition of in-person classes to remote-only formats, while the Campus Facilities Access captures the loss of access to BU's campus facilities, events, and in-person resources. Importantly, I *make no quality claims* regarding Class Modality. That is, I do not describe the "On-campus" modality as superior in any way to the "Online" modality. The survey made no description about the quality of either type of class and focused only on the objective modality of instruction and access to campus facilities criteria.

37. Respondents were also introduced to two "decoy" attributes to divert attention from the key attributes of interest. The purpose of these decoy attributes is to avoid focusing the respondent's attention solely on the key attributes, which could lead some respondents to respond excessively to the net attractiveness of a particular feature.[48] Accordingly, I added two additional decoy attributes: (3) Tutoring Services,[49] and (4) Career Services and Events.[50] Because

---

45. Appendix 4, Q16. Appendix 5, Q17.
46. Appendix 4, Q17. Appendix 5, Q18.
47. *Complaint* at ¶2.
48. *See*, e.g., Gerald Häubl, Benedict Dellaert & Bas Donkers, *Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search*, 29(3) MKTG. SCI. 438-455, 439 (2010). ("[C]onsumers respond excessively to the attractiveness of the currently inspected product, at the expense of all thers ("focalism")[.]").
49. Appendix 4, Q18. Appendix 5, Q19.
50. Appendix 4, Q19. Appendix 5, Q20.

respondents are limited in their cognitive ability to choose among a large number of options, CBC researchers generally limit surveys to six or fewer attributes.[51] As shown in TABLE 1 and TABLE 2 below, my surveys contain five attributes inclusive of the decoy attributes.

38. Finally, respondents were introduced to the final attribute, (5) Semester Cost.[52] The Semester Cost attribute allows me to empirically assign a dollar value to each respondent's individual utilities (explained in the next section). Respondents were informed that this price included all relevant university fees but did not include room and board (which is not at issue in this case). Importantly, respondents were asked to assume that they had the same access to financial aid or scholarships they actually received in real life (or anticipated receiving in the case of a prospective student). This was done to ensure that respondents would view the Tuition and Fee as *charges* in the same way that students did in real life. In that way, a student would internally factor in any financial aid when making their choice.

39. The full list of attributes presented to the undergraduate and graduate respondents is listed in TABLE 1 and TABLE 2. Aside from minor differences in attribute description, the only difference between the undergraduate and graduate attributes are different Semester Cost levels.

51. To avoid cognitive fatigue among respondents, conjoint researchers typically limit surveys to no more than six attributes, four to five products, and no more than 20 choice tasks. Even so, "other researchers argue that many more attributes and products can be included, as long as the subjects understand how the attributes affect them[.]" *See* Moshe Ben-Akiva, Daniel McFadden, and Kenneth Train, FOUNDATIONS OF STATED PREFERENCE ELICITATION: CONSUMER BEHAVIOR AND CHOICE-BASED CONJOINT ANALYSIS 23-24 (Now Publishers 2019) [hereafter, McFadden et al. (2019)] at 21. *See also* McFadden et al. (2013) at 2.

52. Appendix 4, Q20. Appendix 5, Q22.

TABLE 1: UNDERGRADUATE SURVEY CBC ATTRIBUTES

| Feature | Description | Levels |
|---|---|---|
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus<br>Online |
| (2) Campus Facilities Access | If students have access to BU's campus, campus facilities, and in-person events. | Access<br>No Access |
| (3) Tutoring Services | If students have access to tutoring through BU's Educational Resource Center. | Available<br>Not Available |
| (4) Career Services and Events | If students have access to career services and events through BU's Center for Career Development. | Available<br>Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $41,801 |
| | 125% of Base Price | $34,834 |
| | Base Price | $27,868 |
| | 75% of Base Price | $20,901 |
| | 50% of Base Price | $13,934 |

TABLE 2: GRADUATE SURVEY CBC ATTRIBUTES

| Feature | Description | Levels |
|---|---|---|
| (1) Class Modality | If classes take place in classrooms on-campus or online via an internet-based learning platform. | On-campus<br>Online |
| (2) Campus Facilities Access | If students have access to BU's campus, campus facilities, and in-person events. | Access<br>No Access |
| (3) Tutoring Services | If students have access to tutoring through BU's Educational Resource Center. | Available<br>Not Available |
| (4) Career Services and Events | If students have access to career services and events through BU's Center for Career Development. | Available<br>Not Available |
| (5) Semester Cost (Price for a "Semester Package") | 150% of Base Price | $43,642 |
| | 125% of Base Price | $36,368 |
| | Base Price | $29,095 |
| | 75% of Base Price | $21,821 |
| | 50% of Base Price | $14,547 |

40. A brief note on technical terminology: In a CBC survey, a "feature" is a category, which is composed of "levels," or values, that each feature can take. For example, the feature Color may have three levels: Red, Blue, and Green. In a survey design context, the term "attribute" is used to refer to a feature and all of its levels, collectively.[53] In the Attributes Module, I described each attribute to the respondent, meaning that they were informed of a feature (such as Class Modality) as well as all potential levels (such as On-campus or Online) before beginning the Conjoint Module. This allowed respondents to understand the entire array of potential options in the survey. If a respondent did not assert that they understood the attributes described to them, they were disqualified from the survey. The various attributes are described in further detail below.

53. In practice, the terms "feature" and "attribute" may be used synonymously with little loss of clarity. *Step 1: Defining Conjoint Features & Levels*, QUALTRICS (accessed Oct. 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/step-1-defining-conjoint-features-levels/.

41. *Class Modality*: Respondents were told that the semester offerings come in one of two class modalities: On-campus or Online. The Class Modality attribute was described to respondents as follows:

> You will be given the choice of two learning modalities for your classes for the next semester: **On-campus** or **Online**.
>
> **On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the BU campus in Boston, MA. In an **On-campus class**, you will attend a live lecture and have the opportunity to meet with your professors and classmates in person.
>
> **Online** classes will be available via an internet-based learning platform and will consist of both asynchronous and synchronous components. For example, you will have access to pre-recorded lectures at any time and you will be required to participate in group discussions or other online activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

These descriptions were provided to best reflect the choice between the two distinct options that BU students were presented in the real world prior to the Spring 2020 semester. This language did not vary between the undergraduate and graduate surveys. The description of the On-campus learning modality is derived from BU's policy descriptions available to potential students prior to the Spring 2020 semester.[54] The description of the Online learning modality is based on BU's online learning definitions and descriptions, which had been in use since at least June 2015.[55]

---

54. *Credit Assignment to Academic Courses*, BOSTON UNIVERSITY (accessed Nov. 2022), *available at* https://web.archive.org/web/20191020174137/https://www.bu.edu/policies/credit-assignment-to-academic-courses/ ("Course Types:[] Classroom-based: Scheduled contact occurs primarily face-to-face in a classroom setting.") ("Contact: Engagement of instructors with students to advance course objectives. Contact may take various forms: e.g., it may be face-to-face or online, synchronous or asynchronous[.]"); *see also Boston University's Office of Admissions Website* (Dec. 3, 2019), *available at* https://web.archive.org/web/20191203161638/http://www.bu.edu/admissions/ ("Study with leading experts… Learn next to standout students every day. Live in one of the world's most dynamic cities."); *Top 10 Reasons to Choose BU* (Dec. 21, 2019), *available at* https://web.archive.org/web/20191221155831/http://www.bu.edu:80/admissions/why-bu/facts-and-rankings/10-reasons/ ("[Y]ou'll not only meet award-winning professors, you'll engage with them.").

55. *Credit Assignment to Academic Courses*, BOSTON UNIVERSITY (accessed Nov. 2022), *available at* https://web.archive.org/web/20191020174137/https://www.bu.edu/policies/credit-assignment-to-academic-courses/ ("Course Types:[] Online: Scheduled contact is mediated entirely online.") ("Contact: Engagement of instructors with students to advance course objectives. Contact may take various forms: e.g., it may be face-to-face or online,

Again, I made no quality claims regarding Class Modality.

42. *Campus Facilities Access*: Respondents were told that the semester offerings come in one of two access options—Access or No Access:

> Your semester package may allow you access to **Campus Facilities.**
>
> If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to BU's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to BU-sponsored events, such as sporting events, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.
>
> If you select a semester package with without access to **Campus Facilities**, you will not have access to any of the campus facilities, groups, opportunities, or events described above. If you are taking **On-campus** classes, your access to BU's campus and facilities will be limited to the only the classrooms relevant to your classes.

The description of Campus Access was derived from BU's marketing materials that described its campus to prospective students.[56] No Access was described as a negation of the Campus Access

synchronous or asynchronous[.]"); *See also Id.* (BU's description online teaching terms, such as of "Online Lecture (asynchronous, with interactive work)", "Live Online Classroom with Instructor" and "Online Lab Activities/Problem-Solving Sessions: (asynchronous with student interaction)"); *See also Blackboard Learn*, BU TECHWEB (accessed Nov. 2022), *available at* https://www.bu.edu/tech/services/teaching/lms/blackboard/ ("Instructors manage all course materials online, where they are immediately available to students. Instructors can post documents, make announcements, send e-mail, create online assessments, and more. Students can access course documents, send files to their instructor, and access grades directly. Course materials are available 24/7, from any location, allowing students to learn when and where they like… Students can stay connected with instructors and classmates through e-mail, discussion boards, and blogs."); *A Quick Guide to Converting your Face-to-Face Pedagogical Approaches to the Online Environment*, BU CENTER FOR TEACHING AND LEARNING (accessed Nov. 2022), *available at* https://www.bu.edu/ctl/converting-face-to-face-pedagogical-approaches-online/ *See also Technology Requirements and Resources*, BOSTON UNIVERSITY (accessed Nov. 2022), *available at* https://www.bu.edu/online/online-learning/technology/ (discussing the "Learning Management System" and "Synchronous live classroom sessions").

56. *Experience BU*, BOSTON UNIVERSITY (accessed Nov. 2022), *available at* https://web.archive.org/web/20190823093717/https://www.bu.edu/hr/lifebu/experience_bu/ ("Boston University is more than a workplace—it's a community. [] BU Arts Initiative: The Arts Initiative supports faculty, student, and staff arts projects, making sure the arts are deeply embedded within the cultural and intellectual fabric of the University. [] BU Athletics: Attend a game and cheer on our nationally ranked Terrier athletic teams. [] College of Fine Arts: Home to talented undergraduate and graduate students, CFA holds music, theater, and visual art exhibitions throughout the year. [] FitRec Center: FitRec offers hundreds of classes and facilities you won't find elsewhere, including aerial

option.[57]

43. *Price per Semester*: Respondents were told that the semester offerings will be priced inclusive of tuition and fees for the semester but would *not* include room and board. Undergraduate respondents were instructed to assume that the prices shown are for a typical semester; these prices were based on BU's 2019-2020 undergraduate On-Campus tuition and fee rates, which correspond with the Tuition and Fee prices BU charged in-person undergraduates for the Spring 2020 semester.[58] The base price for a semester is equal to $27,360 in tuition plus $508 in fees, for a total of $27,868.[59] The range of prices shown will vary from 50 percent of base ($13,934) to 150 percent of base ($41,801), in steps of 25 percent, as shown in TABLE 3 below.

TABLE 3: PRICE PER SEMESTER FEATURE LEVELS, UNDERGRADUATE

| Discount/Premium | Price Shown |
|---|---|
| 150% | $41,801 |
| 125% | $34,834 |
| **Base Price** | **$27,868** |
| 75% | $20,901 |
| 50% | $13,934 |

Source: CDS 2019-2022

44. The prices shown to graduate respondents were based on BU's 2019-2020 on-campus Tuition and Fee rates for each graduate program, corresponding to prices BU charged in-person graduates for the Spring 2020 semester. The base semester price shown in the conjoint was the average of four BU graduate programs (general graduate, MBA, Law, and Medicine), whose

dance, rock climbing, and one of the best competition pools in Boston. [] Student Activities office: Faculty and staff are invited to become a student organization advisor for one of BU's nearly 500 student organizations. From community service to club sports, advising allows you to share your talents and explore new interests.").

