# Exhibit 36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: BOSTON UNIVERSITY *
COVID-19 *
REFUND LITIGATION * MASTER FILE NO.
__________________________* 1:20-CV-10827-RGS
THIS DOCUMENT RELATES TO:*
ALL ACTIONS *

* * * HIGHLY CONFIDENTIAL * * *

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF
HAL J. SINGER, PH.D.
JANUARY 31, 2023
(REPORTED REMOTELY)

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF HAL J. SINGER, PH.D., produced as a witness at the instance of the DEFENDANT(S), and duly sworn, was taken in the above-styled and numbered cause on JANUARY 31, 2023, from 9:03 A.M. to 3:33 P.M., before AMY PRIGMORE, CSR, in and for the State of Texas, reported by stenographic means, at the THE WITNESS, Oakton, Virginia, pursuant to the Federal Rules of Civil Procedure, the First Emergency Order Regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFF(S):
(REMOTELY)
Patrick Madden
BERGER MONTAGUE PC
1818 Market St Ste 3600
Philadelphia PA 19103
pmadden@bm.net
215-875-3035

Blake G. Abbott
POULIN WILLEY ANASTOPOULO, LLC (FKA ANASTOPOULO LAW FIRM)
32 Ann Street
Charleston SC 29403
blake@akimlawfirm.com
800-313-2546

Lisa Tenerovicz
IN-HOUSE COUNSEL

FOR THE DEFENDANT(S):
(REMOTELY)
Scott Watson
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 S Figueroa St, 10th Floor
Los Angeles CA 90017
scottwatson@quinnemanuel.com

ALSO PRESENT (REMOTELY):
Dan Lapeyrouse, Videographer



INDEX

PAGE
APPEARANCES ................................ 2
STIPULATIONS ............................... 1
SIGNATURE AND CHANGES ...................... 251
REPORTER'S CERTIFICATE...................... 253

E X A M I N A T I O N S

HAL J. SINGER, PH.D. PAGE
EXAMINATION 5
BY MR. WATSON

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | EXPERT REPORT OF HAL J. SINGER, PH.D. | 23 |



P R O C E E D I N G S
* * *

THE VIDEOGRAPHER: Good morning. Today is Tuesday, January 31, 2023. We are on the record at 9:03 a.m.

This is the video recorded deposition of Dr. Hal Singer, in the matter of the Boston University COVID Refund Litigation, in the United States District Court for the District of Massachusetts.

My name is Kenny Parker. I'm a certified legal video specialist here on behalf of Veritext Legal Solutions. The court reporter is Amy Prigmore, also present on behalf of Veritext.

At this time, would all counsel please identify themselves and their firm affiliation for the record.

MR. WATSON: Scott Watson, with Quinn Emanuel. I'm taking the deposition on behalf of Defendant.

MR. MADDEN: Patrick Madden, from Berger Montague, defending the deposition on behalf of Plaintiffs, and the -- the witness.

MS. BOYD: Katherine Lee Boyd, Hecht Partners. I'm with the Plaintiffs, and just



listening in.

MR. McDONOUGH: Also Conor McDonough, also with Hecht Partners, just listening in.

THE VIDEOGRAPHER: Thank you.

Madame Court Reporter, you may proceed.

HAL J. SINGER, PH.D.,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. WATSON:

Q. Good morning, Doctor.
A. Good morning.
Q. Could you state your full name for the record?
A. Sure. Hal Jason Singer.
Q. And, Dr. Singer, where are you currently employed?
A. I have two places of employment currently; Econ One, which is a consulting firm based out of Los Angeles, but with an office in Washington DC, and the University of Utah economics department.
Q. And roughly, how much of your professional time is spent on your Econ One position versus your position with the University of Utah?

surveys in multiple matters, or -- are you using that as an example, or that's the -- the one that comes to mind?
I'm going to close the blind behind me while you answer that question.
A. I was going to ask you --
MR. MADDEN: Objection to form.
But go ahead.
A. That was an example. It's conceivable that -- that I've done other surveys in the antitrust space. And if I can -- if I come up with them here, I'll let you know.
But -- but that was the one, because it's fairly recent. It comes to mind.
Q. (BY MR. WATSON) How did you come to be retained in this case?
MR. MADDEN: Objection to the form.
And I'm going just caution you on not disclosing attorney work product. But you can answer.
A. So, I don't think that I have great insight as to how I came to be retained, if -- if what you're asking is why did they select me. If I knew, might --
Q. (BY MR. WATSON) Well, maybe I'm --

Page 30

A. That's okay. Go ahead. It was just like asking me why my phone rings. I don't know why -- why my phone rings, but my phone rings.
It's conceivable, and it's just pure speculation, of having one -- the first -- having had my conjoints serve as the basis for class certification decisions in Juul and MacBook, people thought that -- that I had a particular talent in this area.
But that's -- you know, that's just speculation. I don't know. I don't know what it was that caused the phone to ring.
Q. Fair enough. Let me come at it a better way.
Was it your understanding that you were retained in this matter to run a conjoint survey?
A. No. The -- the assignments are -- are rarely that specific. I usually am confronted with a problem.
And the problem here was to try to estimate the difference between -- at the time of the contracting, between what the parties -- the contracting party here, the student, believed they were going to get, and what they actually got.
That's -- that's the assignment. It's --

