# Exhibit 37

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: BOSTON UNIVERSITY COVID-19 REFUND LITIGATION | ) | MASTER FILE NO. 1:20-cv-10827-RGS |

# EXPERT REPORT OF

# BENJAMIN S. WILNER, Ph.D.

# Table of Contents


I. Introduction & Summary Of Opinions ..... 1

II. Qualifications ..... 2

III. Case Background ..... 4

A. Named Plaintiffs ..... 5

B. Tuition & Fees ..... 6

IV. Actual Data Contradicts Plaintiffs' Damages Theory ..... 11

A. Putative Class Members Elected To Pay A Similar Price For Semesters Taught Under Conditions Similar To The Spring 2020 Semester ..... 13

B. BU's Separate Online Programs Are Priced The Same As Its In-Person Programs ..... 14

C. Putative Class Members Received Similar Value During The Spring 2020 Semester ..... 15

D. Individualized Factors Predominate And The Singer Analysis Fails To Account For Those Concerns ..... 19

E. Dr. Singer Ignores Research Demonstrating That Students Are Generally Not Granular Economic Decision Makers ..... 21

V. Conjoint Analyses And The Singer Analysis ..... 23

A. Conjoint Analyses ..... 23

B. The Singer Analysis ..... 24

VI. Deficiencies And Flaws In The Singer Analysis ..... 29

A. Courts And The Papers Dr. Singer Cited Demonstrate The Deficiencies In His Analysis ..... 29

1. Courts Have Not Accepted Conjoint Analyses In The Educational Context ..... 29

2. Dr. Singer's Cited Papers Do Not Suggest He Could Apply Conjoint Models As He Did With BU ..... 30

3. Additional Reasons Why Educational Institutions Do Not Utilize Conjoint Analyses ..... 33

B. Dr. Singer Did Not Properly Investigate The Tuition And Fees Students Actually Paid ..... 33

1. There Is A Difference Between List Prices, The Net Prices BU Receives And The Net Prices Students Pay ..... 34
2. Dr. Singer Incorrectly Assumes That BU Sets One Unique Tuition Price When In Fact Prices Are Individualized ..... 34
3. Dr. Singer Incorrectly Assumes Financial Aid Is Unrelated To List Prices ..... 39
4. Dr. Singer Improperly Bases His Conjoint Analysis on List Prices ..... 40
5. Dr. Singer Ignores The Individualized Conjoint Analyses Required When Universities Can Perform Market Segmentation ..... 41
6. Even If It Were Proper To Use One Aggregated List Price In His Conjoint Model, The Results of That Model Are Not Applicable To Dr. Singer's Damages Formula ..... 43
7. Dr. Singer Incorrectly Pro-Rates Alleged Damages ..... 43
8. Dr. Singer Did Not Demonstrate How He Could Calculate The Tuition And Fees (And Damages) Of Each Putative Class Member ..... 46

C. The Singer Analysis Incorrectly Applies Standard Conjoint Methodology Along Multiple Dimensions ..... 47

1. Dr. Singer Incorrectly Applied The Algebraic Method To Estimate His Price Discounts ..... 47
2. Dr. Singer's Misapplication Of Decision Theory Further Biases The Conclusions Of The Singer Analysis ..... 48
3. Dr. Singer Did Not Demonstrate That The Model He Employed Was Appropriate ..... 51
4. Dr. Singer Did Not Determine That All Data Included In His Conjoint Analysis Were Appropriate ..... 52
5. Dr. Singer Did Not Perform A Proper Survey To Elicit Respondent Preferences Regarding BU's Tuition and Fees ..... 52
6. The Singer Analysis Improperly Handles Supply Side Issues ..... 60

D. Dr. Singer's Conjoint Survey Analysis Is Hypothetical, Flawed, Biased & Statistically Unreliable ..... 64

1. Dr. Singer Did Not Properly Statistically Analyze The Results Of His Survey ... 65
2. Dr. Singer's Own Survey Results Demonstrate The Need For Individualized Inquiry To Assess Liability & Damages ..... 65

E. The Singer Analysis Did Not Follow Standard Survey Practices .............................. 71

1. Dr. Singer Did Not Perform A Full Pre-Test ...................................................... 71

2. Dr. Singer's Sampling Frames Are Misdefined .................................................. 72

3. Dr. Singer's Sample Survey Participants Are Not Representative Of Putative Class Members ........................................................................................ 74

4. Dr. Singer Did Not Report His Response Rate And The Ability Of His Sample To Represent The Target Population ..................................................... 75

VII. Even If Dr. Singer Were Able To Demonstrate that BU's Spring 2020 Semester Was Less Valuable, Putative Class Members Were Not Necessarily Damaged ...................... 76

VIII. Conclusion ........................................................................................................ 78

# I. Introduction & Summary Of Opinions

In the middle of the Spring 2020 Semester, Boston University ("BU") – like countless universities nationwide – was confronted with numerous state and federal directives sharply limiting in-person gatherings as a result of the spiraling, deadly global COVID-19 pandemic. In response, BU transitioned to primarily remote instruction and services, enabling its students to continue to make uninterrupted progress toward their academic degrees.

Nevertheless, the Named Plaintiffs – a group of undergraduate and graduate students as well as one parent, including Julia Dutra, Gabriella Dube, Shakura Cox, Olivia Bornstein, Venus Tran, Natalie Silulu, and Valaauina Silulu – claim that they were economically damaged when BU transitioned to remote classes during the Spring 2020 Semester, to protect the health and safety of its community in response to COVID-19 and the ensuing executive orders. To calculate such alleged damages, the Named Plaintiffs submitted the November 18, 2022 Report of Hal J. Singer, Ph.D. who presents a model that purports to calculate classwide damages in this matter in a formulaic manner utilizing a "conjoint analysis" damages methodology (the "Singer Analysis").[1]

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing BU. I, Benjamin S. Wilner Ph.D., in my role as a Managing Director at A&M, have been asked to respond to the Singer Analysis. I conclude that the Singer Analysis is flawed, unreliable, and does not and cannot be used to reliably calculate any individual student's alleged damages, let alone reliably formulaically calculate damages on a classwide basis across the Named Plaintiffs' putative class. I summarize some, but not all, of the flaws discussed in this Expert Report regarding the Singer Analysis:

- Dr. Singer ignores concrete, undisputed, contemporaneous real-world data that demonstrates that putative class members would not demand lower tuition and fees to attend BU during the Spring 2020 Semester. BU students' re-enrollment for the Fall 2020 Semester, their active elections to take remote coursework when a hybrid environment was available, BU's generally equal pre-existing pricing for in-person and online programs, and the benefits that students continued to enjoy during the Spring 2020 Semester all contradict Dr. Singer's conclusions.

- Dr. Singer's academic citations actually demonstrate the flaws in the Singer Analysis.

- Courts have rejected conjoint analyses that were more detailed than the Singer Analysis.

- As the Singer Analysis incorporates List Prices and the Net Prices BU Received, it does not utilize the prices most relevant to calculating alleged damages, the Net Prices Students Paid. Dr. Singer also ignores the individualized nature of all of these prices. Some of this individualization is due to BU's market segmentation that Dr. Singer overlooked when he grouped all undergraduate and graduate students together. Furthermore, Dr. Singer told his survey respondents to make problematic assumptions about financial aid. Notwithstanding the

[1] A "conjoint analysis" is a market research approach typically used by companies and other sellers to assess relative values that consumers place on products and services they sell.

above, Dr. Singer incorrectly claims that the semester-long prices that BU charged can be translated into daily prices on a pro-rata basis.

- Dr. Singer incorrectly implemented his conjoint analysis as he
  - Applied the Algebraic Method, not a competitive simulation, to estimate his price discounts;
  - Utilized inapplicable decision making rubrics;
  - Did not demonstrate the reasonableness of the functional form of his conjoint model;
  - Did not show the propriety of his attribute and attribute value selections;
  - Misstated attributes he included in his conjoint model;
  - Incorrectly handled supply-side issues; and
  - Did not perform a full pre-test.

- The Singer Analysis' results are incorrect because of hypothetical and focalism biases.

- Dr. Singer misdefined his Target Population, Sampling Frame and Sample, as they are non-representative of putative class members.

- Even if Dr. Singer were able to demonstrate that BU's Spring 2020 Semester was less valuable, putative class members were not necessarily damaged.

I generated these conclusions by reviewing the documents listed in ***Exhibit 1***. I respectfully reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

# II. Qualifications

My curriculum vitae (***Exhibit 2***) details my credentials, testimony, publications and awards.

I am a Managing Director at A&M. I have served as an expert witness and business consultant performing economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, and a wide range of class action, intellectual property, insurance claim, lost profits and lost income matters. I received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff by analyzing product bundles, rather than individual imports. I also advise educational institutions on tuition-setting issues. I am the co-chair of an undergraduate admissions subcommittee for part of the Chicago-area for the University of Pennsylvania.

I hold a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course degree in Mathematics & Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science ("MEDS") from the Kellogg Graduate School of Management at Northwestern University. MEDS studies how consumers, governments and businesses make decisions in a wide variety of economic and other environments.

I served as a professor of economics, finance and statistics at the University of Michigan, the University of Iowa, Northwestern University, and the Helsinki School of Economics.

My research has been published in peer reviewed academic journals including the *Journal of Finance*, the leading academic journal in finance. I was awarded research grants from multiple universities and the National Science Foundation ("NSF"). My research has been cited by over 900 other papers.[2] I also served as a referee for multiple academic journals and textbooks.

Last month, I was the only expert on a panel discussing "The Conjoint Damages Standoff: Benefit of the Bargain or Procedural Shortcut?" at the American Bar Association Litigation Section's 26th Annual National Institute on Class Actions.

Conjoint analyses are an amalgamation of decision theory and regression analyses. As discussed below, decision theory touches almost all aspects of decision theory. As part of my decision science doctoral program, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for decision theory, in particular, for analyzing environments that cause respondents to truthfully and accurately reveal their full preferences, as well as Dale Mortensen, who applied decision theory in his study of labor markets, which led to his winning the 2010 Nobel Prize in Economics.

One of my areas of research within decision theory was experimental economics, which is the application of experimental methods to study economic questions. Conjoint analyses are one branch of experimental economics. For my NSF grant, my coauthors and I statistically analyzed data from a consumer buying behavior survey we conducted that determined the prices respondents would pay for products that could be sold in bundles. My undergraduate advisor, Colin Camerer, a MacArthur Genius Award Winner, utilizes experimental economics to study the psychological forces and their deeper neuroscientific foundations that influence economic decisions involving individuals and markets. The former President of the University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers on utilizing experimental economics surveys to generate economic conclusions.

Additionally, not only have I taught regression analyses at multiple universities, but I was taught regression analyses by Lawrence R. Klein, who was awarded the 1980 Nobel Prize in Economics for building regression models, during my three years as a research assistant to him.

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses. A&M is compensated at a rate of $745 per hour for my time. Other individuals from A&M also provided assistance in this matter; their hourly rates range from $250 to $700.[3]

---

[2] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on October 19, 2021.

[3] No one who has contributed to this engagement has any known financial interest in any party to the matter. A&M's compensation is neither based nor contingent on the results of this analysis. This Expert Report is provided solely for use in the matter described in the caption at the top of this Expert Report. This Expert Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of A&M.

# III. Case Background

COVID-19 caused business and school disruptions throughout the country, especially during Spring 2020. BU was no exception.

BU's Spring 2020 Semester began with classes starting on January 21, 2020.[4] On March 10, 2020, the Governor of the Commonwealth of Massachusetts declared a State of Emergency imposing work and travel restrictions.[5] BU then transitioned to remote instruction on March 16, 2020 and announced on March 17, 2020 that for their own health and safety, students should vacate the campus by March 22, 2020.[6] It was reasonably recognized by all parties that it was forbidden and unsafe for students to return to campus.[7] The last day of classes for BU's Spring 2020 Semester was April 30th, and final exams went from May 5th to May 9th.[8]

As a result of these closures and adapting to the COVID-19 pandemic, BU incurred approximately $52 million in unexpected expenditures during the Spring 2020 Semester.[9] Specifically, BU incurred $8 million in costs to transition to remote instruction during the Spring 2020 Semester, including purchasing Zoom licenses, investing in classroom technology and developing technical resources to benefit student learning.[10] BU also disbursed $44 million in refunds to students related to room and board payments.[11]

In addition, BU provided CARES Act funds to students upon request to assist with financial needs arising because of COVID-19 and the transition to remote classes. Although it was only required to distribute to its students 50% of the CARES Act funds it received from the Federal government, unlike many other universities, BU provided 100% of the nearly $15 million it received to aid 5,804 students.[12] This roughly $15 million should be considered a windfall to students that should be deducted from any alleged damages.[13]

Despite the payments BU made, the Named Plaintiffs are seeking damages on behalf of the following putative class:

---

[4] academic-calendar-2019-2020.pdf.
[5] https://www.mass.gov/news/governor-baker-declares-state-of-emergency-to-support-commonwealths-response-to-coronavirus viewed on December 5, 2022.
[6] Second Consolidated Amended Class Action Complaint And Jury Demand ("Complaint"), Dkt. 49, paragraphs 117, 141 & 143, May 6, 2022 Deposition of Robert Brown, p. 78, and Affidavit of Christine Paal ("Paal Affidavit"), Dkt. 100-6, Exhibit 3.
[7] Complaint, Dkt. 49, paragraph 143.
[8] academic-calendar-2019-2020.pdf.
[9] May 2, 2022 Deposition of Gary Nicksa (Affidavit of Marina Lev ("Lev Affidavit"), Dkt. 100-5, Exhibit 2), p. 207.
[10] *Id.,* pp. 63, 206-207 & 208.
[11] *Id.,* p. 63.
[12] https://www.bu.edu/articles/2020/bu-awards-federal-cares-aid-to-students/ viewed on December 5, 2022.
[13] Put another way, this 100% payment is equivalent to BU providing students with approximately an additional $7.5 million that they were not "owed" pursuant to the government mandate, and caused BU to incur an additional approximately $7.5 million in losses.

> All people who paid BU tuition [and] fees … for in-person educational services, programs [and] access …that BU failed to provide during the Spring Term, and whose tuition and/or fees have not been refunded.[14]

### *A. Named Plaintiffs*

The Named Plaintiffs include Olivia Bornstein, Shakura Cox, Gabriella Dube, Julia Dutra, Natalie Silulu, and Venus Tran – all of whom were BU students during the Spring 2020 Semester. Ms. Silulu's father, Valaauina Silulu, is also a Named Plaintiff.

Mx. Bornstein matriculated into the full-time undergraduate program at BU's College of Arts and Sciences ("CAS") on September 5, 2017, majoring in Sociology. She changed her major during the Spring 2019 Semester to Philosophy and Neuroscience. She completed and received credits in one of her four classes in which she was enrolled during the Spring 2020 Semester, withdrawing from one class after the standard withdrawal date at BU.[15] Mx. Bornstein then took a leave of absence from BU for the 2020-2021 academic year, beginning with the Fall 2020 Semester.[16] With the exception of some coursework during BU's 2021 and 2022 Summer Sessions and the Fall 2021 Semester, it is my understanding that Mx. Bornstein has been on leave through the present day, and has indicated their intent to continue working toward double majors in Philosophy & Neuroscience and in Earth & Environmental Sciences.[17]

Ms. Cox matriculated into BU's full-time School of Social Work ("SSW") on September 3, 2019. Ms. Cox successfully completed and received credits for all six of her Spring 2020 Semester courses in which she was enrolled for credit.[18] Ms. Cox graduated from BU with Master's degree in Social Work on September 25, 2021.[19]

Ms. Dube matriculated into BU's full-time undergraduate program at BU's CAS on September 4, 2018, majoring in Sociology. During BU's Fall 2019 Semester, she transferred to the Questrom School of Business ("QST"), studying Business Administration and Management. Ms. Dube successfully completed and received credits for all five of her Spring 2020 Semester classes. Ms. Dube earned a Bachelor of Arts degree in Sociology as well as a Bachelor of Science degree in Business Administration on September 25, 2021.[20] Ms. Dube is currently employed as a Trust Recruiting Associate for PricewaterhouseCoopers in Boston.[21]

Ms. Dutra matriculated into BU's full-time undergraduate program at the College of Communications ("COM") on September 4, 2018, studying film and television. Ms. Dutra successfully completed and received credits for all four of her Spring 2020 Semester classes. Ms.

---

[14] Complaint, Dkt. 49, paragraph 147. While the Complaint originally asserted claims for room and board, the Court dismissed those in its January 7, 2021 Order granting in part BU's Motion to Dismiss (Dkt. 63).
[15] Bornstein Olivia Transcript.pdf, Spring 2020 WD Dates.xlsx and Olivia Bornstein - CAS CH102 Drop.pdf.
[16] Paal Affidavit, Dkt. 100-6, paragraph 13 and Bornstein Olivia Transcript.pdf.
[17] 2022.12.14 Letter from N. Verge – Olivia Bornstein.pdf.
[18] Only six of the classes in which she was enrolled were for-credit. See Cox Shakura Transcript.pdf.
[19] Paal Affidavit, Dkt. 100-6, paragraph 14.
[20] *Id.,* paragraph 15.
[21] https://www.linkedin.com/in/gabriella-dube/ viewed on December 13, 2022.

Dutra graduated from BU's COM with a Bachelor of Science degree on January 25, 2022.[22] Ms. Dutra is currently employed as a Business Development Representative at OpenReel.[23]

Ms. Silulu matriculated into BU's full-time undergraduate program at the COM on September 3, 2019. Ms. Silulu successfully completed and received credits for four of her five Spring 2020 Semester classes.[24] Ms. Silulu transferred into QST during the Spring 2021 Semester and graduated from BU with a Bachelor of Science degree in Business Administration in May 2022.[25] Ms. Silulu is now employed as an Associate Functional Consultant at Oracle Net Suite.[26]

Ms. Tran matriculated into BU's Master of Science program in Oral Health Sciences within the Division of Graduate Medical Sciences at the School of Medicine on September 3, 2019. Ms. Tran successfully completed and received credit for all six of her Spring 2020 Semester classes. Ms. Tran graduated from BU with a Master of Science degree in Oral Health Sciences on September 25, 2020.[27]

All Plaintiffs, except Mx. Bornstein (who took a leave of absence) and Ms. Tran (who graduated in September 2020),[28] reenrolled in BU's regular degree programs paying full tuition for the Fall 2020 Semester.[29]

### *B. Tuition & Fees*

The Singer Analysis claims that BU should have charged its students reduced tuition and fees for the Spring 2020 Semester. Before I discuss Dr. Singer's claims, I note that BU did **not** charge uniform tuition and fees to its undergraduate and graduate students because of, amongst other things, varying program prices and financial aid.

There are three relevant prices associated with tuition and each fee: 1) the List Price, 2) the Net Price BU Receives and 3) the Net Price Students Pay.

- List Prices for tuition and fees are the amounts that the university lists on its website, catalogues and brochures. Because of the sizable financial aid BU provides, most students in its traditional programs do not pay these List Prices.[30]
- The Net Price BU Receives equals the List Price minus BU-provided financial aid.

---

[22] Paal Affidavit, Dkt. 100-6, paragraph 16.
[23] https://www.linkedin.com/in/juliadutraa/ viewed on December 13, 2022.
[24] For her fifth class, Ms. Silulu received an NC grade, which was a grading option made available by BU for only the Spring 2020 Semester, whereby students could elect to elect to designate any course as "Credit/No Credit after reviewing their letter grades. See https://www.bu.edu/provost/2020/03/27/university-grading-policies-for-spring-semester-2020/ viewed on December 15, 2022.
[25] Paal Affidavit, Dkt. 100-6, paragraph 17.
[26] https://www.linkedin.com/in/natalie-silulu-0aabb5196/ viewed on December 13, 2022.
[27] Paal Affidavit, Dkt. 100-6, paragraph 18.
[28] It is my understanding while Ms. Tran was not officially enrolled in any classes during the Summer of 2020, she was certified as a full-time student in the Summer 2020 Semesters by BU for purposes of working on research. This is a common practice for Masters and Doctoral students at BU. The fee paid for the summer 1 and summer 2 terms was equivalent in List Price to four credits of tuition.
[29] Paal Affidavit, Dkt. 100-6, paragraph 20.
[30] BU Financial Aid Stats.pdf

- The Net Price Students Pay equals the List Price minus both the financial aid BU provides as well as the financial aid provided by external sources, such as Federal, State, Local and foreign governments, charities, organizations, corporations, other private entities, along with friends and family.

As students receive different financial aid amounts from BU and from external sources, the Net Price BU Receives and the Net Price Students Pay are individualized. For example, if BU's List Price for tuition was $20,000, BU provided a given student with $6,000 in financial aid and that student's local Chamber of Commerce gave the student a $3,000 scholarship, the Net Price BU Receives from this student is $14,000 and the Net Price the Student Paid would be $11,000.

Changes in the Net Prices Students Pay are the relevant prices needed to determine how much putative class members were damaged.[31] Analyses based upon List Prices or the Net Prices BU received cannot accurately assess damages. If BU charged lower List Prices, but the Net Price Students Paid remained the same, putative class members were not damaged as their out-of-pocket costs would be identical. Section VI.B.1 below shows that changes in List Prices have not meaningfully affected Net Prices over the last decade.

While Section III.B below discusses the Net Prices BU Receives and the Net Prices Students Pay, the subsections below identify the distinct components of the tuition and fees allegedly at issue in this matter and their List Prices for the Spring 2020 Semester. A variety of factors such as enrollment status and program affect BU's List Prices for tuition and fees. However, **it is important to note that modality of education does not affect List Prices for most BU programs. In other words, BU generally charged the same per-credit hour List Prices irrespective of whether students were enrolled in in-person or online classes, all else equal.**

### 1. *Tuition*

The List Prices for tuition BU posted for the Spring 2020 Semester were different based upon enrollment and program status. For example, not only were full-time and part-time students charged different List Prices, but they were differently structured. ***Exhibit 3*** shows the different Spring 2020 Semester tuition List Prices for full-time and part-time students. While full-time students are charged a flat tuition List Price irrespective of the number of credits they took, part-time students are charged on a per credit hour basis.[32] BU's List Prices also varied by program. Exhibit 3 demonstrates that BU charged full-time students 15 different List Prices that ranged from $9,300 to $41,000. BU charged part-time students 14 different List Prices per credit hour that ranged from $428 to $3,064.

---

[31] See *Reference Manual on Scientific Evidence* Third Edition, Federal Judicial Center, 2011 ("Reference Manual"), p. 434. Damages are based on "out-of-pocket" costs.

[32] Students are considered full-time if they are enrolled in 12 or more credits per semester and part-time if enrolled in less than 12 credits All students paying full-time List Prices are permitted to take up to 18 credits, except for seniors who are permitted to take up to 20 credits See https://web.archive.org/web/20200121010442/ https://www.bu.edu/academics/questrom/policies/course-overload/ viewed on December 13, 2022. Full-time School of Music Graduate Program students must be enrolled in 7.0-11.5 credit hours to be considered a full time student. See https://www.bu.edu/reg/registration/tuition-fees/ viewed on December 5, 2022.

With regards to the student Named Plaintiffs, while Ms. Cox faced a $17,568 tuition List Price for the Spring 2020 Semester,[33] all other student Named Plaintiffs' tuition List Prices were $27,360.[34] As discussed in Section VI.B.1, because of the various sources of financial aid available to the majority of BU students during the Spring 2020 Semester, most BU students did not pay these List Prices in any event. Of the six student Named Plaintiffs, four received institutional and/or governmental financial aid.

### *2. Fees*

Dr. Singer claims that putative class members should be refunded portions of the "mandatory fees" BU charged. While he did not specifically identify each of these "mandatory fees" in his Report, I was able to infer that these "mandatory fees" included the Community Service Fee, Student Services Fee and Health & Wellness Fee. I discuss each of these "mandatory fees" and other fees in the subsections below. ***Exhibit 4*** displays BU's List Prices for fees. Even though these fees were displayed on BU's website, not all putative class members paid them. Also, BU used these fees to support various services, but the fees did not guarantee access to particular on-campus services.[35]

#### *a. Community Service Fee*

The List Price for BU's Community Service Fee ("CSF") for full-time undergraduate students at the Charles River campus was $60 for the Spring 2020 Semester.[36] Some full-time graduate students were charged a $150 Program Fee, which covered similar functions.[37] Part-time undergraduate and graduate students are not charged the CSF. While the Named Plaintiffs who were BU undergraduates were charged the CSF, the Named Plaintiffs who were BU graduate students (Ms. Tran and Ms. Cox) were not.[38]

BU does not retain the CSF; instead, funds from the CSF are given to BU's Student Allocations Board, Programming Council and Residence Hall Associations and Student Government.[39] These organizations allocate CSF funds to approximately 500 student groups and organizations as well as use funds for advocacy and Student Activity Office programming, including Weeks of Welcome and Senior Week activities and Club Sports.[40]

---

[33] Paal Affidavit, Dkt. 100-6, Exhibit 1 and Cox Statement Spring 2020.pdf

[34] Paal Affidavit, Dkt. 100-6, Exhibit 1, Silulu, Natalie Spring 2020.pdf, Bornstein Spring 2020.pdf, Tran Statement Spring 2020.pdf, Dutra Statement Spring 2020.pdf and Dube, Gabriella Spring 2020 (1).pdf. In Figure 5 below, Ms. Dube's List Price Tuition is $30,780. The difference in prices is due to Ms. Dube taking 20 credit hours. The standard full-time List Price for Juniors covers 12-18 credit hours. Thus, Ms. Dube incurred an extra $3,420 for two part-time credits.

[35] May 6, 2022 Deposition of Robert Brown (Lev Affidavit, Dkt. 100-5, Exhibit 1), pp. 62-63 & 180.

[36] Paal Affidavit, Dkt. 100-6, Exhibit 1, p. 2.

[37] For example, see https://www.bumc.bu.edu/gms/files/2019/04/2019-2020-Tuition-and-Budget-Information-1.pdf viewed on December 15, 2022.

[38] Silulu, Natalie Spring 2020.pdf, Bornstein Spring 2020.pdf, Tran Statement Spring 2020.pdf, Cox Statement Spring 2020.pdf, Dutra Statement Spring 2020.pdf and Dube, Gabriella Spring 2020 (1).pdf. Ms. Tran was charged the $150 program fee. See Tran Statement Spring 2020.pdf.

[39] Affidavit of John Battaglino ("Battaglino Affidavit"), Dkt. 100-1, paragraphs 2-3. Also see May 6, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 121.

[40] Battaglino Affidavit, Dkt. 100-1, paragraphs 2 & 4.

The Student Allocations Board continued to distribute funds to student organizations after BU's transition to remote classes during the Spring 2020 Semester.[41] As with all semesters, any CSF funds student agencies did not spend during the Spring 2020 Semester were retained in a reserve account to be used to benefit students in future semesters.[42] Consequently, even if students did not receive the benefits of some CSF funds during a given semester, they received the benefits of those funds in future semesters. In other words, any excess funds were not returned to BU; they remained with the students.

As a result, BU could not have received a "windfall" from the CSF during the Spring 2020 Semester.

### b. Student Services Fee

BU had three different List Prices for the Student Services Fee ("SSF") for the Spring 2020 Semester. The List Prices were $307, $172 and $60 for full-time undergraduates, full-time graduates and part-time students at the Charles River campus, respectively.[43] Consequently, the Named Plaintiffs who were BU undergraduates faced a different SSF List Price than the Named Plaintiffs who were BU graduate students.[44]

The SSF supports a variety of student activities, including clubs, religious life activities at the George Sherman Union, and activities at the student service center and the Educational Resource Center, which offers student programming such as tutoring and academic support.[45] After BU's transition to remote education during the Spring 2020 Semester, BU made a number of these services available remotely to students, and many student groups continued to meet online at the discretion of the student members.[46] By the end of the Spring 2020 Semester, BU had allocated all SSF revenue it had received to student organizations and to other things, such as developing online content.[47]

As a result, BU did not receive a "windfall" from the SSF during the Spring 2020 Semester.

### c. Health & Wellness Fee

The List Price for BU's Health & Wellness Fee ("HWF") for full-time students was $219 for the Spring 2020 Semester.[48] Part-time students are not charged the HWF.

---

[41] *Id.,* paragraph 5 and May 6, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 121.
[42] Battaglino Affidavit, Dkt. 100-1, paragraph 6.
[43] Paal Affidavit, Dkt. 100-6, Exhibit 1, p. 2.
[44] Silulu, Natalie Spring 2020.pdf, Bornstein Spring 2020.pdf, Tran Statement Spring 2020.pdf, Cox Statement Spring 2020.pdf, Dutra Statement Spring 2020.pdf and Dube, Gabriella Spring 2020 (1).pdf.
[45] May 5, 2022 Deposition of Jean Morrison (Lev Affidavit, Dkt. 100-5, Exhibit 3), pp. 89-92 and May 2, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 105.
[46] May 5, 2022 Deposition of Jean Morrison (Lev Affidavit Dkt. 100-5, Exhibit 3), pp. 89-92.
[47] May 2, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 106 and Plaintiffs' Counterstatement of Facts and Response to Defendant's Statement of Undisputed Material Facts, Exhibit P (Dkt. 107-16).
[48] Paal Affidavit, Dkt. 100-6, Exhibit 1, p. 2.