57. In the case where a Class Modality: On-campus option appear alongside a Campus Facilities Access: No Access option, I included the caveat that respondents would still have access to their On-campus classrooms, but not access to other campus facilities access.

58. CDS question G1, showing that undergraduate full-time tuition is $54,720 per year, with full-time mandatory fees of $1,172 per year. This coverts to $1,710 and *See also Tuition & Fees*, BU OFFICE OF THE REGISTRAR (accessed Nov. 2022), *available at* https://www.bu.edu/reg/registration/tuition-fees/.

59. Equal to the sum of $54,620 and $1,710, divided by two. See my workpapers for details.

average tuition and fees were $29,095.[60] As in the undergraduate survey, the range of prices shown varied from 50 percent of base ($14,547) to 150 percent of base ($43,642), in steps of 25 percent, as shown in TABLE 4 below.

TABLE 4: PRICE PER SEMESTER FEATURE LEVELS, GRADUATE

| Discount/Premium | Price Shown |
|---|---|
| 150% | $43,642 |
| 125% | $36,368 |
| **Base Price** | **$29,095** |
| 75% | $21,821 |
| 50% | $14,547 |

Source: Average of individual graduate program tuition and fees. See my workpapers for details.

45. *Tutoring Services:* Respondents were told that the semester packages could include access to Tutoring Services. The undergraduate version of this attribute was described as:

> Your semester package may include **Tutoring Services**.
>
> If you select a semester package with **Tutoring Services**, for the next semester you will have access to tutoring through BU's Educational Resource Center. The Educational Resources Center provides four core tutoring programs: Peer Tutoring, Writing Assistance, Language Link, and Academic Skills Advising—and also connects students to academic resources across campus.
>
> If you select a semester package without **Tutoring Services**, you will not have access to these services.

This language was derived from BU's Educational Resource Center.[61] The graduate version contained additional language relevant to graduate students.[62]

46. *Career Services:* Respondents were told that the semester packages could include

60. Specifically, BU's MBA price is $28,206/semester; law is $28,491/semester; medicine is $31,930/semester; general graduate programs are $27,751/semester. *Id.* See workpapers for details. *See also Cost of Attendance for Graduate Schools*, BOSTON UNIVERSITY FINANCIAL ASSISTANCE (accessed Nov. 2022), *available at* https://web.archive.org/web/20200418142744/https:/www.bu.edu/finaid/aid-basics/cost-of-attendance/graduate/

61. *Educational Resource Center*, BOSTON UNIVERSITY (accessed Nov. 11, 2022), *available at* https://www.bu.edu/erc/.

62. Appendix 5, Q19. *Graduate Students*, BOSTON UNIVERSITY (accessed Nov. 11, 2022), *available at* https://www.bu.edu/erc/grad/.

access to Career Services:

> Your semester package may include **Career Services.**
>
> If you select a semester package with **Career Services,** for the next semester you will have access to services through BU's Center for Career Development. This includes career advising for your degree, helping you find internships/jobs, resume/cover letter help, and more. You will also have access to networking opportunities through professional associations, the exclusive alumni network, student organizations, programs and scholarships, and events such as job fairs, networking events, strategy workshops and mock interview sessions.
>
> If you select a semester package without **Career Services,** you will not have access to these services or events.

The language and services described above were derived from BU's Center for Career Development.[63]

47. The Conjoint module then asked respondents to select between semester packages with randomized combinations of the levels available within each attribute. In this survey, I asked each respondent to do this ten times.[64] For each choice task, a respondent was asked to select her preferred alternative from among a "choice set" of alternative semester offerings, with each choice defined by its attributes. In each choice set, the respondent was asked to select the semester offering that she would purchase if those were the only options available. Each choice task presented the respondent with three different semester offerings from which to choose. Importantly, in every choice set, respondents were given the option not to purchase any of the three semester offerings. Including such a "no buy" option allows a researcher to identify the willingness-to-pay of the marginal consumer—that is, the price at which the marginal consumer is indifferent between purchasing the semester offering and not purchasing it. In standard economic theory, the "marginal

---

63. *Center For Career Development*, BOSTON UNIVERSITY (accessed Nov. 11, 2022), *available at* https://www.bu.edu/careers/.

64. CBC survey respondents generally perform at most 30 "choice tasks" within the Conjoint module. *See* Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto, *The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments*, 26 POLITICAL ANALYSIS 112-119 (2018).

consumer" is the last person willing to enter the market and consume the good at that price, so the willingness-to-pay of the marginal consumer for a theoretical product represents the market price for that product. In other words, the marginal consumer sits at the intersection of the supply and demand curves.

48. I engaged Qualtrics to provide the sample respondents for the survey.[65] Qualtrics is an industry standard survey platform.[66] In addition to providing the platform to design the CBC survey, Qualtrics can be contracted to source the sample respondents for the survey.[67] I instructed Qualtrics to provide an internet-based sample of U.S. residents over the age of 18 with the relevant academic qualifications for BU undergraduate and graduate admissions, as described above. The Screener Module filtered out respondents who did not qualify. As described, I sampled undergraduates and graduates independently, drawing a sample of over 500 individuals for each of the graduate and undergraduate groups, which is typically considered the standard survey sample size threshold for CBC.[68]

49. To ensure response quality, before fielding the test to all 500 respondents in a group, I performed "soft-launch" of the survey to a small group of respondents before collecting the full sample. Doing so allowed me to evaluate the average time it took to complete the test, to

---

65. The conjoint survey was administered by Qualtrics, which regularly conducts such surveys on behalf of business schools and large corporations. *See Conjoint Analysis Software Tool*, QUALTRICS, *available at* https://www.qualtrics.com/core-xm/conjoint-analysis/.

66. Qualtrics has been relied upon by over 16,000 brands and 75 percent of the Fortune 100. Qualtrics is cited in various professional and academic publications. *See, e.g.*, William G. Zikmund et al., BUSINESS RESEARCH METHODS (with Qualtrics Printed Access Card) (Cengage Learning 9th ed. 2012).

67. *Online Sample*, QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/research-services/online-sample/. (Qualtrics' sampling method and incentive structure for respondents can be reviewed here.), *28 Questions to Help Buyers of Online Samples*, QUALTRICS (accessed Nov. 2022), *available at* https://www.iup.edu/arl/files/qualtrics/esomar.pdf.

68. Qualtrics provides their own estimate of the number of respondents needed given the number of levels across all features, the number of choice tasks, and a multiplier. Sawtooth software recommends a 500-user minimum. In practice, the 500 responded threshold often far exceeds traditional minimum sample size calculations. *See Conjoint Analysis White Paper*, QUALTRICS (accessed Oct. 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/#SurveyandSampleSize.

assess if respondents were confused by any of the question language, to identify errors in the survey logic, and to identify if respondents were being disqualified from the survey at particular validation questions. These "soft-launch" responses were included in the final sample. In addition, as a part of its standard sample offering, Qualtrics removes low quality or fraudulent responses from the survey.[69] These include, for example, responses from "bots," "speeders" who rushed through the survey, or respondents who attempted to take the survey multiple times.[70]

50. Summary statistics for both surveys are presented in Appendix 3. Broadly, the results of my surveys indicate that consumers are highly sensitive to the two key attributes, Class Modality and Campus Facilities Access. These results are consistent with the academic research reviewed in Part I.B above. Specifically, 80 percent of the 524 survey respondents considered in my undergraduate analysis expressed a preference for the On-campus Experience relative to the Online Experience.[71] 56 percent of respondents would have required a *higher* discount than the highest discount offered in the survey; in other words, 56 percent would have required a discount greater than 50 percent in order to tolerate the switch.[72]

51. Results are similar for graduate students. Approximately 74 percent of the 555 survey respondents considered in my graduate analysis expressed a preference for the On-campus Experience relative to the Online Experience.[73] Finally, approximately half would have required

---

69. *Response Quality*, QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/support/survey-platform/survey-module/survey-checker/response-quality/.

70. As this process is automatically handled by Qualtrics' staff, Qualtrics did not record or report number of these low-quality responses to me. They are not included in the final survey sample.

71. Specifically, 59 percent of undergraduate respondents preferred the On-campus modality, and 91 percent preferred having access to Campus Facilities. These 20 percent of respondents who expressed a preference for the Online Experience, even though they indicated they opted for an On-campus Experience in reality, would still have been harmed by virtue of paying a price higher than that which would have prevailed had the market been fully informed at the point of purchase.

72. Ten percent would have tolerated a 50 percent price increase in the presence of the switch. *See* fn. 83, *supra*, for how these respondent subsets are represented in my required discount calculations.

73. Specifically, 53 percent of undergraduate respondents preferred the On-campus modality, and 90 percent preferred having access to Campus Facilities. These 20 percent of respondents who expressed a preference for the

a discount greater than 50 percent.[74]

52. It bears noting that in any survey, there may exist some number of respondents who express preferences counter to initial expectations. For example, there may be some subset of respondents who express a preference for a higher price, all else equal. The academic literature explains that some purportedly "irrational" responses are to be expected in real-world surveys. Economists recognize that real-world survey participants sometimes provide responses that appear to deviate from the textbook economic model of a rational consumer. Nobel Laureate Daniel McFadden and his co-authors explain that "[c]onsumer choices from repeated menus in laboratory and market experiments *often deviate* from strict neoclassical theory."[75] The presence of such responses is hardly surprising, and does not invalidate my surveys, just as the residuals around a regression line do not invalidate the underlying relationships among economic variables. The literature cautions against disregarding seemingly irrational responses from CBC surveys or other Discrete Choice Experiments ("DCEs") as potentially counterproductive.[76] Doing so "may result

---

Online Experience, even though they indicated they opted for an On-campus Experience in reality, would still have been harmed by virtue of paying a price higher than that which would have prevailed had the market been fully informed at the point of purchase.

74. As with the undergraduate survey population, the relative proportion who would have tolerated a 50 percent price increase was significantly lower, at 14 percent.

75. McFadden et al. (2019) at 37. (emphasis added). *See also* McFadden et al. (2013) at 3 ("Irrational responses occur when a consumer makes a decision that violates one or more of economists' standard assumptions about consumer preferences. For example, a consumer makes an irrational choice if he prefers a good that costs more over the same good that costs less or if he chooses an inferior good over a superior good at the same price. Of course, irrational choices occur in other contexts, and they are a subject of study and debate among economists.").

76. Emily Lancsara and Jordan Louviere, *Deleting 'irrational' responses from discrete choice experiments: a case of investigating or imposing preferences?*, 15 HEALTH ECONOMICS 797–811, 797 (2006) [hereafter Lancsara and Louviere] ("This paper outlines a number of reasons why deleting responses from DCEs may be inappropriate after first reviewing the theory underpinning rationality, highlighting that the importance placed on rationality depends on the approach to consumer theory to which one ascribes. The aim of this paper is not to suggest that all preferences elicited via DCEs are rational. Instead, it is to suggest a number of reasons why it may not be the case that all preferences labelled as 'irrational' are indeed so. Hence, deleting responses may result in the removal of valid preferences; induce sample selection bias; and reduce the statistical efficiency and power of the estimated choice models."). *See also* Mandy Ryan, Verity Watson, and Vikki Entwistle, *Rationalising the 'Irrational': A Think Aloud Study of Discrete Choice Experiment Responses*, 18 HEALTH ECONOMICS 321–336 (2009) [hereafter Ryan et al.] ("Following an examination of adherence to the axioms of utility theory, the question is raised of what to do with respondents who fail such tests. Individuals may be dropped from further analysis, or analyse the response data with

in the removal of valid preferences; induce sample selection bias; and reduce the statistical efficiency and power of the estimated choice models"[77] For that reason, I do not exclude any of the respondents in my surveys for deviating from what we would *a priori* consider strictly rational response patterns.

53. With that said, the results of my survey indicate that the population of respondents exhibited utilities consistent with economic expectation. To illustrate, the chart below displays the average net utility with respect to percent discount for the populations of respondents in each survey. In each survey, the population of respondents strictly prefers lower prices to higher prices, as expected. Further, the relationship between discount and utility is approximately linear, lending support to my linear demand assumption described in Part III.B below.[78] These results are consistent with a net reduction in value between the On-campus Experience and the Online Experience.

and without 'irrational' respondents. Lanscar and Louviere (2006) discuss a number of reasons why deleting 'irrational' responses is not appropriate, arguing that removal of such respondents may also result in removal of valid responses. McFadden (1999) stated that to define responses as truly 'irrational', additional information about respondents' perceptions and beliefs (that inform the decision process) as well as attitudes, motives, and preferences is required. When this additional information is considered, apparently 'irrational' responses may be shown to be rational.").