Page 31

it's rare that someone comes to me and say, you know, how I -- how -- I want you to, you know, use an instrumental variable regression model, right, to solve -- that's not -- that's typically not how attorneys will approach me.
They'll approach me by saying, we have a hard problem. Can you think of a way that -- that this can be estimated, using, you know, the best econometric practices.
Q. And ultimately, how did you understand your -- your assignment, at the time that you actually conducted your work here?
MR. MADDEN: Objection to form.
A. I think the assignment was pretty close to what -- what I just gave you in the last answer, is that I -- I needed to come up with a valuation technique that would allow me to estimate the value of what the students were expecting at the time of the contract, and what they actually received, both -- also, at the time of the contract.
So that's -- that was the assignment. And -- and you know -- you know what happened next.
Q. (BY MR. WATSON) You're assuming I've read your report.
So I've -- so I've got -- I've got a

Page 32

question on -- on the way that you formulated that.
A. Sure.
Q. So you're trying to determine an estimate of the value as to what the students were expecting at the time that they entered into the contract, right?
A. Correct.
Q. That's the first step. And then you need to determine an estimate of the value of what was received by the students, right?
A. Critically at the time -- at the time of the contract, yes, yes.
Q. And so -- so tell me -- yeah, so that's -- that's what I wanted to ask about.
So what -- what do you mean, what was received by students at the time of the contract?
A. Well --
MR. MADDEN: Objection to form.
A. Right. So, you can imagine a negotiation between the university and the student, where we're trying to figure out, you know, the willingness to pay of what I call the -- the on-campus experience, at the time of the contracting for the spring 2020 semester.
I suppose this is occurring slightly before

Page 33

the spring. You can call it December of 2019.
And -- and the value of this alternative product, which would be the online experience, but also at the time of the contracting, say, in December of -- of 2019.
And you can -- you can imagine this thought experience, which is if I'm heading towards an on-campus experience, and I formulated the valuation in my head of that -- that experience, and I'm told that I would, instead, have to be converted to an online experience, what kind of discount would I demand, in order to be made whole, for the diminution in utility of moving from what I wanted to what I got.
Q. (BY MR. WATSON) And so, your -- your valuation exercise then is attempting to determine both the expected value and the actual value prior to the commencement of the spring 2020 semester.
Is that right?
A. I think that's fair. And if I could just kind of crystalize it, what we're really ultimately getting at is not the raw utilities, which -- which -- which, as your formulation would suggest, that I'm interested in uncovering those raw utilities.



We -- we really want to know the discount, in percentage terms, that a student would be -- would demand to be made whole, or to be made indifferent, between getting what they want, which is the in-person on-campus experience, and this alternative, which is -- which I define as the online experience.
Q. Again, as defined in, I think you said, December 2019, right?
A. Yeah. The point being --
Q. Roughly, roughly.
A. -- of the contracting, that's right.
Q. Did you consider other methodologies, other than a conjoint survey, to try to answer that question?
A. I think I did. I certainly, you know, want to consider everything. And you know, in particular, it's -- it's conceivable. I don't have perfect memory or recall of everything I considered.
But I certainly have benchmarks, in the back of my -- my head, whenever I'm doing a valuation exercise, if there's some nice natural experiments that we can exploit, I would at least consider a benchmark.



Now, we -- we didn't have any good experiments here. And hopefully we'll get into that, because I know your expert thinks that, you know, fall of 2020, and the extent online offerings represent good benchmarks.
I disagree respectfully. But I certainly have those in mind.
I will note, however, that courts, in my experience, have been reluctant to embrace benchmarks, because they often -- you know, life just doesn't deliver us something clean.
And it's very easy for an opposing party to attack a benchmark, and it's not being comparable in certain dimensions.
So, as a practice, what I do, is I -- to the extent I -- I incorporate benchmarks into a -- a damages model, I typically use them to corroborate some econometric model, or some economic model.
And maybe I'll stop there and leave it at that.
Q. You referenced courts.
You're not offering a legal opinion in this matter, right?
A. I'm not offering a legal opinion. But -- but knowing the vulnerability of benchmarks, and



the vulnerability of the benchmark that's being offered here by Dr. Wilner, I am reluctant to put out something that -- that I think could be struck down or -- or undermined fairly easily.
And -- and the problem with benchmarks, generally -- I don't want to rule them out as a class of models, but I -- I tend to relegate them to corroborating, if at all, as opposed to being a primary damages model, in my work.
And -- and the problem that we have often is just that the world doesn't give you a natural experiment that you -- that you need.
Q. Now, did you make an independent determination about the point in time that you should be valuing, or were those assumptions that were provided to you by counsel?
MR. MADDEN: Objection to form.
A. I think -- I think the assignments largely dictated the notion of -- of constructing this model to get at the value at the time of contracting.
I do think that was -- that was part of the assignment. But I also think that it's supported in economics, as well. If you think about what we're trying to do is -- is to figure out the

discount that would be demanded in a voluntary transaction, under no duress, between a willing buyer and a willing seller, who's revealed a preference for the on-campus experience, you know, to what extent would they need to be compensated to move to some alternative experience that they didn't -- that was not their first choice, namely the online experience.
Q. (BY MR. WATSON) So, if I'm understanding you correctly, the assignment was to value both the -- the contracting expectations and what was received, as of -- prior to the start of the spring 2020 semester, but that also makes sense to you as an economic matter.
Is that correct?
MR. MADDEN: Objection -- objection to form.
A. I think it -- I think it was part of the assignment, but it also makes sense, as an economic matter that that's the right thing to do.
From an economic matter, the right thing to do is to do what I've done, which is try to figure out the discount that would be demanded, whenever this contract was entered into, prior to the spring of 2020, such that a student would be made whole