Funds from the HWF along with other university funds support BU's Student Health Services.[49] BU's Student Health Services provides students with confidential, urgent, and primary medical care with a 24-hour on-call providers; Emergency Medical Services ("EMS") with rapid response to on-campus emergencies; Behavioral Medicine services ("BehMed"), including a Sexual Assault Response and Prevention Center ("SARP"); and Health Promotion and Prevention programs.[50]

BU's Student Health Services continued to provide these services in-person as well as via telehealth after BU's transition to remote instruction.[51] In fact, students scheduled the same number of telehealth appointments at BU's BehMed and SARP during the first week after the transition to remote education as they did prior to campus closure.[52] BehMed and SARP expanded their service offerings by increasing appointment hours to allow for students in different time zones to access their remote services and to facilitate greater student coverage.[53] BU Student Health Services' Primary Care began offering in-person services on April 20, 2020, with two Primary Care physicians working extended hours, and offering extended hours telehealth services from 8:00 am EDT to 9:00 pm EDT, Monday through Friday.[54] BU Student Health Services' Primary Care also offered online nursing coverage on the weekends.[55]

HWF funds also support the BU Fitness and Recreation Center,[56] which offered remote learning throughout the remote portion of the Spring 2020 Semester for physical education and offered online content, at no additional charge, to help meet the personal fitness, recreation and educational needs of students after BU's transition to remote education.[57]

As a result, because of the cost of the ongoing and additional services it provided, BU did not receive a "windfall" from the HWF during the Spring 2020 Semester.

### *d. Other Fees*

The List Prices for other BU fees included application fees ranging from $75 to $125 per application, Applied Music Fees ranging from $600 to $1,850 per semester, Clinical Affiliation Fees ranging from $1,400 to $3,420 per semester, Continuing Study Fees ranging from $600 to $3,930 per semester, Lab Fees (Non-Computer Science Courses) for $200 per course, Orientation fees ranging from $100 to $310, Doctoral Dissertation Fees for $115 per dissertation and Master's Thesis Fees for $25 per thesis.[58]

In addition, students can opt to pay a voluntary annual $130 Sports Pass Fee, which entitles attendance to intercollegiate lacrosse, ice hockey, baseball and soccer home games for BU.[59] Most

---

[49] Affidavit of Judy Platt ("Platt Affidavit"), Dkt. 100-7, paragraph 3 and May 2, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), pp. 142 & 147.
[50] Platt Affidavit, Dkt. 100-7, paragraph 3.
[51] *Id.,* paragraph 4.
[52] *Id.,* paragraph 5.
[53] *Id.*
[54] *Id.,* paragraph 6.
[55] *Id.*
[56] May 5, 2022 Deposition of Jean Morrison (Lev Affidavit, Dkt. 100-5, Exhibit 3), pp. 76-77.
[57] Affidavit of Shaun Bossio ("Bossio Affidavit"), Dkt. 100-2, Exhibit 1, paragraph 5.
[58] Paal Affidavit, Dkt. 100-6, Exhibit 1, p. 2.
[59] May 2, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), pp. 95-96.

of these athletic games for Spring 2020 had already taken place by the time BU transitioned to remote instruction in Spring 2020.[60] BU had to cancel only five home men's lacrosse games and five home women's lacrosse games, and no other events that would be covered by the Sports Pass.[61]

Dr. Singer did not include these Other Fees in his damages model presumably because he assumed that, unlike the fees discussed in the prior subsections, they for some reason would not change in the but-for world, discussed below.

# IV. Actual Data Contradicts Plaintiffs' Damages Theory

The Singer Analysis is flawed and unreliable because, among other things, it ignores concrete, undisputed, contemporaneous real-world data. BU students' re-enrollment for the Fall 2020 Semester, their active elections to take remote coursework when a hybrid environment was available, BU's generally equal pre-existing pricing for in-person and online programs, and the benefits that students continued to enjoy during the remote portion of the Spring 2020 Semester are all well-established facts that Dr. Singer's analysis tries to obviate by relying on counterfactual hypotheticals. But the fact remains that when presented with the exact choice in the real-world that Dr. Singer claims to replicate through a hypothetical conjoint analysis, BU students overwhelmingly elected to continue paying the same prices for remote education.

To assess alleged damages, one needs to compare the actual economic position of **each** putative class member with what their economic position would have been "but for" the defendant's allegedly improper actions. Dr. Singer estimated the "but for" economic position of all putative class members **as a whole** through the construction of a conjoint model. As discussed in subsequent Sections VI-VII of this Expert Report, there are several flawed assumptions underlying the Singer Analysis. The implementation of conjoint models naturally requires a large amount of explicit and implicit assumptions, several of which are flawed in the Singer Analysis.

The subsections below demonstrate that the economic position of putative class members "but for" the defendant's alleged improper actions could be modeled without so many assumptional uncertainties by investigating concrete, undisputed, contemporaneous real-world data. These actual data show that most putative class members would have paid the same amount of tuition and fees in the "but for" world as they actually did during the Spring 2020 Semester.

The "but for" world asks what tuition and fees putative class members would have paid had they known in advance that remote education and reduced campus access were possible during the Spring 2020 Semester. Subsection A below shows that students' actions during the Fall 2020 Semester provide a great benchmark about what their actions would have been in the "but for" world. In particular, students knew prior to BU's Fall 2020 Semester that classes would likely be remote and campus access could be reduced, an environment very similar, if not identical, to the "but for" world required to assess alleged damages in this matter.

[60] *Id.,* p. 97.
[61] *Id.*

Subsection A further demonstrates that most students did re-enroll at BU in the Fall 2020 Semester, being charged at least the same tuition and fee List Prices as the Spring 2020 Semester at issue in this lawsuit while knowing that Fall 2020 Semester classes would likely be remote and campus access could be reduced. These concrete, undisputed real-world data show that most putative class members would have paid the same tuition and fees in the "but for" world as they did in the actual world. No damages exist when there is not a difference between the tuition and fees paid in the actual and "but for" worlds.

As a result, one only has to look at students' actual behavior to determine if there would be a price reaction to students receiving remote classes and services in the middle of a global pandemic and not construct an assumption-laden economic model like Dr. Singer did. Actual behavior indicates that there would not be a price reduction for most, if not all, putative class members because of BU's transition to remote classes in response to COVID-19 during the Spring 2020 Semester. Dr. Singer ignored these concrete, undisputed real-world data and constructed a hypothetical alternative reality for the purposes of litigation in order to incorrectly claim that students had a lower willingness to pay and overpaid tuition and fees during the Spring 2020 Semester.

Subsection B provides additional concrete, undisputed, contemporaneous real-world data demonstrating that putative class members would have paid the same tuition and fees in the "but for" world as they did in the actual world. As discussed above, BU generally charged the same List Prices irrespective of whether students were enrolled in in-person or online classes. Therefore, concrete, undisputed, contemporaneous real-world data show that students voluntarily agreed to pay the same tuition and fees for remote classes contrary to conclusions of the Singer Analysis.

The Singer Analysis presumably found that students would have paid less for remote classes and reduced campus access because they allegedly believed that they would not receive all of the benefits they believed they bargained for when they enrolled at BU for the Spring 2020 Semester. However, Subsection C shows that contrary to that assumption, concrete, undisputed, contemporaneous data shows that students received similar benefits as they would have received had BU not transitioned to remote education during the Spring 2020 Semester. Moreover, students received *additional* benefits, such as the demonstrably valuable benefits of health and safety, by transitioning to a remote environment for the second portion of the Spring 2020 Semester.

While some students might have received lesser benefits after the Spring 2020 Semester transition and would not have enrolled at BU in the "but for" world, Subsection D shows that individualized analyses would be required to identify such students as well as what benefits diminishment they had. The Subsection also shows that the benefit diminishment of these students would not cause tuition and fees to be lowered for all putative class members.

The Sections below demonstrate that putative class members need to employ intricate analyses and decision making in order to generate the results of the Singer Analysis. Subsection E discusses how the Singer Analysis ignores research demonstrating that students do not utilize such intricate analyses and decision making when making their college choices.

### A. *Putative Class Members Elected To Pay A Similar Price For Semesters Taught Under Conditions Similar To The Spring 2020 Semester*

Students who enrolled at BU for the Fall 2020 Semester knew that some or all of their classes would be conducted remotely and that they would not have access to full on-campus activities for all or part of that semester.[62] Students knew no later than May 29, 2020, that many Fall 2020 Semester courses at BU would be offered "in a blended modality of remote and in-person learning" via a 'Learn From Anywhere' policy.[63]

Exhibits 3 and 4 show that BU's List Prices for tuition and fees in the Fall 2020 Semester were no less than the List Prices for the Spring 2020 Semester.[64]

As a result, all non-graduating BU students encountered the following question prior to the start of the Fall 2020 Semester, which is identical to the question needed to properly analyze the "but for" world in this lawsuit:

> *Will you enroll in the Fall 2020 Semester knowing that you will not have full in-person access to campus facilities and some or all classes may be taught remotely and that the tuition rate will not be reduced?*

BU enrollment data demonstrate that **most** students, including all but one non-graduating Named Plaintiff (Mx. Bornstein, who was on leave), **agreed** to be charged full tuition prices in the Fall 2020 Semester in an environment similar to the one for which the Plaintiffs now claim they were overcharged. Specifically, 89.28% of BU's in-person student population during the Spring 2020 Semester reenrolled for the Fall 2020 Semester despite the List Prices for tuition and fees either increasing or remaining the same.[65]

This contradicts Dr. Singer's claim that **all** putative class members were overcharged at the time and point of sale. BU students' **actual decisions** demonstrate that most did not believe they were overcharged at the time and point of sale for the education they received during the remote portion of the Spring 2020 Semester. Consequently, at a minimum, any student who reenrolled at BU for the Fall 2020 Semester was not damaged in the Spring 2020 Semester and should be excluded from the putative class. Individualized analyses would be required to determine whether any BU students who did not reenroll for the Fall 2020 Semester were damaged in the Spring 2020 Semester. For example, students elect to not reenroll in universities for many reasons other than the circumstances at issue in this lawsuit.[66] As a result, it is questionable and individualized analyses would be required to determine whether such non-reenrolling students were damaged by BU's allegedly improper actions.

---

[62] https://www.bu.edu/provost/2020/05/29/fall-2020-planning-undergraduate-programs-learn-from-anywhere-and-other-updates viewed on December 5, 2022.
[63] *Ibid.*
[64] https://www.bu.edu/reg/registration/tuition-fees/ viewed on December 5, 2022.
[65] Fall 20 re-enrollment.xlsx. If non-degree students are excluded, the reenrollment rate would increase to 93.97%.
[66] https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/ viewed on August 9, 2021.

Even more tellingly, BU students overwhelmingly elected to take remote classes *even when given the option* to take in-person classes during the Fall 2020 Semester. BU's Learn From Anywhere policy during the Fall 2020 Semester specifically contemplated that courses would be taught in a hybrid modality, such that students could elect to come to class or to join remotely. Concrete, undisputed, contemporaneous real-world data from the Fall 2020 Semester demonstrate that over 60% of the nearly 30,000 BU students elected to study remotely rather than in-person while paying "full" tuition and fees.[67]

Therefore, actual BU student behavior in the Fall 2020 Semester provides a great benchmark for what their behavior would have been in the "but for" world. This behavior shows that putative class members were not injured by the transition to remote instruction, contrary to the results of the Singer Analysis. As discussed above, actual data are generally preferable to assumption-laden forecasting models based on hypotheticals like the Singer Analysis. Consequently, concrete, undisputed, contemporaneous data show that putative class members were not damaged in a formulaic manner by the conduct alleged in this lawsuit.

### B. BU's Separate Online Programs Are Priced The Same As Its In-Person Programs

Prior to the COVID-19 pandemic, BU generally offered the same per-credit List Price for its traditional in-person and exclusively online programs. Thus, the per-credit market value at BU for its online courses is identical to its in-person courses. These concrete, undisputed, contemporaneous data show that putative class members were not injured by the transition to remote instruction, contrary again to the claims of the Singer Analysis. To the extent that Dr. Singer concludes that students would price a remote instructional environment lower than an in-person one, BU's historical List Price data contradict his claims; BU charged the same per-credit hour List Prices for online and in-person coursework, and students have for years elected to pursue both programs, for reasons unrelated to cost (since the per-credit costs were the same).

BU generally sets its annual List Price tuition for both its in-person and online courses in the same way: by charging identical tuition for each, basing its pricing model on whether students are enrolled in part-time or full-time courses.[68] Students enrolled full-time in online programs are charged the same annual List Price tuition rate that students enrolled in in-person programs are

[67] LfA Enrollment Projections_2020_12_04.xlsx.
[68] Paal Affidavit, Dkt. 100-6, paragraph 9, Exhibits 1 & 2.

charged.[69] The per-credit hour List Prices all part-time BU students are charged are the same, whether students enrolled in online or in-person courses or programs,[70,71] except for one program.[72]

### *C. Putative Class Members Received Similar Value During The Spring 2020 Semester*

The Singer Analysis implies that students would demand lower tuition prices because they believed they would receive lesser benefits after the transition to remote education during the Spring 2020 Semester. However, several contemporaneous metrics, as opposed to the hypothetical hindsight, assumption-laden analysis of Dr. Singer, show that, on average, students received

---

[69] *Id.*

[70] Part-time students are those enrolled in 1-12 credit hours for undergraduates, 1-11.5 credit hours for graduate students. Paal Affidavit, Dkt. 100-6, Exhibit 2. "Online students who exceed these per-credit limits will be charged the University's full-time tuition rates."

[71] For example, Metropolitan College (one of the 17 Schools and Colleges within BU), charges the same annual tuition rates for its in-person and online programs. This "Met College" tuition website provides explicitly that, "[i]n general, Metropolitan College tuition is set according to the number of credits being taken, plus any additional fees or course costs. The tuition rates listed below are applicable to courses and programs on campus and online." (https://www.bu.edu/met/admissions/tuition-and-fees/ viewed on December 5, 2022.) BU does not have, and did not have an online undergraduate degree program in the Spring 2020 Semester; the Met College offered a part-time undergraduate degree completion program for students who had already completed prior undergraduate coursework (https://web.archive.org/web/20201113022012/https://www.bu.edu/met/admissions/apply-now/ viewed on December 5, 2022.).

[72] Only 2% (714 of 34,589) of BU students during the Spring 2020 Semester were part-time in its Master of Social Work program (G3b-Fact-Sheet-FY2020.pdf.).

BU's MSW charges part-time students different List Prices on a per-credit basis, charging on-campus part-time students $1,098 per credit, online part-time students $850 per credit and off-campus extension students $727 per credit. (Paal Affidavit, Dkt. 100-6, Exhibit 1.) However, there are differences amongst the programs that demonstrate that modality is not the reason for the List Price difference.

*First*, off-campus extension courses are in-person ($727 per credit) but are offered at a *lower* rate than the online courses ($850). (https://web.archive.org/web/20191218221824/https://www.bu.edu/ssw/academics/msw/ viewed on December 5, 2022.)

*Second*, students in the online program have lesser options than students in the in-person program. In particular, specializations (similar to a minor) are unavailable in the online program. (https://web.archive.org/web/20191209214109/http://www.bu.edu/ssw/academics/msw/online/ viewed on December 5, 2022.) The in-person specializations include: Children, Youth & Families; Behavioral Health; Lowy Specialization in Aging Practice; Policy & Social Justice; Trauma & Violence; and Leadership in Groups & Organizations. Specializations within the MSW programs allow students to deepen their knowledge and expertise in a specific area of focus. Students pursuing such specializations enroll in advanced electives and complete an integrative seminar and advanced field placement. (https://web.archive.org/web/20191220163150/http://www.bu.edu/academics/ssw/programs/specializations/ and https://www.bu.edu/ssw/academics/msw/majors/ both viewed on December 5, 2022.)

*Third*, financial aid is not offered to the Online MSW program (only a Federal Direct Unsubsidized Loan). (https://www.bu.edu/ssw/admissions/msw/msw-financial-aid/financial_aid/ viewed on December 5, 2022.) Thus, if average financial aid was deducted from the in-person List Price, then the average Net Price that the student is actually charged is similar or less than the online List Price. The per credit List Price for the in-person and Online MSW programs are $1,098 and $850, respectively (Paal Affidavit, Dkt. 100-6, Exhibit 1). On average, a part-time traditional graduate student receiving aid is granted financial aid of 24.6% of COA (BU Financial Aid Stats.pdf). Therefore, the Net Prices per credit for the in-person program ($827.89) is less than the online program ($850) when financial aid is applied.

Therefore, these three reasons clearly show that the difference in the online List Price for the MSW program is not due to modality; rather, it is due to curriculum options and other financial factors.

similar, if not greater, value from their classes during the Spring 2020 Semester than they would have had classes remained in-person. While some students might have received lesser value, individualized analyses on a student-by-student basis would be required to determine the extent and distribution of these allegedly lower values.

First, at its core, BU's mission is to educate its students. One way to measure education is through students' Grade Point Average ("GPAs"). Students who learn more generally receive higher grades. ***Figure 1*** below shows that average traditional student GPAs increased from the 2018 – 2019 academic year to the 2019 – 2020 academic year.[73]

| Figure 1 | | |
|---|---|---|
| Average GPAs | | |
| Semester | 2018-2019 | 2019-2020 |
| Fall | 3.25 | 3.28 |
| Spring | 3.27 | 3.34 |

It is noteworthy that most of the Named Plaintiffs received their highest GPAs to date during the Spring 2020 Semester as demonstrated in ***Figure 2*** below.[74] Such data are consistent with students' education not diminishing during the Spring 2020 Semester. As a result, Dr. Singer further cannot accurately claim that putative class members received a diminished value during the Spring 2020 Semester.

| Figure 2 | | | | | | |
|---|---|---|---|---|---|---|
| Named Plaintiff GPAs by Semester | | | | | | |
| | Fall 2017 | Spring 2018 | Fall 2018 | Spring 2019 | Fall 2019 | Spring 2020 |
| Olivia Bornstein | 3.58 | 3.28 | 3.00 | 2.25 | 2.43 | 3.30 |
| Shakura Cox | n/a | n/a | n/a | n/a | 3.96 | 4.00 |
| Julia Dutra | n/a | n/a | 3.70 | 3.24 | 2.84 | 3.70 |
| Natalie Silulu | n/a | n/a | n/a | n/a | 2.43 | 3.40 |
| Venus Trans | n/a | n/a | n/a | n/a | 3.57 | 3.61 |
| Gabriella Dube | n/a | n/a | 3.00 | 3.18 | 3.10 | 3.68 |

Second, another core BU mission is to graduate its students. ***Figure 3*** below shows BU's graduation rates increased from 2019 to 2020 and was maximal in 2020 as compared to 2017 to 2019.[75] Such data are consistent with students' education not universally diminishing during the

[73] GPAs 2018-2020.xlsx. BU did offer an enhanced Credit/No Credit option during the Spring 2020 Semester. https://www.bu.edu/provost/2020/03/27/university-grading-policies-for-spring-semester-2020/ viewed on December 15, 2022.

[74] Bornstein Olivia Transcript.pdf, Cox Shakura Transcript.pdf, Dutra Julia Transcript.pdf, Silulu Natalie Transcript.pdf, Tran Venus Transcript.pdf and Transcript-Gabriella Dube.pdf.

[75] https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2017, https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2018, https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2019 and https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2020 viewed on December 13, 2022. The six-year graduation rates reported by BU are tracked by the year the students entered as first-time, full-time freshmen through August of the sixth year.

remote class portion of the Spring 2020 Semester. As a result, Dr. Singer further cannot claim that putative class members received a diminished value from the Spring 2020 Semester.

| Figure 3<br>Six-Year Graduation Rates | | | | |
|---|---|---|---|---|
| **Description** | **2017** | **2018** | **2019** | **2020** |
| Graduation Percentage | 87% | 88% | 88% | 89% |

Third, many students attend institutions of higher learning in order to enhance their earnings. ***Figure 4*** below shows that average starting salaries of BU undergraduate graduates increased after the 2019 – 2020 academic year.[76] This increase occurred in spite of the 2020 COVID-19 recession, which significantly impacted the job market. Economy-wide, there was a decrease in employment and labor force participation rates of recent college graduates in 2020, which exceeded the decline recent college graduates experienced during the Great Recession of 2008.[77]

| Figure 4<br>Average Starting Salary by Graduation Year | | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| Average Annual Salary | $ 51,019 | $ 52,003 | $ 57,816 |

Consequently, Figure 4 is consistent with students' education not being lessened during the remote class portion of the Spring 2020 Semester. As a result, Dr. Singer cannot claim that putative class members received a diminished value from the remote class portion of the Spring 2020 Semester.

Fourth, Dr. Singer's theory that students receive diminished value from remote classes is inconsistent with Nobel Prize-winning research. In 1973, Michael Spence published a paper called "Job Market Signaling" in the *Quarterly Journal of Economics* for which he won the 2001 Nobel Prize in Economics.[78] Dr. Spence, who was Dean of Stanford Business School, concluded that, regardless of a student's academic fulfilment, completing an education conveys information about a student's inherent abilities. He demonstrated that because more advanced individuals would have an easier time completing college than their less advanced counterparts, the latter would not attend universities. Thus, college completion signals a student's strength even if college did not make them intellectually stronger. This conclusion continues to hold as *New York Magazine* wrote in May 2020 that "no one has really come up with the ability to certify [potential hires] to the same extent that universities[' admissions departments] do."[79]

Because Dr. Singer has not disputed that a degree from BU still provides a strong signal about a student's ability that allowed them to obtain employment, graduate school placement or another post-college activity, he cannot claim that students received a diminished value from the remote class portion of the Spring 2020 Semester. Even if the value was diminished in some way, Dr. Singer did not demonstrate that the value was diminished relative to students at all other

[76] https://www.bu.edu/careers/career-ready/outcomes/ viewed on December 13, 2022.
[77] https://www.pewresearch.org/fact-tank/2021/05/14/college-graduates-in-the-year-of-covid-19-experienced-a-drop-in-employment-labor-force-participation/ viewed on September 22, 2021.
[78] Spence, Michael "Job Market Signaling." *Quarterly Journal of Economics*. 87(3), 1992, pp. 355-374.
[79] Walsh, James D. "The Coming Disruption," *New York Magazine*, May 11, 2020.

universities in the U.S. who similarly transitioned to remote education during the Spring 2020 Semester.

Consequently, Nobel Prize-winning research is consistent with the value students received during the remote portion of the Spring 2020 Semester being comparable to the value they received in other semesters. In other words, Nobel Prize-winning research is inconsistent with the Dr. Singer's supposition that putative class members received diminished value during the remote portion of the Spring 2020 Semester.

Fifth, Dr. Singer cannot claim that BU reduced the services it provided to its students during the Spring 2020 Semester. BU continued to provide some student services in-person and migrated some services online after the transition to remote education during the Spring 2020 Semester. Fitness classes were made available remotely to students at no extra cost.[80] BU's Educational Resource Center continued to make tutors and other academic support available remotely.[81] BU provided additional services for students as a result of the pandemic (e.g., COVID-19 testing lab and contact tracing, PPE, sanitation services).[82] The Student Allocations Board continued to distribute proceeds from the CSF to student organizations after BU's transition to remote classes during the Spring 2020 Semester.[83] Additionally, as mentioned above, by the end of the Spring 2020 Semester, BU had allocated all SSF revenue it had received to student organizations and to amongst other things, such as developing online content.[84] Student-led organization, supported by funds collected through these fees, continued to meet through Zoom.[85] Finally, BU Student Health Services continued to provide primary and emergency medical care and behavioral health services, both in-person and remotely, with expanded schedules to accommodate students in other time zones.[86] The Singer Analysis does not account for such services to students and the individualized assessments required.

In any event, as demonstrated by students' active choices to take remote classes during the Fall 2020 Semester at BU at "full" prices even when in-person courses *were* available, students during the Spring 2020 Semester benefited from the opportunity to learn remotely and, therefore, mitigate their risk of contracting and spreading a potentially lethal virus that has since claimed the lives over one million Americans.[87] This benefit of improved health and safety has some benefit that the Singer Analysis incorrectly ignored when he constructed his conjoint analysis that assumed that COVID-19 itself would not have factored into students' decisions.

[80] Bossio Affidavit, Dkt. 100-2, paragraphs 5-6, Exhibit 1.
[81] May 5, 2022 Deposition of Jean Morrison (Lev Affidavit, Dkt. 100-5, Exhibit 3), p. 90.
[82] https://www.bu.edu/2020-year-in-review/chapter-09, https://www.bu.edu/2020-year-in-review/chapter-15 viewed on December 13, 2022 and May 2, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 75.
[83] Battaglino Affidavit, Dkt. 100-1, paragraph 5 and May 6, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 121.
[84] May 6, 2022 Deposition of Gary Nicksa (Lev Affidavit, Dkt. 100-5, Exhibit 2), p. 106.
[85] May 5, 2022 Deposition of Jean Morrison (Lev Affidavit, Dkt. 100-5, Exhibit 3), p. 92.
[86] Platt Affidavit, Dkt. 100-7, paragraphs 4-6.
[87] https://coronavirus.jhu.edu/region/united-states viewed on December 15, 2022.

## *D. Individualized Factors Predominate And The Singer Analysis Fails To Account For Those Concerns*

Dr. Singer alleges that putative class members received lesser benefits during the Spring 2020 Semester because students' learning environment changed and their campus access changed. However, the impact of such changes differed from student to student.[88]

Dr. Singer incorrectly claims that he does not have to address such individualized issues because all students would equally benefit from the lower tuition and fees BU had to charge.[89] However, as discussed below in Section IV.D.3, the individualized manner in which BU sets its tuition and fees prevents the "free riding" that Dr. Singer incorrectly assumed would exist.

### *1. The Benefits Students Received From Learning In The Spring 2020 Semester Differ From Student To Student*

Dr. Singer alleges that putative class members received lesser benefits during the Spring 2020 Semester because students' learning environment and their campus access changed. However, the magnitude of any change that might have occurred differed from student to student as his model implies.[90] Because of BU's individualized pricing, Dr. Singer cannot ignore these individualized valuation factors.

The benefits students receive from classes vary with the classroom interaction among teachers and students. While students still interacted with teachers and with their peers during remote classes, any alleged diminishment in classroom interaction from such classes compared to campus-based classes would be highly individualized.

For example, about half of the total course hours universities across the country deliver are high volume courses like Sociology 101.[91] The classroom interaction in such classes likely could be less impacted by a move to remote classes than specialized seminars.[92] While students who attended large lecture classes in-person might not have had much classroom interaction in the first place, some students in small seminars might (or might not) have more classroom interaction. Teacher-student interactions can also differ by major. While the number of full-time faculty members in majors like comparative literature and physics in general exceed the number of undergraduate degrees they annually award, other majors like psychology award 4 to 5 undergraduate degrees per faculty member.[93] Additionally, the modality of classroom discussion can differently impact those taking dance classes or mathematics classes as well as vary based upon individualized preferences, class makeup and other factors.

---

[88] As discussed below in Section VI.B, university pricing is individualized. As a result, such factors are important because Dr. Singer cannot demonstrate that all putative class members received a uniform, class-wide tuition reduction.

[89] Expert Report of Hal J. Singer, Ph.D. ("Singer Report"), dated November 18, 2022, paragraph 67.

[90] Singer Report Workpapers (Conjoint Results.xlsx).

[91] https://www.eurekalert.org/news-releases/783251 viewed on October 28, 2021.

[92] Faculty without Students: Resource Allocation in Higher Education. William R. Johnson and Sara Turner *Journal of Economic Perspectives*: 23(2), 2009, p. 177.

[93] *Ibid.,* p. 172.

In fact, one of the Named Plaintiffs discussed how important university learning is not tied to in-person classes. In particular, Ms. Tran stated "[y]our personality, experiences, and what you bring to the table outside of the clinic matter much more in the long run as a provider and when treating patients from all backgrounds—it's really not all about getting good grades (although never hurts)!"[94]

Dr. Singer did not propose any common, formulaic method to measure the individualized value diminishment from his alleged lack of classroom interaction.

### *2. The Benefits Students Received From Campus Access In The Spring 2020 Semester Differ From Student To Student*

Any alleged diminishment in campus use also would be highly individualized. Because students utilize the campus in different ways, any losses they might have suffered because of the Commonwealth-ordered closure would also be different.