77. Lancsara and Louviere at 797 ("Results of this nature that might be considered irrational are known to occur in the experimental setting. In many cases, they can reflect a specific behavioral response to the choice scenarios and may in fact be valid; thus, simply discarding them would be inappropriate. Indeed, the attribute non-attendance literature tells us that utility would be unaffected if respondents were simply ignoring certain attributes, so it is likely we are seeing some specific behavior here. Further, the notion of rational consumption in the case of risky health behaviors has been questioned."). *See also* John Buckell & Jody L. Sindelar, *The impact of flavors, health risks, secondhand smoke, and prices on young adults' cigarette and e-cigarette choices: a discrete choice experiment*, 114(8) ADDICTION 1427-35 (2019).

78. This relationship is consistent with a linear demand curve. A demand curve is a function of both price and quantity; this result informs the price component.

FIGURE 1: AVERAGE UTILITY BY DISCOUNT LEVEL




54. Importantly, all of the results and subsequent calculations of the CBC survey are a reliable estimate of *Class Member's own preferences and valuations*. The CBC was designed to objectively measure the theory of harm in this case by simulating the tradeoffs between an Online Experience and an On-campus Experience for Spring 2020 students. Further, the sample selected for the CBC surveys is representative of the relevant BU undergraduate and graduate populations. The results and subsequent calculations flowing from the CBC survey are therefore a reliable estimate of Class Members' valuation at the time of enrollment for the Spring 2020 semester. [79]

## B. Calculation of Net Reduction in Value

55. In this section, I calculate the net reduction in value switching from On-campus Experience to the Online Experience. I explain how the CBC surveys use "utility scores" to

79. As instructed by Counsel, my CBC and analyses does not measure, discuss, nor assume any difference in the educational quality of the Online and On-campus Experiences.

calculate the change in each *individual* survey respondent's valuation resulting from moving from an On-campus Experience to an Online Experience. I then show how the *individual* valuation of each of the respondents can be aggregated to calculate the *marketwide* reduction in value using standard methods. In the following section, I explain why this net reduction in value calculated from the CBC analysis is a reliable estimate of the reduction in fair market value.

56. Once all responses from the CBC survey are recorded, Qualtrics uses standard statistical methods to calculate each *individual* respondent's "utility" for every level of every feature.[80] That is, based on their responses to the Conjoint module, the CBC analysis calculates how much each respondent values the different feature components, and expresses this value as a utility. Utilities on their own have no direct meaning—they are an index that of a consumer's preferences. Utilities can either be positive or negative. A negative utility is sometimes called a "disutility."[81] The net utility of a product package is the sum of all of the individual utilities (and disutilities) of its components. When presented with multiple packages (including a "none of these options" package, which also has its own utility scores), the consumer selects the package with the highest net utility.

57. Unitless utilities can be converted into dollars using the Semester Cost attribute.[82] I can determine the dollar value a respondent places on each utility by looking at the difference in

80. Qualtrics software uses standard Hierarchical Bayesian Methods to converge on the coefficients that represent the value of each attribute for each individual. Hierarchical Bayesian Methods represent the current standard in CBC analysis. *See Conjoint Analysis White Paper*, QUALTRICS (accessed Nov. 2022), *available at* https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/.

81. For example, if a survey respondent tended to avoid Semester Packages that contained an Online Class Modality (unless offset by a positive feature, such as a large discount or access to Tutoring Services), the software would calculate that this individual had a low or negative utility (a disutility) associated with Online classes.

82. Allenby at 242 n. 42 ("Consumer WTP for a particular attribute level is determined by dividing the part-worth of the attribute level (which is measured in utils) by the part-worth of price in order to obtain a part-worth expressed in dollar terms.").

dollars and the difference in utilities between different Semester Cost levels.[83] This allows me to calculate the change in a respondent's valuation *in dollar percentage terms* resulting from the shift from the On-campus Experience to the Online Experience at BU. As explained above, I model the On-campus Experience where *Class Modality* is set to "On-campus," and where *Campus Facilities Access* is set to "Access." I model the Online Experience where *Class Modality* is set to "Online", and where *Campus Facilities Access* is set to "No Access." My CBC analysis reveals that both undergraduate and graduate students are highly sensitive to shifting from an On-campus Experience to an Online Experience. These results are consistent with the literature cited above, which finds that students place more value on face-to-face interaction.[84] I demonstrate this calculation below.

58. The CBC analysis provides me with each respondent's utility scores for every level of a feature. Using this raw data from the CBC, I first calculate for each respondent their individual net utility for the On-campus Experience (where *Class Modality* is "On-campus" and *Campus Facilities Access* is "Access") and the Online Experience (where *Class Modality* is set to "Online" and *Campus Facilities Access* is "No Access"). That is:

$$OnCampus\ Experience\ Net\ Utility = \left(Utility_{On-campus} + Utility_{Campus\ Access}\right)$$

$$Online\ Experience\ Net\ Utility = \left(Utility_{Online} + Utility_{No\ Campus\ Access}\right)$$

The net utility for the On-campus Experience is typically positive, and the net utility for the Online Experience is typically negative.

83. McFadden et al. (2013) at 2 ("Conceptually, we can illustrate how a respondent's choices can be used to determine WTP using the cola example. Suppose that all features other than price and type of sweetener are fixed, and we observe that the respondent: (1) chooses (patented) artificial sweetener when it costs 25 cents more than cane sugar and (2) chooses cane sugar when artificial sweetener costs 50 cents more. From these results, we can infer that the respondent's WTP for artificial sweetener lies between 50 cents and 25 cents.").

84. Duncan (2020) at 41 ("[C]ourse delivery is the most important criteria and face-to-face instruction is more important than CARES scholarship support and also as important as tuition and fees."). Manley et al (2019) at 242 ("students expressed a preference for 'a traditional face-to-face class over an online class.'").

59. I then determine how respondents' net utilities are changed from the shift from an On-campus Experience to an Online Experience. This "Online Shift Utility Change" is the *difference* in net utility between the On-campus Experience Net Utility and the Online Experience Net Utility. That is:

$$\begin{aligned} &Online\ Shift\ Utility\ Change \\ &\qquad = OnCampus\ Experience\ Net\ Utility - Online\ Experience\ Net\ Utility \end{aligned}$$

I find, consistent with the prior academic research, that the Online Shift Utility Change is typically negative, as respondents typically value the On-campus Experience at higher utility values than they do the Online Experience. This means that respondents are made worse off by the switch from an On-campus to Online Experience, all else held equal.

60. The next step is to convert the utility value associated with the Online Shift Utility Change into a dollar value. I can map utilities to dollars by calculating the "Price Change Utility," or the total utility associated with receiving a discount or premium off of the base Semester Cost. The Price Change Utility is defined as the difference between (1) the utility that the respondent derives from a semester offering when the Tuition and Fees are discounted or increased by a given amount, *x*; and (2) the utility she derives from an otherwise identical offering at the base Tuition and Fees. That is:

$$Price\ Change\ Utility_x = Utility_{Price\ Change\ x} - Utility_{Base\ Price}$$

61. With the Online Shift Utility Change and the Price Change Utility calculated for each respondent, I can then calculate each respondent's "required discount" (expressed in dollar percentage terms) to make them whole following the switch from the On-Campus Experience to the Online Experience. Put differently, this method calculates how much of a price discount in Tuition and Fees a respondent would need to be equally well off from the shift from the On-campus

to an Online Experience at BU.

62. Consider the following example: Assume a respondent *i* with the following utility scores:

TABLE 5: EXAMPLE INDIVIDUAL UTILITY SCORES

| # | Feature | Levels | Individual' i's Utility |
|---|---|---|---|
| [1] | Class Modality | On-campus | 0.5 |
| [2] | | Online | -0.5 |
| [3] | Campus Facilities Access | Access | 0.75 |
| [4] | | No Access | -0.75 |
| [5] | Semester Cost | Base Price | 0 |
| [6] | | 75% of Base Price | 2 |
| [7] | | 50% of Base Price | 3.5 |

Given those values, I could calculate On-Campus Experience Net Utility at 1.25 (0.5 + .75) the Online Experience Net Utility at -1.25 (-0.5 + -.75), and the Online Shift Utility Change at -2.5 (-1.25 – 1.25), as demonstrated below:

TABLE 6: EXAMPLE NET UTILITY SCORE AND SHIFT UTILITY CHANGE CALCULATIONS

| # | Term | Calculation | Utility |
|---|---|---|---|
| [8] | On-Campus Experience Net Utility | [1] + [3] | 1.25 |
| [9] | Online Experience Net Utility | [2] + [4] | -1.25 |
| [10] | Online Shift Utility Change | [9] - [8] | -2.5 |

We now know that individual *i* has a *negative* utility of -2.5 associated with the shift to the Online Experience. The next step is to compare this negative utility to the *positive* utilities associated with receiving a discount, and to find at what point individual *i* is "made whole"— that is, where her overall utility is back to zero. In this example, a 25 percent discount (75% of Base Price) is not sufficient to compensate the respondent for the disutility she experiences (-2.5 + 2.0 = -0.5, which is < 0). However, a 50 percent discount (50% of Base Price) is more than sufficient to compensate the respondent for the disutility she experiences (-2.5 + 3.5 = 1.0 which is > 0). We can infer that this respondent would require a discount of between 25 percent and 50 percent to compensate her

for the disutility resulting from the shift from the On-campus Experience to an Online Experience at BU.[85] A more precise discount can be calculated as the utility-weighted average of 25 percent and 50 percent, calculated using the linear relationship between the two discount levels:

$$y = mx + b$$

where $m$ is the slope and $b$ is the utility at the lower discount level. Here, $m = \frac{1.0-(-0.5)}{50\%-25\%}$ and $b = -0.5$. To find the distance from the lower discount level, $x$, at the point at which the respondent is indifferent, the relevant equation sets her utility $y = 0$, such that:

$$0 = \frac{1-(-0.5)}{50\% - 25\%}x - 0.5$$

Solving algebraically for $x$ yields approximately 8.3 percent. Therefore, the required discount for this respondent to be made whole and *accept* the shift from On-campus to Online is 33.3 percent (= 25 percent + 8.3 percent).[86] In other words, this fictional respondent would require the Online experience to be 33.3 percent cheaper than the base Tuition and Fees cost to be *indifferent* between an On-campus and the Online Experience.[87] The required discount is thus the change in value resulting from the shift. That is, if a respondent values an On-campus Experience at $100 and an

85. McFadden et al. (2013) at 2, discussing that a valuation for an attribute can lie between two price points.

86. My CBC methodology was designed conservatively to account for respondents who have a positive utility for the Online Experience, even though some or all of those students would not have been likely to enroll in On-Campus programs with Campus Access. Even those students, to the extent they *did* enroll in an On-Campus program with Campus Access suffered harm because market prices are set at the margin. That is, the market price for a product is determined by the most price-sensitive customers on the product's demand curve. As long as aggregate demand for BU's educational services decreased when BU switched to the Online Experience, every consumer (even those that individually valued the Online Experience) would have been charged lower Tuition and Fees in the but-for world.

87. Dr. McFadden explains that by including a "no buy" options (as I did in this survey), the valuation (or WTP) calculation can directly inform the valuation premium (here, a price discount) for specific product features. McFadden et. al. (2013) at 4 ("Defendants have argued that WTP results emerging from the conjoint analysis do not directly address the value of the patents in question. However, it is important to note that different research questions require different information about WTP. […] f the researcher wants to assess the price premium associated with the infringing feature, then he will need to develop a conjoint survey that assesses the WTP of the marginal consumer — i.e., the consumer who is indifferent between buying and not buying the infringing product. It is the WTP of the marginal consumer that is equivalent to the price premium associated with the infringing level of the attribute; this marginal consumer can be identified by offering respondents a "no buy" option.").