for moving from his or her first choice, the on-campus experience, to an online experience.
Q. (BY MR. WATSON) And so, what was the -- in your answer there, you just said the student would be made whole for moving from his or her first choice, the on-campus experience, to an online experience.
It's not the case that all students preferred the on-campus experience to the online experience, right?
MR. MADDEN: Objection to form.
A. So, I think that, as an economist, we can infer that if someone was enrolled in the on-campus experience, as opposed to the online offerings, at BU, then it's reasonable to infer that their preference, yes, is for on-campus.
Q. (BY MR. WATSON) So you -- you would agree that looking at what people actually do in the real world is reflective of their preference in a purchasing decision?
MR. MADDEN: Objection to form.
A. If the -- with the very important caveat, which is not satisfied here, which is that if -- if the environment in which they're making decisions can provide for the -- the outside options, if it



can provide for the lack of duress, if it can avoid other difficulties in contracting that result in lock-in -- we can get into these as well -- then -- then I think that we might be able to exploit a natural experiment, in which we could -- which we could figure out the discount that would be demanded.
Unfortunately, here, we can't, because the experiment of the fall of 2020 is badly contaminated.
Q. (BY MR. WATSON) When you say, the outside option, what do you mean by, the outside option?
A. Right. So, remember, in -- in my conjoint, when I'm asking the student basically to choose between these different modalities at Boston University, I give them an outside option.
And the outside option, presumably, would be something outside of Boston University, including a -- a choice of a university offering an on-campus experience.
That's what's being captured in my outside option, when -- you know, the "none of the above," it's the fourth option in each choice set.
And in contrast, in the real world, in the fall of 2020, there were no outside options



involving an on-campus experience, because COVID, as you know, was still raging in the fall of 2020.
And so, right off the bat, we're not replicating this bargaining environment that -- that we seek of a willing buyer and a willing seller, not operating under duress, full outside options available to them.
And that just wasn't present in the fall of 2020. And put differently, the student in that environment didn't have the same kind of bargaining power, as they would in alternative universe, in which these outside options were available.
In other words, the choice set was so badly diminished in the fall of 2020, that I don't think that you can get a good read on willingness to pay for in-person versus online, by virtue of what BU actually offered students, in the real world.
There are other infirmities, as well, involving lock-in which we could get into. I don't know if -- if you want to hear me wax on, on this. But I just, for -- for a myriad of reasons, the fall of 2020 is a -- is a badly contaminated experience.
Q. I mean, there wasn't really an alternative option come mid spring semester 2020 either, right?

MR. MADDEN: Objection to form.
A. Well, that's fair. And that's why I didn't try to use any kind of the discounts that were offered or demanded in the -- in mid spring, as my basis for my damages model, either, right.
I -- I, instead, used a conjoint survey in which we could simulate this experience in a world in which the students would have outside options.
They could say no to Boston University. Boston University said, we're not going to give you a -- a penny off the tuition for you to do the online.
You know, there was -- there was no place for students to go, even -- you're right, even in the spring, middle of the spring, of -- of 2020.
And for that reason, we can't look to that experiment, to understand what a willing buyer and willing seller, under no duress, would demand, be compensated, for going from their first choice to some alternative modality.
Q. (BY MR. WATSON) And when you say duress, and you used that word earlier, what -- what do you mean when you -- when you say duress, in this context?
A. What I mean is that we -- we want to



simulate a bargaining environment in which both parties can walk away from the other.
And for -- for at least two reasons -- and fre -- when I'm using -- I'm using the term, free of duress -- that is, I'm free to walk away and there's no -- there's not going to be any kind of harm from me doing it.
Here, I mean, there's two -- there's two frictions or impediments that really undermine the fall 2020 experiments.
The first we talked about before, which is there really is no walking away from BU and saying, you know, that's an unfair discount on the online. You really should be taking 13 percent off the -- the price, but you're really giving me zero. I'm going -- I'm going to go to some other school.
There really -- there really wasn't a rich set of -- of choices available, and that all -- all other schools were offering online as well.
But the second thing, if I could, is this notion of lock-in, which is that many of the -- of the contracting decisions, with respect to the fall of 2020, were made well before the fall of 2020.
We think about sophomores, juniors, or seniors, they've all -- they've all entered into



this -- this contract at a much earlier date.
And -- and the notion that they can just freely, you know, walk away midstream, into the program -- and -- and this could be considered to be some kind of voluntary or transaction of free will -- it ignores all the frictions and impediments that -- the term that economists use is lock-in, that would undermine, again, the student's bargaining position vis-à-vis Boston University.
And so, for those two reasons, I cannot accept the fall of 2020 as a -- as a realistic benchmark of what -- of what I'm trying to value, and what my assignment is, as I understand it.
Q. Well, in -- individual students don't really have any bargaining position vis-à-vis an academic institution, do they?
A. No, that's not true. I mean, going into the relationship, a prospective student doesn't -- doesn't have to take the offer. They can -- they can consider the field.
And -- and at that point, the -- the university doesn't have as much leverage, if you will, over -- over the student.
But of course, as -- as you get deeper and deeper into the process, then -- then it becomes



difficult, and the bargaining kind of moves away from the student and in the direction of the university.
Q. Are you familiar with the term, stickiness, in the context of lock-in?
A. Sure.
MR. MADDEN: Objection to form.
Q. (BY MR. WATSON) And generally, it's the concept, right, that if I'm committed to a -- an institution, or to a product line, or something like that, once I've made an investment, initially I'm going to have a tendency, all else being equal, to stay with that product, you know, institution, the like, right?
MR. MADDEN: Objection --
Q. (BY MR. WATSON) Is that a fair general characterization?
MR. MADDEN: Objection to form.
A. I think that's fair, and the -- and it's precisely why I'm reluctant to look at the fall of 2020 as an experiment.
I don't think that for -- for many of the students, you know, sophomores, juniors, and seniors, they're really in a position to say, you know what, that's not a fair discount for what --