On one hand, there are many students who do not utilize campus amenities, such as the gym, library or student union, at all. Studies have even shown that certain demographics generally tend to not utilize certain amenities. For example, commuter students are less likely to use on campus services, like a gym, library or student union.[95]

Economics demonstrates that students who do not utilize the campus amenities, such as the gym, library or student union, at all could not have been damaged by its closure. Such students would have been in the same economic position even if it had not been closed. The closure did not reduce these students' access to the amenities. Even though not all students utilize campus amenities, one educator found that "the majority of students agree that they should fund programs they may never utilize with student fees."[96]

On the other hand, there were some students who did utilize campus amenities; however, they utilized them to varying degrees. Using the student union example, some students may eat at its restaurants daily. Some students may attend events there weekly; others might have different social outlets including going to their primary residence on weekends. Freshmen might utilize the student union in different ways than upperclassmen. Students who pay fees themselves might have a greater desire to utilize its services than students whose fees are at least partially paid by a third-party.[97]

As a result, even if access was a proper means to assess damages, the different ways students utilize campus amenities would cause damages to be highly individualized.

---

[94] https://calpolyprehealth.blogspot.com/2021/07/alumni-letter-venus-tran-tufts.html viewed on December 13, 2022.

[95] Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, p. 142.

[96] Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, p. 20.

[97] For example, see a discussion of how payment methodology could affect consumption in Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on May 31, 2022.

### 3. *All Respondents Who Would Not Demand Lower Prices Cannot "Free Ride" and Obtain Lower Prices Because Others Could Make Such Demands*

Dr. Singer acknowledged in the footnotes to his report that not all students would demand lower tuition prices in response to remote classes.[98] However, he incorrectly claimed without any evidence that such students would be able to "free ride" off of the lower tuition BU demanded by other students.[99]

First, as discussed above in Section IV.A, the alleged actions of these other students would not force BU to lower the List Price of its tuition and fees as despite the fact that some students elected to not re-enroll at BU during the Fall 2020 Semester, BU did not reduce its List Prices.

Second, even if BU were forced to lower the List Price of its tuition to some students, not all students would be charged this lower tuition. Section VI.B shows that students actually pay Net Prices, not the List Prices on BU's website. BU tailors Net Prices based upon socioeconomic and demographic characteristics such as income, race, first generation college and honors status. A National Bureau of Economic Research ("NBER") paper shows that students' perception of remote education is affected by such socioeconomic and demographic characteristics.[100] For example, it found that second generation and honors students value on campus social interaction more than first generation and non-honors students, respectively, and that in-person instruction was more valuable to second generation college students.[101] Consequently, BU has the ability to limit "free riding" by tailoring any tuition reductions it may provide to students with characteristics that are more likely to demand such reductions.

Not only does BU have the ability to limit "free riding," but it did so. In particular, even though some students might have been unwilling to pay "full" tuition and fees at BU during the Fall 2020 Semester, as discussed above in Section IV.A, such attitudes did not force BU to lower its List Prices for all of its students. As a result, Dr. Singer is economically incorrect when he stated that all students would experience his hypothetical lower tuition pricing.

## E. *Dr. Singer Ignores Research Demonstrating That Students Are Generally Not Granular Economic Decision Makers*

As discussed below in Sections IV.E, students have to know detailed information about their universities and perform detailed analyses of that information in order for the results of the Singer Analysis to occur. However, research demonstrates that students generally do not rely upon such detailed information as compared to purchasers of other products and services; in particular, they often may not know the tuition and fees they were charged.

---

98 Singer Report, footnotes 72 & 74.
99 *Ibid.,* paragraph 67.
100 Aucejo, Esteban M., Jacob F. French and Basit Zafar, "Estimating Students' Valuation for College Experiences" NBER Working Paper 28511, February 2021 ("Aucejo"), pp. 4 & 11.
101 *Ibid.,* pp. 16-17.

For example, one Harvard researcher concluded that "[e]vidence suggests that students are quite poor at estimating" the tuition and fees they pay their university.[102] A Brookings study found that:

> [A] bare majority of respondents (52 percent) at a selective public university were able to correctly identify (within a $5,000 range) what they paid for their first year of college….
>
> Using nationally representative data, we find that about half of all first-year students in the U.S. seriously underestimate how much student debt they have, and less than one-third provide an accurate estimate within a reasonable margin of error.[103]

Even though one survey found that more than half of respondents believed they knew "a lot or a good amount" about college costs, they significantly misestimated those costs.[104] A study of schools found that few students could accurately estimate fees.[105] "Many students simply pay their tuition bills without actually reading the fine print."[106] These data are likewise individualized as studies have shown that specific demographics tend to be less knowledgeable about college tuition and fees.[107]

Consequently, the Singer Analysis, which is based on students making decisions based upon detailed knowledge about the tuition and fees they would pay, is not realistic. One of the papers Dr. Singer cited that was written by Nobel Laureate Daniel McFadden, Ph.D. who noted that it is important for a conjoint analysis to present the same complexities about pricing that "consumers see in the real market,"[108] which the Singer Analysis did not do.

Notably, students frequently make their college choices in concert with other family members. Generally, students tend to focus more on the college's benefits and parents tend to focus more on costs. *The Parents Role in the College Admission Process* describes how parents frequently place financial constraints on a student's college selection.[109]

Consequently, the Singer Analysis is further flawed because it only analyzed the supposed decisions of individuals who enrolled or intended to enroll in college. Dr. Singer did not survey parents of such individuals who often have strong influence on the college decision, nor did he

---

[102] Dynarski, Susan and Judith Scott-Clayton "Financial Aid Policy: Lessons From Research" NBER Working Paper, 2013, p. 30.

[103] Akers, Elizabeth J. and Matthew M. Chingos "Are College Students Borrowing Blindly?" Brown Center on Education Policy at Brookings, December 2014, p. 1.

[104] "Information Constraints and Financial Aid Policy" Judith Scott-Clayton, NBER Working Paper 17811, February 2012 ("Scott-Clayton"), p. 4.

[105] Jones, Willis A. and Michael J. Rudolph "Athletic Subsidies and College Costs: Are Students Paying for Rising Costs in Intercollegiate Athletics Spending?", p. 7.

[106] Kaufman, Jonathan "State of the Unions: The Impact of *Janus* on Public University Student Fees" *Georgia Law Review*, Vol 54, 2020, p. 759.

[107] For example, see Krsmanovic, Masha and Lou L. Sabina "Resident, Non-resident, and 'The Other': Examining Institutional and State Policies for International Student Residency Classification for Tuition Purposes and the Associated Cost of Fees" *Journal of Education Finance*, Volume 45, Number 4, Spring 2020, p. 544.

[108] Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, *Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis.* 10(1-2) FOUNDATIONS AND TRENDS IN ECONOMETRICS 1–144 (2019) ("McFadden"), p. 20.

[109] https://educationaladvocates.com/the-parents-role-in-the-college-admission-process-2/ viewed on August 8, 2022.

analyze the individualized dynamics of the group decision making underlying a student's college choice. Ignoring such influential decision makers and the decision making process biases the results of the Singer Analysis.

Even though the putative class contains "all people who paid BU tuition [and] fees," because Dr. Singer only surveyed individuals who enrolled or intended to enroll in college, his results do not apply to parents or others "who paid BU tuition [and] fees," but did not attend BU. As noted above, Ms. Silulu's father is a Named Plaintiff. As a result, Dr. Singer did not calculate the alleged damages of Mr. Silulu or any other non-student "who paid BU tuition [and] fees."

Furthermore, concrete, undisputed, contemporaneous real-world data show that BU students are not tuition minimizers on a per-class basis as the Singer Analysis requires them to be. In particular, full-time BU undergraduates pay a flat tuition and fee amount that allows them to take up to 18 credit hours per semester (20 if they were a senior). However, 72% of BU full-time undergrads (excluding MET) took under 18 credit hours during the Spring 2020 Semester.[110] As a result, such students effectively "overpaid" for the credit hours they took as they could have paid less in tuition and fees per credit hour if they had taken more classes. Consequently, the actual behavior of full-time BU students who took less than the maximal number of credit hours were not damaged by BU's alleged actions and should be excluded from the putative class.

# V. Conjoint Analyses And The Singer Analysis

Before I address some of the serious flaws in the Singer Analysis, I first describe conjoint analyses generally and then Dr. Singer's model specifically.

## *A. Conjoint Analyses*

Products and services often contain multiple attributes. Companies and institutions effectively place their manufacturing, marketing and finance departments in a room together to determine the prices to charge for such products and services. Manufacturing states the costs the company would incur to provide various amounts and types of the product or service, including the attributes included in the product or service. This information from manufacturing informs the "supply side" of a product analysis. Marketing presents market research models that forecast the "demand side," in particular, how consumers would react to different prices and product types. Finance uses the inputs from manufacturing and marketing to determine prices and product types to be sold.

Marketing can and often does employ several market research models to forecast the demand side. These models include analyses of historical data, field trials, competitive analyses, focus groups, customer observations, social media listening interviews as well as conjoint analysis models. Most companies do not utilize all of these models as part of their market research as industry dynamics could make some more relevant. As each model could provide different forecasts of consumer behavior, marketers frequently do not directly utilize the results of any particular market research model; instead, they amalgamate results.

[110] BU Spring 2020 Undergraduate Credit Hours by Number of Students.xlsx.

As discussed below, Dr. Singer assumes that BU would have solely relied on the conjoint analysis model he constructed as well as employed very simplistic "supply side" analyses to determine its tuition and fees.

Conjoint analyses arose because marketers found that survey respondents did not accurately state their preferences if directly asked "How much would you pay for this attribute?" Conjoint analyses do not ask such direct questions. Instead, the first step of a proper conjoint analysis places survey respondents that are representative of the purchasers of the product or service in question in a realistic buying situation and asks them about their preferences if faced with a decision between products or services with different realistic and comprehensive attributes.

The second step of a proper conjoint analysis inserts the survey data into a statistical regression. That regression identifies how much each individual respondent values (as measured by utilities or partworths) each possible attribute value included in the survey. It is important to note that the conjoint regression demonstrates that each respondent has a **different** valuation of each attribute. So, by definition, a conjoint analysis shows that respondents have individualized valuations.

The third step of a proper conjoint analysis is to perform simulations based upon the individualized valuations of the survey respondents. These simulations identify one, unique price that the respondents will pay for a product or service with given attributes.

Additionally, companies often sell multiple products and services, each containing different attributes. For example, airlines set different prices for passengers willing to pay for a first class seat, passengers willing to sit in the middle seat, passengers wanting to check a bag, passengers who want to buy alcohol on the plane, etc. To set these different prices, airlines segment their customers into different groups and perform separate market research studies of each of them. As a result, it is improper for a company or institution to amalgamate all customers together into one group in market research studies when it charges different customers different prices. Instead, separate market research studies are needed for each group.

## *B. The Singer Analysis*

Recognizing one way in which BU offers different products or services to its students, Dr. Singer performed separate conjoint analyses for undergraduates and graduate students.[111] Using statistical language, the Target Population of one of his conjoint analyses is supposed to be undergraduates who were enrolled at BU during its Spring 2020 Semester. The Target Population of the other conjoint analysis is supposed to be graduate students who were enrolled at BU during its Spring 2020 Semester.

The Sampling Frames are the individuals surveyed in Dr. Singer's conjoint analyses. In general, Sampling Frames could be identical, different, larger or smaller than the relevant Target Populations.

Dr. Singer's Sampling Frames are different than both Target Populations. For his undergraduate conjoint analysis, Dr. Singer asked Qualtrics, an online survey company, to construct a Sampling Frame of individuals who were between 18 and 30 years old, resided in the United States, had "taken within the past five years, or plan to take within the next two years, undergraduate, in-

[111] Singer Report, paragraph 30.

person, on-campus courses at a college or university," and had GPAs & SAT/ACT scores "consistent with BU's undergraduate admissions criteria."[112] The Sampling Frame for Dr. Singer's graduate student conjoint analysis consisted of individuals who were over 18 years old, resided in the United States, "enrolled within the past five years, or plan to enroll within the next two years, in an in-person, on-campus graduate program at a college or university," and had "an unweighted undergraduate GPA and standard test scores on graduate admissions tests consistent with BU's graduate admissions criteria."[113]

Dr. Singer performed a "'soft-launch' of the survey … to evaluate the average time it took to complete the test, to assess if respondents were confused by any of the question language, to identify errors in the survey logic, and to identify if respondents were being disqualified from the survey at particular validation questions."[114] Even though he did not present the results of this "soft-launch," he included the responses of "soft-launch" participants in his final results.[115]

Dr. Singer's survey reduces complex, dynamic and diverse universities, such as BU, to a drab and limited combination of attributes that he alone has selected without a proper basis. In particular, his survey assumes that **all** BU undergraduate and graduate students select their university based upon **only** five overlapping attributes: 1) class modality, 2) campus access, 3) access to tutoring services at BU's Educational Resource Center, 4) access to career services and events through BU's Center for Career Development and 5) semester cost (price for a "Semester Package").[116] The questions in his undergraduate and graduate student conjoint analyses were identical,[117] though he assumed the Base Price of the "Semester Package" differed for graduates and undergraduates.

For the class modality attribute, Dr. Singer offered respondents the choice between on-campus and online classes, where all classes either were live lectures that took place "primarily in classrooms, laboratories, art and dance studios, and performing arts spaces on the BU campus in Boston, MA," or were "available via an internet-based learning platform and will consist of asynchronous and synchronous components."[118]

For the campus access attribute, Dr. Singer offered respondents the choice between full access to BU's campus facilities and "BU-sponsored events, such as sporting events, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events" and no "access to any of the campus facilities, groups, opportunities, or events described above."[119]

For the tutoring services attribute, Dr. Singer offered respondents the choice between access to BU's Educational Resource Center and no access.[120]

---

[112] *Ibid.,* paragraphs 32, 48 & 50.
[113] *Ibid.,* paragraphs 33 & 51.
[114] *Ibid.,* paragraph 49.
[115] *Ibid.*
[116] *Ibid.,* Tables 1 & 2.
[117] *Ibid.,* see Appendix 4 (Undergraduate CBC Survey) vs. 5 (Graduate CBC Survey). There were slight variations in his background questions, but the Conjoint Modules were the same.
[118] *Ibid.,* paragraph 41.
[119] *Ibid.,* paragraph 42.
[120] *Ibid.,* paragraph 45.

For the career services attribute, Dr. Singer offered respondents the choice between access to BU's Center for Career Development and no access.[121]

For the Price for a "Semester Package" attribute, Dr. Singer established separate Base Prices for undergraduates and graduates. He set the Base Price for undergraduates to be the price he claims equals the List Price of undergraduate full-time tuition plus full-time mandatory fees, which he converted to a different number.[122] He set the Base Price for graduate students to be the price he claims equals the average of the List Prices for MBA, law, medicine and general graduate programs.[123] He did not include List Prices for graduate programs in the School of Social Work or the Division of Graduate Medical Studies in his graduate Base Price Averages.[124] Ms. Cox and Ms. Tran, the only graduate student Named Plaintiffs, were enrolled in these two schools that Dr. Singer ignored.

He offered respondents the choice between prices equal to 150%, 125%, 100%, 75% or 50% of these Base Prices.[125] His respondents were asked to assume that financial aid was unaffected by the university's Cost of Attendance.[126]

Dr. Singer did not state any basis behind his attribute selection or the values of those attributes. For example, Dr. Singer excluded attributes, such as types and availability of majors, reputation with anticipated employers, access to and quality of faculty in particular majors, extracurricular activities (sports, Greek life, etc.), class timing, geographic proximity to home, proximity to family/friends and family history to name a few.

Even if he properly determined the relevant attributes, Dr. Singer did not discuss how he determined the specific and hypothetical values for these attributes that he included in his analysis. Bryan K. Orme, a leading authority on running conjoint analyses, on whose work Dr. Singer claims to have relied as one basis for his use of conjoint analyses generally,[127] wrote how results could be biased if incorrect attribute values were included in a survey.[128]

To "determine" the preferences that he believes putative class members would have regarding these attributes, Dr. Singer "constructed" hypothetical combinations by randomly selecting a value for each of his five attributes. For example, the survey respondent with ResponseId R_2CcYWerqJ5hOfxM had the option to select a combination that would cost 150% of the Base Price and possess in-person classes as well as no access to campus facilities, tutoring services and career services. [129]

Dr. Singer did not demonstrate that any of these values are real, that any of the hypothetical combinations he constructed will match those of any existing university, or even describe realistic

[121] *Ibid.,* paragraph 46.
[122] *Ibid.,* footnote 58.
[123] *Ibid.,* footnote 60.
[124] Singer Report Workpapers (BU 2019-2020 Unit Prices.xlsx, tab "Grad Base Semester Prices").
[125] Singer Report, paragraphs 43 & 44.
[126] Cost of Attendance includes the List Price of tuition and fees as discussed below in Section VI.B.3. *Ibid.,* paragraph 38.
[127] *Ibid.,* footnote 24.
[128] Orme, Bryan K. & Chrzan, Keith, Becoming an Expert in Conjoint Analysis – Choice Modeling for Pros, Second Edition, 2021 ("Orme & Chrzan"), pp. 97 & 241.
[129] Singer Report Workpapers (BU-Undergraduate Respondents.csv).

choices, which are necessary to conduct a conjoint analysis.[130] Dr. Singer created choice options that do not exist in the real world and provides no basis to establish that any combination of attributes actually exist at any university such that survey respondents could have ever been presented with such a "choice" in the real world. For example, it is not realistic to believe that any university would offer in-person classes, but no access to campus facilities, tutoring services and career services.

Dr. Singer improperly constrained the decision making of his survey participants, by forcing them to make decisions in an economic environment significantly different than what putative class members experienced during the Spring 2020 Semester at BU. In particular, as discussed above, BU (and every other institution of higher education in the U.S.) transitioned to remote education during the Spring 2020 Semester because of COVID-19. However, Dr. Singer did not inform his survey respondents that the COVID-19 pandemic could affect the school's attributes and their decisions. Consequently, his analysis by definition does not simulate an accurate education choice experience that putative class members faced "in real life" during the Spring 2020 Semester.[131] Additionally, as discussed in Section VI.B.3 below, Dr. Singer made his survey respondents incorrectly assume that financial aid was unaffected by BU's stated Cost of Attendance. Furthermore, the Singer Analysis asked his survey respondents to answer questions about their preferred "Semester Package," even though students generally purchase multiple "Semester Packages" in order to obtain their degrees. The fact that most putative class members were already enrolled at BU prior to the Spring 2020 Semester could affect their choices during the Spring 2020 Semester.

Dr. Singer asked his survey respondents to select one of three hypothetical combinations he constructed ten different times.[132] He then performed mathematical calculations using a regression analysis on the multiple survey respondents' responses to supposedly determine each respondent's preferences for the hypothetical attributes he constructed. In particular, he calculated the utility each respondent would have for each value of each attribute in his survey.[133]

Dr. Singer then summed the utilities each respondent had for on-campus modality and campus facilities access to determine his assumed utility for an On-Campus experience for each respondent. He also summed the utilities each respondent had for an online modality and no campus facilities access to determine his assumed utility for an Online experience for each respondent.[134] These summations showed that 20% and 26% of his undergraduate and graduate survey respondents preferred the Online experience.[135]

Dr. Singer also calculated how much additional utility each survey respondent would obtain if the price of the "Semester Package" was 50% or 75% of List Prices.[136] Through interpolation, Dr.

---

[130] Proceedings of Sawtooth Software Conference, October 2013 ("Sawtooth Proceedings"), (Download from https://www.sawtoothsoftware.com/support/technical-papers/100-support/proceedings/1426-proceedings2013 viewed on August 10, 2021), p. 349, Rao, V. R. (2014), Applied Conjoint Analysis. Heidelberg: Springer ("Rao"), p. 45, 99 and McFadden, p. 25.
[131] Singer Report, paragraph 38.
[132] For example, see Singer Report, paragraph 47 and pp. 87-88.
[133] Singer Report, paragraph 62.
[134] *Ibid.*
[135] *Ibid.,* paragraphs 50 & 51.
[136] *Ibid.,* paragraph 62.

Singer calculated for each survey respondent what percentage of Base Price or List Prices would have the same additional utility as the difference in utilities he calculated between On-Campus and Online experiences.[137] Dr. Singer then assumed that the resulting percentage of List Prices implies the discount each respondent would have for being placed in an Online experience. This method of determining prices is called the Algebraic Approach to simulating prices.[138] As each respondent had different discount values, Dr. Singer averaged the discounts and assumed that that average is the discount needed to make all putative class members whole for the Spring 2020 Semester.[139] He calculated separate averages for undergraduates and graduate students.

Dr. Singer then calculated the total Net Prices BU Received from all of its graduate and undergraduate students from BU's financial statements. In particular, he subtracted the financial aid BU provided to its students from the tuition and fees it received.[140]

He finally calculated alleged damages by multiplying the discount off of List Prices he "determined" from his conjoint analysis by both 1) BU's revenue based upon the total Net Prices BU Received as well as 2) the percentage of the Spring 2020 Semester he believes was "Online, No Campus Facility Access."[141] Dr. Singer had to multiply by the Semester percentage because his conjoint analysis measured alleged losses for a "Semester Package," not a "Portion of Semester Package."

Dr. Singer recognized that this damages calculation assumed that "supply of the product at issue (enrollment spots at BU) would have remained the same in the but-for world. That is to say: BU would *not* have reduced enrollment by *kicking out students or accepting fewer new students* in its programs in the face of the lower valuation by students following a switch to the Online Experience."[142]

He further noted that his aforementioned assumption that all students who had enrolled at BU for the Spring 2020 Semester would continue to do so in his "but for" world could be questionable.[143] Section VI.C.6 of this Expert Report demonstrates that his assumption of static enrollment of the same individuals is incorrect. He then proposed a revised methodology he claims could assess alleged damages without such an assumption using information about BU's Marginal Costs and its own-price elasticity of demand.[144] Dr. Singer alleged that this revised methodology would be one half the amount of the damages he calculated when enrollment and supply assumptions remained fixed in the "but for" world.[145] Section VI.C.6.e of this Expert Report shows that the assumptions underlying Dr. Singer's revised methodology are also flawed.

[137] *Ibid.*
[138] Orme & Chrzan, pp. 200-202.
[139] Singer Report, paragraph 63.
[140] *Ibid.,* paragraph 69.
[141] *Ibid.,* paragraph 70.
[142] *Ibid.,* paragraph 10.
[143] *Ibid.,* paragraph 72.
[144] *Ibid.,* paragraph 82.
[145] *Ibid.,* paragraph 85.

# VI. Deficiencies And Flaws In The Singer Analysis

The Singer Analysis contains multiple deficiencies and flaws as described in the following subsections.

## *A. Courts And The Papers Dr. Singer Cited Demonstrate The Deficiencies In His Analysis*

Dr. Singer incorrectly claims that conjoint analyses are widely accepted in the education industry.[146] However, he did not demonstrate that any university utilizes conjoint analyses as part of its tuition and fee setting process. Having worked with multiple universities on tuition issues, I know of none that utilize conjoint analyses in their pricing decisions.

### *1. Courts Have Not Accepted Conjoint Analyses In The Educational Context*

Courts in similar tuition refund lawsuits have rejected conjoint models that were even more detailed than Dr. Singer's.[147] For example, the plaintiffs in *Smith v. Ohio State University* presented a conjoint methodology that contained attributes that were more closely aligned with attributes that students actually utilize in their decision making process than what Dr. Singer included in his analysis.[148] I submitted an expert report for Ohio State in the *Smith* case. The Ohio Court of Appeals relied on my analyses to overturn class certification in that case because, amongst other things, conjoint survey participants were not told that remote education was necessary to provide a safe learning environment due to the COVID-19 pandemic. In particular, the Court found:

> First, instead of considering whether Smith presented sufficient evidence of the economic injury she claimed to have occurred, the trial court here assumed a "benefit" was lost based only on the fact OSU closed its campus and switched to remote classes and services in response to the pandemic. In other words, the trial court either accepted Smith's allegations as true, as would occur under a pleading standard, or believed the asserted breach in this case—closure of campus and temporary termination of in-person classes and services—itself served as evidence of economic injury. Either scenario constituted an abuse of discretion….
>
> Second, the trial court did not review the evidence and arguments raised by OSU contesting proof of injury. OSU argued that, having not conducted any portion of the market survey or analysis, [the plaintiffs' conjoint survey expert] admitted he could not opine to a reasonable degree of scientific certainty that OSU students were injured in this case. Moreover, according to [the plaintiffs' conjoint survey

146 *Ibid.,* Section I.A.
147 *Weiman v. Miami Univ.*, *2022-Ohio-4294*. Appeals from the Court of Claims of Ohio Decision Rendered December 1, 2022.
148 *Smith v. Ohio State Univ., 2022-Ohio-4101* Declaration of Steven P. Gaskin, dated June 23, 2021, paragraph 29. University, Undergraduate Teacher Ranking, Student-Faculty Ratio, 4-Year Graduation Rate, Ethnic Diversity Index, Tuition per Semester and Class and Campus Format.

> expert]'s report and testimony, **the methodology presented to potentially answer the question of whether the class suffered any common injury due to the campus closure and switch to remote classes excludes any survey questions or consideration of market preferences during an emergency such as the pandemic that forced the closure here. OSU submitted an expert report that made this point, as well as evidence that students paid the same for in-person and online learning and that the in-person teaching modality carried the possibility of substantial remote instruction even in a normal semester**.…
>
> Thus, having accepted the closure of campus and temporary termination of in-person classes and services as an injury per se, and having failed to consider how the pandemic affects class certification in this case at all, the trial court **did not undertake a rigorous analysis with respect to the number and nature of individualized inquires that might be necessary to establish liability with respect to both tuition and fees**.[149]

Consequently, this Ohio Court of Appeals ruling implies that Dr. Singer's conjoint model would be flawed because:

1. It did not consider "market preferences during an emergency such as the pandemic that forced" BU to make the decisions it did during the Spring 2020 Semester,

2. It did not recognize that BU "students paid the same for in-person and online learning and that the in-person teaching modality carried the possibility of substantial remote instruction even in a normal semester" as demonstrated above in Section IV.B, and

3. It did not "undertake a rigorous analysis with respect to the number and nature of individualized inquires that might be necessary to establish liability with respect to both tuition and fees."

### 2. *Dr. Singer's Cited Papers Do Not Suggest He Could Apply Conjoint Models As He Did With BU*

Dr. Singer noted only four research papers that were written on the topic of conjoint analyses in education.[150] However, a careful read of these papers demonstrates the flaws in his model. One paper to which Dr. Singer cited that he claims supports the use of conjoint analyses in education stated that conjoint models could **not** be utilized to assess damages in a matters like this one.[151] In particular, the paper stated that conjoint models

> are, therefore, not consistent with neoclassical economic theory… classical conjoint measurements models are not associated with any error theory, and hence, they cannot be statistically interpreted or tested. Overall, while conjoint analysis [sic] are useful, for example for marketing studies, they are not discrete choice

149 *Smith v. Ohio State Univ., 2022-Ohio-4101* Court of Appeals of Ohio Decision on November 17, 2022, paragraphs 44-46. (emphasis added)
150 Singer Report, Section I.A.
151 *Ibid.,* footnote 30.

> experiments and cannot be used for obtaining valid measures of economic value.[152]

That paper also noted that a key criticism of conjoint analyses is

> the so-called hypothetical bias. Simply put, this means people may over- or under-state their [Willingness To Pay] values in a systematic fashion because no actual payment is made. The economics response was improving survey design methods and developing ex-ante/ex-post methods to reduce hypothetical bias, thus improving survey design methods. It is clear that poor survey design and administration could easily induce numerous anomalous behaviors, including a hypothetical bias. On the other hand, studies that invested considerable time and effort into understanding what people believed, and in preparing a credible choice scenario with a well-defined good, generally appear to produce results that are well behaved.[153]

Dr. Singer did not "invest considerable time and effort into understanding what [BU students] believed, and in preparing a credible choice scenario with a well-defined good." He just stated that he "added two additional decoy attributes."[154] He did not state how he chose those attributes, whether BU students cared about them or whether BU students cared more about other attributes. Section VI.C.5.a demonstrates that proper and realistic attribute selection is vital to obtaining accurate results from a conjoint. Section VI.C.5.b further discusses the hypothetical bias inherent in the Singer Analysis.