Online Experience at $66.67, the respondent would require a $33.33 discount to be made equally well off if they purchased an On-campus Experience and were then switched to an Online Experience.

63. Having calculated every respondent's *individual* required discount to be made whole, the final step is to aggregate the *net* required discount and change in valuation for all respondents in the survey. I do this by averaging the required discount across all respondents.[88] The average required discount is 27.1 percent for undergraduate respondents and 21.2 percent for graduate respondents. TABLE 7 shows the results of these calculations.

TABLE 7: CBC RESULTS: REQUIRED DISCOUNT TO MAKE RESPONDENTS WHOLE SHIFTING FROM THE ON-CAMPUS EXPERIENCE TO THE ONLINE EXPERIENCE

| | **Undergraduates** | **Graduates** |
|---|---|---|
| **Required Discount** (Shift from On-campus/Access to Online/No Access) | **27.1%** | **21.2%** |

## C. Fair Market Value, Common Impact, and Aggregate Damages Using Traditional CBC Framework

64. In this section, I demonstrate how the required discount calculated from the CBC—the dollar value of the net reduction in value following the switch—translates into an estimate of the change in fair market value of the Tuition and Fees BU charged Class Members. I then demonstrate that this change in fair market value leads to common impact to the entire Class using a standard "but-for world" damages model. This model assesses what Class Members *would have* paid in Tuition and Fees in a "but-for" world where Class Members were fully informed of the

88. *See* McFadden et. al. (2013) at 4 ("[I]f the researcher seeks qualitative information about how much consumers value the fringing level(s) of the attribute at issue, he can develop a conjoint survey that provides that average or median consumer WTP"). *See also* Allenby at 442. ("Plaintiffs' experts then estimated damages through a calculation that essentially multiplied average consumer WTP"). I cap respondents at the lowest (50 percent of base price) and highest (150 percent of base price) discounts/premiums in the event that they either could not have been made whole with the discount range presented or would have paid greater premiums than reflected in the survey options. These are respondents who have an extreme aversion to the Online Experience, or who indicated they would tolerate a more than 150 percent price increase for the Online Experience.

mid-semester switch from an On-campus Experience to an Online Experience.[89] I then calculate aggregate damages to the Class.

65. Above, I demonstrated how the net reduction in utility associated with the switch from the On-campus Experience to the Online Experience could be translated into a required discount measured in percentage terms. The final step is to calculate how this required discount translates into a reduction in the fair market value of the Tuition and Fees BU charged to each Class Member.

66. The required discount, calculated from the net change in utility, is simply a quantification of the downward shift in the demand curve for BU's educational product following the shift from On-campus to Online. This represents what BU's demand curve *would* have been during the enrollment of Spring 2020 in a "but-for" world where students knew, *a priori*, that they would be purchasing an Online Experience instead of an On-campus Experience.[90] The vertical distance of the shift is exactly equal to the required discount—27.1 percent for undergraduates and 21.2 percent for graduates—as shown in FIGURE 2 below.

89. Theon van Dijk and Frank Verboven, *Quantification of Damages*, 3 ISSUES IN COMPETITION LAW AND POLICY 2331-2348, 2332 ABA Section of Antitrust Law (2008) ("The concept underlying most economic damages assessments is that of the "but-for" world. [T]he but-for world represents the economic outcome that would have occurred without the agreement. The difference between this counterfactual world and the actual world provides the measurement of damages.").

90. Note this illustration shows the results of a *full* semester Online. I adjust by the *partial* semester that was actually Online in my calculation of damages.

FIGURE 2: ILLUSTRATION OF A DOWNWARD DEMAND SHIFT




67. Fair market value, or the market price *assuming* all participants have complete information, occurs at the intersection of the demand curve and the supply curve.[91] The traditional CBC approach is to assume that the supply curve is fixed (vertical) as shown in FIGURE 3 below.[92]

91. *See, e.g.*, MANKIW at 66 ("[S]upply and demand determine prices in a market economy[.]").

92. I explain why a fixed supply curve is an appropriate assumption in Part III, and how the fair market value and calculations of damages change if the supply curve is not fixed.

FIGURE 3: ILLUSTRATION OF MARKET PRICE GIVEN DOWNWARD DEMAND SHIFT AND FIXED SUPPLY




Thus, under the traditional CBC approach where the supply curve is fixed, *the shift in the market price, or the change in fair market value, is exactly equal to the required discount.* Moreover, this *reduction in fair market value affects all students by the same percentage*, because BU does not price discriminate and all students within a program are charged the same Tuition and Fees. That is, in the Spring 2020 semester, all students (even the ones who may individually prefer an Online Experience) paid a price represented by the "Market Price, Original Demand" point shown above. However, had all students known at the point of purchase that they would receive the Online Experience instead, the prevailing market price would have been "Market Price, Shifted Demand." Aggregate damages are thus borne by *all* students in the market, regardless of their own individual tolerance for any given price level, because they paid more than the market would have dictated had the market been fully informed.

68. Aggregate damages are calculated using the decline in value between an On-campus Experience and an Online Experience for the affected period across all Class Members. In this analysis, the decline in value experienced by Class Members is equal to the Tuition and Fees price reduction because the supply curve is fixed. Because I calculated the required discount in percentage terms, the percentage reduction in value can be applied regardless of whether the student received financial aid.[93]

69. I estimate BU's net Tuition and Fees for Spring 2020 Semester in TABLE 8 below using BU's "Board of Trustees Finance and Budget Committee's Fiscal 2021 Proposed Budget," which contains tuition, financial aid, and fee values for fiscal year 2020.[94] I estimate Tuition and Fees *net* of financial aid grants to students. I exclude any revenues associated with summer or online programs.[95] I estimate Spring 2020 Tuition and Fees for undergraduates at $316.5 million and graduates at $182 million. The details of these calculations are available in Appendix 3.[96]

TABLE 8: ESTIMATED SPRING 2020 NET TUITION AND FEES ($MILLIONS)

| | [1] | [2] | [3] = [1] - [2] |
|---|---|---|---|
| **Est. Spring 2020 Tuition and Fees** | **Gross** | **Aid** | **Net** |
| Undergrad (Incl. Wheelock) | $455.7 | $139.2 | **$316.5** |
| Graduate (Charles River + Medical Campus) | $224.8 | $42.8 | **$182.0** |

Source: BU-00005160.

70. Aggregate damages to the Class is the product of: (1) net student expenditures on

93. This is, in part, why I asked responded to consider their answers to the survey in light of the real world scholarships or financial aid they received or anticipated receiving. The tuition and damages calculations in this report are all net of financial aid. Similarly, to the extent BU claims that its Tuition and Fees are in any way subsidized, my use of a percentage reduction in the fair market value means that the post-subsidy price can be adjusted by the same amount.

94. BU-00005160.

95. For example, I exclude all tuition from the MET and Summer Term.

96. See Appendix for details. I start with the FY 2020 tuition and aid values for undergraduates (including the Wheelock school) and graduates (including Charles River Campus graduates, professional degree students, and Medical Campus students). I then decompose the undergraduate and graduate tuition to the Spring 2020 semester based on the Spring to Fall enrollment ratio for all undergraduates and graduates. Because fees are only reported in aggregate for FY 2020, I calculate a "fee-to-tuition ratio" and estimate gross fees for undergraduates and graduates. Finally, I sum the gross Spring 2020 tuition and fee values for undergraduates and graduates and then subtract aid to arrive at net Spring 2020 Tuition and Fees for both populations.

Tuition and Fees for On-Campus learning with Campus Access in the Spring 2020 semester at BU (estimated above); (2) the proportion of the semester during which students received only Online learning with No Campus Access; and (3) the reduction in Tuition and Fees required to make students whole, implied by the disutility calculations described above. While I establish damages in the aggregate herein, using this same formula on any individual Class Member would calculate that individual's damages as well. I show this calculation for undergraduate Class Members in the aggregate in TABLE 9 below. Damages for undergraduate Class Members are approximately $41.68 million.

TABLE 9: AGGREGATE DAMAGES - UNDERGRADUATE CLASS MEMBERS ($MILLIONS)

| [1] | [2] | [3] = [1] * [2] | [4] | [5] = [3] * [4] |
|---|---|---|---|---|
| **Spring 2020 Semester, Tuition and Fees** | **Portion of Spring 2020 Semester Subject to Online, No Campus Facility Access** | **Tuition and Fees Subject to Online, No Campus Facility Access** | **Required Discount** | **Damages** |
| $316.52 | 48.62% | $154 | 27.08% | $41.68 |

I repeat this calculation for graduate Class Members in TABLE 10 below. Damages for graduate Class Members are $18.77 million.

TABLE 10: AGGREGATE DAMAGES – GRADUATE CLASS MEMBERS ($MILLIONS)

| [1] | [2] | [3] = [1] * [2] | [4] | [5] = [3] * (1 - [4]) |
|---|---|---|---|---|
| **Spring 2020 Semester, Tuition and Fees** | **Portion of Spring 2020 Semester Subject to Online, No Campus Facility Access** | **Tuition and Fees Subject to Online, No Campus Facility Access** | **Required Discount** | **Damages** |
| $181.99 | 48.62% | $88.49 | 21.21% | $18.77 |

71. Thus, total damages for the Class sum to approximately $60.45 million ($41.68 million + $18.77 million). This calculation of aggregate damages is entirely classwide, in the sense that it does not turn on any individualized inputs. Calculating damages attributable to any individual Class Member is as simple as inputting such individual's net Tuition and Fees for the

Spring 2020 Semester into this same formula.

## III. INCORPORATING MORE COMPLEX SUPPLY-SIDE CONSIDERATIONS

72. The traditional CBC method described above, without further analysis, is an approach that has been widely accepted as appropriate to calculate damages in several types of litigation matters where customers receive products or services that differ from what they had been promised and expected to receive in exchange for the price they paid.[97] And it warrants repeating that this traditional approach does not "ignore" the supply side;[98] rather, it assumes that the supply curve for enrollment slots would have remained constant (vertical) had BU anticipated the decline in Class Members' Tuition and Fees valuation associated with the shift from the On-campus Experience to the Online Experience. BU did in fact supply a set quantity for enrollment, which Class Members actually purchased. Thus, as a matter of historical fact, the supply was fixed, Class Members were harmed on each unit of that constant supply, and the relevant question is by how much Class Members were harmed for those specific purchases. The traditional CBC approach is therefore consistent with a consumer-driven theory of harm.

### A. Evaluating Supply-Side Considerations in the Context of Higher Education

73. Nevertheless, for completeness, in this section I contemplate the possibility of an additional supply-side analysis. As a matter of theory, such analyses are relevant in understanding the behavior of the traditional short-term profit-maximizing firm; that is, a firm with some level of pricing power that could reduce its supply in the short run in response to a decline in demand. Theoretically, reducing supply in response to lower prices might be rational for a short-term profit

97. *See, e.g.*, *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018).

98. The supply side of the market is implicitly incorporated through the attributes and pricing levels shown to respondents, which are based upon actual market prices. Actual market prices reflect the behavior of rivals to BU and the competitive landscape within which BU's pricing models were developed.

maximizing firm because reducing supply would help such a firm to avoid incurring variable costs associated with producing its product. A reduction in supply might also affect the market and exert upward pressure on prices. Such theoretical principles are unlikely to apply fully in the context of not-for-profit higher education for three reasons: (1) not-for-profit colleges and universities maximize “profits” differently than typical for-profit private sector firms; (2) colleges and universities operate primarily under a fixed-cost or quasi-fixed-cost pricing model; (3) supply decisions were made and implemented on a broader basis than the single semester under consideration in this matter. Below, I discuss each of these in detail.

74. Economic literature analyzing enrollment and pricing optimization strategies for institutes of higher education acknowledges that a non-profit college or university faces a different maximization problem than a traditional profit-maximizing firm. Specifically, not-for-profit colleges and universities must incorporate additional factors, including, for example, considerations for a strong athletics program, diversity initiatives, and future earning potential of admittees. In other words, enrollment and pricing decisions are made for reasons other than profit.