Q. (BY MR. WATSON) Have you criticized conjoints in litigation at all?
MR. MADDEN: Objection to form.
A. I have not had the opportunity, but that was because the -- you know, in the -- in the handful of cases in which I've -- I've served as a defendant's expert in consumer protection, the plaintiff's expert did not offer a conjoint model.
I -- I -- I'm pretty sure of this. And when I go back, at least -- at least in the most recent case, it's possible in a prior case, I did.
But in -- in the most recent case, the -- the plaintiff's expert did not offer a conjoint model.
Q. (BY MR. WATSON) You would agree that there are some consumer choice questions that are not well-suited to the conjoint methodology, right?
A. I -- I mean, the way that it's stated is so broad, I -- I have to -- I have to allow for the possibility that there are some problems out there that don't lend themselves to conjoint, for sure.
Q. I mean, is it your view that if we're trying to value an attribute of a -- a multi-attribute bundle product, that a conjoint is always the best way to get at that question?



A. It's -- it's certainly a good way. It's a well-recognized way. I mean, that is the example that McFadden uses in the music case, right, where he's -- he's got six odd attributes, play lists, and whether it's going to be curated by the -- by the platform or not.
And so, you know, none of those -- none of those attributes are sold individually in the marketplace.
And so, to get at the value of those individual attributes, you've got a conjoint, or potentially you could run what's called a hedonic regression model. So I'll leave it at that.
But a conjoint would be a good application to use, in those. A good candidate, at least.
Q. Did you consider using some kind of hedonic regression here?
A. I did. I did. It's certainly a -- a consideration. But -- but I think that assembling the -- the right data would -- would be -- would be a challenge. And -- and also the data could be contaminated by the whole COVID experience as well.
And so -- and for many reasons. As you may or may not know, I -- I supplemented the conjoint in the MacBook keyboard defect case with a hedonic



model. And I think Judge Javelin liked the hedonic model that much.
So it's possible that, after that experience, that I'm now -- I'm now a bit -- a bit scared of hedonic models in general.
Q. What -- is there a particular -- were there particular types of data that you thought were missing in this market, that made a hedonic regression less desirable than the -- the tool you ultimately came to, with the conjoint?
A. Yes, and -- yes --
MR. MADDEN: Objection to form.
Go ahead.
A. Sorry. The -- the -- what's missing or what's contaminated in the real world is that we don't have a stand-alone provider of the -- of the online option.
And what that does is, by allowing Boston University -- and I don't mean to pick on BU, because they're no different from any other school in this context.
But when -- when Boston University sets its online offering price, it must be careful not to -- not to cannibalize its moneymaker, which is the on-campus package.



You can imagine if -- if -- if BU were to say, you know, we're -- we're going to give you basically the same education, excepting, of course, this modality change, for 1/20th of the price of -- of the on-campus experience, that might cause a giant sucking sound, and it could put downward pressure on the price BU is charging for its -- its online -- its -- its in-person experience.
And so for that reason, we don't have great data on -- on the pricing of online offerings, by what I'll call vertically integrated or by -- by -- by the universities that are offering both, their primary product, which is the on-campus experience, and the online offering.
I think that every university, not just BU, is -- is concerned about cannibalization, when it's setting the price of its online offering.
MR. MADDEN: We've been going for about an hour 20, if you want to take a break.
MR. WATSON: Sure. Yeah, that's fine. Ten minutes?
MR. MADDEN: Yeah, that works for me.
THE VIDEOGRAPHER: 10:24 a.m., we are off the record.

(Break.)
THE VIDEOGRAPHER: The time is 10:35 a.m. Central Standard Time. We are on the record.
Q. (BY MR. WATSON) Setting aside the similar cases that you were involved in regarding Pepperdine and USC, have you done other professional work, testimonial expert work, relating to the academic space?
MR. MADDEN: And I'll just caution the witness, to the extent you're involved in any cases for which you have not been disclosed, that are, again, subject to attorney work product, not to answer. But if you have anything that you can answer, please go ahead.
A. Okay. See, there is -- there is a case that if I describe it to you, it would be obvious which one it is. So I -- I probably should steer clear of that. I have not yet been disclosed.
So, I'll go -- I'll try to go backwards in time.
Sitting here, I don't know if I can come up with any. It's possible that, you know, if I went through the CV, I could find something.
But sitting here, I'm hard pressed. I mean,



as close as -- I've been involved in some NCAA matters, but I -- I wouldn't say that that's really related, at least, to the pricing of educational services, which I think is what's at issue here.
Q. (BY MR. WATSON) Now, did you conduct a pretest of your survey in this case?
A. We did.
Q. And can you tell me how you went about pretesting the survey?
A. Sure. So we have a -- a design, we -- you know, we edit internally, and then we edit with Qualtrics. And then we -- we put it out in the field and stop with 50.
At that point, we get back some diagnostics with Qualtrics, in which we can measure such things as whether -- whether students were -- or whether respondents may have been confused, or -- or expressed some surprising preferences.
And -- and we sit down and we analyze the first 50. We -- we basically run them through our model, as if that's the ultimate sample.
And we make a determination as to whether or not, you know, something has to be changed.
Q. And that's -- I think you refer to that in your report as a soft launch.