The papers to which Dr. Singer cited utilized more robust attributes in their analysis than he did. For example, these papers found the following attributes were relevant to student choices:

- Tuition per semester, Mean monthly net salary 4 years after graduation, Compliance with personal interests, Distance from home, School prestige and Mode of study.[155]

- "Student commitment, family background, quality of a program, school reputation, self-efficacy, prior online experience, and interactions" as well as prior experience with online classes.[156]

- Course topic, time face-to face course is offered, days per week face to face court meets, specifics about the way in which online content was offered.[157]

---

[152] Czajkowski, Mikolaj, Tomasz Gajderowicz, Marek Giegiczny, Gabriela Grotowska and Urszula Sztandar-Sztanderska "Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method." *Research in Higher Education* (2020) 61 ("Czajkowski"), p. 515.
[153] *Ibid.,* p. 527.
[154] Singer Report, paragraph 37.
[155] Czajkowski, p. 519.
[156] Manley, Kelly, Yongseung Han, Michael Ryan and Christopher Serkan "Undergraduate Students' Willingness to Pay for Online Courses" *Journal of Education Finance*, 45:2, Fall 2019 ("Manley"), pp. 234-235.
[157] Mann, John T. and Shida R. Henneberry, "Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes" 2012 ("Mann"), Tables 3(a) & (b).

- CARES Act Funds.[158]

These attributes, which were not included in Dr. Singer's analysis, are very important in college selection as the papers found them to be statistically significant. For example, one paper concluded that the expectation of better grades and convenience in scheduling affected students' perception of online classes.[159] Not including at least some of the aforementioned attributes biases Dr. Singer's conclusions. Even if Dr. Singer attempted to include them, he would be unable to do so in a formulaic, non-individualized manner.

The attributes Dr. Singer did include in his analysis are also suspect. For example, his conjoint model emphasizes attributes concerning the way in which educational content is provided to students. However, one of Dr. Singer's cited papers found that, consistent with Dr. Spence's Nobel Prize winning research, the educational content students received was "less important than obtaining a diploma."[160] Dr. Singer also did not describe the in-person and online environments in as great of a detail as his cited papers. As noted above, one of Dr. Singer's cited papers found the following attributes affect student decisions between online and in-person classes:[161]

- Online attributes: topic discussion videos of differing lengths, recorded face to face lectures, online course lecture notes, chat room with instructor, chat room with class mates, threaded discussions with classmates, Online drop box for assignments, taking exam and quizzes online.
- In-person attributes: Course topic, time face-to face course is offered, days per week face to face court meets.

That paper also found that such online and in-person details affected student preferences. For example, students had a greater preference for online classes if the in-person class was early in the morning or late in the day, did not meet twice a week on weekdays or covered certain subjects.[162] Consequently, Dr. Singer understated the appeal of online classes and overstated alleged damages because he did not properly describe the in-person and online environments that allegedly would have existed at BU.

Even if Dr. Singer included proper attributes in his conjoint analysis, one of his cited papers found that "consumers' limited knowledge on the true attribute levels of the education alternatives limit[s survey models'] applicability."[163]

Section IV.E above discusses how college choice is often a group decision and that students often do not pay a large portion of their tuition and fees themselves. One paper to which Dr. Singer cited concluded that people who were "not responsible for tuition and fees … were not able to realistically answer questions related to tuition and costs."[164] As Dr. Singer only surveyed students

---

[158] Duncan, Kevin "Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19" Journal of Higher Education Management, 35(3), p. 38.
[159] Manley, pp. 240-241.
[160] Czajkowski, p. 526.
[161] Mann, Tables 3(a) & (b) and 4(a) & (b).
[162] *Ibid.,* Tables 3(a) & (b).
[163] Czajkowski, p. 525.
[164] Manley, p. 237.

or potential students who might not be responsible for their tuition and fees, his own citations further demonstrate the flaw in his analyses.

Dr. Singer's cited papers also noted student preferences were highly heterogenous, varying with socioeconomic factors, age, marital status and household income.[165] As universities such as BU tailor their Net Prices based upon such factors, Dr. Singer's cited papers imply that one conjoint model could not properly determine university prices; instead, separate conjoints need to be run for each market segment upon which BU sets its prices. Section VI.B.5 below discusses market segmentation in greater detail.

### *3. Additional Reasons Why Educational Institutions Do Not Utilize Conjoint Analyses*

As discussed above, having worked on tuition issues for multiple universities, I know of no university that has ever used conjoint analysis to establish tuition and fees. There are several reasons why universities do not utilize conjoint analyses. First, students' reasons for selecting a particular educational experience is complex and takes into account a multitude of individualized factors including, but not limited to, geographic location, professors, programs, athletics and campus activities. Conjoint analyses are limited in the number of features they can consider. As a result, conjoint analyses, if used at all, are traditionally utilized by marketers as one datapoint of many that are used to estimate how consumers value certain components or features of more basic consumer products that have fewer features than universities, like dishwashers and microwaves.

Second, separate conjoint analyses have to be run when entities can segment their customers into different groups. For example, airlines make separate pricing decisions for first class passengers and those willing to sit in a middle seat of the last row of the plan. Universities segment their customers (students) much more than most businesses as they have detailed information on the students' financials and other characteristics. Using this information to tailor financial aid to each student, universities effectively set individualized prices to each student. Consequently, universities are able to segment their customers in a way such that each student is essentially their own segment as further discussed in Section VI.B.2 below. As a result, it is erroneous to run a single conjoint analysis that lumps all students into one segment as Dr. Singer did.

Third, unlike many products and services, multiple decision makers are often involved in a student's university choice. For example, while students traditionally focus on certain university attributes as part of their selection process, parents and other family members traditionally focus on other attributes. Conjoint analyses cannot be accurately used when purchases are made by multiple decision makers with often different points of emphasis.

## *B. Dr. Singer Did Not Properly Investigate The Tuition And Fees Students Actually Paid*

As noted above, changes in the Net Prices Students Pay are the relevant prices needed to determine how much putative class members were allegedly damaged.

[165] For example, see Manley, p. 247 and Czajkowski, pp. 524-525.

Despite that, Dr. Singer did not analyze such prices in his model. Instead, his conjoint analysis analyzed List Prices. His damages calculation utilized that conjoint conclusion that was based on List Prices as well as the Net Prices BU Received. The Net Prices Students Pay were not in his damages model.

Because he did not analyze the prices that are needed to assess alleged damages, Dr. Singer's analysis did not accurately determine alleged damages in this matter.

### 1. There Is A Difference Between List Prices, The Net Prices BU Receives And The Net Prices Students Pay

As discussed above, List Prices for tuition and fees are the amounts that the university states on its website, catalogues and brochures are being charged. Financial aid causes most students in traditional programs at BU to not pay these List Prices.[166] The Net Price BU Receives equals the List Price minus BU-provided financial aid. The Net Price Students Pay equals the List Price minus both the financial aid BU provides and the financial aid provided by external sources, such as Federal, State, Local and foreign governments, charities, organizations, corporations, other private entities, as well as friends and family.

As mentioned in Section III.B, as students receive different financial aid amounts from BU and from external sources, the Net Prices BU Receives and the Net Prices Students Pay are individualized. For example, if BU's List Price for tuition was $20,000, BU provided a given student with $6,000 in financial aid and that student's local Chamber of Commerce gave the student a $3,000 scholarship, the Net Price BU Receives from this student is $14,000 and the Net Price the Student Paid would be $11,000.

These prices do not necessarily move in concert with one another. While the List Prices of tuition and fees at private, nonprofit, 4-year institutions have sizably increased over the last decade, Net Prices are virtually unchanged.[167] This is because, consistent with the Bennett Hypothesis by former Secretary of Education William Bennett, "[s]chools, public and private, have been raising both their listed tuitions *and* their discounting of tuition engaging in increased price discrimination to increase revenue."[168]

Consequently, it is economically improper for Dr. Singer to assume as he did that if List Prices decreased, so would the Net Prices Students Pay.

### 2. Dr. Singer Incorrectly Assumes That BU Sets One Unique Tuition Price When In Fact Prices Are Individualized

As discussed in Section V.B above, Dr. Singer combines each of his respondents' individualized preferences in order to determine the purported single, unique discount that he incorrectly claims BU should have offered its undergraduate and graduate students, respectively.

---

[166] BU Financial Aid Stats.pdf.

[167] Gansemer-Topf, Ann M., Peter F. Orazem and Darin R. Wohlgemuth "Do liberal arts colleges maximize profit?" *Southern Economic Journal*, 2021; 88, p. 275.

[168] Weisbrod, Burton A., Jeffrey P. Ballou, and Evelyn D. Asch Mission and Money: Understanding the University Cambridge University Press, 2008 ("Weisbrod"), p 100.

However, this assumption further undermines and makes the Singer Analysis unreliable because it does not analyze the relevant Net Prices Students Pay. Survey respondents were wrongly told that they need not consider any financial aid, work-study, scholarships, or other forms of tuition support they might receive, all of which are significant real world factors in Plaintiffs' and putative class members' analysis and decisions, as discussed in the next Subsection.

Universities generally, and BU in particular, do not utilize a one-size-fits-all pricing. Instead, BU segments its customers (students), modifies the product each receives (education) and tailors prices (tuition). For example, BU identifies students in different schools and sets different prices for them. Dr. Singer recognized this when he noted that BU set different List Prices for undergraduates, MBA students, law students, medical students and other graduate students.[169] Dr. Singer utilized incorrect prices in his analysis as he did not include the List Prices relevant to all of the Named Plaintiff graduate students as discussed above in Section V.B. Additionally, when BU changes its tuition List Prices, the changes are not necessarily identical for each of these segments. Additionally, through the use of financial aid, BU individually evaluates each student's characteristics and adjusts List Prices, as discussed below, to set different tuition amounts for each student.

As noted above, Dr. Singer incorrectly bases his conjoint analysis on the wrong metric, List Prices. Given the primacy of all institutional and third-party financial aid, work-study, scholarships, or other forms of tuition support, including subsidized loans in a student and their family's school selection,[170] Dr. Singer cannot properly determine student preferences for schools by ignoring such aid. If preferences are incorrectly determined, Dr. Singer's purportedly required discount percentage and resulting damages would be inaccurate.

Even if Dr. Singer analyzed the proper metric, his analysis would still be flawed because he incorrectly assumed that all students faced the same prices. However, as discussed above, BU separately sets 1) the List Price; 2) the Net Price the University Receives; and 3) the Net Price each Student Pays.

BU also customizes the Net Price the University Receives (which likely adjusts the Net Price Students Pay) by tailoring the institutional financial aid packages it provides. By providing grants, scholarships, loans and work-study jobs, BU individually sets its prices for each student based upon granular characteristics such as financial need, academic ability, intended major and price sensitivity. For example, as shown below in Figure 6, while Mx. Bornstein and Ms. Tran did not receive any institutional aid from BU, Ms. Silulu, Ms. Cox, Ms. Dutra and Ms. Dube did in differing monetary amounts.

In addition, the Net Prices Students Pay are also individualized as students receive different third-party aid. For example, while Mx. Bornstein did not receive any federal government aid, Ms. Silulu, Ms. Tran, Ms. Cox, Ms. Dutra and Ms. Dube did in different monetary amounts and forms, such as both loans and grants.

The aforementioned factors have led economists to conclude that "the net price of college … [has] become increasingly individualized."[171] For example, ***Figure 5*** & ***Figure 6*** show the

[169] Singer Report, footnotes 58 & 60.
[170] https://studentaid.gov/articles/4-things-consider-choosing-college-career-school/ viewed on August 8, 2022.
[171] Scott-Clayton, p. 2.

individualized List Prices, Net Prices BU Received and the Net Prices Students Paid for the Named Plaintiffs during the Spring 2020 Semester.[172]

| Figure 5 | | | | | | |
|---|---|---|---|---|---|---|
| **Named Plaintiff Cost of Attendance for Spring 2020** | | | | | | |
| **Description** | **Silulu** | **Bornstein** | **Tran** | **Cox** | **Dutra** | **Dube** |
| **Tuition** | | | | | | |
| Total List Price Tuition | $27,360 | $27,360 | $27,360 | $17,568 | $27,360 | $30,780 |
| **Fees** | | | | | | |
| Community Service Fee | $60 | $60 | $ - | $ - | $60 | $60 |
| Student Services Fee | $307 | $307 | $ - | $172 | $307 | $307 |
| Health & Wellness Fee | $219 | $219 | $219 | $219 | $219 | $219 |
| Program Fee | $ - | $ - | $150 | $ - | $ - | $ - |
| **Total List Price Fees** | **$586** | **$586** | **$369** | **$391** | **$586** | **$586** |
| **Room & Board[173]** | | | | | | |
| Residence Charge-Room | $2,844 | $ - | $ - | $ - | $3,444 | $5,066 |
| Residence Dining Plan | $1,320 | $ - | $ - | $ - | $776 | $ - |
| Apartment Plan | $ - | $ - | $ - | $ - | $ - | $74 |
| **Total List Price R&B** | **$4,164** | **$ -** | **$ -** | **$ -** | **$4,220** | **$5,140** |
| **Misc. Charges** | | | | | | |
| Total Misc. Charges | $100 | $25 | $50 | $ - | $25 | $ - |
| | | | | | | |
| **Cost of Attendance** | **$32,210** | **$27,971** | **$27,779** | **$17,959** | **$32,191** | **$36,506** |

[172] The sources for Figures 5 and 6 are Silulu, Natalie Spring 2020.pdf, Bornstein Spring 2020.pdf, Tran Statement Spring 2020.pdf, Cox Statement Spring 2020.pdf, Dutra Statement Spring 2020.pdf and Dube, Gabriella Spring 2020 (1).pdf. Loan subsidies are ignored.
[173] Net of Credits.

| Figure 6<br>Named Plaintiff Financial Aid & Loans for Spring 2020 | | | | | | |
|---|---|---|---|---|---|---|
| **Description** | **Silulu** | **Bornstein** | **Tran** | **Cox** | **Dutra** | **Dube** |
| **Cost of Attendance** | | | | | | |
| Cost of Attendance | $32,210 | $27,971 | $27,779 | $17,959 | $32,191 | $36,506 |
| **Financial Aid** | | | | | | |
| Student Scholarship | $13,350 | $ - | $ - | $13,176 | $10,600 | $7,050 |
| Student Scholarship-Housing | $1,700 | $ - | $ - | $ - | $1,700 | $ - |
| **Total Institutional Aid** | **$15,050** | **$ -** | **$ -** | **$13,176** | **$12,300** | **$7,050** |
| **Net Price BU Receives** | **$17,160** | **$27,971** | **$27,779** | **$4,783** | **$19,891** | **$29,456** |
| | | | | | | |
| Federal Pell Grant | $2,472 | $ - | $ - | $ - | $ - | $ - |
| MA State Grant | $700 | $ - | $ - | $ - | $ - | $ - |
| Gilbert (MA) Matching Grant | $1,250 | $ - | $ - | $ - | $ - | $ - |
| **Total External Aid** | **$4,422** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| **Total Financial Aid** | **$19,472** | **$ -** | **$ -** | **$13,176** | **$12,300** | **$7,050** |
| | | | | | | |
| **Net Price Charged to Students (excluding Loan Subsidies)** | **$12,738** | **$27,971** | **$27,779** | **$4,783** | **$19,891** | **$29,456** |
| **Loans** | | | | | | |
| Federal Sub. Loan | $1,732 | $ - | $ - | $ - | $2,227 | $2,721 |
| Federal Unsub. Loan | $990 | $ - | $10,142 | $10,142 | $990 | $990 |
| Federal Plus Loan | $13,180 | $ - | $21,545 | $4,549 | $ - | $25,375 |
| Mass No Interest Loan | $1,500 | $ - | $ - | $ - | $ - | $ - |
| Sallie Mae Loan | $ - | $ - | $ - | $ - | $21,209 | $ - |
| Contra-Loans | $(5,274) | $ - | $(8,141) | $(9,908) | $ - | $ - |
| **Total Loans** | **$12,128** | **$ -** | **$23,546** | **$4,783** | **$24,426** | **$29,086** |
| | | | | | | |
| **Out of Pocket Costs in Spring 2020** | **$610** | **$27,971** | **$4,233** | **$ -** | **$(4,535)** | **$370** |

The above Figures display many individualized tuition issues. First, the total List Price tuitions for all the Named Plaintiffs varied and ranged from $17,568 to $30,780.

Second, the Net Price the University Received varied for all the Named Plaintiffs because the institutional financial aid they received ranged from $0 to $15,050. For example, Mx. Bornstein and Ms. Tran did not receive any institutional financial aid; whereas, the other Named Plaintiffs received student scholarships from BU.

Third, the Net Price Students Paid (excluding loan subsidies) varied for all the Named Plaintiffs as the third-party financial aid they received differed. For example, one Named Plaintiff, Ms.

Silulu, received a Federal Pell Grant, which was $2,472. Additionally, Ms. Silulu received state grants totaling $1,950. Such financial aid reduced the tuition and fees to a Net Price the Students Paid (excluding loan subsides) ranging from $4,783 to $29,456.

Fourth, the payment methods of the Named Plaintiffs call into question their exact payment. Ms. Silulu, Ms. Tran, Ms. Cox, Ms. Dutra and Ms. Dube took out loans to pay for college. If their loans had a subsidized interest rate, their payments do not equal the face value of the loan. The tuition they paid through loans would equal the payments they made on the loan discounted by an unsubsidized interest rate. The payments would be individualized as some might extend their loans, pay early or have their loans be discharged or forgiven. The unsubsidized interest rate would also be individualized. Individualized issues further exist with the student loan repayment pause that has existed throughout the pandemic.[174] Additionally, on August 24, 2022, President Biden announced student loan forgiveness, which further individualizes the Net Price Students Paid. In particular, borrowers who earned less than $125,000 (less than $250,000 for married couples) are eligible to have $10,000 of their student loans forgiven ($20,000 if they also received a Pell Grant).[175] This forgiveness, if implemented,[176] would convert loans into grants or scholarships. To determine which putative class members would have their loans forgiven if the Biden plan is implemented, and the amount of that forgiveness, one must at a minimum individually determine 1) which putative class members took out student loans, 2) the current earnings of all putative class members who had student loans, 3) whether the putative class member also received a Pell Grant and 4) how to allocate the forgiveness among the various semesters students might have taken out loans.

In summary, the Named Plaintiffs alone demonstrate the many individualized prices and payments that students and third-party payors make for college tuition as opposed to the incorrect assumption that Dr. Singer makes, asserting that there is one unique price would be negotiated for tuition to graduate students and another unique price for undergraduates.

If, as the Plaintiffs allege, BU should have charged different tuition and fees during the Spring 2020 Semester, the aforementioned factors would have made such different tuition and fees individualized as well. As discussed below in Section VI.B.3, institutional and third-party aid students received likely also would change along with any tuition and fee changes

Consequently, even if Dr. Singer analyzed relevant prices (the Net Prices Students Paid), he cannot conclude that putative class members were charged and would have been charged specific, classwide tuition amounts. As a result, individualized factors and preferences **would define** both the actual and "but for" tuition and fees as well as any price differential or discount percentage that might exist. Consequently, by definition, individualized factors and preferences would be a key determinant of each putative class member's damages.

---

[174] For example, see https://studentaid.gov/announcements-events/covid-19/payment-pause-zero-interest viewed on August 30, 2022.

[175] https://www.usatoday.com/story/money/2022/08/25/how-is-student-loan-debt-forgiven/7884574001/ viewed on August 30, 2022.

[176] Courts are currently weighing the legality of this forgiveness decision. https://studentaid.gov/debt-relief-announcement viewed on December 14, 2022.

### 3. *Dr. Singer Incorrectly Assumes Financial Aid Is Unrelated To List Prices*

Dr. Singer erroneously told his respondents

> to assume that they had the same access to financial aid or scholarships they actually received in real life (or anticipated receiving in the case of a prospective student). This was done to ensure that respondents would view the Tuition and Fee as *charges* in the same way students did in real life.[177]

This statement is incorrect and misleading.

"In real life," students and their families focus on the Net Prices Students Pay rather than List Prices.[178] Consequently, they do not view the List Prices for tuition and fees as actual charges as Dr. Singer told them to assume.

Additionally, even though students and their families might have "the same access to" financial aid or scholarships irrespective of Dr. Singer's adjusted List Prices for tuition and fees, "the actual amount of" financial aid or scholarships students would receive would vary with List Prices.

For example, university officers dispensing Federal and institutional need-based financial aid at least partially base their aid recommendations on the school's Cost of Attendance ("COA") and the student's Expected Family Contribution ("EFC").

The COA is the amount it will cost a student to attend a university. The COA includes an estimate of the List Price of tuition and fees; the List Price of room and board (or living expenses for students who do not contract with the school for room and board); the cost of books, supplies, transportation, loan fees, and miscellaneous expenses (including a reasonable amount for the documented cost of a personal computer); an allowance for child care or other dependent care; costs related to a disability; and/or reasonable costs for eligible study-abroad programs.[179]

The EFC is determined from the Federal government's Free Application for Federal Student Aid ("FAFSA") form. Students provide detailed family financial information as well as information about the schools' students are considering attending on the FAFSA form. BU's Office of Financial Aid utilizes the information reported on the FAFSA form to calculate the EFC, which is how much money a student's family could contribute if the student were to attend BU.[180] The formula includes information on the student's/family's taxed and untaxed income, assets, and benefits (such as unemployment or Social Security), as well as demographic characteristics such as the student's family size and the number of family members who will attend college during the year.[181]

---

177 Singer Report, paragraph 38.
178 Weisbrod, p. 80.
179 https://studentaid.gov/complete-aid-process/how-calculated viewed on January 17, 2022.
180 *Ibid.*
181 FAFSA form for July 1, 2019 – June 30, 2020. (https://fsapartners.ed.gov/sites/default/files/attachments/drug worksheets/20192020FAFSAEN.pdf viewed on December 15, 2022)

Assume that the COA for one school within BU was $20,000 and a given family's EFC was $15,000. In this example, BU has the option, but not the obligation, to provide that student with the difference between the COA and the EFC, or $5,000 in scholarships, which would, if fully granted, cause the Net Price the Student Pays to be $15,000.

Now assume that the List Price for tuition drops by $1,000. As tuition List Price is one component of the COA, the COA would drop to $19,000. This change would cause the difference between the COA and EFC, and the potential scholarship, to fall to $4,000 and the Net Price the Student Pays would remain at $15,000, unchanged by the List Price drop.

As a result, this simple example shows that financial aid would change as a result of changes in List Prices, not the Net Prices Students Pay. By telling his survey respondents to ignore financial aid, Dr. Singer had his survey respondents "view Tuition and Fee as *charges* in **a different** way than students did in real life," further biasing his results.

### *4. Dr. Singer Improperly Bases His Conjoint Analysis on List Prices*

Economists have found university List Prices to be "uninformative." In particular, one study found that:

> Although one typically associates a single number with a school's undergraduate tuition (the listed price), the actual prices that students pay to take classes (the net tuition) vary from student to student. Indeed, it is quite common for two students in the same major and taking identical classes to pay different net tuitions in the same way that two people sitting next to one another on a plane flight likely paid different prices for their tickets. The reasons for the differential pricing may differ, however. For the airline the price "discrimination" is simply geared to a profit-maximizing strategy, whereas for a public or private nonprofit school it is aimed at both revenue and student mix….
>
> The school's listed tuition – its "list price" – is often about as (un-) informative as the list price of a car. Many students pay less than the list price, and hence **any study using listed tuitions as the price of education will exaggerate both the real cost to students and the school's tuition revenue**….
>
> With financial aid in the form of a tuition discount common, list price is frequently less meaningful than "net tuition" – the discounted price – not to mention other forms of student aid, including loans and work-study jobs.[182]

Because Dr. Singer's conjoint analysis was based upon uninformative and exaggerated List Price data, his results would likewise be uninformative and exaggerated.

An *Economics of Education Review* paper that used economic models to analyze university pricing noted that not individually accounting for each students' school-provided and third-party provided

[182] Weisbrod, pp. 77, 78 & 80. (emphasis added)

scholarships causes "serious aggregation problems."[183] It went on to describe sizable problems with the inclusion of a non-individualized tuitions in an economic model when it stated:

> While the use of net tuition should theoretically be a more accurate measure of the price of schooling to a typical student, aggregating over students with diverse scholarships and opportunities introduces other measurement errors. The most obvious problem is that different students get different levels of scholarships which range from zero to amounts which may equal or exceed the tuition. The college can use scholarships to price discriminate among students, even those who are judged to have similar "need." ….
>
> The fact that the net price varies among students at a single college is not the only problem. The variable in price among colleges that we observe does not capture the net price variation faced by any particular student. We do not know what scholarship offers were turned down by students, and therefore we do not know the price trade-offs any individual actually faced before choosing a school. Accordingly, there is a considerable aggregation problem in using a single number of "average" net tuition.[184]

Consequently, Dr. Singer's analysis is further flawed because his conclusions are based on "a single number" for tuition.

### *5. Dr. Singer Ignores The Individualized Conjoint Analyses Required When Universities Can Perform Market Segmentation*

Mr. Bryan Orme, the president of a leading conjoint analysis software company, has explained that calculating prices based upon overall market-wide averages as Dr. Singer did is incorrect because firms tend to segment the market into different groups and target prices and products to those groups. For example, Mr. Orme stated:

> There are a number of fundamental problems with analysis based on average dollar values. First it attempts to ascertain an average willingness to pay for the market as a whole. Firms usually offer products that appeal to specific targeted segments of the market. The firm is most interested in the willingness to pay among its current customers, or among buyers likely to switch products, rather than in an overall market average. Second, this approach does not reference any specific product, but instead considers an average product. We expect that a respondent's willingness to pay for an additional feature would depend upon the specific product that is being enhanced (e.g., a discount or a premium offering). Third, and most fundamental, this approach assumes no competition. Because a product purchase usually constitutes a choice among specific alternatives, the competitive context is a critical part of the purchase situation. [An investigator would come up with a

[183] Harford, Jon D. and Richard D. Marcus "Tuition and U.S. Private College Characteristics: The Hedonic Approach." *Economics of Education Review*, Vol. 5, No. 4, p. 417.
[184] *Ibid.,* p. 424.

> false result if they interpret] average dollar values, without respect to competitive offerings.[185]

When a company has demographic information that could be used to segment the market like BU does, that company should run separate conjoint analyses for each segment.[186] Mr. Orme went on to say:

> Customizing products to appeal to target segments or even individuals is a common theme in marketing. Many companies dedicate significant resources to developing a portfolio of products that it hopes will appeal to unique segments. For line extensions, the challenge for any company is to design new products that take share from its competitors without stealing an unacceptable amount of share from products within its existing line. One common approach to designing an effective line extension is to use the conjoint data to segment the market into latent (not observed) market segments (sometimes referred to as clusters) that have similar preferences. These segments are called latent because they are not simply delineated based on an explicit variable such as gender, income, or company size. Rather, the underlying segments are revealed through a statistical segmentation technique such as cluster analysis or latent class modeling. Segments are formed with the goal of maximizing the differences in preference between groups while minimizing the differences in preference within groups. Once these latent segments have been identified, one can profile them in terms of other variables in the survey (i.e., demographics, usage, or media habits).[187]

The Singer Analysis, which only looks at overall market averages by aggregating all survey respondents into one segment, ignores this fundamental segmenting requirement. Because the Singer Analysis assumes that BU sets a common, uniform price to undergraduates and a separate common, uniform price to graduates students, Dr. Singer did not follow Mr. Orme's precepts making his analysis further flawed and unreliable.

---

[185] Orme, Bryan K. Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Fourth Edition, 2020 ("Orme"), p. 86. On pp. 90-92, Mr. Orme additionally states: "Looking only at average preferences or part-worth utilities can mask important market forces caused by patterns of preference at the segment or individual level. Marketers are often not interested in averages, but in targetable segments or the idiosyncratic behavior of individuals…If you have segmentation information (such as demographics or firmographics), you can investigate product formulations that appeal to different groups of respondents. It is likely that, by designing products that appeal uniquely to targetable segments, you can increase your overall share for your product line or occupy a niche that is not currently being served."

[186] *Ibid.,* p. 92.

[187] *Ibid.,* p. 98.

### *6. Even If It Were Proper To Use One Aggregated List Price In His Conjoint Model, The Results of That Model Are Not Applicable To Dr. Singer's Damages Formula*

To calculate alleged damages, Dr. Singer multiplied the discount he calculated from his List Price-based conjoint analysis by the Revenue based on the Net Prices BU Received related to tuition and fees.[188]

Such a multiplication equates apples and oranges. He is multiplying something based on List Prices by something related to Net Prices BU Received. Dr. Singer has not demonstrated that such a multiplication is appropriate. As discussed above in Section VI.B.1, List Prices and Net Prices often move independently of each other.

In fact, Dr. Singer's own analysis suggests that students have different reactions to different prices. As discussed above, Dr. Singer ran separate conjoints for undergraduates and graduates, which had identical questions except the Base Price or List Price differed by roughly $1,200 or 4%. Not only did Dr. Singer think it important enough to designate a 4% price differential in his conjoints, but the results of the conjoints were different. From Dr. Singer's analyses, it is reasonable to infer that he believes he would have obtained different discount rates had he utilized Net Prices, which can be markedly different from List Prices in his conjoint analysis.