75. Moreover, the academic literature on higher education acknowledges that “universities do not typically cover all their costs through tuition and other fees, and *it is difficult to state what universities are maximizing* or even who is doing the maximizing.”[99] The reasoning behind this ambiguity is related to the long-term incentives borne by institutions of higher education. The marginal net revenue generated by an individual student during his or her enrollment is not necessarily the expected total revenue generated by that student; colleges and universities also factor in considerations of, for example, future donative contributions based on

99. Michael Rothschild and Lawrence J. White, *The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs*, 103:3 JOURNAL OF POLITICAL ECONOMY 583-586, 583 (1995) (emphasis added).

the earning potential of each admitted student and his or her experience at the college or university.[100] By extension, universities face incentives to maximize not only their per-semester revenues, but also to "maximize 'prestige' by maximizing alumnus success in the long run"[101] In other words, "[i]f the institution maximizes the human capital acquired by each student enrolled in the short run, then enrolling the highest quality student body consistent with the institution's quality reputation and its financial resources can maximize alumni success. Hence, in the short run the institution maximizes the *quality* of each class enrolled."[102]

76. Given this incentive structure, colleges and universities do not consider short-term profit-maximization the same way that other economic actors do. In fact, if the goal is to maximize long-term revenues, then the optimal enrollment strategy is to set tuition levels to maximize the number of prestige-enhancing students enrolled, subject to capacity constraints, without losing prestige by admitting underqualified students.[103]

77. This incentive structure—maximizing enrollment while respecting capacity constraints—also follows from the cost structure associated with institutes of higher education. Broadly, economists recognize three distinct cost types faced by all firms, including college and universities. These three cost types are fixed costs, variable costs, and quasi-fixed or stepwise costs. Fixed costs are independent of enrollment and include, for example, maintaining a building, making payments on debt, etc. Variable costs are an increasing function of enrollment and include,

---

100. Glenn A. Bryan and Thomas W. Whipple, *Tuition Elasticity of the Demand for Higher Education among Current Students*, 66(5) JOURNAL OF HIGHER EDUCATION 560-574, 569 (1995) ("However, the output of the [optimization] model is only one factor in the tuition decision process. Net earnings maximization may not be the major objective of the institution, as nonprofit goals may have higher priority.").

101. Donald I. Bosshardt, Larry Lichtenstein, and Mark P. Zaporowsky, *A Model Of College Tuition Maximization*, 2(1) CONTEMPORARY ISSUES IN EDUCATION RESEARCH 53-70, 54 (2009)[hereafter Bosshardt et al (2009)].

102. Robert E. Martin, *Tuition Discounting Without Tears*, 23(2) ECONOMICS OF EDUCATION REVIEW 177-189 (2004).

103. Bosshardt *et al* (2009) at 59.

for example, software licenses and supplies for food services provided to students. Quasi-fixed or stepwise costs are costs that are fixed for certain enrollment levels and increase in a stepwise manner as enrollment levels reach certain thresholds, for example, an additional instructor must be hired for every 100 additional students enrolled. According to the economic literature on higher education pricing, "colleges are more likely to vary their net tuition price in order to attain a relatively *fixed* target enrollment… enrollment targets are likely to be set based on a college's residential hall capacity, instructional staff size, or available classroom and lab facilities."[104] That is, enrollment decisions are made with respect to targeting a specific capacity, rather than targeting a specific tuition level.

78. Finally, enrollment decisions are made on a long-term basis in at least two dimensions. *First*, students were admitted based on the expectation of an enrollment extending over multiple semesters.[105] *Second*, to a lesser extent, hiring decisions—both instructional and in an academic support capacity—were made on at least an academic year basis, with the possible exception of part-time lecturers.

79. Taken together, these three factors—(1) universities face incentive structures not necessarily compatible with traditional short-term profit maximization; (2) fixed costs are relatively higher than variable costs in the context of higher education and therefore universities are incentivized to enroll at their capacity constraint; and, (3) enrollment decisions are rarely

---

104. Ann M. Gansemer-Topf, Peter F. Orazem, and Darin R. Wohlgemuth, *Do Liberal Arts Colleges Maximize Profits?*, 88(1) SOUTHERN ECONOMIC JOURNAL 274-294 (emphasis added).

105. *See, e.g.*, Deposition of Jean Morrison (May 5, 2022) at 97:9-99:24 and Morrison Ex. 15 (reviewing the course catalog in the BU Bulletin for 2019-2020 and acknowledging that undergraduate students enrolled in Spring 2020 would need to complete a major to graduate and that students must obtain 128 credits to graduate, 48 of which must be from BU; Exhibit 15 at pages 2-3 also shows that full time undergraduate students in the CAS program must take at least 12 credits per semester, but are normally expected to take 16 credits each semester, and must take at least 4 semesters of second language courses to graduate); *see e.g.*, *id.* at 107:11-109:7 and Morrison Exhibit 17 (noting that 2019/2020 BU Bulletin explains that the master degree in social work includes 2 years of full-time study on the BU Charles River Campus in Boston).

limited to a single-semester outlook—imply that supply in the Spring 2020 semester at BU in terms of enrollment slots was likely fixed. Therefore, it is my economic opinion that the relevant supply under consideration is the fixed supply actually offered to students during that time frame.

**B. Aggregate Damages Using Linear Demand Approximation**

80. Despite economic reasoning in support of fixed supply, as described in detail above, as an alternative, an additional supply-side analysis that I will describe in this section allows for the possibility that BU could have reduced supply in the but-for world Tuition and Fees were lower—where Class Members were fully informed of the switch to an Online Experience and thus required a discount on Tuition and Fees. This analysis allows BU to respond to Class Members' lower demand for the education product by reducing the number of enrollment slots available to students. Such a reduction might have allowed BU to incur lower costs in the but-for world where Tuition and Fees were lower, by reducing the total variable costs attributable to students.[106] Again, as a practical economic matter, this is unlikely; it would not be in BU's long-term economic interests to remove students generally, and it would certainly not in in BU's long-term interests to remove students between the Fall 2019 and the Spring 2020 semester as a cost saving measure. Nevertheless, should a factfinder determine it is important to evaluate the impact that a supply reduction would have, this additional supply-side modeling can be added on to the CBC framework developed above.

81. Elementary economic models show how a decrease in demand in a competitive market leads to a decrease in price, via a movement along the market supply curve.[107] As explained

106. Supply-side analysis holds costs fixed between the but-for and actual worlds. I understand that BU likely did incur remote-transition costs. *See, e.g.*, Nicksa Dep. at 207:15-20. These expenses included purchasing Zoom licenses, investing in classroom technology, and the development of technical resources. *Id*. at 63:10-17, 206:21-207:20, 208:8-11. Such costs generally would have been similar whether or not BU had reduced supply.

107. *See, e.g.*, MANKIW at 80("How an Increase [or Decrease] in Demand Affects the Equilibrium[:] An event that raises [lowers] quantity demanded at any given price shifts the demand curve to the right [left]. The equilibrium price and the equilibrium quantity both rise [fall].").

below, standard economics also shows that firms respond to a decrease in demand by lowering their prices. Because the supply-side analysis depends on BU's own-price elasticity of demand, which depends on outside options for buyers, it takes into account the behavior of rival suppliers.[108]

82. To maximize profits, firms increase the price of their output until the markup of price over marginal cost is equal to the inverse of the own-price elasticity, a tenet of pricing theory sometimes referred to as the Lerner Index.[109] A profit-maximizing firm with pricing power chooses the price of its output—and thus the amount of output to supply—using this inverse elasticity rule, which can be written:

$$\frac{P-C}{P}=\frac{1}{E_D}$$

where $P$ is the price, $C$ is the marginal cost, and $E_D$ is the own-price elasticity of demand, defined as the percentage decrease in quantity demanded generated by a one percent increase in price. When $E_D$ is low, demand is said to be inelastic. The more inelastic is demand, the greater will be the markup of price over cost because consumer demand is less affected by price. As explained below, the inverse-elasticity formula allows one to calculate how a profit-maximizing firm with pricing power would adjust its prices in response to a decrease in demand.

83. I can use the output of the CBC analysis described in Part II above, combined with the Lerner Index, to calculate the decrease in BU's profit-maximizing price resulting from the shift from the in-person, on-campus BU experience to online, remote-only. Economists commonly

108. *See* William Landes & Richard Posner, *Market Power in Antitrust Cases*, 94 HARVARD LAW REVIEW 937, 944-945 (1981) (showing mathematically that a firm's own-price elasticity of demand is a function of the supply elasticity of competing firms).

109. *Id.*

employ linear approximations to the demand curve.[110] As demonstrated below, this approach takes BU's price-cost margins into account, without requiring any data on BU's costs. Moreover, it applies to any downward-sloping linear demand curve, regardless of its slope or intercept. Accordingly, I begin with a linear approximation to the demand curve for BU semester offerings. A linear demand curve is written:

$$Q = \alpha - \beta P$$

where $\alpha$ is the intercept of the demand curve, $\beta$ is the slope of the demand curve, $Q$ is the quantity demanded, and $P$ is price.

84. Recall from Part II above that the survey will yield the required decline in price to compensate consumers for the shift from the in-person BU experience to online. To sell the same quantity it did in the actual world, BU would have to provide this full shift downward in Tuition and Fees.

85. Faced with this decline in demand, BU's profit-maximizing response in this scenario (again, assuming *arguendo*, contrary to its mission, that BU was singularly focused on maximizing profit in the short term, which as described above is not an appropriate assumption) would be to adjust its price downward, *and* to reduce its supply. After accounting for these supply-side factors, the calculated decline in market price as BU shifted from On Campus programs with

110. *See, e.g.*, Jerry Hausman, Serge Moresi & Mark Rainey, *Unilateral Effects of Mergers With General Linear Demand*, 111(2) ECONOMICS LETTERS 119–21, 119 (2011) ("We derive the formula for the unilateral price effects of mergers of two products with linear demand in the general asymmetric situation. The formula uses the same information required to calculate upward pricing pressure in the 2010 Horizontal Merger Guidelines."); Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models*, 18(1) PRODUCTION AND OPERATIONS MANAGEMENT 95-113, 95 (2009)("We consider two substitutable products and compare two alternative measures of product substitutability for linear demand functions that are commonly used in the literature."); Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index*, 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003) [hereafter, Hausman (2003)] (using a linear approximation to the demand curve to calculate consumer surplus). More generally, linear approximations are standard in economics. *See, e.g.*, ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMETRIC MODELS & ECONOMIC FORECASTS 233 (McGraw-Hill, Inc. 3rd ed., 1991) [hereafter, Pindyk & Rubinfeld] ("[A]ny nonlinear function can be expressed as a [linear] Taylor series expansion."). *See also id.* at 510-11.

Campus Access to Remote programs with No Campus Access would be *one half* the prior amount. This is not a coincidence—it can be shown mathematically that this is a general property of linear demand curves: When the demand curve is linear, the decrease in the profit-maximizing price resulting from a downward vertical shift in the demand curve is equal to one-half of the distance of the vertical shift. This result holds for any linear demand curve, regardless of its slope or intercept.[111] Thus, pursuant to this alternative method—that I include conservatively even though the method incorrectly assumes colleges and universities approach pricing in a manner similar to sellers in other industries—my calculation of aggregate damages results in aggregate damages of half the amounts found where supply is held constant.

## CONCLUSION

86. For the foregoing reasons, I conclude that economic injury and aggregate damages can be reliably demonstrated using methods and data common the Class.

* * *

Hal J. Singer, Ph.D.:



Executed on November 18, 2022

111. Note that for a linear demand curve, $P = \alpha/\beta - Q/\beta$. If the intercept of the demand curve, $\alpha$, shifts downward to $\alpha'$, then the downward vertical shift is $\Delta P = [\alpha/\beta - Q/\beta] - [\alpha'/\beta - Q/\beta] = [\alpha - \alpha']/\beta$. The profit-maximizing price for a firm facing a linear demand curve is $PMAX = 0.5[\alpha/\beta + C]$. Therefore, the decrease in the firm's profit-maximizing price resulting from a downward shift in demand is $\Delta PMAX = 0.5[\alpha/\beta + C] - 0.5[\alpha'/\beta + C] = 0.5[\alpha - \alpha']/\beta = 0.5\Delta P$. *See also* Jerry Hausman & Gregory Leonard, *Efficiencies from the Consumer Viewpoint* 7 GEORGE MASON LAW REVIEW 707 (1999) (solving for the pass-through rate when a monopolist faces a linear demand curve).