Is that right?
A. Correct.
Q. Now, in the -- in the soft launch period, the respondents are taking the survey, same as the other respondents later took the survey, correct? Subject to any changes that were made.
A. Let me -- let me just hear it again. The respondents are taking the survey like they did --
Q. Yeah --
A. -- just like the actual respondents do?
Q. Yeah, that's correct.
A. Yes. But they have to go through all of our filters. So if they don't meet -- they don't meet the eligibility criteria, they don't match our target frame, then we -- you know, they're excluded. But subject to that, yes, it's --
Q. Yeah.
A. You can get, you know, 50 real observations, if you want.
Q. All right. I mean, all your respondents have to meet the screening criteria, right?
A. Correct.
Q. Okay. So, I'm just -- I'm just trying to understand, you know, sometimes in a conjoint survey, the survey designer will, you know, have



a -- a small number of respondents take the survey and actually interrupt them at points in the survey and interview them to make sure that they're understanding the task choice, and those types of things.
That's what I traditionally think of as the -- as a pretest, as opposed to a soft launch, which is where you put the survey out in the field, you run it for a little bit, and then you kind of look at the data, and see if anything is coming up, you know, concerning, right?
A. It's -- it's the latter that we --
MR. MADDEN: Objection --
THE WITNESS: Sorry. Were you -- was there --
MR. MADDEN: I said objection to form.
Go ahead.
A. Well, it's the latter that's closer to what we did. I -- I have not, in my experience, ever interfered with -- and I don't know that's too harsh of a word for what you just described.
Never stopped one, questioned them, either during or after.
What -- what we are doing is we are

attending or plans to attend college, right?
A. Correct.
Q. And -- and I believe you said that they plan to attend it in person, as opposed to online, right?
A. Correct.
Q. And you know that because of the language in question 3, where it says, on a college campus.
Do you see that?
A. Yes.
Q. Is -- is that the screening language that was intended to exclude people who took college, you know, online?
MR. MADDEN: Objection to form.
A. Well, it was done so that we could approximate the population that we're aiming to -- to -- to capture here, which is those people who attended, you know, BU, in person, on campus, in the spring of 2020.
Q. (BY MR. WATSON) And I -- fair enough. I'm just trying to understand if there is any other screening question that would have excluded respondents or would have somehow categorized respondents, based on their preexisting preference for in-person versus online learning?

Page 102

A. I think that's it. That's the one, Q3.
Q. Okay. And then to turn back to Q13, the respondents being told, you're considering enrolling for an upcoming undergraduate semester, right?
A. At BU. This is an important detail that I want -- I want to communicate to your expert, yes, at BU. At BU.
Q. Sure. And so -- so this is -- you should have in mind you're going to enroll in, you know, courses at BU, for spring 2023, or -- or sometime later.
Is that right?
A. Well, it's just some -- some future course. I don't think we're specific as to what -- what semester that course is going to be.
Q. But it would have to be at least --
A. The upcoming -- I'm sorry, the upcoming undergraduate semester, yeah. On page 76, the upcoming, yes.
So the upcoming would be -- you're correct, the upcoming would be spring of 2023.
Q. And then, you go -- you go on to describe the attributes that are included in the survey, and the levels of those attributes, right?

Page 103

A. Correct.
Q. And in terms of the descriptions of the levels, where did you draw the -- the verbiage you used for that?
A. We tried to draw it exclusively from BU-specific material. Like, for example, marketing material, to describe the -- you know, the on-campus versus online experience.
I think we took that directly from BU's marketing material. Pricing, of course, we took from BU's actual prices being charged.
Campus life, I think there was -- there was something also in -- in the BU marketing material that allowed us to -- to come up with language for that, and the facilities as well.
Q. One of the things that is important in constructing a conjoint survey is to ensure that you don't use biasing language.
You would agree with that?
A. Yes. And you know, we -- we were painstaking in -- in not using any language that would be pejorative of -- of the online experience, or try to suggest that it would be associated with some kind of degradation in quality. We went out of our way to avoid that.

Page 104

And I think that had we -- had we not been so careful, that -- that someone, a critic of the survey, could say, oh, you've already set it up so that they're naturally going to think this is an inferior quality, we did not do that.
Q. All right. And so what -- what you're trying to do here is, for the features of interest -- which are described there in Q16 and Q17, I believe, right?
A. Right.
Q. Your -- your goal here is you want to quantify the -- the difference in value between the on-campus experience, in -- in the case of Q16, that the respondent understood they were receiving at the time they entered the -- the spring 2020 semester, and the online experience that was ultimately necessitated by the COVID pandemic, right?
MR. MADDEN: Objection to form.
A. Well, there was a lot in there. But you're -- you're correct that what we ultimately want to measure is that decline from what they were expecting to get, at the time of contracting, from what they got, right.
But when we're -- when we're using basically

Page 105

a simulation of that environment, through the survey, right, we're -- we're asking people in the fall of 2022 to -- to think about toggling between an on-campus and an online experience, for the spring of 2023.