Even if it were proper to equate apples and oranges as Dr. Singer did, his formula measured the wrong thing as it did not analyze the Net Price Students Paid, which is the only price relevant to assessing alleged damages.

### *7. Dr. Singer Incorrectly Pro-Rates Alleged Damages*

Dr. Singer's conjoint analysis measures prices regarding "Semester Packages." In other words, he determined his alleged prices and discounts based on semester-long classes. Additionally, the Revenue related to the Net Prices BU Received he used in his damages formula was based on the academic year.[189]

Even though his discount and revenue were based on semester-long and year-long numbers, respectively, Dr. Singer prorated the discounts and revenue as BU transitioned to remote education during the middle of the Spring 2020 Semester. His proration methodology is incorrect. In particular, Dr. Singer made the incorrect and unsupported prorate assumption that each day of the semester was equally valuable to students. While such an assumption is convenient and makes calculations easier, it likely is not economically correct because Dr. Singer 1) improperly and uniformly unbundled a bundled price and 2) ignored individualized marginal utility.

#### *a. Dr. Singer Improperly and Uniformly Unbundled a Bundled Price*

Institutions can employ different pricing methodologies when selling their products and services. For example, an institution can opt to sell a single product or bundled set of products. Different

---

[188] Singer Report, paragraph 70.
[189] *Ibid.,* paragraph 69.

pricing methodologies could be employed for each. For example, a grocery store could sell a six-pack of soda for $3.00 and an individual can for $1.00. A consumer cannot claim that the grocery store overcharged them for the individual can. Because different consumer types might desire an individual can over a six-pack, the grocery store utilizes different pricing methodologies that are fine-tuned to the characteristics of the consumers that tend to purchase the product in question. As a result, one cannot look at the price of the six-pack and assume that because six cans cost $3.00, each can must cost $0.50 (= $3.00 / 6). Similarly, the price of a 48 ounce fountain drink at a convenience store is usually not double the price of a 24 ounce fountain drink.

As discussed in my *Journal of Economic Behavior and Organization* paper,[190] which was derived from my NSF funded research, whether the implied price of an individual product in a bundle is more or less than the price of the individual product if it was individually sold depends on the characteristics of the product and bundle. For example, convenience could cause consumers to purchase a bundle of a product and servicing of that product (e.g., extended warranty) even though it would be monetarily cheaper to purchase the product and servicing separately.

Current U.S. Treasury Secretary Janet Yellen co-authored with William James Adams one of the seminal economic articles on bundling in 1976.[191] They concluded that one cannot draw conclusions about the prices of individual components of a bundle from the bundled price. The infinite set of possible individual component prices that could be derived from the bundled price "seriously complicates public appraisal of …. [and] affects certain conclusions that may be drawn."[192] As another author wrote regarding the possible individual component prices can be derived from a bundled price, "nearly anything can happen with bundling."[193]

The Singer Analysis violates these economic maxims. In particular, Dr. Singer incorrectly assumes that the List Price BU charged for an entire semester could be translated into a daily List Price. For the reasons discussed above, there are an infinite set of possible daily List Prices that could be derived from the List Prices that span an entire semester. Dr. Singer did not consider these possible differences in his hypothetical model.

As a result, the Singer Analysis is flawed and unreliable because it improperly purports to translate BU's semester-based List Prices into a daily List Price. Daily List Prices are a vital input to Dr. Singer's calculations. If daily List Prices cannot be accurately calculated, the Singer Analysis fails by definition.

Furthermore, it is questionable whether it is proper to analyze per semester prices to assess alleged damages. Dr. McFadden wrote that a reliable conjoint analysis must take into account the broader context of the purchases a consumer made,[194] which Dr. Singer did not do. While students pay on a semester basis, most are pursuing a degree that spans multiple semesters. Consequently, one could contend that it is proper to analyze the overall cost of a degree, not the cost of an individual semester. This contention would imply that it is improper to investigate the costs students incurred

[190] Manelli, Alejandro M., Martin Sefton and Benjamin S. Wilner, "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" *Journal of Economic Behavior and Organization*, 61(2), October 2006, pp. 304-323.
[191] Adams, William James and Janet Yellen (1976) "Commodity Bundling and the Burden of Monopoly" Quarterly Journal of Economics, 90 ("Adams and Yellen"), pp. 475-498.
[192] *Ibid.,* pp. 477 & 497.
[193] Varian, Hal R. "Price Discrimination," Working Paper, July 1987 ("Varian"), p. 628.
[194] McFadden, p. 16.

for a particular semester; rather, one would have to investigate the costs for all semesters needed to complete a degree. As he did not analyze the total cost of a BU degree, Dr. Singer's methodology did not address the question of interest under this scenario.

### *b. Dr. Singer Ignored Individualized Marginal Utility*

One standard economic maxim is that people generally obtain decreasing marginal utility for consuming products.[195] In other words, the additional benefits one receives from consuming an additional unit of a product decreases as one consumes more. For example, a person generally gets greater benefits from consuming the first slice of pizza than the tenth slice.

The Singer Analysis does not consider whether students received greater benefits from in-person education and campus use during the first portion of the Spring 2020 Semester than they would have in the second portion if the state-ordered closure had not occurred. There are an enumerable number of reasons why such an economic phenomenon could occur. For example, graduating seniors who had secured early employment or graduate school admission might view the second portion of the Spring 2020 Semester differently than other students.

The degree to which students experienced decreasing marginal utility from in-person education and campus use would be individualized. Consequently, Dr. Singer cannot value putative class members potential losses by utilizing his prorate assumption.

Even if his prorate assumption were valid, individualized analyses would be required to determine the proper prorate percentage. Dr. Singer just uniformly applied the fraction of the days that students were taking remote classes divided by the total days in the semester. However, individualized analyses would be required to determine both the numerator and denominator of this proportion.

For example, the Spring 2020 Semester ended with Finals Week. Students whose finals ended early during the Spring 2020 Semester might leave campus early as well. The number of days that students were taking remote classes and the total days would be lower for such early leavers as compared to students whose finals ended later. Some students would have started classes earlier in the Spring 2020 Semester than others as well.

In addition, Dr. Singer does not demonstrate that the following would be identically situated with regards to his pro-ration:

- A weekend day where students had no classes, but did have access to campus and a weekday where students had access to both.
- A student who only had classes 2 days a week and one who had classes every weekday.
- A student who took more credit hours than another student.
- Students who went home for some or all weekends.
- Students who were intentionally enrolled in online classes during the Spring 2020 Semester.
- Students who infrequently attended professor office hours.

[195] https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on June 16, 2021.

- Students who ditched classes.

The aforementioned logistical issues make the claimed formulaic calculation of damages truly highly individualized, contrary to Dr. Singer's unsupported assumption.[196]

As discussed above in Section VI.B.2, BU's ability to offer students individualized pricing allows them to act on such individualized issues.

### *8. Dr. Singer Did Not Demonstrate How He Could Calculate The Tuition And Fees (And Damages) Of Each Putative Class Member*

Dr. Singer simply claims he has determined total alleged damages on a classwide basis. He did not show how one could allocate alleged damages to each individual putative class member.

As discussed above, Dr. Singer calculated alleged damages by multiplying Tuition & Fees by a discount rate by a prorate percentage. All three numbers possess individualized issues that Dr. Singer ignored.

First, Dr. Singer did not demonstrate how much each putative class member paid in tuition and fees. It is my understanding that BU does not even have such information. BU does not necessarily know of all third-party aid a student might have received as the university could be unaware of some third-party aid paid directly to a student. For example, a student's local church charity could have provided the student with the full amount of BU's tuition that the student then used to pay BU. In such a scenario, BU's accounting records for the student would show that they received no financial aid, when in fact, aid accounted for 100% of their tuition payments.

A student in such situation would be incorrectly included in the putative class as they might appear to have been a student payer, but they actually were not as they paid no money toward their tuition. Dr. Singer has not identified a methodology to identify which BU students actually paid tuition and fees. In fact, an individualized analysis studying each student's finances and sources of funds would be required to determine who are student payers and, thus, included in the putative class.

This lack of information about actual payments to BU prevents the actual calculation of alleged damages, but also impairs the ability to ascertain the appropriate putative class members.

Second, Dr. Singer acknowledged that each of his survey respondents had a different alleged tuition discount rate.[197] Given such variability, Dr. Singer did not demonstrate what the appropriate discount rate would be for each putative class member.

Third, as discussed in the prior subsection, the prorate percentage would differ between putative class members.

Consequently, even if Dr. Singer could calculate alleged damages on a classwide basis, he cannot do so on an individualized basis.

---

[196] While BU did reimburse room and board fees on a prorated basis, it did so as it attempted to be generous with students with a "students first" mentality to providing voluntary refunds to its students. Additionally, students generally utilize meals and lodging more consistently than other campus activities.
[197] Singer Report, paragraph 63.

## C. *The Singer Analysis Incorrectly Applies Standard Conjoint Methodology Along Multiple Dimensions*

Dr. Singer did not follow standard procedures underlying conjoint analyses as discussed below.

### *1. Dr. Singer Incorrectly Applied The Algebraic Method To Estimate His Price Discounts*

Dr. Singer applied the incorrect Algebraic Approach to simulating the prices he used to calculate this required price discounts and damages; he should have utilized a competitive simulation approach instead.

This Algebraic Approach compares the individualized utility points each survey participation associated with a given attribute with that same individual's utility points associated with spending more or less money on a product or service to create each survey participant's Willingness to Pay ("WTP") for that attribute.[198] Specifically, the Singer Analysis uses this Algebraic Approach to determine, for each individual survey participant, what percentage of Base Price or List Prices would have the same additional utility as the difference in utilities he calculated between On-Campus and Online experiences. Dr. Singer then averages these individualized percentage discounts to determine what discount he claims would be required by the "average" consumer (student).

But, utilizing research that occurred in 2021, leading conjoint experts have stated that the Algebraic Approach does not accurately calculate prices when they wrote that:

> There are a number of weaknesses with the algebraic approach to WTP. Calculations at the segment or especially respondent level can lead to WTP estimates that exceed the price ranges shown in the experiment and thus rely on extrapolation. Another drawback is that respondents are treated equally, no matter whether they are on the cusp of choosing a product with the enhanced feature on not. Moreover, the algebraic approach ignores competitive context, assuming the buyer cannot acquire the improved feature elsewhere. More serious attempts to measure WTP avoid these simplifying assumptions…
>
> In a vacuum, WTP may measure what economists call the "maximum price," but in a competitive environment what customers are willing to pay will likely be less. Using a more complete competitive context than just two product alternatives [and the algebraic approach], we find that market simulations allow us to estimate WTP for a feature more realistically.[199]

This critique demonstrates that the Singer Analysis cannot properly assess the alleged damages in this matter.

This competitive simulation approach, which Dr. Singer did not perform, is consistent with microeconomic theory. Microeconomic theory states that entities should price their products and

---

[198] Orme & Chrzan, pp. 200-201.
[199] *Ibid.,* pp. 202-203.

services based upon the desires of the marginal consumer; the marginal consumer is the consumer that is "on the cusp of choosing the firm's product."[200] Instead of utilizing the economically proper marginal consumer analysis, the Singer Analysis is based on an average consumer analysis.

As the Singer Analysis employs a simulation methodology that overstates the WTP for campus-based classes and campus access, their overcharge percentage that forms the basis of his damages calculation is overstated and inaccurate. Consequently, his calculations could not be used to accurately assess alleged damages here.

### 2. *Dr. Singer's Misapplication Of Decision Theory Further Biases The Conclusions Of The Singer Analysis*

Decision theory, which studies how people, businesses and institutions evaluate things like choosing items to purchase and price setting decisions, is the basis underlying conjoint analyses. Different people to utilize different rubrics to make their decisions as "[h]uman choice behavior is certainly complex."[201] I discuss some of these rubrics below and how Dr. Singer misapplies decision theory for the putative class.

#### *a. Additive Compensatory Decision Rubric*

One such decision making rubric that forms the basis of many conjoint analyses including the Singer Analysis is called the additive compensatory decision rule.[202] This rule runs the risk of confounding conjoint analyses because real-world survey respondents frequently do not follow it when making actual decisions.

This additive compensatory decision rubric assumes that a given product can be described by its various attributes and people obtain different utilities for each attribute. If the utilities of each attribute are additive, a consumer could obtain the same overall utility from the product by trading off attribute levels. Receiving lower utility from a shortfall in one attribute could be made up for or compensated by surplus utility in another attribute.

The Singer Analysis applies such a decision rubric; it claims that the purportedly lower value that some survey respondents receive from having remote classes and no campus access could be compensated for by a lower price.

Dr. Singer simply assumes without any analysis that all of his survey respondents and all of the putative class members utilize the additive compensatory decision rule. However, as discussed below, people utilize other decision making rubrics. For example, conjoint analyses would not accurately model respondent preferences if survey respondents utilize these other decision making rubrics, and that respondents generally do so,[203] as

> Not all proposed choice models are compensatory, however.[204]

[200] Varian, Hal R., Microeconomic Analysis, Second Edition, pp. 7-8.
[201] Orme & Chrzan, p. 140.
[202] *Ibid.,* pp. 8-9.
[203] *Ibid.,* pp. 201-202.
[204] *Ibid.,* p. 4.

> Common assumptions [underlying conjoint models] about respondent behavior … included (a) respondents used an additive compensatory decision rule consistent with MNL, and (b) no significant attribute interactions. However, at least one of those assumptions usually is violated with real-world respondents.[205]

> If respondents answer CBC questions in an additive and compensatory manner following the assumptions of the logic choice model, utility balance can increase the D-efficiency of CBC questionnaires- often quite impressively. But, it turns out that most respondents do not answer CBC questionnaires using the additive compensatory rule.[206]

Dr. Singer's implicit additive compensatory decision rubric assumption likely does not apply to the putative class. Dr. Singer did not demonstrate any basis to conclude that all BU students would indeed utilize such a decision making rubric when making the choice whether to take remote courses as "compensable" by lower tuition. In fact, there are several reasons why it is very likely that putative class members did not apply this rubric that is needed for the Singer Analysis to accurately assess alleged damages, all else equal, for several reasons.

First, most survey respondents utilize the lexicographic decision making rubric discussed in the next subsection.

Second, Dr. Singer assumed, without any analysis, that universities can be described by five attributes.[207] However,

> Respondents often don't use the additive compensatory rule when answering CBC tasks regarding high-involvement categories – especially when they involve four or more [attributes].[208]

Third, Dr. Singer incorrectly forced his survey respondents to choose between various BU configurations. It could be that some BU students would have attended BU irrespective of its underlying attributes. For example, some BU students might have expressed a preference for in-person education, but their love for BU was so great that they would have attended BU even if they perceived its education to be suboptimal and overpriced. Similarly, some BU students might have felt so committed to their traditionally in-person BU programs that, even with the knowledge that those programs would temporarily transition to a remote environment, the students would insist on continuing in the same program rather than enroll in a program at another institution. Dr. Singer's model does not account for such beliefs. Such survey respondents likely would have been

---

205 *Ibid.,* p. 27. MNL (Multinomial Logit) Choice Model is a regression used to predict categorical placement in or the probability of a category membership on a dependent variable based on multiple independent variables. (http://bayes.acs.unt.edu:8083/BayesContent/class/Jon/Benchmarks/MLR_JDS_Aug2011.pdf viewed on December 15, 2022.)

206 *Ibid.,* p. 56. CBC is Choice Based Conjoint. D-efficiency is the relative number of runs (expressed as a percent) required by a hypothetical orthogonal design to achieve the same determinant value,. (https://ncss-wpengine.netdna-ssl.com/wp-content/themes/ncss/pdf/Procedures/NCSS/D-Optimal_Designs.pdf viewed on August 22, 2022.)

207 Section VI.C.5.a.i below shows that this assumption understates the number of relevant attributes considered when students make their college selection.

208 Orme & Chrzan, p. 57.

willing to pay more for a "less advantageous" educational environment if they knew that obtaining a "more advantageous" educational environment would require transferring universities.

Not accurately modeling respondent preferences would cause Dr. Singer to misstate alleged damages.

### *b. Lexicographic Decision Rubric*

Leading conjoint analysts found that "70% of respondents in some choice studies seem to be making lexicographic choices."[209] Under a lexicographic decision rubric, respondents identify the most important attribute to them and select the item(s) with the highest value to them of that attribute. If more than one item possesses that highest value, respondents eliminate all items that do not possess the highest value for the most important attribute from the choice set. They then identify the second most important attribute to them and select the item(s) with the highest value to them of that attribute from the remaining choice set. Respondents continue that process until one item is identified.

For example, my boss, who is from Birmingham, Alabama, once stated that he would have only attended the University of Alabama; he would not have gone to Auburn University, Alabama's rival, no matter what Auburn's List Prices were or the financial aid or other attributes it offered. So, he claims he would have attended Alabama even if Auburn was arguably superior along all other dimensions.

For this reason, standard conjoint analyses like the Singer Analysis do not properly calculate values in markets where people base their product selections on lexicographic preferences, like university selection.[210]

### *c. Satisficing Decision Rubric*

Another decision making rubric is called satisficing. With such a rubric, decision makers select the first alternative presented to them that meets their satisfaction threshold.[211] As such decision makers cease their search after finding this first alternative, they do not fully compare all alternatives.

Some students utilize this satisficing rubric as they might have known a great deal about a particular university as a parent or other family member went there. Such information could make students believe that that university would satisfy their college needs. As a result, such students might only consider that university and not compare it to other schools.

Conjoint analyses, like the Singer Analysis, do not properly calculate values in markets where people base their product selections on satisficing or other filtering mechanisms.[212]

---

[209] *Ibid.,* p. 5.
[210] *Ibid.*
[211] *Ibid.*
[212] *Ibid.* and McFadden, pp. 22-23.

#### d. *Other Decision Rubrics*

Other decision making rubrics guide consumer choices including, Elimination-by-Aspects, Conjunctive, Disjunctive, Random Regret Minimization, Relative Advantage Maximization and Must-Have or Unacceptable Levels.[213] Under these rubrics, respondents to "key on a few must-have or must-avoid aspects to narrow down their choices,"[214] which generally occurs with university selections as schools have a multitude of different attributes, all of which cannot practically be considered by prospective students.

### 3. *Dr. Singer Did Not Demonstrate That The Model He Employed Was Appropriate*

To calculate his alleged overcharge percentage, Dr. Singer made several unsupported assumptions that he did not demonstrate were valid. First, Dr. Singer did not identify the exact thought process behind the attributes he included in his survey and their levels.

Second, Dr. Singer did not specify what model he utilized to estimate each of his respondents' individualized utilities. Different models with different functional forms can be used.

> In the course of building models we invariable make decisions (or assumptions); e.g., whether to use a linear function, a non-linear function or dummy variables to represent a quantitative variable, whether to include one set of interactions or another or none at all, and so on.[215]
>
> There often is a tradeoff between statistical efficiency and task realism in experimental design for discrete choice experiments.[216]
>
> [O]ptimization results hinge on the quality of the inputs: garbage in, garbage out. Seemingly mundane issues such as interviewing the right respondents, motivating them to give realistic answers, specifying the right levels for attributes, and data cleaning can have a huge impact on optimization results.[217]

Dr. Singer did not demonstrate how he made the aforementioned required decisions to select the model underlying the Singer Analysis. He did not explain why he made the tradeoffs he did. He also did not perform a recommended robustness check.

> [I]t is helpful to select experimental designs that permit the precise estimation of all first-order interaction effects and then test whether the inclusion of the most promising ones can improve the model's predictions.[218]

Because of the depth and breadth of the statistical decisions that need to be made in a conjoint analysis that could vary from industry to industry and situation to situation,

---

[213] Orme & Chrzan, pp. 6-8 & 27.
[214] *Ibid.,* p. 56.
[215] *Ibid.,* p. 75.
[216] *Ibid.,* p. 50.
[217] *Ibid.,* p. 241.
[218] *Ibid.,* p. 193.

> [p]rior to trusting the results of an optimization algorithm, it is best to have gained experience through multiple applications of conjoint analysis to the particular market of interest so that you are confident that the predictions from the choice simulator indeed track reasonably well with actual market choices.[219]

Without such explanations, Dr. Singer cannot claim that his model is sufficiently accurate to be used to calculate alleged damages in this matter.

Even if he were able to construct a proper conjoint model, the Singer Analysis incorrectly assumes that companies and universities blindly apply the results implied by conjoint analyses and do not utilize other tools in arriving at their pricing decisions. Dr. Singer has not provided any evidence that any university, let alone BU, utilizes conjoint analysis to set prices without considering other factors. Even if conjoint analyses are one way of determining prices, they would not accurately predict prices if BU utilized another method to determine prices. Conjoint analyses assume that the supplier does not have any constraints on their price setting ability. However, BU does, as discussed below in Section VI.C.6.a.

#### *4. Dr. Singer Did Not Determine That All Data Included In His Conjoint Analysis Were Appropriate*

Dr. Singer asked each of his survey participants to complete 10 different university choice selections. He included all of these selections in his model.[220]

However, Dr. Singer did not demonstrate that it is appropriate to include all such selections in determining his overcharge percentage. For example,

> some researchers think that learning effects bias respondents and that the first few conjoint questions might be the most valid of all, the last ones a modeler should discard.[221]

Dr. Singer did not demonstrate that an accurate overcharge percentage could be calculated by his inclusion of university choice selections that some recommend be discarded.

#### *5. Dr. Singer Did Not Perform A Proper Survey To Elicit Respondent Preferences Regarding BU's Tuition and Fees*

As discussed in the subpoints below, to properly run a conjoint analysis one should begin by determining respondents' preferences by asking them to decide between realistic products on the market and not putting unrealistic constraints on those decisions.

Dr. Singer did not perform either of these required steps accurately.

---

[219] *Ibid.,* p. 241.
[220] Singer Report, paragraph 47.
[221] Orme & Chrzan, p. 81.

#### *a. The Singer Analysis Did Not Ask Respondents to Decide Between Realistic Products*

The Singer Analysis is fundamentally flawed as it ignores the complex, individualized preferences that BU students utilize to select their university and program.

It is important that a conjoint survey emulate as close as possible the real-world environment in which the purchasers make their purchasing decision, and present actual products as choices, rather than a list of attributes. As noted by Sawtooth, a conjoint analysis software, conjoint analyses do not provide accurate results if the surveyor does not properly identify the entire set of competitive choices and product attributes consumers consider when making purchase decisions.[222] Conjoint experts agree:

> The profiles presented [in conjoint analysis] should be believable (and should resemble existing products as much as possible).[223]
>
> It is particularly important that subjects have familiarity with the products and features they are being asked to evaluate that is comparable to their real market experiences.[224]

One of the creators of conjoint analyses described the importance of including actual products available in the marketplace plus the item in question in a conjoint analysis.[225]

The Singer Analysis, however, did not have survey respondents evaluate university experiences that are comparable to BU students' real market experiences. Dr. Singer's conjoint survey did not present respondents with actual university choices at all relevant for the Spring 2020 Semester. Instead, he instructed respondents to solely consider price, modality, tutoring services and career services. Dr. Singer provides no evidence that the hypothetical combinations he constructed are consistent with any actual university. Also, he did not show that his respondents would ever face such a "purchase" decision in the real world or would believe that attributes Dr. Singer thought might be important were actually important. For example, he did not show that **all** BU students would make a college decision based even in part upon the availability of tutoring or career services. Dr. Singer did not demonstrate that his survey respondents were sufficiently knowledgeable about online classes. Consequently, Dr. Singer has failed to demonstrate that the attributes listed in his proposed conjoint analysis "resemble[d] existing products as much as possible" or were relevant to **all** putative class members.

Quantifying the preferences of survey respondents is purpose agnostic. It does not matter whether one is constructing an economic model of preferences for an academic paper, to develop a new product, or for class action litigation. The same economic and statistical principles apply.

Dr. Singer tends to call attributes other than the one he is trying to measure decoy attributes.[226] While such attributes might be irrelevant in the third stage of his conjoint model when he

---

[222] Sawtooth Proceedings, p. 342.
[223] Rao, p. 45.
[224] McFadden, p. 25.
[225] Rao, p. 99.
[226] Singer Report, paragraph 37.

determines prices, they are vital in the second stage of his conjoint model when he tries to determine respondent preferences or utilities. As discussed above, irrational preferences could result from providing respondents with an incomplete and inaccurate attribute choice set. It is important that the surveyor identify the omitted attributes and demonstrates that their exclusion would not result in inaccurate, biased preferences. Dr. Singer potentially believes that the other variables are decoys because he ignores them when he analyzed utilities associated with modality. However, as discussed below, the other variables included in a conjoint analysis are not decoys that could be ignored in the determination of respondent preferences.

#### *i. Dr. Singer's Survey Does Not Identify All Attributes Putative Class Members Care About*

Conjoint analyses can be unsuccessful and generate incorrect results.

> Defining proper attributes and levels is arguably the most fundamental and critical aspect of designing a good conjoint study. It is also often the most time-consuming step in executing a conjoint analysis project…. Attribute definition is central to conjoint study design. Assembling the right combinations of attributes and attribute levels is critical to the success of conjoint studies.[227]

One of the authors Dr. Singer cited in constructing his methodology stated that such identification is vital as the quantitative values of the attribute of interest

> could mask the effects of other, omitted attributes…. But if researchers include too many attributes, they may encourage survey respondents to [utilize other decision rubrics]. That, too, may lead the empirically observable quantities to diverge from those of theoretical interest…. The tradeoff between masking and task difficulty presents a key challenge.[228]

Dr. Singer's survey, which assumes without any demonstrated analysis that students care about only five attributes, ignores many attributes students care about. Conjoint analysts use detailed studies such as "[f]ocus groups, in-depth customer interviews, and internal corporate expertise" to identify relevant attributes,[229] which Dr. Singer did not do. Other important university attributes economists have identified as a result of their in-depth study of higher education include:

- "emphasis on undergraduate teaching relative to graduate training and faculty research, number and types of courses and majors, level of intercollegiate sports, religious or secular orientation;"[230]

---

[227] Orme, pp. 49-50.
[228] Bansak, Kirk et al. "Beyond the breaking point? Survey satisficing in conjoint experiments." *Political Science Research and Methods.* May 2019, pp. 2-3. Dr. Singer cited to another article Dr. Bansak wrote on survey satisficing. See Singer Report, footnote 64.
[229] Paul E. Green, Abba M. Krieger, Yoram Wind, (2001) Thirty Years of Conjoint Analysis: Reflections and Prospects, p. 118.
[230] Weisbrod, p. 35.

- Family history. Some students have strong preferences to attend universities their family members have, while others prefer not to attend their sibling's college.[231]
- The size of classes,[232]
- Presence of guidance and counseling offices,[233]
- A safe and friendly campus environment and supportive staff,[234]
- Past graduate's career outcomes and job opportunities for graduates.[235]

US News characterizes BU using other attributes such as its long history since being founded in 1839, its urban setting in Boston, its nearly 500 student clubs/organizations and Division I athletics.

> [A] private institution that was founded in 1839….
>
> Boston University is one of the largest independent, nonprofit universities in the country. The BU Terriers have more than 20 NCAA Division I varsity sports. BU's hockey team has won multiple NCAA national championships. BU also has nearly 500 student clubs, ranging from Ski Racing to the Juggling Association. BU created one of the first study abroad programs, and currently sponsors more than 90 international programs… Boston University's highly ranked graduate schools include the School of Law, School of Management, School of Medicine, College of Engineering and School of Education. BU's School of Medicine is the nation's first combined cancer research and teaching laboratory. BU is also the first university to open all divisions to female students in 1872. Notable alumni include Dr. Martin Luther King, Jr.; actresses Julianne Moore and Geena Davis; television personality Bill O'Reilly; radio host Howard Stern; and Tipper Gore, former wife of Al Gore.[236]

Other important university attributes are also discussed above in Section VI.C.5.a.i.

Dr. Singer did not utilize any of these important and relevant attributes in his conjoint analysis.

Conjoint analysis predictions must "also assume that **all** relevant attributes that influence share have been measured."[237] As Dr. Singer's survey does not include **all** relevant attributes, the conclusions resulting from his conjoint analysis are unreliable.

---

[231] Avery, Christopher and Caroline M. Hoxby "Do and Should Financial Aid Packages Affect Students' Choices?" p. 270.

[232] Hyun Kyung Chatfield, So Jung Lee & Robert E. Chatfield (2012) The Analysis of Factors Affecting Choice of College: A Case Study of University of Nevada Las Vegas Hotel College Students, Journal of Hospitality; TourismEducation, table 1, 24:1, 26-33, DOI: 10.1080/10963758.2012.10696659.

[233] Agrey, L., & Lampadan, N. (2014). Determinant factors contributing to student choice in selecting a university. *Journal of Education and Human Development*, *3*(2), 391-404, p. 399, table 3.

[234] *Ibid.*

[235] https://www.collegematchpoint.com/college-matchpoint-blog/2018/4/making-the-right-choice-how-students-decide-which-college-to-attend viewed on July 25, 2022.