## APPENDIX 1 – CURRICULUM VITAE

**Hal J. Singer**

Econ One Research
Suite 510 805 15th St., N.W.
Washington, D.C. 20005
Phone: 202.312.3065
hsinger@econone.com

**Education**

Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics

B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

ECON ONE, Washington, D.C.: Managing Director 2018-present.

UNIVERSITY OF UTAH, Salt Lake City, UT: Adjunct Professor August 2022 - present.

**Employment History**

GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020, 2021, 2022

ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.

NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.

EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.

CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.

LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.

U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *In re Lidoderm Antitrust Litigation*, Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment? An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co- authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).

**Journal Articles**

*The Abuse of Offsets as Procompetitive Justifications: Restoring the Proper Role of Efficiencies After Ohio v. American Express and NCAA v. Alston*, GEORGIA STATE LAW REVIEW (2022), co-authored with Ted Tatos.

*Antitrust Anachronism: The Interracial Wealth Transfer in Collegiate Athletics Under the Consumer Welfare Standard*, ANTITRUST BULLETIN (2021), co-authored with Ted Tatos.

*Competing Approaches to Antitrust: An Application in the Payment Card Industry*, 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies*, COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements*, ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun)*, COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard*, 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?*, ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About*, ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission*, INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases*, COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co- authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

**Expert Testimony Since 2012**

Federal Trade Commission v. Meta Platforms Inc., et al, Case No. 5:22-cv-04325-EJD (N.D. Cal.)

In Re: Broiler Chicken Growing Antitrust Litigation (No. II), Case No. 6:20-MD-02977-RJS-CMR (E.D. Ok).

Fusion Elite All Stars et al v. Varsity Brands, LLC et al, Case No. 2:20-CV-03390 (SHL-tmp) (W.D. Tenn.)

In Re: Pork Antitrust Litigation, Case No. 0:18-cv-01776 (JRT-HB) (D. Minn.)

(Im)Balance of Power: How Market Concentration Affects Worker Compensation and Consumer Prices (U.S. House Committee on Economic Disparity and Fairness in Growth)

In re Google Play Consumer Antitrust Litigation, Case No. 3:20-cv-05761-JD

(N.D. Cal)

Reviving Competition, Part 1: Proposals to Address Gatekeeper Power and Lower Barriers to Entry Online (U.S. House of Representatives Subcommittee on Antitrust)

Breaking the News – Journalism, Competition, and the Effects of Market Power on a Free Press (U.S. Senate Subcommittee on Competition Policy)

In Re: London Silver Fixing, Ltd. Antitrust Litigation, Case No. 1:14-md-02573-VEC (S.D. N.Y.)

In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, Case No. 19-md-02913-WHO (N.D. Ca.)

Paul Weidman et. al v. Ford Motor Company, Case No. 18-cv-12719 (E.D. Mich.)

Leinani Deslandes et al v. McDonald's USA, LLC, Case No. 17-cv-04857 (N.D. IL)

In Re: Macbook Keyboard Litigation, Case No.: 5:18-cv-02813-EJD (N.D. Ca.)

Estate of Beverly Berland v. Lavastone Capital LLC, Case No. 1:18-cv-02002-CFC (D. Del.)

Donald Conrad et al. v. Jimmy John's Franchise LLC, et al., No. 3:18-cv-00133-NJR (S.D. Ill.)

Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al., No. 18-01994 (FLW)(TJB) (D. N.J.)

In Re GSE Bonds Antitrust Litigation, No. 1:19-cv-01704-JSR (S.D. N.Y.)

beIN Sports, LLC v. Comcast Cable Communications, LLC, File No. CSR-8972-P (FCC)

Chelsea Jensen, et al. v. Samsung Electronics et al., Court File No. T-809-18 (Federal Court in Canada)

Estate of Phyllis Malkin v. Wells Fargo Bank, N.A., No. 17-cv-23136 (S.D. Fl.)

In Re Capacitors Antitrust Litigation, Master File No. 3:14-cv-03264-JD (N.D. Ca.)

In re Foreign Exchange Benchmark Rates Antitrust Litigation, Case No. 1:13-cv-

07789-LGS (S.D. N.Y.)

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST USA, Inc., No. 01-17-0004-3049 (American Arbitration Association)

Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.)

The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-cv-2866 (S.D. Oh.)

Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company, Case No. 17-cv-318 (W.D. Wis.)

Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039 MBS (Cal. Fresno)

In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-WHO (N.D. Cal.)

Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680 (AJN) (RLE) (S.D. N.Y.)

Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al., Case No. 2014-cv-254012 (Ga. Super.)

In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-EMC (N.D. Cal.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.)

Sun Life Assurance Company of Canada v. U.S. Bank National Association and Larry Bryan, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.)

In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries, File No. EB-15-MD-005 (Federal Communications Commission)

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-CV-01509-RBD-DAB (M.D. Fla.)

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.)

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n)

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.)

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board)

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission)

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.)

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.)

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.)

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission)

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission)

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation)

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association)

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.)

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada)

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.)

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce)

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.)

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.)

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.)

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee)

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.)

Game Show Network, LLC v. Cablevision Systems Corp., File No. CSR-8529-P (Federal Communications Commission)

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc., Case No. 2:06-cv-02768-MSG (E.D. Pa.)

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.)

**Memberships**

American Economics Association

American Bar Association Section of Antitrust Law

**Reviewer**

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

## APPENDIX 2 – MATERIALS RELIED UPON

### BATES DOCUMENTS

BU-00005160

Dutra_000007

Silulu000026

### DEPOSITIONS

Deposition of Gary Nicksa (May 2, 2022)

Deposition of Jean Morrison (May 5, 2022)

### LEGAL DOCUMENTS

*Cung Le, et al. v. Zuffa, LLC d/b/a Ultimate Fighting Championship*, Minute Entry, 2:15-cv-01045-RFB-BNW (D. Nev. Dec. 10, 2020), ECF No. 781

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018)

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018)

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 665 (N.D. Ga. 2016)

*In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal. Jun. 28, 2022)

*In re Lidoderm Antitrust Litig.*, No. 12-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)

*In re MacBook Keyboard Litigation,* Case No. 5:18-cv-02813-EJD, 2021 WL 1250378 (N.D. Cal., Mar. 8, 2021)

*Johnson v. Arizona Hosp. and Healthcare Assoc.* No. CV 07-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. July 14, 2009)

*Meijer, Inc. v. Abbott Laboratories*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)

*Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872 (9th Cir. 2012)

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.*, 262 F.R.D. 58 (D. Mass. 2008)

*Southeast Missouri Hospital and St. Francis Medical Center v. C.R. Bard*, No. 1:07cv0031 TCM, 2008 WL 4372741 (E.D. Mo. Sept. 22, 2008)

*United States v. Cartwright*, 411 U.S. 546 (May 7, 1973)

**LITERATURE**

Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) Journal of Political Economy (2002)

Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 Rand Journal of Economics (2000)

Betul Lus & Ana Muriel, Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models, 18(1) PRODUCTION AND OPERATIONS MANAGEMENT 95-113 (2009)

Bryan K. Orme, Getting Started with Conjoint Analysis: Strategies for Pricing Research (2nd ed. Research Publishers 2005).

Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) Marketing science 275-297 (1986)

Emily Lancsara and Jordan Louviere, Deleting 'irrational' responses from discrete choice experiments: a case of investigating or imposing preferences?, HEALTH ECONOMICS 15 797–811 (2006)

Glenn A. Bryan and Thomas W. Whipple, Tuition Elasticity of the Demand for Higher Education among Current Students, 66(5) JOURNAL OF HIGHER EDUCATION 560-574, 569 (1995)

Green & Srinivasan, *supra*, at 3, citing Dick Wittnick & Phillippe Cattin, *Commercial Use of Conjoint Analysis: An Update* 53 Journal of Marketing 91-96 (1989)

Greg Allenby et. al., *Calculating Reasonable Royalty Damages Using Conjoint Analysis*, AIPLA Quarterly Journal 45(2), 2017, 223-254

Jerry Hausman & Gregory Leonard, Efficiencies from the Consumer Viewpoint 7 GEORGE MASON LAW REVIEW 707 (1999)

Jerry Hausman, Serge Moresi & Mark Rainey, Unilateral Effects of Mergers With General Linear Demand, 111(2) ECONOMICS LETTERS 119–21, 119 (2011)

Jerry Hausman, Sources of Bias and Solutions to Bias in the Consumer Price Index, 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003)

John Buckell & Jody L. Sindelar, The impact of flavors, health risks, secondhand smoke, and prices on young adults' cigarette and e-cigarette choices: a discrete choice experiment, 114(8) ADDICTION 1427-35 (2019)

John T. Mann and Shida R. Henneberry, *Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes*, AAEA Annual Meeting (2012)

Kelly Manley, Yongseung Han, Michael Ryan, and Christopher Serkan, *Undergraduate Students' Willingness to Pay for Online Courses*, 45(2) Journal of Education Finance 232-252 (2019)

Kevin Duncan, *Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19*, 35(3) Journal of Higher Education Management 35-43 (2020)

Kirk Bansak, Jens Hainmueller, Daniel J. Hopkins, and Teppei Yamamoto, The Number of Choice Tasks and Survey Satisficing in Conjoint Experiments, 26 Political Analysis 112-119 (2018)

Lisa Cameron, Michael Cragg & Daniel McFadden, *The Role of Conjoint Surveys in Reasonable Royalty Cases*, Law360 (2013)

Mandy Ryan, Verity Watson, and Vikki Entwistle, Rationalising the 'Irrational': A Think Aloud Study of Discrete Choice Experiment Responses, HEALTH ECONOMICS 18: 321–336 (2009)

Michael Rothschild and Lawrence J. White, The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs 103:3 JOURNAL OF POLITICAL ECONOMY 583-586, 583 (1995)

Mikolaj Czajkowski, Tomasz Gajderowicz, Marek Giergiczny, Gabriela Grotkowska, and Urszula Sztandar-Sztanderska, *Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method*, 61 Research in Higher Education 510-539 (2020)

Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis.* 10(1-2) FOUNDATIONS AND TRENDS IN ECONOMETRICS 1–144 (2019)

N. Gregory Mankiw, Principles of Microeconomics 134 (8th ed. 2018)

Paul Green & V. Srinivasan *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice* 54 Journal of Marketing 3-19 (1990)

Robert E. Martin, Tuition Discounting Without Tears, 23(2) ECONOMICS OF EDUCATION REVIEW 177-189 (April 2004)

ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMETRIC MODELS & ECONOMIC FORECASTS (McGraw-Hill, Inc. 3rd ed., 1991)

Stephen Hoenack et. al., *The Marginal Costs Of Instruction*, Research in Higher Education 24(4) 1986, 335-417

Theon van Dijk and Frank Verboven, *Quantification of Damages*, 3 Issues in Competition Law and Policy 2331-2348, 2332 ABA Section of Antitrust Law (2008)

Vithala Rao, Applied Conjoint Analysis (Springer-Verlag 2014)

William Landes & Richard Posner, Market Power in Antitrust Cases, 94 HARVARD LAW REVIEW 937, 944-945 (1981)

**PUBLICLY AVAILABLE MATERIALS**

28 Questions to Help Buyers of Online Samples, QUALTRICS (accessed Nov. 11, 2022), available at https://www.iup.edu/arl/files/qualtrics/esomar.pdf

A Quick Guide to Converting your Face-to-Face Pedagogical Approaches to the Online Environment, BU CENTER FOR TEACHING AND LEARNING (accessed Nov. 2022), available at https://www.bu.edu/ctl/converting-face-to-face-pedagogical-approaches-online/

Ann M. Gansemer-Topf, Peter F. Orazem, and Darin R. Wohlgemuth, Do Liberal Arts Colleges Maximize Profits?, 88(1) SOUTHERN ECONOMIC JOURNAL, available at https://onlinelibrary.wiley.com/doi/full/10.1002/soej.12521