I just want to make sure that we can't -- can't go back in time, of course. And we also can't ask respondents, in October of 2022, to -- to be making hypothetical decisions about matriculating in the spring of 2020.

I don't think you intended to do that in your question. But obviously, we're using this as a proxy, right, for -- for the -- for an environment that existed back in the spring of -- or even earlier, say December of 2019, at the time of -- of contracting, or -- or the decision to enroll.

Q. (BY MR. WATSON) I mean, you raised an interesting point, I want to make sure I circle back to. But just to close this out.

So what you're trying to do here is quantify the difference in value between -- for 16, the on-campus experience that Plaintiffs allege was contracted for, right, and the online experience that Plaintiffs allege was what was received,

Page 106

right?

A. Right. But --

MR. MADDEN: Objection to form.

THE WITNESS: I'm sorry. Sorry Patrick. Go ahead.

MR. MADDEN: No. I objected to form. Go ahead.

A. Oh. But with one -- one important caveat, just -- it's largely right, but with one important caveat.

What they actually received was not the same level of quality as the online offerings in a -- in a normal state of the world in which a university gets to prepare and design a curriculum that is -- that is -- that is made for the online experience, right.

What they actually got, in the real world, was something more akin to emergency remote online. You know, like classes were thrown together, in an online format, in a way that had never been planned for.

And so, what -- what we all -- what we have to recognize, in the design of the survey, the stepdown that we're trying to capture is between the fully functional on-campus experience, and the

Page 107

fully functional online experience.

That is going to be a conservative measure of the actual stepdown that class members experienced in the real world, right.

But I don't want to tell them in a survey, this is going to be some thrown-together product, you know, in an emergency, in a public, you know, pandemic health emergency, where -- where professors are just going to, you know, show up one day and have to perform online without ever having to prepare or design a curriculum designed for online.

I just want to make sure that there's that important caveat, that it's the difference between what they expected, versus what they got, with the caveat, when we -- when we dropped them down, we're dropping them down to the -- to the online, in their mind, of a -- of a fully functional online that had plenty of preparation, right, and was -- was likely a superior product to the -- to what they got, which was something closer to the emergency remote online.

Q. (BY MR. WATSON) Gotcha. So the -- so, I think what you're saying is, look, the -- the qualitative difference between the on-campus and

Page 108

the online classes that were measured in the survey is actually smaller than the qualitative difference that occurred in the real world because in the real world, in the spring of 2020, the online classes were not even as good as -- as what's described in the survey.

Is that right?

MR. MADDEN: Objection to form.

A. That's right. It makes -- it makes the design conservative, and likely understating damages.

And I also just want to come back to this again, it's consistent with my assignment. My assignment was to estimate the value of the time -- at the time of contracting, for both options.

So, at the time that they contracted for that spring semester, the online offering was something that -- that, you know, was not undermined or contaminated in any way by -- by the pandemic. It was something that was fully functional, like a normal, premeditated online experience.

So I actually think that we're getting -- you know, we're getting something that I've been asked to do.

Page 109

A. Well, if -- if what you're asking is did I -- I did try to evaluate these two modalities in the presence of COVID, and the answer is no. I think we've been through this before.
That -- COVID was not present at the time of the contracting and so, therefore, shouldn't -- shouldn't enter into the -- the survey methodology, or the survey instrument.
Q. (BY MR. WATSON) If -- if you were trying to measure the value of -- let me take it back a step.
The -- the reason that you have not included COVID, or some health attribute, in your conjoint survey, is because at the time, December 2019, or thereabouts, you know, your -- your expectation was that that was not a significant factor in students' decision-making, right?
MR. MADDEN: Objection to form.
A. I think that it's correct that they couldn't have known about it in December of '19. Or maybe there was a few cases, but they wouldn't have known the extent of -- of, you know, all the implications of what a full-blown pandemic would look like.
And so, if we're trying to figure out, you know, what kind of discount they would have demanded at the time of contracting, then I --



again, I'm just reading to myself, but you wouldn't want to put COVID at the top of their mind.
I mean, they couldn't have had COVID at the top of their mind, in -- in December of 2019.
Q. (BY MR. WATSON) Now, if you were trying to value what they actually received in the spring of 2020, with full knowledge of the facts as they actually unfolded, would you do the survey differently?
A. I think so. So, if the assignment were something different, like if I -- if I, instead of being asked to estimate these two things at the time of the contracting, but instead, was, you know, at the time of the breach, or post breach, you know, I'm just -- this is a new question being put to me for the first time.
But I can conceive of stating the description of the online experience in a way that more closely captures the emergency remote online.
I -- I imagine there's -- there's language that we could get from -- from somewhere. I would have to think where -- you know, where you would get it. Maybe -- maybe there's some extent description by BU.
But you know, again, I just want to point



out that if you degrade that online experience, in the minds of the respondents, then it follows that they're going to demand a larger discount than the one that they exhibited in my survey.
Q. Well, I suppose your -- your focus -- or you did focus in that answer on the fact that the online experience, as delivered in the midst of the COVID pandemic, may have been perceived as less polished, if you will, than the description of online classes that was provided in your survey, right?
A. Exactly.
Q. But -- but if you were to -- also, if you were to value the differential between on-campus, and online, at the time of the breach, as -- as you described it, sometime mid semester spring 2020, you would agree that you also would have to have included some kind of descriptor to indicate online has a reduced risk of -- of COVID exposure versus in-person, right?
MR. MADDEN: Objection to form.
A. Well, I don't know if I -- if I would have to put in exactly in that language. But you know, again, this is -- it's important to just get this disclaimer out.