[236] https://www.usnews.com/best-colleges/boston-university-2130 viewed on December 15, 2022.

[237] Orme, p. 105. (emphasis added) While Dr. McFadden stated that all attributes need not be included, he wrote that the omitted attributes must have certain characteristics such as non-correlation with included attributes, which Dr. Singer's attributes (especially financial aid as discussed in Section VII below) do not. See also McFadden, p. 21.

### *ii. Dr. Singer's Survey Misstates The Attributes Directly Relevant to His Calculation of Alleged Damages*

Dr. Singer bases his damages on his respondents' perception of two attributes: class modality and campus access. However, his results are biased because he did not properly describe the modality of classes and campus access BU students had during the remote portion of the Spring 2020 Semester.

First, Dr. Singer's campus access attribute erroneously assumes that respondents had the choice between (i) full access to BU's campus facilities & "BU-sponsored events, such as sporting events, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events" and (ii) **no** "access to any of the campus facilities, groups, opportunities, or events described above."[238] However, this attribute describe does not accurately describe the access BU students had during the remote portion of the Spring 2020 Semester. As described above in Section V.B, BU students had access to several "club events, parties, festivals, and social, networking and wellbeing events" as well as "groups, opportunities and events" during the remote portion of the Spring 2020 Semester. While obviously access was reduced during this time, it was not eliminated as Dr. Singer told his survey respondents to assume.

Dr. Singer's incorrect and overly harsh description of the campus access attribute likely caused his respondents to place lower value on his alleged Online Modality than they would have had he provided them with a proper description. As a result, Dr. Singer's incorrect campus access attribute description likely caused him to overstate alleged damages.

Second, Dr. Singer did not properly describe the real-world implications of choosing in-person classes and campus access because he did not tell any of his survey respondents that education modality changes could be due to the COVID-19 pandemic. On the other hand, actual, undisputed, real-world facts demonstrate that the COVID-19 pandemic forced all universities across the country to close and/or pivot to remote learning, caused BU to perform its allegedly improper activity and triggered reactions from students, including the putative class members. As a result, Dr. Singer's conjoint model incorrectly provided his survey respondents with a choice between education modalities when such choices were unavailable during the Spring 2020 Semester. It also left out crucial context.

For example, safety would differ between students who chose in-person classes and campus access and students who chose online classes and limited campus access. Due to the communal spread of infection, it is well established that the risk of catching COVID-19 increases with the greater interaction that would occur if students had access to campus, its facilities and the campus experience especially during the Spring 2020 Semester.[239] As a result, survey participants who chose in-person classes and continued campus access (had such an option been available during the Spring 2020 Semester) would be less safe than survey participants who chose to continue their education with remote classes and limited campus access. Consequently, many students who may have otherwise preferred in-person classes would have preferred remote education for a portion of the Spring 2020 Semester, given the increased risk of contracting COVID-19. Dr. Singer biases

[238] Singer Report, paragraph 42.

[239] https://www.usnews.com/education/best-colleges/articles/coronavirus-on-campus-how-college-students-can-stay-safe viewed on October 15, 2021.

his results by not explaining the COVID-19 rationale behind such restrictions and assuming that safety would be identical in both his actual and "but for" scenarios. As discussed above in Section VI.A.1, the Ohio Court of Appeals stated that informing respondents about such safety issues is vital to properly assessing their preferences in a conjoint analysis.

Another example of the way in which Dr. Singer did not properly describe the real-world implications of choosing in-person classes and campus access is that BU students obtained higher GPAs and larger starting salaries after participating in his so-called Online Modality. Consequently, many students who may have otherwise preferred in-person classes would have preferred remote education if they had been informed that they could receive such greater benefits.

Furthermore, Dr. Singer did not inform his respondents about all of the benefits of online learning that they might not have known a priori.[240] For example, one study showed that students who took coursework remotely obtained increased family time and additional free time to either get a job, sleep, exercise, pursue hobbies, personally or professionally develop and pursue other enjoyments of life.[241] Students benefited when BU gave them an additional opportunity to elect to take classes Credit/No Credit as opposed to receiving a grade after the transition to remote education in the Spring 2020 Semester.[242] Many students made such a selection which allows them to receive credit,[243] while enduring less stress over grades. BU would not have given students such an opportunity in the But For World.

As a result, the aforementioned descriptions that more accurately describe the real-world implications of student choices likely would generate different results than Dr. Singer's simplistic analysis.[244]

Third, Dr. Singer only provided a brief description of the online classes he assumed his survey respondents would take. One study he cited to found that people's preferences for online classes increased the more one described the details of online and in-person classes.[245] Another paper he cited by Dr. McFadden emphasized that survey participants should be familiar with the attributes of the products included in a conjoint "after training if necessary, and experienced in making market choices among them."[246] Because Dr. Singer did not provide training about the full consequences of online and in-person classes and campus access, his conjoint analysis should be considered suspect. Dr. Singer made a point to include survey participants who had previously purchased or intended to purchase in-person classes because they had demonstrated knowledge of the in-person environment.[247] However, he did not show that his survey participants had demonstrated knowledge and were "experienced in making market choices" about a remote environment.

[240] For example, see https://www.vox.com/first-person/21433095/coroanavirus-covid-19-school-reopening-online-learning-remote viewed on August 30, 2022.
[241] Patricia Aguilera-Hermida, A. "College students' use and acceptance of emergency online learning due to COVID-19." International Journal of Educational Research Open vol. 1 (2020): 100011. doi:10.1016/j.ijedro.2020.100011.
[242] https://www.bu.edu/provost/2020/03/27/university-grading-policies-for-spring-semester-2020/ viewed on December 15, 2022.
[243] For example, see Cox Shakura Transcript.pdf and Dutra Julia Transcript.pdf.
[244] I am only stating that these descriptions are more accurate. I am not saying they are fully accurate.
[245] Mann, p. 19.
[246] McFadden, p. 13.
[247] Singer Report, paragraph 31.

### *iii. Dr. Singer's Survey Misstates Other University Attributes*

Dr. Singer's survey suffers from focalism bias. Focalism bias, also known as the focusing illusion, is defined, by a Nobel Laureate, as:

> When a judgment about an entire object or category is made with attention focused on a subset of that category, a focusing illusion is likely to occur, whereby the attended subset is overweighted relative to the unattended subset. In particular, when attention is drawn to the possibility of a change in any significant aspect of life, the perceived effect of this change on well-being is likely to be exaggerated.[248]

Additionally, focalism bias can be described as:

> Whereby people focus too much on the occurrence in question (termed the focal event) and fail to consider the consequences of other events that are likely to occur. People think about the focal event in a vacuum without reminding themselves that their lives will not occur in a vacuum but will be filled with many other events.[249]

Sawtooth, a conjoint software company, warned about focalism causing biased survey results:

> Evaluation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace.[250]

While students likely would be aware of the modality of instruction, the Singer Analysis unduly focuses survey respondents on other attributes that could be unrelated to the attributes upon which putative class members relied to select BU and its programs.

First, while the Singer Analysis specifically informs respondents about tuition prices, students are often not focused on prices when they make their college decisions, as discussed above in Section IV.E. A student whose parents, grandparents and great-grandparents went to BU might be less price sensitive than one who resides outside of the state and has a lesser attachment to the school. This price sensitivity would be a highly individualized issue that would impact any alleged value diminishment due to online learning.

Second, as stated above, one of the creators of conjoint analyses wrote that "[t]he profiles presented [in conjoint analysis] should be believable (and should resemble existing products as much as possible)."[251] Dr. Singer did not demonstrate that his five attributes and their values "resemble existing products." The prior subsection also describes some attributes students care about aside from Dr. Singer's attributes.

---

[248] Schkade DA, Kahneman D. Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction. *Psychological Science*. 1998;9(5):340-346. doi:10.1111/1467-9280.00066, p. 340.

[249] Wilson, T. D., Wheatley, T., Meyers, J. M., Gilbert, D. T., & Axsom, D. (2000). Focalism: A source of durability bias in affective forecasting. *Journal of Personality and Social Psychology, 78*(5), 821–836. https://doi.org/10.1037/0022-3514.78.5.821.

[250] Huber, J. (1997) "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," Sawtooth Software Research Paper Series, p. 2.

[251] Rao, p. 45.

Consequently, the Singer Analysis does not accurately mimic the purchase environment of the putative class members.

### *b. The Singer Analysis Did Not Perform Recognized Steps to Reduce the Hypothetical Bias*

Survey participants are only making hypothetical, subjective choices. They do not need to bear the consequences of a university selection like actual students do. Analysts have found that this lack of consequences can influence decision making as

> Respondents spend no actual money and they don't have to live with their choices…. Hypothetical bias occurs when we ask respondents what they would choose or how much they'd be willing to pay when facing a hypothetical choice and their answers differ from what they would do in the real market…. Their survey responses, though not accurate, may be perfectly rational.[252]

> Respondents taking surveys often spend survey dollars more readily than they spend real ones…. This hypothetical bias, the possibility that respondents may behave differently for hypothetical questions they receive in surveys than they would making those changes in a real market, can affect WTP estimates…. It will exaggerate their apparent willingness to pay for product features.[253]

Hypothetical biases are exacerbated with university selection as 1) universities affect the trajectory of people's lives whereas the purchase of other products and services that might utilize conjoint analyses as part of their price determination usually have lesser impacts and 2) the cost of a university education is usually more expensive than other products and services.

A recent National Bureau of Economic Research ("NBER") paper demonstrates how hypothetical biases cause students to undervalue online education.[254] That paper surveyed 1,500 undergraduate students at Arizona State University ("ASU") in the Spring of 2020 and asked them to declare their intended probability of reenrolling at ASU for the Fall 2020 Semester under various COVID scenarios. The authors then compared their intended probability of reenrollment to the actual Fall 2020 enrollment data. They found that students' survey answers sizably understated their probability of reenrollment if the Fall 2020 Semester had some COVID-restrictions (e.g. remote classes and reduced interactions) similar to what actually occurred in both the Spring 2020 and Fall 2020 Semesters at BU. In particular, the authors found that

> among the pool of students who reported a stated likelihood of [enrollment of] 90% or more in the fall, the actual enrollment was 96%. On the other hand, among student with a stated likelihood of less than 50% of enrolling, the actual enrollment rate was 92%.[255]

[252] Orme & Chrzan, p. 11.
[253] *Ibid.,* pp. 204-205.
[254] Aucejo.
[255] *Ibid.,* p. 12.

Understating the likelihood of reenrollment (as compared to reality) would cause people to undervalue semesters that have remote classes and reduced interactions (as compared to reality).

Consequently, this NBER paper implies that Dr. Singer's conjoint analysis would undervalue education that contained remote classes and reduced campus access. In the same vein, Dr. McFadden, on whom Dr. Singer relies in constructing his methodology, opined that such confirmatory analyses are vital to determining the accuracy of a survey's predictions.[256] As a result, the undervaluation found at ASU would imply that Dr. Singer overstated alleged damages.

Notwithstanding the above, there are several ways in which hypothetical biases in conjoint analyses could be reduced,[257] that Dr. Singer did not perform.

### *6. The Singer Analysis Improperly Handles Supply Side Issues*

As discussed in Section V.B, Dr. Singer presents two methodologies that he claims model the supply side of his conjoint analysis. However, both of his methodologies are incorrect.

#### *a. Properly Accounting for Supply Side Factors*

Economic equilibria exist where all suppliers and consumers are satisfied with their decisions. A multi-step process is needed in order to determine the economic equilibria. A supplier begins by evaluating consumer preferences. The supplier then determines the price it will charge by investigating the interaction between these preferences, the prices other suppliers charge, and its own cost of production. It often segments consumers into distinct groups and sets different prices and product attributes it intends to be used by each group, just like airlines that charge different prices for different tickets. This price determination process requires the investigation of customer price sensitivity and its own cost sensitivity.[258] For example, Sawtooth wrote:

> To compute equilibrium outcomes, we will have to make assumptions about cost and the nature of competition and the set of competitive offers…. In particular, greater care to include an appropriate set of competitive brands, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised.[259]

Suppliers must evaluate the way in which consumers purchase products in this price determination process. For example, conjoint analyses examine when consumers make uniform one-time, one-product purchases. However, different models need to be employed to economically analyze situations where suppliers can set different prices to different consumers, like the aforementioned airline example.[260] Such economic models identify attributes that differentiate consumers. In general, the more differentiating attributes that exist, the more a supplier could individually tailor its pricing.

---

[256] McFadden, p. 30.
[257] Orme & Chrzan, pp. 13-21.
[258] Price sensitivity measures the degree to which a consumer's demand changes with a change in price. Cost sensitivity measures the degree to which a supplier's cost changes with a change in production.
[259] Sawtooth Proceedings, p. 342.
[260] Varian, Chapter 2.

Additionally, consumers often purchase multiple products in a bundle. For example, students purchase tuition, fees, room, board and other items over multiple semesters in one bundle.[261] Recognizing the various line items in a student's bill, publications like *U.S. News and World Report* also combine the published tuition and fee prices for each listed school.[262] In fact, some universities "charge 'comprehensive fees' — the total for tuition, fees, and room and board combined."[263]

As noted above Current U.S. Treasury Secretary Janet Yellen and William James Adams concluded that bundling, which is what occurs with university pricing, "seriously complicates public appraisal of …. [and] affects certain conclusions that may be drawn from" individual product prices.[264]

Additionally, institutions can have regulatory or other constraints that prevent them to charging desired prices "such as length of time on market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness."[265]

When demand for one company's product changes, Dr. Singer recognized that the amount that company supplies could change. That supply change could alter the demand for competitors' products. Those competitors could react to their changed demand by altering their own supply, which would then have a feedback effect and mitigate the initial demand change for the original company's products. As a result, multiple simulations might be required to determine an economic equilibrium.[266]

### *b. Courts Have Found Dr. Singer's Initial Model to Be Flawed*

Dr. Singer incorrectly claims that it is standard for courts to accept conjoint analyses where supply is held constant.[267] However, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020), Judge Charles R. Breyer of the United States District Court in the Northern District of California excluded a conjoint analysis that held supply constant as being unreliable by ruling that:

> "[D]istrict courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations." *MacDougall v. Am. Honda Motor Co.*, No. 17-1079 JBG, 2020 WL 5583534, at *6 (C.D. Cal. Sept. 11, 2020) (collecting cases). Calculating a premium by comparing (1) the actual price of vehicles sold with defeat devices to unwitting consumers, and (2) consumers' willingness-to-pay for vehicles with the defeat device (as opposed to the market price of vehicles with the defeat device) is comparing apples and oranges. And presuming that Defendants would have sold the same number of cars, at the exact price that consumers would have been willing to pay, is not a way to reliably

[261] For example, see https://www.investopedia.com/terms/b/bundling.asp viewed on October 28, 2021.
[262] https://www.usnews.com/education/best-colleges/paying-for-college/articles/what-you-need-to-know-about-college-tuition-costs viewed on October 27, 2021.
[263] https://decided.moneythink.org/guide/tuition-and-fees-explained/ viewed on December 15, 2022.
[264] Adams and Yellen, pp. 477 & 497.
[265] Orme, pp. 104-105.
[266] McFadden, p. 112.
[267] Singer Report, paragraph 72 and footnote 97.

incorporate supply-side considerations. See *In Re General Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 239 (S.D.N.Y. Aug 6, 2019) (rejecting a similar argument because it "would mean that a given product is supplied by the manufacturer in the same quantity no matter what the price is" and because it would be "highly unlikely" that a vehicle manufacturer "would have wanted to sell the same amount of cars at the price implied by [the] but-for analysis") (citation omitted).[268]

#### c. *Dr. Singer's Initial Model Does Not Have ALL Putative Class Members Enroll at BU*

Dr. Singer claims that his initial supply side model kept the amount BU supplied as constant.[269] In other words, he claims that his initial model would set prices so that all putative class members would have enrolled in BU's Online experience during the Spring 2020 Semester.

However, contrary to his claims, Dr. Singer's initial model did **NOT** keep the amount BU supplied as constant. As discussed above in Section V.B, Dr. Singer "calculated" that each one of his survey respondents had different required discount rates in order to make them indifferent between the actual and "but for" worlds he constructed. Dr. Singer then averaged these different discount rates to determine the one, unique average discount rate for graduate students and for undergraduates that he utilized to determine alleged damages.

Because each survey respondent had different required discount rates, some of his survey respondents required discount rates that exceeded the one, unique average discount rate Dr. Singer calculated for both undergraduate and graduate students. Such respondents would not have enrolled in BU's Online experience during the Spring 2020 Semester with the prices Dr. Singer set. Dr. Singer's one, unique average discount rate for graduate students and for undergraduates would not, by his own argument, be large enough to induce such respondents to enroll in BU's Online experience during the Spring 2020 Semester. Consequently, Dr. Singer's own model suffers from the flaw he claims it avoids; "*kicking out students or accepting fewer new students* in its programs in the face of a lower valuation by students following a switch to an Online Experience."[270]

#### d. *Notwithstanding the Fact that Dr. Singer's Own Model "Kicks Out Students," Allowing BU To Raise Its Prices Above His Claimed Discounted Prices Does Not "Kick Out Students"*

Dr. Singer claims that if BU did not charge the prices he claims it should have during the Spring 2020 Semester, it would be "*kicking out students or accepting fewer new students* in its programs in the face of a lower valuation by students following a switch to an Online Experience."[271]

---

[268] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020), pp. 11-12.
[269] Singer Report, paragraph 72.
[270] *Ibid.,* paragraph 10.
[271] *Ibid.*

With such a statement, Dr. Singer pejoratively describes what occurs during every semester at BU irrespective of COVID. Every semester, every student evaluates whether the cost of attending BU outweighs their family's financial position and their opportunities in the marketplace. Several students every semester may decide the cost of attending BU is too high and withdraw. Such decisions are generally more frequent when the economy is in turmoil. In down economies such as what occurred immediately after the COVID-19 pandemic commenced, people's financial positions can become more strained, limiting their ability to afford tuition and fees. In up such economies as what occurred later in 2020, job offers can become more lucrative luring students out of universities. Consequently, students are not "kicked out;" they can make decisions to voluntarily withdraw for economic reasons. For example, one cannot state that Bill Gates or Mark Zuckerberg were kicked out of Harvard University across the river because they had lucrative private sector opportunities that caused them to withdraw from college.

Such withdrawals do not usually decrease the number of students attending BU. BU accepts transfer students to replace students who voluntarily withdrew from the school. Consequently, if the number of current BU students who decided to voluntarily withdraw for economic reasons increased, it is likely that BU would accept **more**, not fewer new students in order to maintain its student body.

### *e. Dr. Singer Made Three Unsupported Assumptions that Undermine His Second Supply Side Methodology*

While Dr. Singer's second methodology utilizes multiple assumptions, I would like to call out three erroneous ones.

First, Dr. Singer assumed without any analysis that the demand curve for a BU education is linear. There are standard economic analyses one could perform to measure a demand curve's shape. Dr. Singer did not employ any of them.

Second, Dr. Singer's model incorrectly assumed without any analysis that the marginal cost of BU providing educational services would be constant and invariant irrespective of the modality of education and the number of students BU enrolled. By not performing any analysis of BU's costs, Dr. Singer did not properly "pay attention to the supply side and take the costs of producing different products/services into consideration."[272]

In fact, concrete, undisputed real-world data the real-world data show that costs would not be constant. As discussed above, BU incurred an additional $52 million in costs to provide remote education. Such expenditures would change the marginal costs that should be inserted into Dr. Singer's model. Because his methodology did not account for such cost changes, it is flawed.

Third, Dr. Singer's analysis does not account for the feedback effect that Dr. McFadden discussed. If, as he assumed, BU would have fewer students in his but-for world, the demand at other universities likely would increase. Those other universities could alter their offerings in response, which would change the demand curve for BU's services. Dr. Singer did not model this feedback

[272] Orme, pp. 92 & 89. (emphasis added). Such conjoint analyses are called market simulators as they simulate how **consumers** would reach to product choices the market presents.

effect, which would lower his alleged damages.

Dr. Singer also did not show that the marginal cost would be the same as the number of students changed.

### *D. Dr. Singer's Conjoint Survey Analysis Is Hypothetical, Flawed, Biased & Statistically Unreliable*

Statistics is vital to analyses of the type Dr. Singer performed. As a portion of this conjoint analysis, Dr. Singer performed a survey on people who were allegedly representative of BU students during the Spring 2020 Semester. He attempted to extrapolate results from his survey to all purchasers in the putative class. However, Dr. Singer's survey and extrapolation do not meet the requirements set forth in the Reference Manual on Scientific Evidence.

The Reference Manual states: "[i]n short, a good survey defines an appropriate population, uses a probability method for selecting the sample, has a high response rate, and gathers accurate information on the sample units."[273] Statistical tools such as variance, standard deviation, and confidence intervals should be applied to best describe the survey's results. Because "[i]n practice, surveys typically count or measure only a portion of the individuals or other units that the survey is intended to describe,"[274] unbiased, representative and non-"cherry picked" sampling is required.

In addition, the procedures underlying the survey must be documented. For example, the Reference Manual states:

> To make it possible for the court and the opposing party to closely scrutinize the survey so that its relevance, objectivity, and representativeness can be evaluated, the party proposing to offer the survey as evidence should also describe in detail the design, execution, and analysis of the survey. This should include (1) a description of the population from which the sample was selected, demonstrating that it was the relevant population for the question at hand; (2) a description of how the sample was drawn and an explanation for why that sample design was appropriate; (3) a report on response rate and the ability of the sample to represent the target population; and (4) an evaluation of any sources of potential bias in the respondents' answers.[275]

As discussed below, Dr. Singer did not properly perform all of these required steps.

Without documented proof, it is standard to assume that the sample selected was biased.[276] Even though online surveys have been accepted by courts, such a fact does not excuse a surveyor from performing the aforementioned required steps.

---

[273] Reference Manual, p. 226.
[274] *Ibid.,* p. 361.
[275] *Ibid.,* p. 362.
[276] According to the Reference Manual (p. 283), bias is defined as "[a]lso called systematic error. A systematic tendency for an estimate to be too high or too low. An estimate is unbiased if the bias is zero. (Bias does not mean prejudice, partiality, or discriminatory intent.)"

### 1. *Dr. Singer Did Not Properly Statistically Analyze The Results Of His Survey*

The Singer Analysis is flawed and unreliable because it failed to properly statistically analyze the survey results, which results my analysis shows to be unreliable as discussed below. A more complete statistical analysis demonstrates that Dr. Singer's survey could not be used to calculate damages with reasonable certainty.

For example, conjoint analysis industry literature typically advises practitioners to perform a hit rate analysis to test the reliability of the conjoint survey model.[277] In particular, to establish the appropriateness of using the individual attribute utilities to forecast changes in market value, a practitioner would test the fit and predictive ability of the conjoint analysis estimates by determining the holdout performance, which measures how well the estimates of individual attribute utilities predict the actual choices made by survey respondents when looking at a subset of the choice sets not used in the estimation.

As Dr. Singer has not demonstrated the hit rate of his conjoint analysis, he has not shown that his model is sufficiently reliable for a damages assessment. I reserve the right to update my opinion if and when Dr. Singer properly demonstrates his statistical analysis.

Additionally, the attributes Dr. Singer utilized in his conjoint analyses are related. For example, respondents' perceptions about whether or not a school has career services could be related to their perception about whether or not a school has tutoring services. Such interrelationships could statistically generate a phenomenon called multicollinearity, which would cause the utilities his conjoint analyses generated to be biased, which would bias his overall damages calculations. Even though there are standard tests to determine the presence of multicollinearity or related statistical issues, Dr. Singer did not present the results of such tests.

### 2. *Dr. Singer's Own Survey Results Demonstrate The Need For Individualized Inquiry To Assess Liability & Damages*

The Singer Analysis is flawed and unreliable because it selectively ignores his survey data establishing that determining each putative class member's alleged damages requires highly individualized analysis.

Even if Dr. Singer properly included the relevant attributes in his survey, he ignored the individualized way in which students perceive these attributes. For example, the desirability of online classes could also vary based upon major, year of study and type of classes. Students with more hands-on majors such as those with labs could have different preferences than those primarily or exclusively attending lectures. Additionally, someone who only took one seminar on campus during the Spring 2020 Semester could have different preferences than someone who only took large lecture classes. Online class desirability could also vary by professor or the classroom teacher overseeing a student teacher. Additionally, individualized study of classroom attendance would be required to identify such attributes.

[277] Orme, p. 195-196.

Furthermore, any alleged diminishment in campus use also would be highly individualized. Because students utilize the campus in different ways, any losses they might have suffered because of the Commonwealth-ordered closure would also be different.

As a result, even if campus access was a proper means to assess damages, the different ways students utilize campus amenities would cause alleged damages to be highly individualized. Additionally, in order to assess any losses putative class members might have suffered, one would also have to conduct a student by student analysis to do so.

#### *a. A Substantial Portion of the Participants in Dr. Singer's Survey Preferred His Online Modality*

While I believe these utilities are inaccurate and biased, to aid the Finder of Fact, I analyzed Dr. Singer's individual respondents' utilities for the Class Modality and Campus Facilities Access attributes to see the breakdown of preferences between the alleged On-Campus and Online Experience.

As shown in ***Figure*** *7*, 41% of Dr. Singer's 524 alleged undergraduate respondents preferred online classes over in-person and 9% preferred no access to campus to campus access.[278] As mentioned above, Dr. Singer sums the utilities of Class Modality and Campus Facilities Access to assume the utility of the alleged On-Campus (On-Campus + Access) and Online Experiences (Online + No Access). Once summed, 20% of Dr. Singer's alleged undergraduate respondents preferred his alleged Online Experience. While Dr. Singer ultimately averages all the alleged discounts allegedly required for survey respondents to switch the alleged Online Experience, the 20% who preferred the Online Experience would actually be willing to pay a premium over the base price. Thus, such respondents willing to pay a premium would not even be damaged on an individualized basis.

**Figure 7**
**Distribution of Preferences**

| | Undergraduates | | Graduate Students | |
|---|---|---|---|---|
| **Attribute** | **Participants Preferring This Option** | **% of Total Participants** | **Participants Preferring This Option** | **% of Total Participants** |
| **Class Modality** | | | | |
| On-Campus | 310 | 59% | 296 | 53% |
| Online | 214 | 41% | 259 | 47% |
| **Campus Facilities Access** | | | | |
| Access | 477 | 91% | 499 | 90% |
| No Access | 47 | 9% | 56 | 10% |
| **Experience** | | | | |
| On-campus Experience | 419 | 80% | 410 | 74% |
| Online Experience | 105 | 20% | 145 | 26% |

[278] Singer Report Workpapers (Conjoint Results.xlsx). As discussed above in Section VI.C.5.a.ii, Dr. Singer's incorrect description of his campus access attribute causes him to find more students preferred campus access than what would have occurred had he properly described this attribute.

Similarly, as also shown in Figure 7, 47% of Dr. Singer's 555 alleged graduate respondents preferred online classes over in-person and 10% preferred no access to campus to campus access. Once summed, 26% of Dr. Singer's alleged graduate respondents preferred the alleged Online Experience. Thus, these respondents would also be willing to pay a premium to switch the alleged Online Experience and would not even be damaged on an individualized basis.

As a result, Dr. Singer's survey data shows that an individualized analysis of the putative class members is required to assess liability and damages.

### *b. Since Many of Dr. Singer's Survey Participants Preferred Online, He Cannot Statistically Support His Conclusions Regarding Student Preferences About the On-Campus Class Modality*

Dr. Singer presented how much his survey respondents valued each attribute included in his conjoint survey in his workpapers of his Report. However, he did not analyze the descriptive statistics of these utilities. The Reference Manual calls upon people conducting surveys to construct statistical confidence intervals around averages.[279] Confidence intervals are regularly defined by an average and then a Margin of Error around that average. Dr. Singer did not provide such confidence intervals in his analysis.

Even if one incorrectly assumed that one should calculate conjoint damages based upon averages, such margin of error calculations are necessary. To that end, I utilized Dr. Singer's data to calculate the margins of error associated with his utilities. In particular, I found that for his On-Campus Class Modality attribute had a Margin of Error of 40% for his undergraduate sample and 134% for his graduate student sample. High Margin of Errors imply that the associated confidence interval is wide.