*Average GPA and MCAT Score for Every Medical School (2022),* Shemmassian Academic Consulting (accessed Nov. 2022), *available at* https://www.shemmassianconsulting.com/blog/average-gpa-and-mcat-score-for-every-medical-school

*BA/MS Program,* BU Arts and Sciences (accessed Nov. 2022), *available at* https://www.bu.edu/cs/undergraduate/academic-programs/bama-program/#:~:text=Application%3A,and%20cumulative%20GPA%20of%203.0

Blackboard Learn, BU TECHWEB (accessed Nov. 2022), available at https://www.bu.edu/tech/services/teaching/lms/blackboard/

*Boston University - Questrom School of Business*, The Princeton Review (accessed Nov. 2022), *available at* https://www.princetonreview.com/business/boston-university-questrom-school-business-1010974

*Boston University - School of Law, The Princeton Review (accessed Nov. 2022), available at* https://www.princetonreview.com/law/boston-university-school-law-1035806

Boston University Common Data Set 2019-2020, *available at* https://www.bu.edu/asir/files/2020/06/cds-2020.pdf

Boston University's Office of Admissions Website (Dec. 3, 2019), available at https://web.archive.org/web/20191203161638/http://www.bu.edu/admissions/

*Common Dataset Initiative*, Common Dataset (accessed Nov. 2022), *available at* https://commondataset.org/

Conjoint Analysis Software Tool, QUALTRICS, available at https://www.qualtrics.com/core-xm/conjoint-analysis/

Conjoint Analysis White Paper, available at https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/

Cost of Attendance for Graduate Schools, BOSTON UNIVERSITY FINANCIAL ASSISTANCE (accessed Nov. 2022), available at https://web.archive.org/web/20200418142744/https:/www.bu.edu/finaid/aid-basics/cost-of-attendance/graduate/

Credit Assignment to Academic Courses, BOSTON UNIVERSITY (accessed Nov. 2022), available at https://web.archive.org/web/20191020174137/https://www.bu.edu/policies/credit-assignment-to-academic-courses/

Donald I. Bosshardt, Larry Lichtenstein, and Mark P. Zaporowsky, *A Model Of College Tuition Maximization*, 2(1) CONTEMPORARY ISSUES IN EDUCATION RESEARCH 53-70, 54 (2009), *available at* https://files.eric.ed.gov/fulltext/EJ1056883.pdf

Educational Resource Center, BOSTON UNIVERSITY (accessed Nov. 11, 2022), available at https://www.bu.edu/erc/

Experience BU, BOSTON UNIVERSITY (accessed Nov. 2022), available at https://web.archive.org/web/20190823093717/https://www.bu.edu/hr/lifebu/experience_bu/

*Fair Market Value*, LII, Cornell Law School (accessed Nov. 2022), *available at* https://www.law.cornell.edu/wex/fair_market_value

Gerald Häubl, Benedict Dellaert & Bas Donkers, Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search, 29(3) MKTG. SCI. 438-455 (2010)

Graduate Students, BOSTON UNIVERSITY (accessed Nov. 11, 2022), available at https://www.bu.edu/erc/grad/

*How to Apply*, Boston University College of Health & Rehabilitation Sciences: Sargent College (accessed Nov. 2022), *available at*

https://www.bu.edu/sargent/academics/departments-programs/health-sciences/master-of-science-in-human-physiology/admission-requirements/

*Mission Statement*, Boston University (accessed Nov. 2022), *available at https://www.bu.edu/about/mission-statement/*

Online Sample, QUALTRICS (accessed Nov. 11, 2022), available at https://www.qualtrics.com/research-services/online-sample/

Qualtrics, Conjoint Analysis White Paper, accessed October 2022, available at https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/#SurveyandSampleSize

Qualtrics, Step 1: Defining Conjoint Features & Levels (accessed October 2022), available at https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/step-1-defining-conjoint-features-levels/

Response Quality, QUALTRICS (accessed Nov. 11, 2022), available at https://www.qualtrics.com/support/survey-platform/survey-module/survey-checker/response-quality/

*Summary of MCAT Total and Section Scores*, AAMC (accessed Nov. 2022), *available at* https://students-residents.aamc.org/media/13381/download

Technology Requirements and Resources, BOSTON UNIVERSITY (accessed Nov. 2022), available at https://www.bu.edu/online/online-learning/technology/

Top 10 Reasons to Choose BU (Dec. 21, 2019), available at https://web.archive.org/web/20191221155831/http://www.bu.edu:80/admissions/why-bu/facts-and-rankings/10-reasons/

Tuition & Fees, BU OFFICE OF THE REGISTRAR (accessed Nov. 2022), available at https://www.bu.edu/reg/registration/tuition-fees/

*Utah Project on Antitrust and Consumer Protection,* The University of Utah, *available at* https://utahproject.utah.edu/

William G. Zikmund et al., BUSINESS RESEARCH METHODS (with Qualtrics Printed Access Card) (Cengage Learning 9th ed. 2012).

**TRIAL MATERIALS**

BU's Responses to Plaintiffs' Requests for Admission ("RPRFA"), No. 2 (June 4, 2021)

Declaration of Julia Dutra (June 3, 2022)

Declaration of Natalie Silulu (June 2, 2022)

Declaration of Olivia Bornstein (June 2, 2022)

Declaration of Venus Tran (June 3, 2022)

Second Consolidated Amended Class Action Complaint and Jury Demand, In Re: Boston University COVID-19 Refund Litigation, Master File No.: 1:20-cv-10827-RGS (D. Mass.), filed November 28, 2022 [hereafter *Complaint*]

## APPENDIX 3 – ADDITIONAL TABLES

TABLE 11: SUMMARY SURVEY RESULTS

| | Undergraduates | | Graduates | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Survey Respondents | 524 | 100% | 555 | 100% |
| On-Campus Preference | 310 | 59% | 296 | 53% |
| Access Preference | 477 | 91% | 499 | 90% |
| *Net On-Campus & Access Preference* | 419 | 80% | 410 | 74% |
| Career Service Preference | 460 | 88% | 515 | 93% |
| Tutor Services Preference | 486 | 93% | 513 | 92% |

| | Undergraduates | | Graduates | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Max Discount Required | 294 | 56% | 280 | 50% |
| Min Discount Required | 51 | 10% | 79 | 14% |

TABLE 12: ESTIMATED SPRING 2020 TUITION AND FEE CALCULATIONS

| | **FY 2020 Approved Budget ($Millions)** | **Gross** | **Aid** | **Net** |
|---|---|---|---|---|
| [1] | CRC: Undergraduate (Incl. Wheelock) | $854.3 | $284.3 | $570.0 |
| [2] | CRC: Masters & Professional | $247.7 | $65.0 | $182.7 |
| [3] | Medical Campus | $194.2 | $26.7 | $167.4 |
| | **Spring to Fall Ratio Enrollment Ratio** | **Ratio** | | |
| [4] | Undergraduate (Incl. Wheelock) | 49.0% | | |
| [5] | Masters & Other | 46.7% | | |
| | **Est. Spring 2020 Tuition** | **Gross** | **Aid** | **Net** |
| [6] = [1] * [4] | Undergrad (Incl. Wheelock) | $418.3 | $139.2 | $279.1 |
| [7] = ([2]+[3]) * [5] | Graduate (CRC + Medical) | $206.3 | $42.8 | $163.5 |
| | **Est. Spring 2020 Fees** | **Gross** | | |
| [8] | Fee-to-Tuition Ratio | 8.95% | | |
| [9] = [6] * [8] | Undergrad (Incl. Wheelock) | $37.4 | | |
| [10] = [7] * [8] | Graduate (CRC + Medical) | $18.5 | | |
| | **Est. Spring 2020 Tuition and Fees** | **Gross** | **Aid** | **Net** |
| [11] = [6] + [9] | Undergrad (Incl. Wheelock) | $455.7 | $139.2 | **$316.5** |
| [12] = [7] + [10] | Graduate (Charles River + Medical Campus) | $224.8 | $42.8 | **$182.0** |

## APPENDIX 4 – UNDERGRADUATE CBC SURVEY

Q1 Have you taken any surveys in the last 30 days on these topics? (Select all that apply.)

- ☐ Clothing
- ☐ Advertisements on TV
- ☐ Video Games
- ☐ Online Education
- ☐ Cosmetics
- ☐ Other Category
- ☐ I have not taken any surveys

Q2 In which state do you currently reside?

▼ Alabama (1) ... I do not reside in the United States (53)

Q3 Have you taken any **undergraduate** courses **on a college campus** within the past five years OR do you plan to take any **undergraduate** courses **on a college campus** within the next two years?

- ○ Yes, I have taken or plan to take undergraduate courses on a college campus
- ○ No, I have NOT taken nor plan to take undergraduate courses on a college campus

Q4 What is your age?

________________________________________________________________

Q5 How do you describe yourself?

- O Male
- O Female
- O Non-binary / third gender
- O Prefer to self-describe ________________________________________
- O Prefer not to say

Q6 Please choose one or more races that you consider yourself to be:

- ▢ White
- ▢ Black or African American
- ▢ American Indian or Alaska Native
- ▢ Asian
- ▢ Native Hawaiian or Pacific Islander
- ▢ Other ________________________________________

Q7 Are you of Hispanic or Latino origin?

- O Yes
- O No

Q8 To the best of your recollection, what is your current unweighted **high school GPA** or what was your **unweighted high school GPA** upon graduation?

- O 0.00 - 0.99
- O 1.00 - 2.99
- O 3.00 - 3.24
- O 3.25 - 3.49
- O 3.50 - 3.74
- O 3.75 - 4.00
- O None of the above

Q9 To the best of your recollection, what was your composite score (400-1600) on the **SAT standardized test**?

- O 400 - 599
- O 600 - 999
- O 1000 - 1199
- O 1200 - 1399
- O 1400 - 1499
- O 1500 - 1600
- O I did not take the SAT standardized test

Q10 To the best of your recollection, what was your composite score (1-36) on the ACT standardized test?

- O 1 - 20
- O 21 - 23
- O 24 - 28

O 29 - 33

O 33 - 36

O I did not take the ACT standardized test

Q11
You have been selected to participate in our survey about course offerings at **Boston University (BU).**

To participate in this survey, you must agree to answer the questions by yourself and without asking for help from anyone else. Answer the questions with your honest answers and opinions. We ask that you complete the survey in one sitting and without stopping in the middle.

Do you agree to these instructions?

O Yes, I agree

O No, I don't agree

Q12
*More about Boston University:*

**Boston University (BU)** is an international, comprehensive, private research university, committed to educating students to be reflective, resourceful individuals ready to live, adapt, and lead in an interconnected world. Boston University is committed to generating new knowledge to benefit society.

Boston University remains dedicated to its founding principles: that higher education should be accessible to all and that research, scholarship, artistic creation, and professional practice should be conducted in the service of the wider community—local and international. These principles endure in the University's insistence on the value of diversity, in its tradition and standards of excellence, and in its dynamic engagement with the City of Boston and the world.

Boston University comprises a remarkable range of undergraduate, graduate, and professional programs built on a strong foundation of the liberal arts and sciences. With the support and oversight of the Board of Trustees, the University, through our faculty, continually innovates in education and research to ensure that we meet the needs of students and an ever-changing world.

O I understand

O I DO NOT understand

Q13
For the remainder of this survey, please assume you are considering **enrolling at BU for an upcoming undergraduate semester.**

You will be shown a set of three **semester "packages,"** which, in addition to your classes for the semester, will come with different options and prices. After carefully considering the options available to you, **please select the semester package that you would actually purchase in real life.** If you would not select any of the packages shown to you, please select the fourth option ("I would not select any of the semester packages shown here").

The survey will ask you to make this decision ten times.

O I understand

O I DO NOT understand

Q14 First, please indicate your actual undergraduate major, or your intended major if you plan to take undergraduate courses.

________________________________________________________________

Q15 Each **semester package** you will pick from will come with a combination of options which will affect your university experience for the semester. These options will be explained in a moment. Please assume that in this semester you are taking courses related to your major or general education requirements.

O I understand

O I DO NOT understand

Q16 You will be given the choice of two learning modalities for your classes for the next semester: **On-campus** or **Online**.