This is very different from the assignment that I was given. But if you were trying to get the stepdown at a later point in time, not at the time of contracting but at the time, like, post breach, you would have to give them a different set of instructions. You would have to describe the two modalities differently.
I think you -- you know, you -- you would -- yes, I -- I -- this is the first time I'm hearing the question. So I'm reluctant to kind of offer up a new -- a new opinion, on the fly.
But I -- what I'll grant you is you could make changes to what I did, try to -- try to measure that different valuation problem.
Q. (BY MR. WATSON) Now, if you still have Appendix 4 in front of you.
A. Yes.
Q. There is -- there is an assumption, or an instruction, that you provide, in Question 20 --
A. Okay.
Q. -- which says: If you -- if you received or anticipate receiving financial aids or scholarship for your undergraduate education, please assume that it is available to you when making your selection.

Do you see that?
A. Yes.
Q. And -- and is that effectively an instruction that says, you know, whatever your actual experience is in the context of financial aid, apply that to the decisions that you're about to make, in the -- in the below.
MR. MADDEN: Objection to form.
A. Well, the language is that -- as it is. But I certainly wanted them to recognize that they wouldn't have to pay the -- the full list price. That is, whatever -- whatever experience they have with respect to financial aid, that they ought to consider, I think, the exact language, that they would have the same access to financial aid as they would, in -- in the real world.
It's important, of course, that we did that, because we want to apply the discount to their net price, not to the -- not to the gross price.
And I just -- while we're on this thing, it's just really important, if Dr. Wilner might be listening in, that I think he used the language, he said that I instructed them to ignore financial aid, and another -- and another time, he said, they need not consider financial aid.



You should look these up, control F, in the Wilner report.
And I just want to make it absolutely clear that that is the opposite of what I instructed them to do.
You just took me to Q20, and we read -- you know, we read the language aloud. I want them to consider it, and to -- and to believe that they will have the same access to financial aid as they did in the real world.
So it is -- it is incorrect. And I don't know how this came about, either from a misreading, or -- or a -- or intentional. I don't know what it is.
But -- but his description, where I -- he says on one point that I instructed them to ignore it, and another time, he said they need not consider it, it just completely misrepresents, you know, what I did.
Q. (BY MR. WATSON) And so, when you get to your semester cost numbers, those numbers are based on either a hundred percent or -- I can't remember now, 125, 150 percent, or some reduced amount of the list price that BU charged, right?
A. Right. We're going -- we're going to center



it around the list price, but we're going to vary it, you know, 50 percent down and 50 percent up, so -- because we need, you know, random assignments to tease out and to -- and to populate what the -- what these parameters look like, their utility look like.
And you can't do that if you -- if you don't vary that along the -- along the precise dimension.
Q. And so, through the selections that respondents made, you generate part worths for costs and part worths for each of the levels of the various attributes, right?
A. Right.
Q. And then you are able to determine, for each respondent, what their utility is for or what their -- basically what their dollar value associated with the level of the class and campus facility attributes, right?
A. I mean, if I --
MR. MADDEN: Objection to form.
A. That's close. But if I could just put it in my words. We -- we're trying to solve for the discount that would be needed to make them indifferent between the two options, right. The dollar discount that would be needed to make them



indifferent between the two modalities.
Q. (BY MR. WATSON) Now, in that step in your analysis, what role is the outside option playing? How does it fit into that calculation?
A. The -- the outside option is really to define what the -- the marginal customer would be willing to pay for this.
So the marginal customer is probably represented somewhere in the survey. But I think for the -- and we need that outside option to -- to estimate, you know, the full utility function. It provides an important role in defining what the marginal customer is; that is, the customer is just different -- indifferent between partaking in the BU offerings or -- or not.
But -- but mechanically, once we -- once we've populated all these parameters, we don't need to know what the -- what the marginal customers' utility looks like.
We can, instead, go, you know, customer by customer, calculate their utility associated with one, take the difference, you know, with the other option, the online, and then solve for the -- the discount that's needed to make them indifferent between the two.

form of external validation, a test of external validation. I reject it. I don't think it's an appropriate one. But for me --
Q. Well --
A. -- for me, what I think is -- I think the best you can do, in terms of external validity, in the absence of actual experiment, at the end of the day, we're asking, did the respondents that we came upon give us confidence that their attitude, with respect to discounts demanded, are reflective of the discounts demanded of the class, of the students enrolled in the spring of 2020. That's what -- that's what we're ultimately asking.
And I think that the way that an economist ensures external validity is by going out and getting the right sample, and getting a random sample, and getting a large enough sample, so that they can be confident in making those -- those predictions out of sample.
I -- I don't know what -- what else, you know, we can do, besides randomize, design the -- the filters of eligibility in such a way as to capture the key attributes of the population.
And then, three, get the sample size big enough so that you can be confident that you have



enough of the attributes and differences in question, so that you can make that extrapolation.
Q. I mean, you're aware of research that suggests that, where possible, one should conduct external validity tests on a -- on the results of a conjoint survey, right?
MR. MADDEN: Objection to form.
A. Where possible -- oh -- I mean, where possible, of course.
If there's some -- you know, if there's some natural experiment that would allow me to -- to test the predictions of the model with respect to discounts demanded. But what -- what's curious about this, of course, is if there's such a good natural experiment out there, begs the question, why didn't you just use that natural experiment.
I start from the position that there is no natural experiment, because the fall of 2020 is corrupted, for the reasons that we discussed earlier.
And -- and certainly, I wouldn't -- I don't know -- I don't know if you have a particular external validity test. I'm happy to entertain the possibilities.
But Dr. Wilner's, you know, comparison of