Dr. Singer's high Margins of Error and wide Confidence Intervals call into question the reliability of his calculations. For example, the Reference Guide states that "if the calculation shows a wide [confidence] interval, that may be a useful indication of the limited value of the estimate."[280] The California Supreme Court reached a similar conclusion in *Duran v. U.S. Bank* 325 P.3d 916, 937-38 (Cal. 2014). In that case, the Court excluded a survey that had a Margin of Error of approximately 40%. In analyzing the Plaintiffs' expert's survey of the number of overtime hours putative class members worked, the *Duran* Court concluded

> that the class worked 11.86 overtime hours per week, with a margin of error of 5.14 hours, or approximately 43 percent….
>
> In other words, he could be 95 percent confident that, on average, RWG members worked as little as 6.72 hours and as much as 17.00 hours of overtime each week. This means that the actual average overtime worked by class members could have been 43.3 percent higher (17.00) or lower (6.72) than the 11.86-hour estimate. Manifestly, the range of potential compensation for plaintiffs in the sample was

[279] Diamond, Shari Seidman, 2011. "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center ("Diamond"), pp. 381-383 & 416.
[280] *Ibid.,* p. 383.

> substantial. The wide range of error means that a judgment based on the estimate could reflect an amount nearly double the true extent of USB's liability. As even plaintiffs acknowledge, this margin of error was intolerably high.
>
> In Bell, *supra*, 115 Cal.App.4th at pages 756 to 757, the same Court of Appeal that decided this case concluded a 32 percent margin of error was so large that the resulting damages award violated due process….
>
> We question whether such ancillary indicia of reliability could ever be sufficient to justify reliance on an estimate with a margin of error approaching 50 percent.[281]

Consequently, the logic of the *Duran* Court implies that the average utilities derived from Dr. Singer's survey are not sufficiently precise to allow him to calculate damages reliably with reasonable certainty.

### *c. Demographic Differences Show Individualized Results*

It would be improper to proportionately allocate any total damages figure Dr. Singer might derive to each putative class member. Not only is it likely that many putative class members would say that they were undamaged, but there likely would be great variability in the amount those that say they were damaged were actually damaged.

***Figure 8*** below shows that there are significant demographic differences in attitudes towards the alleged Online Experience price discount in Dr. Singer's survey of alleged undergraduate respondents.[282] For example, Dr. Singer's results differ based upon the gender, age and high school GPA of his survey respondents.

[281] *Duran v. U.S. Bank* 325 P.3d 916, 937-38 (Cal. 2014). (footnotes removed)
[282] Singer Report Workpapers (BU-Undergraduate Respondents.csv and BU-Undergrad-IU.csv).

| Figure 8<br>Alleged Undergraduate Discount % by Demographic | | | |
|---|---|---|---|
| **Characteristics** | **Participants** | **% of Total Sample** | **Alleged Discount %** |
| Total | 524 | 100.0% | 27.1% |
| **Gender** | | | |
| Male | 162 | 30.9% | 24.8% |
| Female | 353 | 67.4% | 27.9% |
| Other/Prefer Not to Say | 9 | 1.7% | 35.0% |
| **Age** | | | |
| 18-19 | 62 | 11.8% | 36.1% |
| 20-27 | 353 | 67.4% | 25.7% |
| 28-30 | 109 | 20.8% | 26.3% |
| **Ethnicity** | | | |
| White | 290 | 55.3% | 26.2% |
| Black or African American | 138 | 26.3% | 29.7% |
| Other | 96 | 18.3% | 25.9% |
| **High School GPA** | | | |
| 3.25 - 3.49 | 116 | 22.1% | 21.3% |
| 3.50 - 3.74 | 187 | 35.7% | 27.2% |
| 3.75 - 4.00 | 221 | 42.2% | 30.0% |

First, males required an average alleged discount less than females for Dr. Singer's alleged undergraduates.

Second, since this survey was performed over 2 years after Spring 2020, the survey includes respondents with ages before and after what the typical undergraduate age was in Spring 2020. For example, survey respondents that are 18-19 now were 16-17 years old in Spring 2020 and typically would not be undergraduate-aged students like the undergraduate putative class members. Thus, if I compared the survey respondents in the 20-27 age range now or students that were undergraduate age in Spring 2020, it shows that they have alleged discounts less than respondents outside the undergraduate age range. As a result, Dr. Singer has overstated the alleged classwide damages by including less representative ages in his conjoint survey analysis.

Third, undergraduate survey respondents with different ethnicities required different alleged discount percentages. In fact, Black or African American undergraduate students required a discount percentage higher than the total alleged discount percentage for all of his undergraduate survey respondents. However, as shown in Figure 10 below, Dr. Singer's survey had a much higher representation of Black or African American undergraduate students than the actual BU population. Thus, Dr. Singer overstated damages.

Fourth, respondents with a lower high school GPA also have a lower alleged discount. This indicates that less grade-conscious students may have been less allegedly damaged as grade-conscious students.

***Figure 9*** below also shows that there are significant demographic differences in attitudes towards the alleged Online Experience price discount in Dr. Singer's survey of alleged graduate

respondents.[283] For example, Dr. Singer's results show that the gender, age and high school GPA of respondents have vastly different results for the alleged graduates too.

| Figure 9<br>Alleged Graduate Discount % by Demographic | | | |
|---|---|---|---|
| **Characteristics** | **Participants** | **% of Total Sample** | **Alleged Discount %** |
| Total | 537 | 100.0% | 21.6% |
| **Gender** | | | |
| Male | 144 | 26.8% | 12.5% |
| Female | 380 | 70.8% | 24.5% |
| Other/Prefer Not to Say | 13 | 2.4% | 35.8% |
| **Age** | | | |
| 18-24 | 228 | 42.5% | 22.4% |
| 25 and Older | 309 | 57.5% | 21.0% |
| **Ethnicity** | | | |
| White | 359 | 66.9% | 23.8% |
| Black or African American | 100 | 18.6% | 13.2% |
| Other | 78 | 14.5% | 21.9% |
| **High School GPA** | | | |
| 3.00 - 3.24 | 64 | 11.9% | 15.6% |
| 3.25 - 3.49 | 87 | 16.2% | 21.7% |
| 3.50 - 3.74 | 184 | 34.3% | 21.2% |
| 3.75 - 4.00 | 202 | 37.6% | 23.7% |

First, again, males required a smaller average alleged discount than did females. Notably, this alleged discount for the graduate males was approximately *half* of what females allegedly would require.

Second, since this survey was performed over 2 years after Spring 2020, the survey includes respondents with ages before the typical graduate age was in Spring 2020. For example, survey respondents that are 18-24 now were 16-22 years old in Spring 2020 and typically would not be graduate-aged students like the putative class. Thus, if I compared the survey respondents in the 25 and older age range now or students that were typically graduate age in Spring 2020, it shows that they have alleged discounts less than respondents before the graduate age range. As a result, Dr. Singer has again overstated the alleged classwide damages by including less representative ages in his conjoint survey analysis.

Third, graduate students with different ethnicities required different alleged discount percentages. As shown above, there is a great difference between the discount percentages from Black or African American respondents and White or Other respondents.

[283] Singer Report Workpapers (BU-Graduate Respondents.csv and BU-Grad-IU.csv). Note: only 537 survey participants were used in this analysis due to inconsistent Response ID's in the aforementioned Singer Report Workpapers.

Fourth, respondents with a lower high school GPA also have a lower alleged discount, indicating that less grade-conscious students may have been less allegedly damaged as grade-conscious students.

Dr. Singer's respondents included individuals who had taken classes in the last five years or plan to take classes within the next two years.[284] However, Dr. Singer did not record whether his respondents were past or prospective students. Such differences could be significant as one conjoint paper to which he cited obtained different results from people who are currently considering university, students and graduates.[285]

These demographic differences necessitate an individualized inquiry to assess liability and damages in this matter, which Dr. Singer did not address.

## *E. The Singer Analysis Did Not Follow Standard Survey Practices*

The Reference Manual details many steps required to perform an accurate survey. In the subsections below, I would like to specifically identify four steps that Dr. Singer did not properly perform.

### *1. Dr. Singer Did Not Perform A Full Pre-Test*

The Reference Manual recommends surveyors utilize pre-tests to eliminate any ambiguity inherent in his survey. In particular, it states:

> Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous, [footnote includes the statement "No matter how closely a questionnaire follows recommendations based on best practices, it is likely to benefit from pretesting."] and some courts have recognized the value of pretests. [footnote: See e.g., Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670 (S.D.N.Y. 1963); Scott v. City of New York, 591 F. Supp. 2d 554, 560 (S.D.N.Y. 2008) ("[s]urvey went through multiple pretests in order to insure its usefulness and statistical validity.")][286]

Dr. Singer did not document his pre-test whatsoever for this survey. He allegedly

> performed "soft-launch" of the survey to a small group of respondents before collecting the full sample. Doing so allowed [him] to evaluate the average time it took to complete the test, to assess if respondents were confused by any of the question language, to identify errors in the survey logic, and to identify if respondents were being disqualified from the survey at particular validation questions. These "soft-launch" responses were included in the final sample.[287]

---

[284] Singer Report, paragraphs 32-33.
[285] Czajkowski, pp. 521-522.
[286] Diamond, p. 388.
[287] Singer Report, paragraph 49.

However, I have not seen any results of his "soft launch" or pre-test to understand if any respondents did not understand his survey questions. Without such information, it is questionable whether Dr. Singer such have included such "soft launch" participants in his final results.

In addition, Dr. Singer did not utilize pretests as a screening task to identify the most relevant attributes for colleges and universities, which are "high-involvement products and services described by many attributes."[288]

### *2. Dr. Singer's Sampling Frames Are Misdefined*

Not only did Dr. Singer not perform a full pre-test, but he selected survey participants that were not representative of the putative class for his pre-test and final conjoint survey. It is improper to extrapolate from a non-representative sample or to a different universe than what is relevant for the study.

The Reference Manual explains the impact on a survey's value when a sampling frame (i.e., Dr. Singer's survey participants) is not representative of the target population (putative class members).

> More commonly, however, the sampling frame and the target population have some overlap, but the overlap is imperfect: The sampling frame excludes part of the target population, that is, it is underinclusive, or the sampling frame includes individuals who are not members of the target population, that is, it is overinclusive relative to the target population…. If the coverage is underinclusive, the survey's value depends on the proportion of the target population that has been excluded from the sampling frame and the extent to which the excluded population is likely to respond differently from the included population.[289]

Dr. Singer improperly defined the Target Population in his study. The Reference Manual states that "[t]he target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent."[290] As Dr. Singer conducted the survey for this litigation, presumably his universe should be the putative class.

However, Dr. Singer had two Sampling Frames for undergraduate and graduate students. In particular, Dr. Singer stated:

> For undergraduates in this matter, I targeted eligible individuals who could plausibly attend or have attended BU's in-person, on campus undergraduate program. Respondents for this survey were individuals who:
>
> - Have not recently taken a survey regarding online education;
> - Reside within the United States;
> - Have taken within the past five years, or plan to take within the next two years, undergraduate, in-person, on-campus courses at a college or university;
> - Are between the ages of 18 and 30;

[288] Orme, p. 36.
[289] Diamond, p. 378.
[290] *Ibid.,* p. 376.

- Have an unweighted high school GPA and SAT or ACT score consistent with BU's undergraduate admission criteria.

For graduates in this matter, I targeted eligible individuals who could plausibly attend or have attended one of BU's in-person, on campus graduate programs. Respondents for this survey were individuals who:

- Have not recently taken a survey regarding online education;
- Reside within the United States;
- Enrolled within the past five years, or plan to enroll within the next two years, in an in-person, on-campus graduate program at a college or university;
- Are over the age of 18;
- Have an unweighted undergraduate GPA and standardized test scores on graduate admissions tests consistent with BU's graduate admissions criteria.[291]

These Sampling Frames are not the same as the putative class. The putative class includes

> **<u>All people who paid</u>** BU tuition [and/or] fees … for in-person educational services, programs [and/or] access … that BU failed to provide during the Spring Term, and whose tuition and/or fees have not been refunded.[292]

Thus, the Sampling Frames would not match the putative class along multiple dimensions.

- It would not specifically include **<u>payers</u>** (e.g., parent payers, BU student payers or other third-party payers) of a BU student's tuition and/or fees for the Spring 2020 Semester, who often play a large role in choosing where students enroll.
- It would exclude international putative class members, who comprise 21.9% of all BU undergraduates and 28.8% of all BU graduate students during the Spring 2020 Semester.[293]
- It would include people who were not even enrolled in college yet.
- It would include people who may have been out of college for over five years.

Additionally, Dr. McFadden, who Dr. Singer cited, stated that it is appropriate to conduct separate surveys of people who had purchased the product in question before and people who had not.[294] However, even though Dr. Singer surveyed students and potential students in his conjoint analysis, the data he provided did not identify which respondents where students and which were potential students. As a result, I am unable to determine if differences between such individuals exist as recommended.

As a result, these improper Sampling Frames further flaws the Singer Analysis.

[291] Singer Report, paragraphs 32-33. (footnotes removed)
[292] Complaint, Dkt. 49, paragraph 147 (emphasis added).
[293] BU - International and Domestic Enrollments - Fact Sheet Table.xlsx.
[294] McFadden, p. 15.

### 3. *Dr. Singer's Sample Survey Participants Are Not Representative Of Putative Class Members*

Survey respondents need to be representative of putative class members in order for the survey to have any probative value in assessing alleged damages.[295] Dr. Singer attempted to target eligible individuals who could plausibly attend or have attended one of BU's in-person, on campus undergraduate and graduate programs. However, Dr. Singer has not demonstrated such representativeness.

As Dr. Singer targeted an unrepresentative Sampling Frame, his sample would also not be representative of the putative class for the same reasons. As a result, Dr. Singer's results would be based upon people whose characteristics likely would differ from those of putative class members.

First, Dr. Singer did not even ask his survey sample respondents what university they attended. As a result, it is unknown if Dr. Singer's conjoint results were based on participants representing the putative class based on their actual university attendance. He proposed no method to measure and overcome such differences.

Second, Dr. Singer's survey did not ask questions of the true monetary decision makers as parents sometimes pay for their children's college education and set monetary parameters. Conjoint analysis researchers have written that conjoint analyses would not be accurate if there are multiple decision makers. This is especially true in this matter as parents sometimes take just as active, if not more, a role in their child's university selection decision making.[296] Dr. Singer proposed no method to measure and overcome such confounding facts.

Third, many of the undergraduate majors, or intended undergraduate majors, of Dr. Singer's survey respondents were not representative of BU students in Spring 2020. Specifically, 15.5% of undergraduate survey respondents listed majors that are not offered at BU for undergraduate study, according to BU admissions.[297] Dr. Singer proposed no method to measure and overcome such differences.

Fourth, ***Figure 10*** shows the additional characteristics that were unrepresentative in Dr. Singer's survey compared to the putative class.[298] Dr. Singer proposed no method to measure and overcome such differences.

---

295 Diamond, pp. 376-377.

296 https://www.usnews.com/education/best-colleges/slideshows/10-things-parents-of-college-bound-students-need-to-do?slide=5 viewed on October 20, 2021.

297 Singer Report Workpapers (BU-Undergraduate Respondents.csv). See also, https://www.bu.edu/admissions/why-bu/academics/majors/ viewed on December 15, 2022.

298 Singer Report Workpapers (BU-Undergraduate Respondents.csv and BU-Graduate Respondents.csv) and https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=15&unitId=164988&year=2019 viewed on December 14, 2022. Note that IPEDs only reports the residence for first-time undergraduates.

| Figure 10<br>Percentage by Characteristic | | |
|---|---|---|
| **Characteristics** | **Singer Sample** | **BU Population** |
| **Undergraduate Students** | | |
| **Age** | | |
| 24 or Younger | 51.7% | 95.4% |
| 25 or Older | 48.3% | 4.6% |
| **Residence** | | |
| Massachusetts | 1.5% | 15.9% |
| Outside of the 50 United States (and D.C.) | 0.0% | 26.5% |
| **Race/Ethnicity** | | |
| White | 55.3% | 36.1% |
| Black or African American | 26.3% | 4.0% |
| Other | 18.3% | 59.9% |
| **Gender** | | |
| Male | 30.9% | 41.3% |
| Female | 67.4% | 58.7% |
| Other | 1.7% | 0.0% |
| **Graduate Students** | | |
| **Age** | | |
| 24 or Younger | 42.5% | 38.5% |
| 25 or Older | 57.5% | 61.5% |
| **Race/Ethnicity** | | |
| White | 66.9% | 40.2% |
| Black or African American | 18.6% | 3.9% |
| Other | 14.5% | 55.9% |
| **Gender** | | |
| Male | 26.8% | 42.3% |
| Female | 70.8% | 57.7% |
| Other | 2.4% | 0.0% |

Without such representativeness being demonstrated, Dr. Singer cannot properly claim that his proposed methodology could accurately assess damages. Furthermore, he did not weight his responses as recommended by Dr. McFadden.[299]

#### 4. *Dr. Singer Did Not Report His Response Rate And The Ability Of His Sample To Represent The Target Population*

Dr. Singer did not follow the Reference Manual guidance to propose a methodology to investigate any response difference between the excluded and included populations. In particular, Dr. Singer did not report his survey's response rate or discuss any impact of having a low response rate to his survey, although it is required by the Reference Manual. The Reference Manual states that "[a] large nonresponse rate warns of bias" and requires the surveyor to provide "[e]vidence [t]hat

[299] McFadden, p. 16.

[n]onresponse [d]id [n]ot [b]ias the [r]esults of the [s]urvey."[300] Dr. Singer did not provide such evidence.

Furthermore, the Reference Manual states

> Even when a sample is drawn randomly from a complete list of elements in the target population, responses or measures may be obtained on only part of the selected sample. If this lack of response is distributed randomly, valid inferences about the population can be drawn with assurance using the measures obtained from the available elements in the sample. The difficulty is that nonresponse often is not random….
>
> The key to evaluating the effect of nonresponse in a survey is to determine as much as possible the extent to which nonrespondents differ from the respondents in the nature of the responses they would provide if they were present in the sample. That is, the difficult question to address is the extent to which nonresponse has biased the pattern of responses by undermining the representativeness of the sample and, if it has, the direction of that bias. It is incumbent on the expert presenting the survey results to analyze the level and sources of nonresponse, and to assess how that nonresponse is likely to have affected the results.[301]

The Reference Manual states that "high response rates (i.e., 80% or higher) are desirable because they generally eliminate the need to address the issue of potential bias from nonresponse."[302] If Dr. Singer's response or completion rate was lower it would further demonstrate the flaws in and unreliability of the Singer Analysis. For example, BU students or alumni that did not respond to Dr. Singer's survey could have been the result of them being satisfied with their online education and did not want to partake in the survey.

# VII. Even If Dr. Singer Were Able To Demonstrate that BU's Spring 2020 Semester Was Less Valuable, Putative Class Members Were Not Necessarily Damaged

The Singer Analysis is flawed and unreliable because, even if it generated a reliable reduced tuition and fee amount, which it does not, that alone does not establish that any individual student actually suffered any damages. Individual student damages require a highly individualized analysis that must account for changes in student aid, expected family contributions, and other economic considerations that offset the alleged reduced tuition. Dr. Singer ignores and does not account for such considerations in his Methodology.

For example, students receiving financial aid might not be damaged.

[300] Diamond, pp. 226 & 383.
[301] *Ibid.,* p. 383.
[302] *Ibid.,* p. 384.

University officers dispensing Federal and institutional need-based financial aid at least partially base their aid recommendations on the school's Cost of Attendance ("COA") and the student's Expected Family Contribution ("EFC").

Financial aid officers regularly address situations where a student's COA or EFC changes during a term. For example, some students' tuition is based upon the number of credit hours a student is taking.[303] If a student drops a class at the beginning of a term, the required tuition and fees and the COA would decrease. In such an instance, BU's Office of Financial Aid could reduce the grants or scholarships it awarded.[304]

In this lawsuit, students are seeking a refund of tuition. If such a refund were to occur, every student's COA would change. As a result, BU's Office of Financial Aid could recalculate the grants and loans it provided to all students. For example, suppose that BU's List Price for tuition and fees were $30,000, and that BU's Office of Financial Aid determined that a given student's family should only contribute $10,000 toward the student's education in that year. In this situation, BU would provide this student with a $20,000 scholarship.

Assuming that the Finder of Fact in this lawsuit determines that the combined List Price for BU's tuition should have been $1 lower. This would cause the total List Price for tuition and fees to fall to $29,999. The Office of Financial Aid **might** still determine that the given student's family should only contribute $10,000. In this revised situation, BU would provide this student with a $19,999 scholarship.

In this example, the student would not be damaged by the supposed tuition and fee overcharge. The student actually paid $10,000 and would have paid $10,000 if the tuition were "properly" priced. Therefore, this student incurred no out-of-pocket losses from BU's alleged actions.

Even if BU did not adjust this student's scholarship amount, they likely could not claim damages as they paid $10,000 to receive something that had $29,999 in value.

Additionally, COVID could further affect the student's available finances. While some families could have been adversely affected by COVID, others saw their financial positions greatly improved during the Spring 2020 Semester. As a result, students' EFC could also change, which could add additional individualized potential modifications to the financial aid BU provides its students. For example, as discussed below, many students received COVID-relief funds from BU during the Spring 2020 Semester.

Therefore, if it is determined that BU's tuition and fees should have been lower, at a minimum, BU's Office of Financial Aid could have to recalculate all the aid it provided students. To determine the amount that students were damaged by BU's allegedly improper tuition and fees, one would have to, at a minimum, calculate the supposed tuition and fee overcharge and subtract out any financial aid changes caused by COA and other COVID-related changes.

---

[303] Paal Affidavit, Dkt. 100-6, Exhibit 1.

[304] https://www.bu.edu/academics/questrom/policies/adding-or-dropping-a-course/#:~:text=Dropping%20a%20course%20could%20affect%20eligibility%20for%20financial%20aid%20and,for%20renewal%20of%20financial%20aid viewed on December 9, 2022.

Because the aid the Office of Financial Aid provides is highly individualized, any aid recalculation also would be highly individualized. Consequently, properly determining any economic loss students might have suffered because of any alleged tuition and fee overcharge would also be highly individualized. As a result, I do not know how any economically proper refunds of these net prices could be calculated on a uniform formulaic, class-wide basis.

Essentially, the Plaintiffs are claiming that had they, and all other BU students, known that COVID were going to occur during the Spring 2020 Semester, they would have paid less for tuition than they actually did.

However, with such a claim, one must fully analyze all of the economic effects on the students; one cannot isolate one's analysis to just tuition.

For example, BU distributed 100% of the nearly $15 million CARES act funds they received to 5,804 students even though they were only required to distribute 50% of these funds.[305] Because these COVID-relief payments, like the alleged tuition overcharges, would not have happened but for COVID, any COVID-relief money students received would have to be subtracted from any damages award. As Plaintiffs have a duty to mitigate, the COVID-relief and other money that students would have received had they applied also needs to be subtracted from damages.

Because students could have received different COVID-relief payments, this damages adjustment would also be individualized.

Furthermore, given the characteristics of higher education, BU might not reduce its tuition and fees even if "standard" economic models suggest it should. Because the quality of college is hard to identify, the prices universities charge "is taken by many to be an indicator of quality; if an institution lets its tuition fall relative to its competitors, it runs the risk of being perceived as an inferior institution."[306]

As a result, a university might not lower its tuition even if suggested by a hypothetical model that does not take into account this quality effect.

# VIII. Conclusion

In this Expert Report, I conclude that:

- Dr. Singer ignores concrete, undisputed, contemporaneous real-world data that demonstrates that putative class members would not demand lower tuition and fees to attend BU during the Spring 2020 Semester. BU students' re-enrollment for the Fall 2020 Semester, their active elections to take remote coursework when a hybrid environment was available, BU's generally equal pre-existing pricing for in-person and online programs, and the benefits that students continued to enjoy during the Spring 2020 Semester all contradict Dr. Singer's conclusions.

---

[305] https://www.bu.edu/articles/2020/bu-awards-federal-cares-aid-to-students/ viewed on December 5, 2022.

[306] Arnott, Alaine K. "A Descriptive Analysis of Fees at Four-Year Public Universities: Differentiating Between Tuition and Fees" Doctoral Dissertation, University of Missouri, 2012, p. 36.

- Dr. Singer's academic citations actually demonstrate the flaws in the Singer Analysis.

- Courts have rejected conjoint analyses that were more detailed than the Singer Analysis.

- As the Singer Analysis incorporates List Prices and the Net Prices BU Received, it does not utilize the prices most relevant to calculating alleged damages, the Net Prices Students Paid. Dr. Singer also ignores the individualized nature of all of these prices. Some of this individualization is due to BU's market segmentation that Dr. Singer overlooked when he grouped all undergraduate and graduate students together. Furthermore, Dr. Singer told his survey respondents to make erroneous assumptions about financial aid. Notwithstanding the above, Dr. Singer incorrectly claims that the semester-long prices that BU charged can be translated into daily prices on a pro-rata basis.

- Dr. Singer incorrectly implemented his conjoint analysis as he
  - Applied the Algebraic Method, not a competitive simulation, to estimate his price discounts;
  - Utilized inapplicable decision making rubrics;
  - Did not demonstrate the reasonableness of the functional form of his conjoint model;
  - Did not show the propriety of his attribute and attribute value selections;
  - Misstated attributes he included in his conjoint model;
  - Incorrectly handled supply-side issues; and
  - Did not perform a full pre-test.

- The Singer Analysis' results are incorrect because of hypothetical and focalism biases.

- Dr. Singer misdefined his Target Population, Sampling Frame and Sample, as they are non-representative of putative class members.

- Even if Dr. Singer were able to demonstrate that BU's Spring 2020 Semester was less valuable, putative class members were not necessarily damaged.

I hold all opinions stated herein to a reasonable degree of economic certainty. As I understand expert discovery is ongoing, I reserve the right to supplement and/or amend my opinions upon receipt of new or additional information.

December 19, 2022

Benjamin S. Wilner, Ph.D.