**On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the BU campus in Boston, MA. In an **On-campus** class, you will attend a live lecture and have the opportunity to meet with your professors and classmates in person.

**Online** classes will be available via an internet-based learning platform and will consist of both asynchronous and synchronous components. For example, you will have access to pre-recorded lectures at any time and you will be required to participate in group discussions or other online

activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

O I understand

O I DO NOT understand

Q17 Your semester package may allow you access to **Campus Facilities.**

If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to BU's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to BU-sponsored events, such as sporting events, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.

If you select a semester package with without access to **Campus Facilities**, you will not have access to any of the campus facilities, groups, opportunities, or events described above. If you are taking **On-campus** classes, your access to BU's campus and facilities will be limited to the only the classrooms relevant to your classes

O I understand

O I DO NOT understand

Q18 Your semester package may include **Tutoring Services**.

If you select a semester package with **Tutoring Services**, for the next semester you will have access to tutoring through BU's Educational Resource Center. The Educational Resources Center provides four core tutoring programs: Peer Tutoring, Writing Assistance, Language Link, and Academic Skills Advising—and also connects students to academic resources across campus.

If you select a semester package without **Tutoring Services**, you will not have access to these services.

O I understand

O I DO NOT understand

Q19 Your semester package may include **Career Services.**

If you select a semester package with **Career Services,** for the next semester you will have access to services through BU's Center for Career Development. This includes career advising for your major, helping you find internships/jobs, resume/cover letter help, and more. You will

also have access to networking opportunities through professional associations, the exclusive alumni network, student organizations, programs and scholarships, and events such as job fairs, networking events, strategy workshops and mock interview sessions.

If you select a semester package without **Career Services,** you will not have access to these services or events.

O I understand

O I DO NOT understand

Q20 Finally, each **semester package** comes with a price. This is the price for all options of the **semester package** as well as all classes for the semester**.** (To graduate, you must complete eight semesters in total.)

Note that this price includes all other university fees but does **not** include room and board.

If you received (or anticipate receiving) financial aid or scholarships for your undergraduate education, please assume that it is available to you when making your selection.

O I understand

O I DO NOT understand

Conjoint Module (Illustrative Examples):

(1/10) Choose your preferred option below:

| | **Semester Package 1** | **Semester Package 2** | **Semester Package 3** | **None** |
|---|---|---|---|---|
| Class Modality | Online | On-campus | On-campus | I would not select any of the semester offerings shown here |
| Campus Facilities Access | No Access | Access | Access | |
| Tutoring Services | Available | Available | Not Available | |
| Career Services and Events | Available | Available | Available | |
| Semester Cost | $20901.00 | $41801.00 | $34834.00 | |
| | ○ | ○ | ○ | ○ |

(2/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | Online | On-campus | Online | I would not select any of the semester offerings shown here |
| Campus Facilities Access | Access | Access | No Access | |
| Tutoring Services | Not Available | Available | Available | |
| Career Services and Events | Not Available | Not Available | Not Available | |
| Semester Cost | $13934.00 | $27868.00 | $41801.00 | |
| | ○ | ○ | ○ | ○ |

(3/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | Online | On-campus | On-campus | I would not select any of the semester offerings shown here |
| Campus Facilities Access | No Access | No Access | No Access | |
| Tutoring Services | Available | Available | Available | |
| Career Services and Events | Available | Available | Available | |
| Semester Cost | $13934.00 | $13934.00 | $41801.00 | |
| | ○ | ○ | ○ | ○ |

## APPENDIX 5 – GRADUATE CBC SURVEY

Q1 Have you taken any surveys in the last 30 days on these topics? (Select all that apply.)

- ☐ Clothing
- ☐ Advertisements on TV
- ☐ Video Games
- ☐ Online Education
- ☐ Cosmetics
- ☐ Other Category
- ☐ I have not taken any surveys

Q2 In which state do you currently reside?

▼ Alabama (1) ... I do not reside in the United States (53)

Q3 Have you enrolled in any **graduate level** programs that took place **on a college or university campus** within the past five years OR do you plan to enroll in any **graduate level** programs that will take place **on a college or university campus** within the next two years?

- O Yes, I have or plan to enroll in a graduate program on a college campus
- O No, I have NOT nor plan to enroll in a graduate program on a college campus

Q4 What is your age?

________________________________________________________________

Q5 How do you describe yourself?

- O Male
- O Female
- O Non-binary / third gender
- O Prefer to self-describe ________________________________________________
- O Prefer not to say

Q6 Please choose one or more races that you consider yourself to be:

- ▢ White
- ▢ Black or African American
- ▢ American Indian or Alaska Native
- ▢ Asian
- ▢ Native Hawaiian or Pacific Islander
- ▢ Other ________________________________________________

Q7 Are you of Hispanic or Latino origin?

- O Yes
- O No

Q8 To the best of your recollection, what is your current unweighted **undergraduate GPA** or what was your **unweighted undergraduate GPA** upon graduation?

- 0.00 - 0.99
- 1.00 - 2.99
- 3.00 - 3.24
- 3.25 - 3.49
- 3.50 - 3.74
- 3.75 - 4.00
- None of the above

Q9 Please indicate the type of graduate degree program you enrolled in or plan to enroll in.

- Master of Business Administration (MBA)
- Law Degree (JD, LLM, or SJD)
- Medical Degree (MD or DO)
- Medical Degree (MSN, DNP, or RN)
- Other Graduate Degree (MS, MA, PhD, any other "Master")
- None of the above

Q10 To the best of your recollection, what was your total score (200–800) on the **GMAT**?

- O 200 - 599
- O 600 - 659
- O 660 - 709
- O 710 - 749
- O 750 - 779
- O 780 - 800
- O I did not take the GMAT

Q11 To the best of your recollection, what was your score (120–180) on the LSAT?

- O 120 - 149
- O 150 - 159
- O 160 - 169
- O 170 - 174
- O 175 - 180
- O I did not take the LSAT

Q12 To the best of your recollection, what was your composite score (472–528) on the MCAT exam?

- O 472 - 499
- O 500 - 514
- O 515 - 519
- O 520 - 528
- O I did not take the MCAT exam

Q13 You have been selected to participate in our survey about course offerings at **Boston University (BU).**

To participate in this survey, you must agree to answer the questions by yourself and without asking for help from anyone else. Answer the questions with your honest answers and opinions. We ask that you complete the survey in one sitting and without stopping in the middle.

Do you agree to these instructions?

O Yes, I agree

O No, I don't agree

Q14 *More about Boston University:*

**Boston University (BU)** is an international, comprehensive, private research university, committed to educating students to be reflective, resourceful individuals ready to live, adapt, and lead in an interconnected world. Boston University is committed to generating new knowledge to benefit society.

Boston University remains dedicated to its founding principles: that higher education should be accessible to all and that research, scholarship, artistic creation, and professional practice should be conducted in the service of the wider community—local and international. These principles endure in the University's insistence on the value of diversity, in its tradition and standards of excellence, and in its dynamic engagement with the City of Boston and the world.

Boston University comprises a remarkable range of undergraduate, graduate, and professional programs built on a strong foundation of the liberal arts and sciences. With the support and oversight of the Board of Trustees, the University, through our faculty, continually innovates in education and research to ensure that we meet the needs of students and an ever-changing world.

O I understand

O I DO NOT understand

Q15 For the remainder of this survey, please assume you are considering **enrolling at BU for an upcoming graduate semester.**

You will be shown a set of three **semester "packages,"** which, in addition to your classes for the semester, will come with different options and prices. After carefully considering the options available to you, **please select the semester package that you would actually purchase in real life.** If you would not select any of the packages shown to you, please select the fourth option ("I would not select any of the semester packages shown here").

The survey will ask you to make this decision ten times.

- O I understand
- O I DO NOT understand

Q16 Each **semester package** you will pick from will come with a combination of options which will affect your university experience for the semester. These options will be explained in a moment. Please assume that in this semester you are taking courses related to your degree or general education requirements.

- O I understand
- O I DO NOT understand

Q17 You will be given the choice of two learning modalities for your classes for the next semester: **On-campus** or **Online**.

**On-campus** classes will take place primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the BU campus in Boston, MA. In an **On-campus** class, you will attend a live lecture and have the opportunity to meet with your professors and classmates in person.

**Online** classes will be available via an internet-based learning platform and will consist of both asynchronous and synchronous components. For example, you will have access to pre-recorded lectures at any time and you will be required to participate in group discussions or other online activities at specified times over an online video conferencing tool. All communications with faculty, staff, and students would be done through email or video conferencing.

- O I understand
- O I DO NOT understand

Q18 Your semester package may allow you access to **Campus Facilities.**

If you select a semester package with access to **Campus Facilities**, for the next semester you will have full access to BU's state of the art campus facilities, including dining halls, galleries, libraries, athletics facilities, gyms, and more. You will have the opportunity to socialize in various campus buildings, quads, parks, and study areas, as well as the opportunity to be a part of various sports teams and clubs. In addition, you will have access to BU-sponsored events, such as sporting events, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events.

If you select a semester package with without access to **Campus Facilities**, you will not have

access to any of the campus facilities, groups, opportunities, or events described above. If you are taking **On-campus** classes, your access to BU's campus and facilities will be limited to the only the classrooms relevant to your classes

O I understand

O I DO NOT understand

Q19 Your semester package may include **Tutoring Services**.

If you select a semester package with **Tutoring Services**, for the next semester you will have access to tutoring through BU's Educational Resource Center. The Educational Resources Center provides four core tutoring programs: Academic Skills Advising, Skills Workshops, Writing Assistance, and Graduate Writing Support for your thesis, dissertation, or research proposals, and revise articles. The Center also provides a Language Link program where you may join language groups to strengthen and maintain fluency in a second language. The center also hosts a Master's Student Lunch & Learn Series, which are workshops that feature time management and organizational strategies; techniques for maintaining focus and motivation; and strategies to help you become an independent, lifelong learner.

If you select a semester package without **Tutoring Services**, you will not have access to these services.

O I understand

O I DO NOT understand

Q20 Your semester package may include **Career Services.**

If you select a semester package with **Career Services,** for the next semester you will have access to services through BU's Center for Career Development. This includes career advising for your degree, helping you find internships/jobs, resume/cover letter help, and more. You will also have access to networking opportunities through professional associations, the exclusive alumni network, student organizations, programs and scholarships, and events such as job fairs, networking events, strategy workshops and mock interview sessions.

If you select a semester package without **Career Services,** you will not have access to these services or events.

O I understand

O I DO NOT understand

Q21 Finally, each **semester package** comes with a price. This is the price for all options of the **semester package** as well as all classes for the semester**.**

Note that this price includes all other university fees but does **not** include room and board.

If you received (or anticipate receiving) financial aid or scholarships for your education, please assume that it is available to you when making your selection.

O I understand

O I DO NOT understand

Conjoint Module (Illustrative Examples):

(1/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | On-campus | On-campus | Online | I would not select any of the semester offerings shown here |
| Campus Facilities Access | Access | No Access | No Access | |
| Tutoring Services | Not Available | Available | Available | |
| Career Services and Events | Available | Not Available | Not Available | |
| Semester Cost | $29095.00 | $36368.00 | $43642.00 | |
| | ○ | ○ | ○ | ○ |

(2/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | Online | Online | On-campus | I would not select any of the semester offerings shown here |
| Campus Facilities Access | No Access | Access | No Access | |
| Tutoring Services | Not Available | Available | Available | |
| Career Services and Events | Not Available | Not Available | Not Available | |
| Semester Cost | $29095.00 | $21821.00 | $14547.00 | |
| | ○ | ○ | ○ | ○ |

(3/10) Choose your preferred option below:

| | Semester Package 1 | Semester Package 2 | Semester Package 3 | None |
|---|---|---|---|---|
| Class Modality | On-campus | On-campus | On-campus | I would not select any of the semester offerings shown here |
| Campus Facilities Access | No Access | Access | Access | |
| Tutoring Services | Available | Not Available | Available | |
| Career Services and Events | Available | Not Available | Available | |
| Semester Cost | $36368.00 | $29095.00 | $21821.00 | |
| | ○ | ○ | ○ | ○ |