gender and state residents and ethnicity, to -- to the population of BU students, isn't really an external validity test of what I'm -- what I'm actually trying to measure.
Q. (BY MR. WATSON) And I guess what I -- you know, I'm not really speaking with regard to Dr. Wilner's work, as much as a more general proposition, which is, you know, one can construct a survey, one can do their level best to generate, you know, a -- a reasonable survey instrument, like the sample population -- take all of those steps, but ultimately doesn't necessarily mean that you're going to get, you know, the right answer, notwithstanding all the best efforts.
And so, I guess what I was kind wondering is kind of more generally, is there -- when you conducted this exercise, you know, were there things you looked at to try to say, okay, this is a -- outside the model piece of evidence that is -- that, you know, gives me confidence that my -- my experiment is yielding an accurate result.
MR. MADDEN: Objection.
A. Well, what -- what that would look like would be a discount that got demanded by -- and paid by -- you know, to -- how about this. The



discount that was demanded by students who were similarly situated, under the circumstances that we're trying to model.
That would be -- that would be the -- the type of data that could validate the discounts that -- that we are able to uncover, you know, through our conjoint.
And I would submit to you that I don't -- I don't think there is such an experiment out there. If there were, you know, I would have exploited it, as a potential benchmark.
You know, I can't -- I can't accept fall of 2020. And I can't accept, you know, what BU charged for online offerings, particularly when the online offerings are -- are such different products than the ones that are -- you know, for the -- for the on-campus experience.
So I don't -- I don't know where you would go to validate a discount demand that comes out of the survey. I think the best thing you could do for external validity here is make sure you -- your sample, your target -- you know, sample captures the population you're intending to capture, make it random, and -- and make sure the sample size is large enough.

I don't know what -- what else could be done beyond that, for external validity.
Q. Now, in that answer, you had said: I can't accept what BU charged for online offerings, particularly when the online offerings are such different products than the ones that are for the on-campus experience. So I don't know -- I don't know where you would go to validate.
Do you -- I wasn't entirely following that, either.
A. Sure. I can elaborate.
Q. Can you help me understand -- please.
A. Yeah. My understanding is that the online offering for undergraduates at BU isn't really comparable to the on-campus offerings, in the sense it's only available for -- and I might not be getting the exact phrasing, but some kind of continuing education, or -- or someone -- they're accepting folks that have already started somewhere else.
I don't think that -- that it's a similar offering, in product terms. It's sufficiently similar so that we could make apples to apples comparisons. And this is for the -- for the undergraduate.



For the -- for the graduate programs, I don't think that there's an online offering with respect to what we call the moneymakers, you know, law and medicine.
There -- there are some that are -- that -- that might be closer, for lesser -- less important, in terms of money-generating graduate programs for BU.
But finally, we've got this problem that I mentioned before, which so long as BU is in charge of, say, setting the online price of -- of -- say an MB-- an MBA, and also in charge of setting the in-person price of the MBA, that -- that BU is going to be very careful to make sure not to cannibalize, you know, the on-campus experience for the MBA, given how important it is for -- for revenue generation.
Q. Well, wouldn't you think that the market would come into play there?
MR. MADDEN: Objection to form.
A. The problem is that you -- you would need some stand-alone provider of the online offering that has a comparable reputation. And I don't think that that exists, in the universe.
You could -- maybe you could educate me



about some online provider that I don't know about. But so long as the online provision is -- is being done by the same university that's offering the in-person, there's always going to be incentive not to cannibalize and, therefore, not to -- not to charge the stand-alone price, but instead, to take into consideration the pricing of your -- of your moneymaking offering.
Q. (BY MR. WATSON) I mean --
A. So we'll never get to see the true discount in the marketplace, is my conjecture.
Q. So, is it fair to say, then, that your view is that there is no marketplace pricing data that could either confirm or rebut the results of your -- your conjoint survey?
MR. MADDEN: Objection to form.
A. I think -- I think that the two options that your expert has put forward are not viable. And I'm not -- sitting here, I'm not aware of any others.
You know, it's -- it's -- could be extreme to say that it does not exist, but I can tell you, it -- it's hard to fathom how it could exist, because like I said, so long as the -- the enterprise that's offering the online is also



offering the in-person, they're going to be clear incentives not to -- not to price it as if you were a stand-alone offering, but, instead, to take into consideration the moneymaking, in-person offering.
So, we -- we'd have to conceive of a -- of a stand-alone provider online education that has built a reputation on par with Boston University, which -- which I think doesn't exist on earth.
And I -- I mean that in a -- in a flattering way. I think that Boston University is -- presents a particularly hard case here.
If we were starting with some average or middle tier, or even lower tier university, maybe we could -- we could conceive of an online offering that would allow us to perform that calculation.
But I think that Boston University is just too good of a school to -- to find a -- a comparable offering online, where the price is not set by Boston University.
Q. (BY MR. WATSON) Well -- or at least as I -- as I understood, when you said the price is not set by Boston University, I -- I guess what I understood you to be saying is, any comparable offering, the price would be impacted by the desire not to cannibalize the on-campus pricing, right?

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.