**Boston University COVID-19 Refund Litigation** **Exhibit 1**
**Documents Considered**

| I. Legal Filings |
|---|
| Affidavit of Christine Paal & Exhibits, Dkt. 100-6. |
| Affidavit of John Battaglino, Dkt. 100-1. |
| Affidavit of Judy Platt, Dkt. 100-7. |
| Affidavit of Marina Lev & Exhibits, Dkt. 100-5. |
| Affidavit of Shaun Bossio, Dkt. 100-2. |
| Plaintiffs' Counterstatement of Facts and Response to Defendant's Statement of Undisputed Material Facts & Exhibits, Dkt. 107. |
| Second Consolidated Amended Class Action Complaint And Jury Demand, Dkt. 49. |
| Statement of Undisputed Material Facts in Support of Defendant Trustees of Boston University's Motion for Summary Judgment, Dkt. 100. |

| II. Depositions |
|---|
| May 2, 2022 Deposition of Gary Nicksa |
| May 5, 2022 Deposition of Jean Morrison |
| May 6, 2022 Deposition of Robert Brown |

| III. Plaintiffs' Expert Report |
|---|
| BU 2019 Net Tuition and Fees.xlsx |
| BU 2019-2020 Unit Prices.xlsx |
| BU-Grad-Feature Page.pdf |
| BU-Grad-IU.csv |
| BU-Grad-Print Survey.pdf |
| BU-Graduate Respondents.csv |
| BU-Graduate-Word Suvery.docx |
| BU-Undergrad-Feature Page.pdf |
| BU-Undergrad-IU.csv |
| BU-Undergrad-Print Survey.pdf |
| BU-Undergraduate Respondents.csv |
| BU-Undergraduate-Word Survey.docx |
| Conjoint Results.xlsx |
| Damages.xlsx |
| Expert Report of Hal J. Singer, Ph.D., dated November 18, 2022. |
| Grad Choice Task Ex 1.PNG |
| Grad Choice Task Ex 2.PNG |
| Grad Choice Task Ex 3.PNG |
| Graph Illustration.xlsx |
| Undergrad Choice Task Ex 1.PNG |
| Undergrad Choice Task Ex 2.PNG |
| Undergrad Choice Task Ex 3.PNG |

| IV. Documents Received from Counsel |
|---|
| 2022.12.14 Letter from N. Verge – Olivia Bornstein.pdf |
| academic-calendar-2019-2020.pdf |
| Bornstein Olivia Transcript.pdf |
| Bornstein Spring 2020.pdf |
| BU - International and Domestic Enrollments - Fact Sheet Table.xlsx |
| BU Financial Aid Stats.pdf |
| BU Spring 2020 Undergraduate Credit Hours by Number of Students.xlsx |
| Cox Shakura Transcript.pdf |
| Cox Statement Spring 2020.pdf |
| Dube, Gabriella Spring 2020 (1).pdf |
| Dutra Julia Transcript.pdf |
| Dutra Statement Spring 2020.pdf |

**Boston University COVID-19 Refund Litigation** **Exhibit 1**
**Documents Considered**

| IV. Documents Received from Counsel (cont.) |
|---|
| Fall 20 re-enrollment.xlsx |
| G3b-Fact-Sheet-FY2020.pdf |
| GPAs 2018-2020.xlsx |
| LfA Enrollment Projections_2020_12_04.xlsx |
| Olivia Bornstein - CAS CH102 Drop.pdf |
| Silulu Natalie Transcript.pdf |
| Silulu, Natalie Spring 2020.pdf |
| Spring 2020 WD Dates.xlsx |
| Tran Statement Spring 2020.pdf |
| Tran Venus Transcript.pdf |
| Transcript-Gabriella Dube.pdf |

| V. Texts |
|---|
| "Information Constraints and Financial Aid Policy" Judith Scott-Clayton, NBER Working Paper 17811, February 2012. |
| Adams, William James and Janet Yellen (1976) "Commodity Bundling and the Burden of Monopoly" Quarterly Journal of Economics, 90. |
| Agrey, L., & Lampadan, N. (2014). Determinant factors contributing to student choice in selecting a university. Journal of Education and Human Development, 3(2). |
| Akers, Elizabeth J. and Matthew M. Chingos "Are College Students Borrowing Blindly?" Brown Center on Education Policy at Brookings, December 2014. |
| Arnott, Alaine K. "A Descriptive Analysis of Fees at Four-Year Public Universities: Differentiating Between Tuition and Fees" Doctoral Dissertation, University of Missouri, 2012. |
| Aucejo, Esteban M., Jacob F. French and Basit Zafar, "Estimating Students' Valuation for College Experiences" NBER Working Paper 28511, February 2021. |
| Avery, Christopher and Caroline M. Hoxby "Do and Should Financial Aid Packages Affect Students' Choices?" |
| Bansak, Kirk et al. "Beyond the breaking point? Survey satisficing in conjoint experiments." Political Science Research and Methods. May 2019. |
| Czajkowski, Mikolaj, Tomasz Gajderowicz, Marek Giegiczny, Gabriela Grotowska and Urszula Sztandar-Sztanderska "Choosing the Future: Economic Preferences for Higher Education Using Discrete Choice Experiment Method." Research in Higher Education (2020) 61. |
| Diamond, Shari Seidman, 2011. "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center. |
| Duncan, Kevin "Using Conjoint Analysis to Prioritize College Student Preferences in the Time of COVID-19" Journal of Higher Education Management, 35(3). |
| Dynarski, Susan and Judith Scott-Clayton "Financial Aid Policy: Lessons From Research" NBER Working Paper, 2013. |
| Faculty without Students: Resource Allocation in Higher Education. William R. Johnson and Sara Turner Journal of Economic Perspectives: 23(2), 2009. |
| Gansemer-Topf, Ann M., Peter F. Orazem and Darin R. Wohlgemuth "Do liberal arts colleges maximize profit?" Southern Economic Journal, 2021; 88. |
| Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" Harvard Business Review, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on June 17, 2021. |
| Harford, Jon D. and Richard D. Marcus "Tuition and U.S. Private College Characteristics: The Hedonic Approach." Economics of Education Review, Vol. 5, No. 4. |
| Huber, J. (1997) "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," Sawtooth Software Research Paper Series. |
| Hyun Kyung Chatfield, So Jung Lee & Robert E. Chatfield (2012) The Analysis of Factors Affecting Choice of College: A Case Study of University of Nevada Las Vegas Hotel College Students, Journal of Hospitality Tourism Education, 24:1, DOI: 10.1080/10963758.2012.10696659. |
| Jones, Willis A. and Michael J. Rudolph "Athletic Subsidies and College Costs: Are Students Paying for Rising Costs in Intercollegiate Athletics Spending?" |
| Kaufman, Jonathan "State of the Unions: The Impact of Janus on Public University Student Fees" Georgia Law Review, Vol 54, 2020. |
| Krsmanovic, Masha and Lou L. Sabina "Resident, Non-resident, and 'The Other': Examining Institutional and State Policies for International Student Residency Classification for Tuition Purposes and the Associated Cost of Fees" Journal of Education Finance, Volume 45, Number 4, Spring 2020. |
| Manelli, Alejandro M., Martin Sefton and Benjamin S. Wilner, "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" Journal of Economic Behavior and Organization, 61(2), October 2006. |
| Manley, Kelly, Yongseung Han, Michael Ryan and Christopher Serkan "Undergraduate Students' Willingness to Pay for Online Courses" Journal of Education Finance, 45:2, Fall 2019. |

| **V. Texts (cont.)** |
|---|
| Mann, John T. and Shida R. Henneberry, "Undergraduate Students' Preferences and Willingness to Pay for College Course Attributes" 2012. |
| Moshe Ben-Akiva, Daniel McFadden & Kenneth Train, Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis. 10(1-2) FOUNDATIONS AND TRENDS IN ECONOMETRICS 1–144 (2019). |
| Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", Academy of Educational Leadership Journal, Vol 15, 2011. |
| Orme, Bryan K. & Chrzan, Keith, Becoming an Expert in Conjoint Analysis – Choice Modeling for Pros, Second Edition, 2021. |
| Orme, Bryan K. Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Fourth Edition, 2020. |
| Patricia Aguilera-Hermida, A.. "College students' use and acceptance of emergency online learning due to COVID-19." International Journal of Educational Research Open vol. 1 (2020): 100011. doi:10.1016/j.ijedro.2020.100011. |
| Paul E. Green, Abba M. Krieger, Yoram Wind, (2001) Thirty Years of Conjoint Analysis: Reflections and Prospects. |
| Rao, V. R. (2014), Applied Conjoint Analysis. Heidelberg: Springer. |
| Reference Manual on Scientific Evidence Third Edition, Federal Judicial Center, 2011. |
| Schkade DA, Kahneman D. Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction. Psychological Science. 1998;9(5):340-346. doi:10.1111/1467-9280.00066. |
| Spence, Michael "Job Market Signaling." Quarterly Journal of Economics. 87(3), 1992. |
| Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011. |
| Varian, Hal R. "Price Discrimination," Working Paper, July 1987. |
| Varian, Hal R., Microeconomic Analysis, Second Edition. |
| Walsh, James D. "The Coming Disruption," New York Magazine, May 11, 2020. |
| Weisbrod, Burton A., Jeffrey P. Ballou, and Evelyn D. Asch Mission and Money: Understanding the University Cambridge University Press, 2008. |
| Wilson, T. D., Wheatley, T., Meyers, J. M., Gilbert, D. T., & Axsom, D. (2000). Focalism: A source of durability bias in affective forecasting. Journal of Personality and Social Psychology, 78(5). https://doi.org/10.1037/0022-3514.78.5.821. |

| **VI. Other Documents Considered** |
|---|
| Duran v. U.S. Bank 325 P.3d 916, 937-38 (Cal. 2014). |
| http://bayes.acs.unt.edu:8083/BayesContent/class/Jon/Benchmarks/MLR_JDS_Aug2011.pdf viewed on December 15, 2022. |
| https://calpolyprehealth.blogspot.com/2021/07/alumni-letter-venus-tran-tufts.html viewed on December 13, 2022. |
| https://collegestats.org/articles/beware-the-top-5-reasons-for-dropping-out-of-college/ viewed on August 9, 2021. |
| https://coronavirus.jhu.edu/region/united-states viewed on December 15, 2022. |
| https://decided.moneythink.org/guide/tuition-and-fees-explained/ viewed on December 15, 2022. |
| https://educationaladvocates.com/the-parents-role-in-the-college-admission-process-2/ viewed on August 8, 2022. |
| https://fsapartners.ed.gov/sites/default/files/attachments/drug worksheets/20192020FAFSAEN.pdf viewed on December 15, 2022 |
| https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2017 viewed on December 13, 2022. |
| https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2018 viewed on December 13, 2022. |
| https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2019 viewed on December 13, 2022. |
| https://nces.ed.gov/ipeds/datacenter/FacsimileView.aspx?surveyNumber=8&unitId=164988&year=2020 viewed on December 13, 2022. |
| https://ncss-wpengine.netdna-ssl.com/wp-content/themes/ncss/pdf/Procedures/NCSS/D-Optimal_Designs.pdf viewed on August 22, 2022. |
| https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on October 19, 2021. |
| https://studentaid.gov/announcements-events/covid-19/payment-pause-zero-interest viewed on August 30, 2022. |
| https://studentaid.gov/articles/4-things-consider-choosing-college-career-school/ viewed on August 8, 2022. |
| https://studentaid.gov/complete-aid-process/how-calculated viewed on January 17, 2022. |
| https://studentaid.gov/debt-relief-announcement viewed on December 14, 2022. |
| https://web.archive.org/web/20191209214109/http://www.bu.edu/ssw/academics/msw/online/ viewed on December 5, 2022. |
| https://web.archive.org/web/20191218221824/https://www.bu.edu/ssw/academics/msw/ viewed on December 5, 2022. |
| https://web.archive.org/web/20191220163150/http://www.bu.edu/academics/ssw/programs/specializations/ viewed on December 5, 2022. |
| https://web.archive.org/web/20200121010442/https://www.bu.edu/academics/questrom/policies/course-overload/ viewed on December 13, 2022. |
| https://web.archive.org/web/20201113022012/https://www.bu.edu/met/admissions/apply-now/ viewed on December 5, 2022. |
| https://www.bu.edu/2020-year-in-review/chapter-09 viewed December 13, 2022. |
| https://www.bu.edu/2020-year-in-review/chapter-15 viewed on December 13, 2022. |

**Boston University COVID-19 Refund Litigation** **Exhibit 1**
**Documents Considered**

| VI. Other Documents Considered (cont.) |
|---|
| https://www.bu.edu/academics/questrom/policies/adding-or-dropping-a-course/#:~:text=Dropping%20a%20course%20could%20affect%20eligibility%20for%20financial%20aid%20and,for%20renewal%20of%20financial%20aid viewed on December 9, 2022. |
| https://www.bu.edu/admissions/why-bu/academics/majors/ viewed on December 15, 2022. |
| https://www.bu.edu/articles/2020/bu-awards-federal-cares-aid-to-students/ viewed on December 5, 2022. |
| https://www.bu.edu/careers/career-ready/outcomes/ Viewed on December 13, 2022. |
| https://www.bu.edu/met/admissions/tuition-and-fees/ viewed on December 13, 2022. |
| https://www.bu.edu/provost/2020/03/27/university-grading-policies-for-spring-semester-2020/ viewed on December 15, 2022. |
| https://www.bu.edu/provost/2020/05/29/fall-2020-planning-undergraduate-programs-learn-from-anywhere-and-other-updates viewed on December 5, 2022. |
| https://www.bu.edu/reg/registration/tuition-fees/ viewed on December 5, 2022. |
| https://www.bu.edu/ssw/academics/msw/majors/ viewed on December 5, 2022. |
| https://www.bu.edu/ssw/admissions/msw/msw-financial-aid/financial_aid/ viewed on December 5, 2022. |
| https://www.bumc.bu.edu/gms/files/2019/04/2019-2020-Tuition-and-Budget-Information-1.pdf viewed on December 15, 2022. |
| https://www.collegematchpoint.com/college-matchpoint-blog/2018/4/making-the-right-choice-how-students-decide-which-college-to-attend viewed on July 25, 2022. |
| https://www.eurekalert.org/news-releases/783251 viewed on October 28, 2021. |
| https://www.investopedia.com/terms/b/bundling.asp viewed on October 28, 2021. |
| https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on June 16, 2021. |
| https://www.linkedin.com/in/gabriella-dube/ viewed on December 13, 2022. |
| https://www.linkedin.com/in/juliadutraa/ viewed on December 13, 2022. |
| https://www.linkedin.com/in/natalie-silulu-0aabb5196/ viewed on December 13, 2022. |
| https://www.mass.gov/news/governor-baker-declares-state-of-emergency-to-support-commonwealths-response-to-coronavirus viewed on December 5, 2022. |
| https://www.pewresearch.org/fact-tank/2021/05/14/college-graduates-in-the-year-of-covid-19-experienced-a-drop-in-employment-labor-force-participation/ viewed on September 22, 2021. |
| https://www.usatoday.com/story/money/2022/08/25/how-is-student-loan-debt-forgiven/7884574001/ viewed on August 30, 2022. |
| https://www.usnews.com/best-colleges/boston-university-2130 viewed on December 15, 2022. |
| https://www.usnews.com/education/best-colleges/articles/coronavirus-on-campus-how-college-students-can-stay-safe viewed on October 15, 2021. |
| https://www.usnews.com/education/best-colleges/paying-for-college/articles/what-you-need-to-know-about-college-tuition-costs viewed on October 27, 2021. |
| https://www.usnews.com/education/best-colleges/slideshows/10-things-parents-of-college-bound-students-need-to-do?slide=5 viewed on October 20, 2021. |
| https://www.vox.com/first-person/21433095/coroanavirus-covid-19-school-reopening-online-learning-remote viewed on August 30, 2022. |
| In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prod. Liab. Litig., 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020). |
| Proceedings of Sawtooth Software Conference, October 2013, (Download from https://www.sawtoothsoftware.com/support/technical-papers/100-support/proceedings/1426-proceedings2013 viewed on August 10, 2021). |
| Smith v. Ohio State Univ., 2022-Ohio-4101 Court of Appeals of Ohio Decision on November 17, 2022. |
| Smith v. Ohio State Univ., 2022-Ohio-4101 Declaration of Steven P. Gaskin, dated June 23, 2021. |
| Weiman v. Miami Univ., 2022-Ohio-4294. Appeals from the Court of Claims of Ohio Decision Rendered December 1, 2022. |

Exhibit 2

Alvarez & Marsal
Disputes and Investigations, LLC
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

**Benjamin S. Wilner, Ph.D.**

Managing Director – Disputes and Investigations

bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**

Kellogg Graduate School of Management, Northwestern University
Ph.D.
Managerial Economics and Decision Science

University of Pennsylvania
BA magna cum laude with distinction in major
Economics & Mathematics

London School of Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues. For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms. He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics. Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press. Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

### Testimony before a Trier of Fact

- Employment Hearing Testimony in Scott Coren v. Ronald Pieri, Board of Fire and Police Commissioners, Highwood, Illinois, October 2019 & January 2020
- Sentencing Hearing Testimony in United States v. Mark Hazelwood, United States District Court, Eastern District of Tennessee, September 2018
- Arbitration Testimony in Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, November 2017
- Trial Testimony in Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2017
- Trial Testimony in Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017
- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015
- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015
- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015
- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014
- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012
- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011
- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010

- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009
- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009
- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008
- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008
- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008
- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007

### Deposition Testimony

- Alec Faber and Ahnaf Rahman et al. v. Cornell University, United States District Court, Northern District of New York, October 2022
- Holly Blaine Vanzant and Sherry Nevius et al. v. Hill's Pet Nutrition Inc. and PetSmart, Inc., United States District Court, Northern District of Illinois, September 2022
- Penny Ninivaggi et al. v. University of Delaware & Hannah Russo et al. v. University of Delaware, United States District Court, District of Delaware, September 2022
- Nicholas Bergeron and Nick Quattrociocchi, et al. v. Rochester Institute of Technology, United States District Court, Western District of New York, August 2022
- Jennifer Pennington and Josh Pennington v. Memorial Hospital of South Bend, Inc. d/b/a Beacon Health and Fitness, Spear Corporation and Panzica Building Corporation, State of Indiana, St. Joseph Superior Court, April 2022
- Honeywell International Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust, United States Bankruptcy Court, Western District of Pennsylvania, March 2022
- Astria Health v. Cerner Corporation and Cerner Revenue Cycle, LLC., United States Bankruptcy Court, Eastern District of Washington, March 2022

- Paul E. Dubuque v. Dubuque Coffee Co., LLC and Charles T. Dubuque, State of Illinois, Circuit Court of Cook County, October 2021
- Winamac Southern Railway Company v. Irving Materials, Inc., State of Indiana, County of Howard, October 2021
- Brooke Smith v. The Ohio State University, Court of Claims for the State of Ohio, September 2021
- H&T Fair Hills, Ltd., et al. v. Alliance Pipeline L.P., United States District Court, District of Minnesota, April 2021
- Thomas P. Gorczynski, et al. v. Electrolux Home Products, Inc., et al., United States District Court, District of New Jersey, Camden Division, February 2020
- Thomas Allegra, et al. v. Luxottica Retail North America, United States District Court, Eastern District of New York, Brooklyn Division, December 2019
- Sdahrie Howard, et al. v. Cook County Sheriff's Office and County of Cook, United States District Court, Northern District of Illinois, Eastern Division, April 2019
- In re: Whole Foods Market Group, Inc. Overcharging Litigation, United States District Court, Southern District of New York, January 2019
- WHB International, Inc. and WHB Fundição, S/A v. Allison Transmission, Inc., Marion Superior Court, Indiana Commercial Court, December 2018
- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018
- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018
- Rick Lindsey v. Officer Michael Orlando, Officer Jamie Falardeau, the City of Chicago, Delta Airlines, Thomas Steinfels, and Marcella Pirvu, United States District Court, Northern District of Illinois, Eastern Division, March 2018
- Syncora Guarantee Inc. v. Alinda Capital Partners, LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi, Supreme Court of the State of New York, County of New York, December 2017
- Kelley Antekeier v. Laboratory Corporation of America, United States District Court, Eastern District of Virginia, Alexandria Division, November 2017
- Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, October 2017

- Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017
- Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2016
- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Minnesota, February 2016
- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, December 2015
- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014
- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014
- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013
- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013
- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013
- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009
- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011
- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011
- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011

- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010
- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010
- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009
- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009
- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009
- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008
- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008
- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

## Awards

- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

## Professional Memberships

- American Bar Association (Associate Status)
- American Statistical Association

## Publications

- "Sampling is Harder and Cheaper than You Think" *Raising the Bar*, January 2021
- "Does (Sample) Size Matter" *For the Defense*, February 2019
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) *Trébol*, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), *Crop Insurance Today*, 44(2), pp. 28 – 32, May 2011
- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) *The SRR Journal*, Spring 2010
- "Statistical Analyses Relation to Reductions In Force," *The SRR Journal*, Spring 2009
- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) *The SRR Journal*, Fall 2007
- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) *The SRR Journal*, Spring 2007 (reprinted on mondaq.com)
- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), *Journal of Economic Behavior and Organization*, 61(2), pp. 304 – 323, October 2006
- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," *Journal of Finance*, February 2000
- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," *Credit and Financial Management Review*, Summer 1999
- "Paying Your Bills: The Effect of Corporate Quality" September 1996
- Refereed for the *American Economic Review*, *American Real Estate Society*, *Journal of Finance*, the *Journal of Business, Finance and Accounting*, and John Wiley Publishers

**Boston University COVID-19 Refund Litigation**
**Tuition List Prices 2019-20 vs. 2020-21**

**Exhibit 3**

| Count of Unique List Prices | Tuition List Prices | Unit | 2019-20 | 2020-21 | Change from 19-20 to 20-21 |
|---|---|---|---|---|---|
| | **Full-Time** | | | | |
| 1 | Full-time (fall & spring) - Applicable All Programs (exceptions below) | per semester | $ 27,360 | $ 28,427 | 3.90% |
| | **College of Fine Arts (CFA)** | | | | |
| 2 | Opera Institute | per semester | $ 14,500 | $ 14,500 | 0.00% |
| 3 | MFA Program in Theater & Visual Arts | per semester | $ 13,693 | $ 14,227 | 3.90% |
| 4 | School of Music Graduate Programs (7-11.5 credits/semester)* | per semester | $ 11,850 | $ 12,300 | 3.80% |
| | **Metropolitan College (MET)** | | | | |
| 5 | MET International Graduate Certificate Programs | per semester | $ 14,080 | $ 14,480 | 2.84% |
| 6 | MET International Advanced Graduate Certificate Programs | per semester | $ 17,700 | $ 18,180 | 2.71% |
| 7 | MET International Undergraduate Semester Programs | per semester | $ 9,300 | $ 9,600 | 3.23% |
| | **School of Law (LAW)** | | | | |
| 8 | Full-time | per semester | $ 27,850 | $ 28,825 | 3.50% |
| | **School of Social Work (SSW)** | | | | |
| 9 | Full-time students | per semester | $ 17,568 | $ 18,095 | 3.00% |
| | **School of Theology (STH)** | | | | |
| 10 | Full-time students (DMin & Other Graduate Programs) | per semester | $ 10,640 | $ 10,944 | 2.86% |
| 11 | Full-time ThD/PhD entering Fall 2014 or later | per semester | $ 27,360 | $ 28,427 | 3.90% |
| | **Goldman School of Dental Medicine (SDM)** | | | | |
| 12 | DMD Program | per semester | $ 40,000 | $ 40,000 | 0.00% |
| 13 | Post-Doctoral Program | per semester | $ 41,000 | $ 41,000 | 0.00% |
| | **School of Medicine (MED)** | | | | |
| 14 | MD Program | per semester | $ 31,436 | $ 32,442 | 3.20% |
| | **BU Academy** | | | | |
| 15 | Tuition | per semester | $ 23,084 | $ 24,076 | 4.30% |
| | **Part-Time** | | | | |
| 1 | Part-time (fall & spring) - Applicable All Programs (exceptions below) | per credit | $ 1,710 | $ 1,777 | 3.92% |
| | **College of Fine Arts (CFA)** | | | | |
| 2 | Master of Music in Music Education (Evening Classes) | per credit | $ 855 | $ 889 | 3.98% |
| | School of Music – Performance Diploma (Continuing Students) | per credit | $ 855 | $ 889 | 3.98% |
| | Graduate Evening Music Education & Art Education Courses | per credit | $ 855 | $ 889 | 3.98% |
| | All online courses | per credit | $ 855 | $ 889 | 3.98% |
| | **Metropolitan College (MET)** | | | | |
| 3 | Part-time, courses numbered 100-599 | per credit | $ 480 | $ 490 | 2.08% |
| 4 | Part-time, courses numbered 600-999 | per credit | $ 905 | $ 925 | 2.21% |
| 5 | Part-time, Military Graduate Programs | per credit | $ 710 | $ 710 | 0.00% |
| | **Wheelock College of Education and Human Development** | | | | |
| | Graduate evening courses | per credit | $ 855 | $ 888 | 3.86% |
| 6 | Off-campus extension courses | per credit | $ 428 | $ 444 | 3.74% |
| | **School of Law (LAW)** | | | | |
| 7 | Graduate Banking and Financial Law Program | per credit | $ 2,321 | $ 2,402 | 3.49% |
| | Graduate Tax Law Program | per credit | $ 2,321 | $ 2,402 | 3.49% |
| | Online Graduate Tax Program | per credit | $ 2,321 | $ 2,402 | 3.49% |
| 8 | Executive LLM Program | per credit | $ 3,064 | $ 3,171 | 3.49% |
| 9 | Other | per credit | $ 1,741 | $ 1,802 | 3.50% |
| | **School of Social Work (SSW)** | | | | |
| 10 | Part-time students | per credit | $ 1,098 | $ 1,131 | 3.01% |
| 11 | Off-campus extension courses | per credit | $ 727 | $ 749 | 3.03% |
| 12 | Online MSW courses | per credit | $ 850 | $ 875 | 2.94% |
| | **School of Theology (STH)** | | | | |
| 13 | Part-time students (excluding DMin) | per credit | $ 887 | $ 912 | 2.82% |
| 14 | Part-time students (DMin) | per credit | $ 665 | $ 684 | 2.86% |
| | Part-time ThD/PhD entering prior to Fall 2014 | per credit | $ 665 | TBD | n/a |
| | Part-time ThD/PhD entering Fall 2014 or later | per credit | $ 1,710 | $ 1,777 | 3.92% |

**plus Applied Music Fee, if applicable*
**Source**: https://www.bu.edu/reg/registration/tuition-fees/ viewed on December 5, 2022.

**Boston University COVID-19 Refund Litigation**
**Fee List Prices 2019-20 vs. 2020-21**

**Exhibit 4**

| Fee List Prices | Unit | 2019-20 | | 2020-21 | | Change from 19-20 to 20-21 |
|---|---|---|---|---|---|---|
| **Student Services Fee – Charles River Campus Only** | | | | | | |
| Full-time Undergraduate students | per semester | $ | 307 | $ | 319 | 3.91% |
| Full-time Graduate students | per semester | $ | 172 | $ | 178 | 3.49% |
| Part-time Undergraduate & Graduate students | per semester | $ | 60 | $ | 60 | 0.00% |
| **Community Service Fee** | | | | | | |
| Full-time Undergraduate students – Charles River Campus | per semester | $ | 60 | $ | 62 | 3.33% |
| **Health & Wellness Fee – CRC & BUMC** | | | | | | |
| Full-time Undergraduate & Graduate students | per semester | $ | 219 | $ | 228 | 4.11% |
| **Medical Insurance** | | | | | | |
| BU Student Basic | per year | | TBD | | TBD | n/a |
| BU Student Plus | per year | | TBD | | TBD | n/a |
| **Application Fee** | | | | | | |
| Undergraduate | per application | $ | 80 | $ | 80 | 0.00% |
| Metropolitan College & School of Law | per application | $ | 85 | $ | 85 | 0.00% |
| Questrom School of Business (Graduate) | per application | $ | 125 | $ | 125 | 0.00% |
| School of Medicine | per application | $ | 110 | $ | 110 | 0.00% |
| School of Dental Medicine (domestic/international) | per application | $ | 75 | $ | 75 | 0.00% |
| Other graduate applications | per application | $ | 95 | $ | 95 | 0.00% |
| **Applied Music Fee*** | | | | | | |
| Half-hour Lessons (14 lessons) | per semester | $ | 925 | $ | 925 | 0.00% |
| Half-hour Lessons with Graduate Assistant (14 lessons) | per semester | $ | 600 | $ | 600 | 0.00% |
| One-hour Lessons (14 lessons) | per semester | $ | 1,850 | $ | 1,850 | 0.00% |
| One-hour Lessons with Graduate Assistant (14 lessons) | per semester | $ | 1,200 | $ | 1,200 | 0.00% |
| Part-time students | per credit | $ | 825 | $ | 889 | 7.76% |
| **Clinical Affiliation Fee (SAR)** | | | | | | |
| Neurological Residency Program | n/a | $ | 1,400 | $ | 1,400 | 0.00% |
| Physical Therapy | n/a | | | | | |
| Charged in the spring semester of the first 2 years | n/a | $ | 1,710 | $ | 1,777 | 3.92% |
| Charged in the final semester of the program | n/a | $ | 3,420 | $ | 3,554 | 3.92% |
| Occupational Therapy | n/a | | | | | |
| Charged in the final semester of the on-campus program | n/a | $ | 3,420 | $ | 3,554 | 3.92% |
| **Continuing Study Fee** | | | | | | |
| Continuing Study Fee | per semester | $ | 3,420 | $ | 3,554 | 3.92% |
| College of Fine Arts (CFA) | per semester | $ | 1,710 | $ | 1,777 | 3.92% |
| School of Theology (STH) – excluding DMin &ThD/PhD entering prior to Fall 2014 | per semester | $ | 887 | $ | 912 | 2.82% |
| MED MS Program in Dermatology | per semester | $ | 3,930 | $ | 4,055 | 3.18% |
| Non-BU External Program Fee (assessed to BU students in Non-affiliated Study Abroad Programs; fall & spring only) | per semester | $ | 600 | $ | 600 | 0.00% |
| **Law School In-Absentia Fee** | | | | | | |
| Law School In-Absentia Fee | per leave | $ | 5,570 | $ | 5,765 | 3.50% |
| **Laboratory Fees (Non-Computer Science Courses)** | | | | | | |
| MET | per course | $ | 200 | $ | 200 | 0.00% |
| Summer Term | per course | $ | 200 | $ | 200 | 0.00% |

**Boston University COVID-19 Refund Litigation**
**Fee List Prices 2019-20 vs. 2020-21**

**Exhibit 4**

| Fee List Prices | Unit | 2019-20 | 2020-21 | Change from 19-20 to 20-21 |
|---|---|---|---|---|
| **Orientation Program Fee** | | | | |
| Entering Freshmen and Transfers | one-time fee | $ 310 | $ 315 | 1.61% |
| Parents (Summer Orientation) | one-time fee | $ 150 | $ 155 | 3.33% |
| Parents (Winter Orientation) | one-time fee | $ 150 | $ 155 | 3.33% |
| Children | one-time fee | $ 100 | TBD | n/a |
| **School of Public Health (SPH)** | | | | |
| Graduate Program Fee – Full-time | per semester | $ 150 | TBD | n/a |
| Graduate Program Fee – Part-time | per semester | $ 150 | TBD | n/a |
| **Doctoral Dissertation Fee** | | | | |
| Doctoral Dissertation Fee | per dissertation | $ 115 | $ 115 | 0.00% |
| **Masters Thesis Fee** | | | | |
| Masters Thesis Fee | per thesis | $ 25 | $ 25 | 0.00% |
| **BU Academy** | | | | |
| University Fee – BU Academy Students only | per semester | $ 340 | $ 340 | 0.00% |

**This additional fee does NOT apply to full-time undergraduate CFA music students with Applied Music in their curriculum.*
**Source**: https://www.bu.edu/reg/registration/tuition-fees/ viewed on December 5, 2022.