# Exhibit 38

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - x

IN RE: BOSTON UNIVERSITY

COVID-19 REFUND LITIGATION MASTER FILE NO.

- - - - - - - - - - - - - - - - - - - - - x

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

ALL PARTICIPANTS APPEARING VIA ZOOM

VIDEO DEPOSITION of BENJAMIN S. WILNER, PhD

Thursday, February 2, 2023 - 10:18 a.m.

Reporter: Jill K. Ruggieri, RPR, RMR, FCRR, CRR

APPEARANCES:

Hecht Partners LLP
Conor B. McDonough, Esq.
Kathryn Lee Boyd, Esq.
125 Park Avenue, 25th Floor
New York, New York 10017
212.851.6821
cmcdonough@hechtpartners.com
lboyd@hechtpartners.com
Counsel for plaintiff Olivia Bornstein, individually and on behalf of all others similarly situated

Quinn Emanuel Urquhart & Sullivan LLP
Marina Lev, Esq.
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
213.443.3000
marinalev@quinnemanuel.com
Counsel for Boston University and the deponent

Also present: Blake Abbott
Hal Singer
Patrick Madden
Stephen Beck

Videographer: Gayle Ashton

# I N D E X

WITNESS:

BENJAMIN WILNER, PhD

Examination by Mr. McDonough 6

## E X H I B I T S


| | | |
|---|---|---|
| Exhibit 1 | Expert Report of Benjamin S. Wilner, PhD | 8 |
| Exhibit 2 | Expert Report of Hal J. Singer, PhD | 161 |
| Exhibit 3 | Wilner Figure 7a | 190 |

enrolled at the University of Pennsylvania, 10:25:41
what was your course of study there? 10:25:43
A So it's -- I received a bachelor of 10:25:45
arts, magna cum laude, with distinction, and 10:25:48
major in mathematics and economics. 10:25:51
Q And what kind of focus, if you 10:25:56
recall, did you have in that course of study? 10:25:58
A Well, it was very broad, because, for 10:26:02
example, I went and I spent three years being a 10:26:09
research assistant for a gentleman named 10:26:12
Lawrence Klein, who won the Nobel Prize in 10:26:14
economics for macroeconomic modeling, 10:26:18
statistical forecasting, things like that. So 10:26:21
that was one area of focus. 10:26:23
Additionally, I went and I wrote 10:26:26
my thesis and did other studies in decision 10:26:30
science, studying how to conduct surveys in -- 10:26:36
to elicit proper economic valuations that 10:26:44
people might have. 10:26:48
And for that, I studied under 10:26:51
one gentleman named Colin Camerer, who was a 10:26:53
MacArthur Genius Award winner, is now at 10:26:56
Caltech, as well as a gentleman named Hugo 10:27:00
Sonnenschein, who became the president of the 10:27:05
University of Chicago. 10:27:07

Q And in your studies at the University of Pennsylvania, did any classes or any of your thesis work focus on conjoint analysis? 10:27:11 10:27:13 10:27:16
A So it's -- one of the classes that I took was called Experimental Economics. And what experimental economics does is it goes and it looks at various methods that marketers, economists, financiers can go and ask of individuals in order to elicit their valuations of items. 10:27:22 10:27:23 10:27:28 10:27:32 10:27:41 10:27:50 10:27:59
And I ended up writing my undergraduate thesis on that topic, and that undergraduate thesis was -- the conclusions of that was used by the president -- by the University of Chicago in one of his papers that studied how to conduct such surveys and interpret the economic data resulting from it. 10:28:00 10:28:02 10:28:06 10:28:12 10:28:14 10:28:17 10:28:20
Q But I guess my question is a little more specific than that. 10:28:24 10:28:27
Did any of the courses that you take involve or examine conjoint analysis? 10:28:29 10:28:30
A Well, it's one of the things -- so it's -- first, we covered many models. I think conjoint was one of them. But I just want to kind of make sure that we're all on the same 10:28:36 10:28:38 10:28:41 10:28:45

page, is that conjoint is really an amalgamation of various economic and statistical ideas. 10:28:48 10:28:51 10:28:54

So it's -- for example, one component of conjoint analysis is running a regression. 10:28:57 10:28:58 10:29:01

So while technically the regressions that I ran for Dr. Klein in macroeconomics you might not think are relevant, because -- they are very relevant because they go and they inform one vital component of the conjoint analysis. 10:29:02 10:29:04 10:29:08 10:29:11 10:29:16 10:29:21

Q All right. 10:29:25

I think you -- you also said that you had taken -- I don't remember if you withdrew or if you transferred, but you had spent at least one year at the London School of Economics? 10:29:25 10:29:26 10:29:31 10:29:34 10:29:37

A That's correct. 10:29:38

Q And that was -- according to your CV, it was 1988 to 1989? 10:29:38 10:29:41

A That's correct. 10:29:43

Q And what was your study -- what did you study at the London School of Economics? 10:29:43 10:29:47

A I went and I was technically in the 10:29:50

mathematics and statistics program at the London School. 10:29:52 10:29:57

Q And did any of the coursework you studied there address conjoint analysis? 10:29:57 10:29:59

A Again, it went -- and while I was there, I studied under a gentleman named Ariel Rubinstein, who went and developed various models to go and elicit consumer behavior and people's behavior. 10:30:04 10:30:06 10:30:10 10:30:14 10:30:26

But I do not think that the totality of the amalgamation of conjoint analyses were presented within my study at the London School of Economics, though components were. 10:30:27 10:30:30 10:30:33 10:30:37 10:30:40

Q All right. 10:30:46

You -- after you obtained your bachelor's degree, you then attended Northwestern for your doctoral program; is that right? 10:30:46 10:30:50 10:30:52 10:30:55

A That is correct. 10:30:55

Q And what was the focus of your work as a graduate student? 10:30:59 10:31:01

A So it's -- technically, I was in the Department of Managerial Economics and Decision Science, though I went and I did a lot of work 10:31:03 10:31:06 10:31:11

in other departments. 10:31:16
For example, while my doctoral thesis was intended to study decision science and economics, it became much more financially based, which allowed me to become a finance professor after I graduated. 10:31:22 10:31:24 10:31:31 10:31:34 10:31:38
So I don't know how you want to say whether it's decision science, economics, finance -- it's a whole amalgamation of things. 10:31:39 10:31:44 10:31:48
Q Understood. 10:31:52
And did you take any coursework there that dealt with conjoint analysis? 10:31:52 10:31:54
A Well, it's, again, definitely a component of studying regressions, studying decision-making and the decision science principles that underlie conjoint analyses, and I took a marketing class, and they might have touched on conjoint now that I sit here and think about it as well. 10:32:05 10:32:07 10:32:11 10:32:16 10:32:22 10:32:22 10:32:22
Q Did any of your professors, either from your undergraduate work at Penn or the London School of Economics, or your advisors in your doctorate program, did any of those people have a specialty or focus on conjoint analysis? 10:32:32 10:32:35 10:32:39 10:32:42 10:32:44
A So, first, it's hard for me to answer 10:32:55

that, because I don't really know as I sit here -- I don't recall all of the research focus -- foci or focuses of all of my professors. But definitely they went and studied components of conjoint analysis, and that was the focus of their research and analysis. 10:32:56 10:32:59 10:33:02 10:33:08 10:33:11 10:33:15 10:33:17

I definitely know components. Whether or not the professors published on them or did research on them, I just don't know. 10:33:18 10:33:21 10:33:25

Q And do you know if they published any peer-reviewed work -- peer-reviewed articles that involved conjoint analysis? 10:33:31 10:33:33 10:33:36

A Well, again, one thing to sit here and say -- so it's Colin Camerer, who was my undergraduate thesis advisor, he went and he publishes a great deal studying the neuroscience behind decision-making. 10:33:40 10:33:43 10:33:46 10:33:49 10:33:52

And so that is -- and he's published a lot. He's won various economic awards for that research. So definitely, he is involved. 10:33:56 10:33:58 10:34:01 10:34:06

Obviously the paper that I went and published -- that the president of Chicago published, my National Science Foundation grant 10:34:08 10:34:13 10:34:26

was involved in this. My published paper was involved in this, this stuff. 10:34:28 10:34:33

I went and I had colleagues who I regularly interacted with who dealt with conjoint and surveys of individuals. 10:34:37 10:34:39 10:34:41

So it's there. Whether or not specifically they wrote papers on that limited focus amalgamation that you're talking about, I don't know. 10:34:45 10:34:53 10:34:55 10:34:57

Q Okay. Understood. 10:35:01

You've discussed what you've said are components of conjoint analysis, is that what you -- 10:35:02 10:35:03 10:35:06

A Yes. 10:35:07

Q I think one of the things you referred to was conducting regression analyses? 10:35:09 10:35:10

A Yes. 10:35:12

Q Okay. 10:35:13

Is it your testimony that conducting regression analyses would give you expertise in conjoint analysis? 10:35:14 10:35:16 10:35:20

A Conducting regression analyses would give me great knowledge about one portion and one component of a conjoint analysis, yes. 10:35:23 10:35:26 10:35:32

Q Well, my question is a little 10:35:35

different, because it's -- does it make you an expert in conjoint analysis entirely? 10:35:37 10:35:39

A In amalgamation and in combination with the other research and studies I've done, yes. 10:35:44 10:35:49 10:35:51

Q Regression is a fairly common technique used in econometrics and economics, right? 10:36:09 10:36:11 10:36:15

A Define "fairly common." 10:36:15

Q Fair to say that most undergraduate economics students have conducted a regression by the time they graduate? 10:36:19 10:36:21 10:36:24

A I don't know if that's the case. I -- 10:36:28 10:36:30

Q Have any of your colleagues not performed a regression, that you know of? 10:36:32 10:36:33

A I'm sorry? 10:36:35

Q Have any of your colleagues in the field of economics/econometrics -- do you know of anyone who hasn't performed a regression? 10:36:35 10:36:37 10:36:41

MS. LEV: I'm going to object that that calls for speculation. 10:36:44 10:36:44

A Again, I don't know. Probably they've conducted regression, but I don't know what everyone has done in their experience. 10:36:51 10:36:52 10:36:54

Q Is it, however, your opinion that having done a regression is sufficient to give you expertise in conjoint analysis as a whole? 10:37:14 10:37:16 10:37:19
A Again -- 10:37:25
MS. LEV: I'm going to object as to vague. 10:37:26 10:37:29
A -- what I've said multiple times is that understanding the details behind regression, not just going to a website and clicking a button and having a result pop out, understanding the mathematics, understanding the theory, understanding the logic underlying the regressions gives me great expertise within one component of a conjoint analysis when married with my other expertises, gives me great knowledge about how conjoint works. 10:37:32 10:37:34 10:37:39 10:37:40 10:37:47 10:37:49 10:37:53 10:37:58 10:38:00 10:38:06
Q You are the author on a number of scholarly publications, correct? 10:38:25 10:38:29
A Define "a number." 10:38:32
Q Whatever is listed in your CV. 10:38:35
A It's -- I have published the articles that are listed in my CV, yes. 10:38:38 10:38:42
Q Were those articles peer-reviewed? 10:38:45
A Some were; some weren't. 10:38:50
Q Did any of those articles involve the 10:38:51

application of conjoint analysis? 10:38:53

A So it's -- the paper called Multiunit Auctions that I wrote dealt with asking questions of individuals in order to glean their valuation of certain products, similar to a conjoint, but it did not implement all components that are contained within a conjoint. It implemented some of them. 10:39:02 10:39:07 10:39:19 10:39:25 10:39:28 10:39:32 10:39:35

Similarly, the first two papers that are listed in my publication list are about statistical sampling, which is also one component of conjoint analyses. 10:39:38 10:39:41 10:39:42 10:39:50

And so it's -- those two things touch on different aspects of conjoint analysis, but there's no one paper that discusses all components of conjoint analysis within itself. 10:39:52 10:39:55 10:39:59 10:40:03 10:40:07

Q When we talk about the components of conjoint analysis that are not included in the articles that you're discussing, where do you get the expertise to -- I'm going to strike that question. 10:40:10 10:40:14 10:40:18 10:40:21 10:40:28

You've said that regression is one of the components of conjoint analysis. 10:40:32 10:40:35

A I'm sorry, could you repeat the 10:40:37

A Well, it's the -- again, another thing they do is -- so it's within this application of conjoint that Dr. Singer is attempting to do, he is trying to utilize conjoints to assist with a damages calculation, therefore, understanding the interaction between conjoint and proper damage calculations is also very vital. 10:44:56 10:44:58 10:45:01 10:45:05 10:45:10 10:45:14 10:45:18 10:45:20

Q I want to just touch base on the -- some of your experience with the folks you mentioned from whom you gleaned expertise in these various components. 10:45:25 10:45:27 10:45:30 10:45:34

You mentioned several people who had won Nobel Prizes. 10:45:36 10:45:39

A Mm-hmm. 10:45:41

Q Did any of those individuals receive the Nobel Prize for work on conjoint analyses specifically? 10:45:41 10:45:44 10:45:49

A The two people who I had mentioned are Lawrence Klein, who won for regression analyses and understanding the theory and the mathematics underlying regression analysis, which is an important component of conjoint analysis. And then Roger Myerson, who won the Nobel Prize for figuring out how to elicit -- 10:45:54 10:45:56 10:45:59 10:46:04 10:46:06 10:46:09 10:46:13

how to ask questions that will properly elicit people's valuations, is another important component of conjoint analysis. 10:46:20 10:46:24 10:46:30

But no one -- you're asking, saying has -- did anyone win the Nobel Prize for putting all the pieces together? I don't think anyone has won the Nobel Prize for conjoint analysis, because I question whether or not it's Nobel-worthy. 10:46:34 10:46:36 10:46:40 10:46:42 10:46:44 10:46:47

Q There are other methods than conjoint analysis for eliciting individual preferences in decision-making, right? 10:46:55 10:46:56 10:46:56

A Yes. 10:46:57

Q Are the rules that apply to one technique for eliciting individuals' preferences, in particular to avoid biases, technical issues, those are not necessarily applicable to another technique; is that right? 10:46:57 10:47:11 10:47:13 10:47:17 10:47:20

MS. LEV: Objection. Vague. 10:47:22

A Well, it's -- the same basic economic principles span all models, in my belief, but obviously there are certain components and certain steps that are involved in one market research analysis which are not applied and applicable in another one, but in general I 10:47:30 10:47:36 10:47:41 10:47:45 10:47:47 10:47:53

would say the rules of economics hold for all models. 10:48:01 10:48:04
Q Other than in this litigation, you have been an expert in litigations previously; is that right? 10:48:15 10:48:16 10:48:21
A I have. 10:48:22
Q And in any of these litigations in which you served as an expert, have you offered an opinion dealing with conjoint analysis, again, other than -- other than this one? 10:48:22 10:48:25 10:48:27 10:48:30
A I have, yes. 10:48:35
Q Which cases are those? 10:48:36
A Would you like me to go through my CV? I don't remember them all. 10:48:38 10:48:39
Q So as you sit here today, you can't recall? 10:48:43 10:48:45
A No, I -- 10:48:47
MS. LEV: Mischaracterizes -- give me a beat to object. Objection. Mischaracterizes testimony. 10:48:48 10:48:49 10:48:51
A I said I do not remember all of them, and I asked if you wanted me to look at my CV to refresh my recollection. 10:48:53 10:48:55 10:48:58
Q If you -- if you need to, that's fine. If you want to look at your CV, and if 10:49:02 10:49:03

you can point me to litigations where you conducted a conjoint analysis, that would be helpful. 10:49:06 10:49:10 10:49:12

A Well, that's a different question that you just asked. 10:49:15 10:49:16

Q I just want to know if you conducted conjoint analyses as part of your work in previous litigations. 10:49:17 10:49:20 10:49:21

A That's a different question than you asked before, in that I have opined in several litigations about conjoint analyses, but I have not run a conjoint analysis within a litigation that I've testified about. 10:49:28 10:49:30 10:49:32 10:49:37 10:49:44

Q Okay. 10:49:47

Have you ever run a conjoint analysis? 10:49:54 10:49:56

A I have. 10:49:56

Q In what context? 10:49:59

A So it's -- I work at a firm called Alvarez & Marsal, and a large portion of Alvarez & Marsal is involved in business consulting, so helping businesses make decisions about things. 10:50:00 10:50:02 10:50:10 10:50:13 10:50:16

And there was a time where I was asked by some of my business consulting 10:50:19 10:50:21

colleagues to run a conjoint for one of their clients, which was used in concert with other market research that they had done. And I ran it, and that was presented to one of Alvarez & Marsal's clients. 10:50:25 10:50:27 10:50:34 10:50:37 10:50:40

Q Can you describe the methodology that you applied? 10:50:42 10:50:44

A What do you mean? 10:50:48

Q You said you conducted a conjoint analysis. I just want to know how you -- what you did to conduct the conjoint analysis. 10:50:49 10:50:51 10:50:53

A I followed -- 10:50:58

MS. LEV: Objection. Vague. 10:50:59

A I followed standard steps, but also it's -- I don't know if I'm at liberty to discuss the details behind some work that I did for another Alvarez & Marsal client. 10:51:01 10:51:06 10:51:10 10:51:13

Q Was it a choice-based survey? 10:51:18

A Yes. 10:51:19

Q And did you use a vendor like Qualtrics? 10:51:22 10:51:24

A I did not use Qualtrics. 10:51:25

Q Which vendor did you use? 10:51:28

A I think we used Sawtooth. 10:51:33

Q And you described what you said were 10:51:39

standard steps. That's correct? 10:51:40
A Yes. 10:51:42
Q How did you decide what those standard steps were? 10:51:46 10:51:48
A Through my years of experience studying conjoint analyses and the components of conjoint analysis. 10:51:51 10:51:52 10:51:56
Q Do you know if the conjoint analysis that you had performed here was used to set prices for anything? 10:51:58 10:52:01 10:52:04
A I believe that it was -- the client was asking about Alvarez & Marsal's opinion about what prices to be set, and that I provided one data point to go and assist in the -- that decision-making and advice. 10:52:11 10:52:12 10:52:20 10:52:23 10:52:29
How they went and used it, if they used it at all, I have no clue. 10:52:33 10:52:34
Q So is it fair to say that conjoint analyses can be used when setting a price for something? 10:52:42 10:52:47 10:52:52
A It is my opinion that under certain contexts and in certain situations, conjoint analyses can be used as one data point that can assist a company or institution in setting prices. 10:52:55 10:52:59 10:53:01 10:53:05 10:53:09

Q Does a conjoint analysis -- 10:53:14
A Sorry. I said that could be used to 10:53:15
assist them in doing it. 10:53:17
Q Okay. 10:53:23
So you described that there are 10:53:23
certain conditions that need to attain in order 10:53:27
to make use of conjoint analyses to set prices; 10:53:28
is that correct? 10:53:33
A I believe so, yes. 10:53:36
Q What are those conditions? 10:53:37
A I think that's too voluminous for me 10:53:41
to describe as I sit here. 10:53:45
Q Well, are there any conditions that 10:53:50
you believe weren't satisfied by Dr. Singer's 10:53:53
survey? 10:53:58
A I do. 10:54:00
Q What were those? 10:54:01
A Would you like me to read the 10:54:02
entirety of my report to you? 10:54:04
Q No. 10:54:07
I'm just asking you if, as you 10:54:07
described the conditions that you believe to be 10:54:12
necessary to use conjoint analyses to set 10:54:14
prices, what conditions you believe were not 10:54:19
satisfied by Dr. Singer's survey? 10:54:23

whether they're tied or forced together in some way. 12:53:51 12:53:55

And so therefore, under such a scenario, if you are looking at the relationship and identified that there is a relationship between the purchase of goods, that you need to study the totality of those goods, not just one of those goods. That's basic Economics 101. 12:53:57 12:54:02 12:54:04 12:54:09 12:54:12 12:54:15 12:54:19

Q So I just want to make sure I understood, because we took an intervening set of questions. 12:54:27 12:54:32 12:54:35

Is it your opinion that because certain of the students either decided to take a leave of absence or graduate, for example, that that is evidence that students don't experience lock-in? Is that -- did I get that right? 12:54:37 12:54:40 12:54:43 12:54:52 12:54:55 12:54:59

MS. LEV: Objection. Mischaracterizes his testimony. 12:54:59 12:55:00

A What -- the concept of lock-in means that people do not have a choice and they are forced to purchase a second product. 12:55:03 12:55:06 12:55:10

And so it's -- the things that you point to are evidence that at least some 12:55:22 12:55:24

people had choices. 12:55:29

There are probably other people who sat there and said, you know what, I just want to continue purchasing, because I -- that's the best option for me to do. 12:55:30 12:55:33 12:55:36 12:55:40

But that is an individualized decision, one; and two, requires one to analyze the whole stream of purchases, not just one purchase in that stream. 12:55:43 12:55:45 12:55:50 12:55:54

Q Would you agree that for a student who decided to reenroll for the fall of 2020, that deciding to try and apply to another school would be a potential barrier to leaving BU? 12:55:56 12:55:59 12:56:06 12:56:11 12:56:18

A There are costs to just about every economic decision anyone makes, and what one has to do and what consumers do is they weigh those costs against the benefits. 12:56:23 12:56:26 12:56:32 12:56:37

Q And so if I am facing the choice of going through an application process, potentially getting accepted, but potentially not getting accepted, at a university other than BU, and on the flip side, remaining at BU for my education, that represents a choice that I have to make, right? 12:56:41 12:56:44 12:56:49 12:56:52 12:56:54 12:56:59 12:57:10

A Everything is involved with choice, but one of the things is that another problem I have with Dr. Singer's analysis is that he goes and he assumes that people have concurrent choices of economic educational modalities, but that I am -- that most schools operated similarly to BU in the spring 2020 and the fall 2020, and so therefore, it is not like one could have a choice to go somewhere else and, in general, get a different educational modality. 12:57:12 12:57:16 12:57:20 12:57:28 12:57:32 12:57:35 12:57:44 12:57:51 12:57:55 12:58:00 12:58:02

Q And when we're talking about spring 2020, we're talking about March of 2020 in that context, right? 12:58:18 12:58:21 12:58:23

A We've talked about so much, I'm not sure what time -- because, again, you keep mixing time periods and talking about -- 12:58:24 12:58:26 12:58:27

Q Sorry -- 12:58:30

A -- spring and fall seasons. I'm not sure what the question is. 12:58:32 12:58:33

Q Yeah. 12:58:34

You were talking about because schools were operating similarly to BU in the spring and fall of 2020, that students wouldn't necessarily be able to just go to a different 12:58:35 12:58:39 12:58:42 12:58:47

school and face a different set of circumstances, and so I just wanted to get the timing right. 12:58:48 12:58:50 12:58:53

You mean -- when you say spring 2020, you mean March-April 2020 onward, right? 12:58:53 12:58:55

A I meant for the entire -- I meant for the entire semester, I think. 12:59:00 12:59:01

Q The entire spring 2020 semester? 12:59:09

A Yeah, because, again, most schools operated with the same modalities in the first portion of the spring 2020 semester, and they operated under the same but different modalities in the second half. 12:59:12 12:59:14 12:59:17 12:59:20 12:59:21

Q Got it, okay. 12:59:26

That was just -- 12:59:27

A I don't mean half but portion, sorry. 12:59:28

Q Understood. 12:59:31

So March time frame onward. 12:59:32

A Yes. 12:59:35

Q Okay. 12:59:35

Are you aware that BU administrators have testified in this case that they hadn't been able to predict or expect the COVID-19 pandemic prior to spring of 2020? 13:00:22 13:00:23 13:00:29 13:00:31

MS. LEV: Objection. 13:00:39

Foundation. 13:00:39

A I reviewed a bunch of deposition transcripts. I don't remember that quote in particular, but if you want to point me to such a quote, I'm happy to look at it and consider it. 13:00:46 13:00:49 13:00:52 13:00:53 13:00:56

Q I was just asking if you were aware of testimony to that effect. 13:00:58 13:01:00

A I've reviewed a lot of testimony. I don't recall that quote in particular as I sit here, but if you want to refresh my recollection, I would love it. 13:01:03 13:01:04 13:01:07 13:01:13

Q Well, if it's true that BU administrators didn't have any reason to expect or predict the COVID-19 pandemic prior to spring 2020, do you agree that they wouldn't have accounted for COVID-19 when setting their tuition policies, right? 13:01:16 13:01:18 13:01:21 13:01:25 13:01:32 13:01:36

MS. LEV: Objection. Foundation. 13:01:37 13:01:38

A Sorry, can you repeat the question? There was a ding in the middle of the question. 13:01:41 13:01:43

Q So I'm representing to you that BU administrators have offered testimony that they -- I'm not quoting, but that they did not 13:01:45 13:01:48 13:01:53

(Discussion off the record.) 14:42:07

THE VIDEOGRAPHER: We are back on the record. The time is 2:47. 14:46:56 14:46:57

BY MR. McDONOUGH: 14:47:05

Q So I think when we left off, I was asking you about whether you agree that the market price can accurately reflect aggregate consumer demand. 14:47:05 14:47:08 14:47:10 14:47:14

A I think I answered the question. 14:47:19

Q I didn't catch your answer. 14:47:22

A I think I answered the question. 14:47:24

Q Can you remind me what your answer was? 14:47:26 14:47:28

MS. LEV: Wait, is there a question pending? 14:47:29 14:47:30

Q Yeah. It's you'd agree that the market price can reflect aggregate consumer demand, right? 14:47:32 14:47:34 14:47:36

MS. LEV: Asked and answered. Objection. 14:47:37 14:47:39

A Do you want the court reporter to read back my answer to make this flow better? 14:47:41 14:47:42

MR. McDONOUGH: Yeah, please. 14:47:46

(Record read as requested.) 14:48:27

BY MR. McDONOUGH: 14:48:28

Q So in the scenario I outlined above where we are -- or assuming that there's a market price for something that's $8, and that's the price that anybody who wants to buy this thing is going to pay, where market price can be affected by aggregate consumer demand, imagine that my individual willingness to pay is actually $10, okay? 14:48:29 14:48:32 14:48:34 14:48:36 14:48:38 14:48:44 14:48:52 14:48:54

A Okay. 14:48:58

Q So you agree that a rational decision-maker in that scenario, though willing to pay $10, would still prefer to pay the $8 market price, right? 14:49:00 14:49:04 14:49:07 14:49:10

A So, first of all, I want to be clear that this hypothetical that you are asking me is different than the actual economic environment that exists within universities that charge individualized prices. So the question that you're asking is not relevant to university prices. 14:49:12 14:49:15 14:49:19 14:49:23 14:49:26 14:49:30 14:49:34

So just to say that specifically, that it -- it is -- in the hypothetical that you talk about, that consumers would be able to retain what's economically called their consumer surplus, but 14:49:36 14:49:39 14:49:46 14:49:53 14:49:56

one of the things that companies and 14:49:59
institutions try to do is they go and try to 14:50:01
set pricing so that they capture more and more 14:50:06
of that consumer surplus. 14:50:10

Q And my question was, you'd agree that 14:50:16
a rational decision-maker who was willing to 14:50:18
pay $10 would still prefer to pay the $8 market 14:50:20
price, right? 14:50:27

A I think they'd prefer to pay $2, but 14:50:27
whether or not that's what the market will bear 14:50:32
is another question. 14:50:34

Q So where the market price is $8, the 14:50:38
rational decision-maker who is willing to pay 14:50:40
10 would still prefer to pay the market price 14:50:41
of $8, right? 14:50:44

A In general, people -- well, let me 14:50:47
take a step back. 14:50:51

In that prices oftentimes have 14:50:56
signals, and so one of the things that I 14:51:00
discuss in my report, which has been written up 14:51:06
a lot within the educational economic 14:51:10
literature, is that because higher education, 14:51:17
and education generally, it is hard to 14:51:25
determine the quality of the education, that 14:51:27
what people -- that prices have been viewed as 14:51:35

a proxy for quality of education. 14:51:41
So therefore, it is possible -- 14:51:46
and one of the things people in the 14:51:51
literature -- higher education literature have 14:51:53
talked about is that schools are sometimes wary 14:51:55
of reducing list prices because then the 14:51:59
schools will be viewed as being of lesser 14:52:05
quality. 14:52:07
So to the extent that signals 14:52:09
are -- quality signals or signals of other 14:52:14
things are embedded within price, I disagree 14:52:16
with your hypothetical. 14:52:20
Q So that does in no way answer my 14:52:22
question. 14:52:27
So the question is, you'd agree 14:52:28
that the rational decision-maker who is willing 14:52:30
to pay $10 would still prefer to pay the $8 14:52:33
market price because it's lower, right? 14:52:38
A But if they believe that paying the 14:52:42
$10 will go and provide some signal of higher 14:52:45
quality education, I disagree with that 14:52:54
premise. 14:52:56
Q I didn't mention anything about 14:52:57
signals in the hypothetical, correct? 14:52:58
A But what you asked me was what a 14:53:00

rational person would do, and I am talking about a rational -- a consideration that a rational person would consider, which has been written up in the higher education literature. 14:53:03 14:53:06 14:53:11 14:53:14
Q And so you'd agree that that rational person would -- even though they're willing to pay 10, would rather pay $8 market price, right? 14:53:18 14:53:20 14:53:22 14:53:25
A No. I gave you a -- I'm sorry? 14:53:27
Q Do you disagree with that? 14:53:33
A What I did is I went and I said and gave you an example of if the person believes that the amount paid can be a signal about product quality, then they might have a different view of things in your hypothetical, so that because prices within education are sometimes used as signals, you cannot dismiss the possibility that I raise. 14:53:35 14:53:41 14:53:47 14:53:52 14:53:56 14:54:01 14:54:06 14:54:12
Q My hypothetical doesn't even remotely trigger the considerations that you've just articulated, but -- 14:54:21 14:54:24 14:54:28
A Well -- 14:54:30
Q I just want to know if someone acting rationally, even though they're willing to pay more for something, would still prefer to pay a 14:54:30 14:54:34 14:54:36

lower market price? It's a yes-or-no question. 14:54:39
A And what I am answering you is that 14:54:42
if you are talking about a product where there 14:54:46
is not a potential signal embedded in the 14:54:53
price, potentially, I agree with you. But that 14:54:58
is not the case oftentimes within higher 14:55:02
education. 14:55:06
So if you want to talk about a 14:55:07
hypothetical divorced from this case, I can 14:55:09
talk about it. 14:55:12
But if you want to talk about 14:55:13
the hypothetical relative to this case, I need 14:55:14
to bring up the signaling aspect. 14:55:16
Q So how many people are you aware of 14:55:20
who have offered to pay higher than the list 14:55:21
price for tuition at an educational institution 14:55:24
because they believe that that signals higher 14:55:27
quality to the world? 14:55:30
A What I -- 14:55:31
Q Zero. 14:55:32
A What I am -- 14:55:32
MS. LEV: Just a minute. 14:55:34
Counsel, is there a question pending? Because 14:55:35
it sounds like you're answering your own 14:55:38
question. 14:55:39

Q We'll get -- 15:58:08
A Let me -- if I can answer. 15:58:09
Q Let -- 15:58:12
A One of the things that you see -- 15:58:13
Q Let me just -- let me just ask you -- 15:58:15
(Simultaneous speech.) 15:58:16
(Reporter interruption.) 15:58:16
Q So please answer yes or no, if you can, and then I guarantee you I will let you follow up. 15:58:26 15:58:29 15:58:32
A What is the question? 15:58:33
Q Okay. 15:58:34
So the -- this is a yes-or-no question, and if you can't answer yes or no, okay. But you say that -- survey -- Dr. Singer's survey presents a series of list prices and asks respondents to make a selection, mentally considering their own financial aid situation, right? 15:58:34 15:58:35 15:58:38 15:58:46 15:58:49 15:58:52 15:58:56
A Their belief about their financial aid situation, which could differ from the actual situation. 15:59:00 15:59:02 15:59:05
Q Okay. 15:59:07
Now, you wanted to follow up with a qualifier. 15:59:09 15:59:10

A Well, it's -- again, it was kind of along the lines of what I just qualified in that people's beliefs about what their financial aid could be frequently is different than what they actually receive, and that's why studies have shown you need to be concrete about the numbers that are talking about, and Dr. Singer is not concrete with what the numbers of payments are. He just says there is some number that is going to be adjusted. 15:59:12 15:59:16 15:59:21 15:59:24 15:59:29 15:59:33 15:59:37 15:59:41 15:59:44 15:59:50

So that -- this is like saying here is the MSRP for a car, figure out what you're going to pay for it. But often, people don't pay MSRP for a car, and you need to take into account a variety of factors, which Dr. Singer does not provide any guidance, any substantive guidance to his survey respondents about. 15:59:55 15:59:57 16:00:01 16:00:06 16:00:09 16:00:13 16:00:15 16:00:19

Q So if you were to propose modification to this instruction, how would you revise it to reflect what you think is an accurate instruction? 16:00:22 16:00:23 16:00:28 16:00:31

A I haven't even considered that. 16:00:34

Q Okay. 16:00:36

Do you think it could be done? 16:00:37

A One of the things that Dr. McFadden says is that you need to present prices within the proper buying context, and so I know that this is not the proper buying context. 16:00:41 16:00:44 16:00:48 16:00:53

I have not considered how to create the proper context on a uniform basis because the context is so individualized. 16:00:56 16:00:59 16:01:06

Q You haven't done your own conjoint or any survey that -- of the set of respondents to see how changing this prompt would impact the results of Dr. Singer's survey, right? 16:01:13 16:01:15 16:01:20 16:01:24

A Neither has Dr. Singer. 16:01:28

Q Well, you haven't done your own study. 16:01:32 16:01:34

MS. LEV: Objection. Asked and answered. 16:01:37 16:01:38

Q You haven't done your own -- you haven't done your own study applying the features and aspects that you believe to be important that Dr. Singer did not to see how -- to see whether there's any impact on results, right? 16:01:38 16:01:40 16:01:42 16:01:44 16:01:49 16:01:51

A Well, I didn't, because for all the reasons that I've enumerated in the reports and we've talked about for a couple hours, I think 16:01:53 16:01:57 16:02:00

even if you got results, they would be irrelevant and not applicable to the situation. 16:02:02 16:02:04
So I didn't do it because if I did it, the answer still would be meaningless. 16:02:08 16:02:12
Q How do you know? 16:02:15
A Because of the individualized nature, because this is a hypothetical. Because of focalism bias, because of lots of things I wrote in my report. 16:02:19 16:02:22 16:02:25 16:02:29
Q So is it your view that effectively you can't do a survey to estimate damages in this context? 16:02:30 16:02:33 16:02:35
A No, I'm not saying that. I'm saying that Dr. Singer's analysis doesn't get there, and making minor tweaks to Dr. Singer's survey and conjoint analysis, as you described, I don't think would get you there. Whether there are wholesale changes that could be done that might be able to do something, that's not something I considered. 16:02:36 16:02:39 16:02:45 16:02:48 16:02:53 16:02:55 16:03:00 16:03:03
Q So you haven't done an analysis to show that had you taken the approach you would advocate for a survey study, you would find a different set of results than what Dr. Singer found, correct? 16:03:10 16:03:11 16:03:16 16:03:20 16:03:22

A I did not have to do a survey, because the economic literature on higher education proved this point out in multiple ways. 16:03:23 16:03:25 16:03:27 16:03:32

Q Because the economic literature of higher education studied the tuition impact of COVID-19 at Boston University in the spring of 2020? 16:03:36 16:03:38 16:03:41 16:03:45

A What the economic literature on higher education has done is studied greatly about how list prices, net prices and other fees, fees and tuition, how framing affects go and can radically change results. 16:03:46 16:03:49 16:03:53 16:03:57 16:04:03

Q So you'd agree that's a framework with which to approach a problem, right? 16:04:09 16:04:10

A I agree that framing of -- the proper framing of tuition and fees that people actually pay out of pocket is an important factor that one needs to consider throughout an economic analysis of tuition and fees. 16:04:16 16:04:24 16:04:28 16:04:32 16:04:36

Q But you didn't actually do the test to see if that, in fact, changed the results that Dr. Singer observed, correct? 16:04:40 16:04:42 16:04:44

MS. LEV: Objection. Asked and answered. 16:04:47 16:04:49

A There is -- I think I have a quote from a higher education source saying that things based upon list prices without being specific about net prices gives you exaggerated and uninformed responses. 16:04:51 16:04:55 16:05:01 16:05:04 16:05:10

So therefore, I did not -- if you're asking did I go and verify this inclusion that basing something on list prices gets exaggerated and uninformed results, I didn't do that. 16:05:11 16:05:13 16:05:20 16:05:23 16:05:27

But I'm relying on the literature of people who have studied this particular point. 16:05:28 16:05:29 16:05:31

Q Did those people do survey studies to assess the impact of COVID-19 on tuition preferences -- 16:05:40 16:05:43 16:05:46

(Technical difficulties.) 16:05:47

(Reporter clarification.) 16:05:56

Did the references that you just referred to study the impact of COVID-19 on tuition preferences at Boston University in the spring of 2020? 16:05:57 16:05:58 16:06:03 16:06:07

A They did not look at the specific thing that you talked about. They just went and did broad conclusions that I see no reason 16:06:09 16:06:11 16:06:13

would not impact the framing of the situation you describe. 16:06:19 16:06:22

Q But you haven't tested whether that is in fact the correct assumption, right? 16:06:24 16:06:25

A I have not gone and verified as a -- let me put it a little bit differently. 16:06:30 16:06:39

Dr. Singer has not gone and shown that this economic principle does not hold in the situation you described. 16:06:40 16:06:43 16:06:46

Q My question was, did you go and study whether the assumptions that you're making based on literature were in fact correct, and that if you did a study applying those principles, you would find a different result than what Dr. Singer did? 16:06:49 16:06:52 16:06:55 16:07:00 16:07:02 16:07:04

A I did not go and verify well-accepted economic principles, but neither did Dr. Singer go and disprove that well-accepted economic principles did not exist in the situation he described and analyzed. 16:07:07 16:07:12 16:07:15 16:07:20 16:07:21

MR. McDONOUGH: I'm sorry, while I'm rearranging things, how long have we been on the record? 16:08:15 16:08:17 16:08:19

THE VIDEOGRAPHER: Give me one second to add the most recent... 16:08:27 16:08:27

About four hours and seven minutes. 16:08:33 16:08:37
MS. LEV: Conor, how much more do you have a sense you'll go? 16:08:41 16:08:43
MR. McDONOUGH: It's hard to say. Again, I think I have a fair amount. 16:08:47 16:08:48
BY MR. McDONOUGH: 16:09:17
Q Page 22 of your report? 16:09:18
A 2-2 of my report? 16:09:21
Q Yup. 16:09:23
A Okay. 16:09:24
Q The very bottom -- 16:09:26
A Hold on. I'm not at the page. Okay, I'm there, yes. 16:09:28 16:09:30
Q The very bottom paragraph, it starts: "Consequently, the Singer analysis is further flawed." 16:09:31 16:09:36 16:09:39
Do you see that? 16:09:40
A Yes. 16:09:40
Q And the sentence as a whole reads: "Consequently, the Singer analysis is further flawed because it only analyzed the supposed decisions of individuals who enrolled or intended to enroll in college." 16:09:42 16:09:44 16:09:45 16:09:49 16:09:50
A Yes. 16:09:53

Q And then it continues: "Dr. Singer did not survey the parents of such individuals who often have strong influence on the college decision" -- and then proceeding to the next page -- "nor did he analyze the individualized dynamics of the group decision making underlying a student's college choice." 16:09:54 16:09:56 16:09:58 16:10:02 16:10:07 16:10:10 16:10:11
Did I read that correctly? 16:10:15
A Yes. 16:10:16
Q Okay. 16:10:18
Do you have a basis to believe that parents or other payors would have a different preference or willingness to pay from the BU student respondents? 16:10:18 16:10:20 16:10:27 16:10:33
A If you look at the sentence prior to the one that you read, I cite to a paper that discusses how parents have different financial considerations than students. 16:10:37 16:10:41 16:10:48 16:10:56
Q Do you know if that -- do you know if there's a difference between payors or parents and their willingness to pay from BU student respondents? 16:11:05 16:11:09 16:11:14 16:11:22
A The sentence that I just described says that in general, parents view the finances of an education different than students. 16:11:24 16:11:26 16:11:35

Q Do you -- but do you have a basis to conclude that there's a difference in willingness to pay as between those students and parents or other payors? 16:11:42 16:11:44 16:11:46 16:11:48
A Well, it's effectively, that's the same thing in that financial constraints means that -- again, with the way this is constructed in this conclusion, is that parents have a lower willingness to pay than students. That's effectively what this sentence says, in general. 16:11:53 16:11:55 16:12:00 16:12:06 16:12:12 16:12:15 16:12:18
Q What basis do you have to conclude that that principle would be applicable to payors and parents for BU students as opposed to BU students? 16:12:27 16:12:30 16:12:33 16:12:37
A Again, this is like the answer to the question before, in that what I do is I went and I cited to one source -- and I could have put in other sources -- showing a basic economic principle that goes across higher education. 16:12:42 16:12:43 16:12:48 16:12:56 16:12:58 16:13:10
I did not go and question whether or not that economic principle was violated -- I'm sorry, I did not question whether that principle did not hold in -- at BU 16:13:10 16:13:12 16:13:15 16:13:18

for the spring 2020 semester. 16:13:24
Similarly, but more importantly, Dr. Singer did not show that this principle did not hold, which would be required for him to show that his basis had -- his model has any basis in reality. 16:13:27 16:13:29 16:13:31 16:13:35 16:13:40
Q Did you conduct -- I take it you didn't conduct a survey of your own to see if BU parents or payors had a different willingness to pay from BU students around the time of the spring 2020 semester? 16:13:43 16:13:46 16:13:49 16:13:51 16:13:56
A I did not conduct my own independent analysis confirming this conclusion. 16:14:01 16:14:05
But, more importantly, Dr. Singer would need to demonstrate that this basic economic principle would not hold in the situation you described, which he didn't do. 16:14:09 16:14:11 16:14:13 16:14:17
Q So you're -- but you're making a claim that this principle applies and assuming it does, right? 16:14:22 16:14:24 16:14:26
A What I am doing is I am going and saying this is a principle that experts have found exists throughout higher education. 16:14:27 16:14:34 16:14:36
I have not tested to see that it holds in all situations, but effectively, what 16:14:41 16:14:44

Dr. Singer's model does is Dr. Singer's model assumes that this generally accepted principle does not hold in -- at BU in the semester. 16:14:50 16:14:56 16:15:00

So therefore, it is much more incumbent upon Dr. Singer to go and demonstrate a well-recognized fact doesn't exist than for me to confirm a well-recognized fact. 16:15:04 16:15:06 16:15:09 16:15:12

Q When you describe it as a "well-recognized fact," you're talking about the point being offered by the parents' role in the college admission process that you cite at footnote 109? 16:15:15 16:15:17 16:15:19 16:15:24 16:15:28

A So that is one cite that goes and explains this principle, but if you want, I can provide you with other cites. 16:15:32 16:15:34 16:15:37

Q Well, in your report you cite the parents' role in the college admission process, right? 16:15:39 16:15:41 16:15:45

A One of the -- that is what I specifically cited to. 16:15:45 16:15:49

Q Okay. 16:15:51

A But if you wanted me to cite to everything that went and supported the statements here, my report would be five times as long. 16:15:51 16:15:53 16:15:56 16:15:59

I went and I tried to be brief but complete. If you want me to be more expansive, I'm happy to be more expansive. 16:16:02 16:16:05 16:16:10

Q I just want to make sure that your report set out the bases for all your opinions, so I just -- if it's not in the report, it's not in the report. 16:16:13 16:16:15 16:16:18 16:16:22

But what you cite here, I'm accurately relating this, The Parents' Role in the College Admission Process -- 16:16:23 16:16:25 16:16:27

A That -- 16:16:28

Q -- and you cite -- 16:16:30

A I said -- I said that is the basis that I cite in my report, but it's by no means the exclusive basis based upon my knowledge of the industry. 16:16:32 16:16:34 16:16:37 16:16:40

Q Okay. 16:16:40

So based upon what you claim to be a fact established by The Parents' Role in the College Admission Process, you don't see -- you didn't see a reason to test whether the premise being offered in this Parents' Role in the College Admission Process in fact held true for BU parents relative to students and willingness to pay at the time frame of the 16:16:41 16:16:43 16:16:51 16:16:53 16:16:56 16:16:59 16:17:01 16:17:04

spring 2020 semester, right? 16:17:08
A As I said, I did not test it, 16:17:12
because, again, this is something that 16:17:13
people -- I did not prove -- I did not feel it 16:17:17
was necessary to go and prove things that 16:17:20
people believe, but I think it is more 16:17:25
incumbent upon Dr. Singer to disprove what 16:17:29
people believe in order to demonstrate the 16:17:33
validity of his model. 16:17:36
Q So would you -- is it true that 16:18:05
the -- do you have any basis to dispute that 16:18:10
utility of the college experience -- of a 16:18:13
parent or payor is a function of the student's 16:18:21
utility? 16:18:24
MS. LEV: Objection. 16:18:34
Foundation. 16:18:35
You can answer. 16:18:35
A I'm just laughing because -- so 16:18:37
it's -- I had coffee with my father yesterday 16:18:38
morning, and while I long for the time when my 16:18:41
kids were in diapers, like the two of yours 16:18:48
are, it's a -- well, some aspects of it, so -- 16:18:53
so my kids are getting close to college age, 16:18:59
and one thing my father said to me just out of 16:19:03
the blue when we were going to talk about my 16:19:06

kids in college, he went and he said, you know what, paying for an education is one of the best things that you can give a kid, so that that -- that statement shows that he went and he garnered benefits. He went and he got enjoyment out of the education that he was able to provide to my sister and I. 16:19:08 16:19:11 16:19:14 16:19:21 16:19:28 16:19:32 16:19:36

And so therefore, I'm using that as an example of where the benefits of college are not solely focused on the student. 16:19:39 16:19:42 16:19:49

Q Well, if the student doesn't get any utility because they don't go to college, I would assume that whoever would be paying for that can't get utility from something that doesn't exist? That's a fair statement, right? 16:19:58 16:19:59 16:20:01 16:20:03 16:20:07

A If some -- well, first -- 16:20:16

Q I can't get any economic utility from going to college if I don't go to college, right? 16:20:18 16:20:20 16:20:22

A Maybe. I don't know. 16:20:27

Q Well -- you're saying that the -- using your anecdote from your father, his -- what you would -- I think you're assigning as his utility was some manner of reward for the experience of knowing his children were going 16:20:29 16:20:35 16:20:38 16:20:41 16:20:48

to college. 16:20:50
Is that -- is that an accurate 16:20:50
statement? 16:20:52
A My -- since my father gained utility 16:20:52
from the fact that his kids went to college, 16:20:55
yes. 16:21:00
Q Okay. 16:21:00
That anecdote aside, do you 16:21:02
think that that serves as a basis to dispute 16:21:07
that, as a general matter, there is never a 16:21:11
function -- never a relationship between the 16:21:13
utility the student experiences and the utility 16:21:16
a parent experiences? 16:21:21
A I'll give you another anecdote. 16:21:25
When I was a professor, I tried 16:21:31
to in all instances attend commencement, and 16:21:35
what I did is I put on my academic garb, put on 16:21:41
my robe, and I just sat on the stage. I did 16:21:45
nothing, just -- literally, I was a stage prop. 16:21:48
And the reason I did that, not 16:21:52
to give up a Saturday afternoon, but I went and 16:21:56
I loved the fact and I was able to revel in the 16:21:59
fact that everyone was so happy there. 16:22:03
Students were happy, families were happy, 16:22:08
friends were happy, because someone graduated 16:22:09

from college. And that gave me a lot of enjoyment, so I gained utility from the fact that I observed other people completing a college experience. 16:22:13 16:22:22 16:22:24 16:22:28

Q Right. 16:22:33

So we've agreed you've got these anecdotal experiences about how you or your father reports reward or enjoyment from the fact of other people attending college. But my question is a little different, because it -- my question is, do you have a basis to dispute that as a general matter, payor utility or -- the utility a parent or payor experiences is never a function of the student's utility? 16:22:34 16:22:36 16:22:38 16:22:42 16:22:45 16:22:47 16:22:50 16:22:56 16:22:59

A Oh, no -- again, obviously student utility matters, but one of the things that you're talking about here is a couple of things. First is, is it only student utility that matters. 16:23:06 16:23:09 16:23:11 16:23:14 16:23:19

And secondly, you sometimes have a -- if I went to the store and I bought a television, most likely I am the one who receives a utility and a benefit from the television, and I'm the one who pays, so that those two things are encapsulated in one 16:23:20 16:23:23 16:23:33 16:23:37 16:23:41 16:23:47

person. 16:23:49
With universities, you have a divergence of that, in that you have some -- sometimes you have where one individual is the one who receives the ben- -- most of the benefits or a large portion of the benefits, and another person who pays. 16:23:52 16:23:54 16:23:57 16:24:02 16:24:05 16:24:07
And when you have that diversion of, for lack of -- I'm going to say benefiter and payor, that creates some differences that I'm talking about here in this section. 16:24:10 16:24:12 16:24:17 16:24:24
Q But again, my question is a little different. 16:24:32 16:24:35
A Okay. 16:24:35
Q My question isn't whether -- whether payor or parent utility is only a function of student utility. It's do you have a -- any reason to dispute that as a general matter, a parent's utility can be a function of the student's utility? 16:24:36 16:24:38 16:24:41 16:24:44 16:24:51 16:24:54
A Yes, a parent's utility can be a function of what students -- student's utility, yes. It can be. 16:24:59 16:25:04 16:25:09
Q So in that -- in that framework, you'd agree that surveys like Dr. Singer's can 16:25:30 16:25:33

capture the views of payors or parents indirectly, right? 16:25:40 16:25:42

A No. 16:25:45

Q It cannot capture the views of parents or payors indirectly? 16:25:47 16:25:50

A Because one, you don't know how much -- I'm going to say transferred utility parents might get. Furthermore, sometimes -- again, not always -- sometimes students don't really know how much potential financial pain parents might have, and so their decisions are irrelevant to the financial pain that parents might face, or other payors. 16:25:53 16:25:54 16:26:01 16:26:07 16:26:11 16:26:21 16:26:26 16:26:29

Q I think we've already -- we've already agreed that you didn't conduct your own survey to see whether differences exist between the utility experienced by the student and the utility experienced by a parent, right? 16:26:34 16:26:36 16:26:37 16:26:41 16:26:44

A Again, it's the same answer as before, in that the higher education economic literature goes and shows that there are differences between parents and students in how -- but to the extent that parents are payors -- and that that's a general principle. 16:26:51 16:26:52 16:26:57 16:27:01 16:27:06 16:27:08

I did not go and conduct any 16:27:15

independent research to verify that principle, but it is more incumbent on Dr. Singer to demonstrate that that principle does not hold because that is what is required in order for his model to make any sense. 16:27:17 16:27:20 16:27:24 16:27:26 16:27:28

Q And that assumes that the principle that you're describing actually applies to the scenario that Dr. Singer studied, right? 16:27:39 16:27:41 16:27:46

A It is incumbent upon Dr. Singer to demonstrate that the principle -- that the well-accepted principle does not apply. That's what I'm saying. 16:27:51 16:27:54 16:27:56 16:27:59

Q Did you demonstrate that it does? 16:28:00

MS. LEV: Objection. Asked and answered. 16:28:02 16:28:03

A I demonstrated through one example, but I'm happy to provide more examples, of this is a common belief throughout the higher education literature. 16:28:10 16:28:11 16:28:14 16:28:17

That's what I did show. 16:28:18

Q But you cited The Parents' Role in the College Admission Process in your report. That's what you're offering as the proof of this point? 16:28:23 16:28:25 16:28:27 16:28:29

A Again, I went and I provided what I 16:28:34

believe to be a sufficient basis behind the point. 16:28:37 16:28:39

If you would like me to provide other bases to go and supplement that, I'm happy to do that. 16:28:39 16:28:42 16:28:46

Q You're -- it's correct to say you're making an assumption, that in your view is justified, that the conclusions articulated in The Parents' Role in the College Admission Process apply to parents' versus students' utility, right? 16:28:51 16:28:53 16:28:56 16:29:01 16:29:04 16:29:08

A I am going and I am stating a general economic principle that I see no reason why does not hold in the particular situation. But if you would -- you or Dr. Singer would like to provide me with some evidence that either of you believe that this general economic principle does not hold in a particular situation, I'm happy to consider it. 16:29:14 16:29:21 16:29:26 16:29:29 16:29:32 16:29:36 16:29:38 16:29:40

Q I'm not bringing the case, so it's -- I am not the expert. 16:29:46 16:29:48

MR. McDONOUGH: We've been going a little under an hour. Maybe go for another five or so minutes, and then we can take another break? 16:30:04 16:30:04 16:30:07 16:30:09

MS. LEV: Sounds good. 16:30:12

MR. McDONOUGH: Or we -- I have that right. Actually, wait, we've been going over an hour, haven't we? 16:30:14 16:30:15 16:30:18

MS. LEV: Time flies when you're having fun, Conor. 16:30:20 16:30:21

THE VIDEOGRAPHER: About 48 minutes. 16:30:23 16:30:24

MR. McDONOUGH: Oh, all right. So that's in line with what I thought. Okay. 16:30:25 16:30:25

Why don't we take a break now and come back in maybe, I don't know, five minutes. 16:30:32 16:30:34 16:30:36

MS. LEV: Okay. 16:30:40

MR. McDONOUGH: 4:35. 16:30:40

MS. LEV: Yup. 16:30:42

THE VIDEOGRAPHER: The time is 4:30. We are going off the record. 16:30:43 16:30:44

(Recess.) 16:30:46

THE VIDEOGRAPHER: We are back on the record. The time is 4:40. 16:40:42 16:40:42

BY MR. McDONOUGH: 16:40:47

Q Dr. Wilner, welcome back. 16:40:47

I'd like to turn your attention to the Exhibit Share. We're -- I guess -- I 16:40:50 16:40:51

major impact. 17:04:39

Q And the column that you present here, just limiting the consideration to class modality attribute, that is describing a scenario where students had access to the physical campus facilities, right, versus online courses; is that right? 17:04:44 17:04:47 17:04:50 17:04:52 17:05:02 17:05:07

A I am not going and saying that this is -- that this properly describes campus access attribute. I'm not saying that this calculation does, not in any way, shape or form. I'm not making such a conclusion. 17:05:11 17:05:13 17:05:19 17:05:21 17:05:23

All I'm doing is showing how much that one attribute, which is misdescribed, goes and affects alleged damages. That's all I'm trying to do. 17:05:27 17:05:30 17:05:34 17:05:37

Q So it -- if you change or if you rather -- if you just ignore everything about access -- the physical access to campus facilities attribute, this column is showing a change in the damages estimate; is that -- is that accurate? 17:05:40 17:05:46 17:05:48 17:05:51 17:05:54 17:06:00

A If one assumes that Dr. Singer's model is correct, which I do not believe, and I think the evidence clearly shows that it is 17:06:00 17:06:04 17:06:08

inaccurate. But if you believe his model, his model is so sensitive to proper descriptions that damages change by 75 percent by just changing one attribute. 17:06:14 17:06:17 17:06:23 17:06:27

So this goes and demonstrates a qual- -- further demonstrates a qualitative point I made in my report that is supported by the literature in that you have to be very exacting about the way in which you describe attributes, the way in which you describe attribute values, and how slight changes can have a significant impact on results. 17:06:29 17:06:32 17:06:35 17:06:38 17:06:42 17:06:45 17:06:48 17:06:52

Q What was changed about the attribute description? 17:06:57 17:06:59

A What I am -- so it's -- in what we were talking about before, I think it was on page 56, I went and I said how the class access attribute description that Dr. Singer did was wrong and did not properly describe the situation that existed after BU's transition to virtual education. 17:07:04 17:07:07 17:07:09 17:07:16 17:07:20 17:07:24 17:07:29

Q But you didn't conduct your own study to show that if you used a definition or a description of that attribute you prefer, that there would be any impact on the survey 17:07:32 17:07:34 17:07:35 17:07:38

responses, correct? 17:07:40
A I did not do my own independent calculations to go and -- I did not do my own primary research to figure out how different descriptions would have impacted damages. 17:07:42 17:07:44 17:07:54 17:07:57
I'm just showing in this figure how one incorrect description had an impact. 17:08:00 17:08:03
And if Dr. Singer wants to go and show that there are no differences, I welcome that, and I'm happy to respond to it. 17:08:07 17:08:09 17:08:17
But I'm just showing how one incorrect description can have a major impact on damages. 17:08:20 17:08:21 17:08:24
Q The portion that you show here is what happens if you just ignore what you described as the incorrectly described attribute, right? 17:08:27 17:08:29 17:08:33 17:08:39
A So it's effectively I am eliminating that incorrect -- well, I take a step -- 17:08:40 17:08:43
It does and it doesn't, because by going and including an improper attribute in a conjoint study, what that does is that can go and bias the utilities and preferences for all attributes in a study. 17:08:46 17:08:55 17:09:01 17:09:05 17:09:10
So, first of all, I think that 17:09:12

his incorrect attribute biases everything. But if you go and take what he did and effectively ignore this incorrectly described attribute, you get the results I show in the column in my Exhibit 7a -- Figure 7a. 17:09:15 17:09:19 17:09:26 17:09:31 17:09:35

Q So if it turns out you're wrong and Dr. Singer's description of the campus attribute is correct or accurate, how does that impact your analysis? 17:09:44 17:09:49 17:09:50 17:09:58

A Well, it's -- I think that his calculations are wrong for a multitude of reasons, and so if it turns out that somehow he shows that his attribute's properly described, even though actual real-world data shows that it is improperly described, if he's able to do that, all of my other critiques still hold. 17:10:02 17:10:05 17:10:08 17:10:16 17:10:22 17:10:26 17:10:29

Q And in Figure 7a, the column that you've presented here, alleged damages based on just the class modality attribute, you're not -- what you're not -- 17:10:34 17:10:38 17:10:41 17:10:46

What you've done is remove from consideration results that are attributed to the campus access attributes responses as Dr. Singer proposed them, right? 17:10:49 17:10:51 17:10:56 17:11:00

A I've removed some but not all. 17:11:04

Q So you didn't, for example, introduce a different definition of campus access attributes and then run the study with the class modality attribute as well to come up with an assessment of whether Dr. Singer's results would be changed, right?
A I did not do my primary -- I did not do any primary research to generate new data, no.
Q And what you -- you said there are certain miscalculations aside from the misdescription of the campus access attribute.
What were those miscalculations?
A So it's as I said before, that if you go and misdescribe an attribute, that goes and can bias people's preferences for all attributes in the study.
So therefore, even if one solely looks at the class modality attribute, the data involving that attribute could be biased because survey respondents were asked about improperly described campus access attribute.
Q So you're not -- you're not disputing Dr. Singer's mathematics? You're disputing that the -- some of the inputs to his

mathematics are flawed and that those flaws impact the accuracy the calculations generated? 17:12:38 17:12:42
A Could you repeat that question. 17:12:50
Q You're not disputing that the numbers that Dr. Singer generated, that he crunched those numbers correctly. 17:12:52 17:12:56 17:13:00
Your view is the numbers themselves that he perceived were impacted by what you claim to be an inaccurate characterization of one of the attributes on the survey, right? 17:13:01 17:13:02 17:13:08 17:13:11 17:13:13
A Based upon the best of my recollection, we were able to replicate all of the -- maybe not all, but we were able to replicate with a plus or minus all of Dr. Singer's calculations. 17:13:15 17:13:18 17:13:24 17:13:30 17:13:36
But what I am primarily doing is saying that because he went and conducted an improper analysis, the data he generated were wrong, and he did improper calculations based upon the incorrect data he generated, his -- his analysis generated. 17:13:39 17:13:42 17:13:47 17:13:51 17:13:55 17:13:58
Q Okay. 17:14:01
So I think that's where I want to make sure I understand. 17:14:02 17:14:03

When you say he did improper calculations, it's not that the math he did was wrong; it's that the input to the math that he used was wrong, right? 17:14:04 17:14:05 17:14:08 17:14:10

A Both the inputs were incorrect because of his descriptions, and he went and conceptually performed improper mathematical calculations. 17:14:13 17:14:16 17:14:23 17:14:31

Q Again, that's where I'm getting a little confused. 17:14:33 17:14:35

You're not saying he added two and two to equal five. You're saying that the numbers he should have added weren't two and two? 17:14:38 17:14:40 17:14:43 17:14:44

A No. It's -- what I'm saying, using your analogy, is twofold: 17:14:46 17:14:52

First is that -- and, again, this is not what he did, but I'm just kind of trying to play off your analogy, is that -- 17:14:54 17:14:58 17:15:01

(Simultaneous speech.) 17:15:03

Q Let me -- you had said something like the conceptual mathematics that he applied were not correct. I don't -- I don't know what that means. 17:15:04 17:15:07 17:15:10 17:15:12

A So it's -- again, if I can sit there 17:15:13

and kind of use your analogy, I think that 17:15:14
can -- describe it but that is not in 17:15:17
particular what he did. So that what I am 17:15:22
saying is that his survey and conjoint analysis 17:15:26
generated two and two. Or let's say generated 17:15:35
two and three, and that I think his generations 17:15:40
of two and three are wrong. That's step one. 17:15:47
Second thing is then he went and 17:15:53
he added, let's say, two and three together to 17:15:54
get five. 17:16:00
But what I'm saying is that it 17:16:01
is very possible that instead of adding two and 17:16:02
three, he should have multiplied two and three 17:16:08
to get an answer of six instead of five. 17:16:13
So that he went and he -- I 17:16:16
think. I'm not certain. I need to recheck the 17:16:21
calculations, but I think he added two and 17:16:24
three properly, but the question is, is it 17:16:26
proper to add those things the way that he did. 17:16:29
Does that make sense? 17:16:34
Q And so looking at the -- the 17:16:35
calculations that you contend Dr. Singer didn't 17:16:37
do correctly, where is that -- where are you 17:16:41
indicating that that error is in Dr. Singer's 17:16:45
calculations? What should he have done 17:16:49

differently, other than change the attribute description that you dispute? 17:16:51 17:16:53

A Well, I'd do lots of things, but one of those things is that it is improper to add in the effects of an improperly described attribute. 17:16:59 17:17:01 17:17:07 17:17:14

Q My question -- set that aside. 17:17:15

Is there -- where else has he done -- where else is it improper to do the -- the mathematics, or is that it? 17:17:20 17:17:22 17:17:24

A That's what I can think of as I sit here. But, again, literally, I went and skimmed a rough draft of a deposition where he brought up this point, and I did not have the full time that I normally would to consider and review and look at all the potential flaws in what Dr. Singer said. 17:17:29 17:17:31 17:17:36 17:17:41 17:17:46 17:17:50 17:17:57

Q Okay. 17:18:03

I want to go back -- we were talking about the potential of whether there's a difference in the utilities that a student experiences as opposed to a parent or payor; do you recall that? 17:18:06 17:18:07 17:18:12 17:18:17 17:18:23

A Well, what's -- 17:18:25

(Simultaneous speech.) 17:18:27

(Reporter interrupted.) 17:18:35
A I remember what you were saying, that 17:18:36
discussion of parents versus students. 17:18:38
Q Yes. 17:18:41
A But you threw the word "payor" in, 17:18:41
which I don't know if is applicable, because it 17:18:43
requires an individualized analysis to 17:18:48
determine who the payors are, and that is not 17:18:51
something that I have seen how it is done, and 17:18:55
would be necessary in order to calculate 17:19:00
damages -- alleged damages of a putative class 17:19:03
member, and I believe that determining who the 17:19:06
payors are -- 17:19:09
Q Sir, I haven't -- I haven't asked you 17:19:12
a question about any of that. I'm just asking 17:19:14
if you recall what we were talking about so 17:19:16
that I can ask you some follow-up questions. 17:19:18
So there wasn't really a question pending. 17:19:20
A Again -- 17:19:26
MS. LEV: Counsel, I think you 17:19:27
did ask him a question, and the witness is 17:19:28
responding to your question. 17:19:29
(Simultaneous speech.) 17:19:31
(Reporter interrupted.) 17:19:54
BY MR. McDONOUGH: 17:19:55

A So that Dr. Singer admits that BU is -- can be described by at -- by more than four attributes, at a minimum. 17:52:42 17:52:47 17:52:52

Q So -- 17:52:59

A And -- 17:52:59

Q Just to make sure I understand, because the sentence doesn't say "BU." 17:52:59 17:53:00

It just says Dr. Singer assumed without analysis that universities, plural, can be described by five attributes. 17:53:03 17:53:05 17:53:07

A If you would prefer -- I was talking generally, but if you want to sit there and substitute in "BU" for "universities," I would have no problem with that. 17:53:11 17:53:15 17:53:19 17:53:23

Q That's because Dr. Singer's survey was specific to BU, right? 17:53:26 17:53:27

A Well, he went and -- I'd need to look at the way his survey was conducted, but -- 17:53:35 17:53:37

I'm sorry, yes, most likely it's because he's specific to BU. 17:53:45 17:53:46

Q Okay. 17:53:51

And -- is it -- do you take issue with the number of attributes that he selected? 17:53:55 17:53:59 17:54:04

A If you look at the block quote below 17:54:07

that sentence that you read, effectively what it -- what that block quote says is that doing the -- doing the conjoint analysis calculations that Dr. Singer did comes up with inaccurate figures if the product in question has four or more attributes. 17:54:10 17:54:14 17:54:19 17:54:23 17:54:28 17:54:32

Q Where does it in that block quote say that there's an inaccurate outcome? 17:54:37 17:54:40

A So what that block quote says is respondents do not utilize a certain decision-making rule if there are more than four attributes, four or more attributes. 17:54:45 17:54:49 17:54:53 17:54:55

And then what I say prior to that is that the conjoint analysis calculations that Dr. Singer did assumes that additive compensatory decision-making rule. 17:54:58 17:55:01 17:55:10 17:55:15

So therefore, he goes and he, through his model, assumes that people make decisions a certain way when that decision-making rule is not applied and generates wrong conclusions when you have four or more attributes. 17:55:18 17:55:19 17:55:26 17:55:29 17:55:33 17:55:36

Q You did not conduct your own survey here altering either the number of attributes or otherwise trying to account for the decision 17:55:40 17:55:42 17:55:47

rubric that you described to see if the outcome 17:55:50
would change from Dr. Singer's survey, right? 17:55:52
A Well, again, as I said in other 17:55:57
sections of this report, I believe that you -- 17:56:01
I believe and other experts, including the 17:56:06
people who Dr. Singer cited in his report, 17:56:11
believe that universities are described by 17:56:15
multiple attributes, and so therefore, it is -- 17:56:18
I don't think there is any way to go and 17:56:25
properly describe a university using less 17:56:30
attributes. In fact, I think it needs to be 17:56:33
described by more. 17:56:37
So that effectively in your 17:56:37
hypothetical, you are saying did you go and run 17:56:42
a conjoint that improperly describes 17:56:48
universities, and the answer to that is no. 17:56:50
Q If you can open to page 76 of 17:56:54
Dr. Singer's report. 17:56:58
A 7-6? 17:56:59
Q Yes. 17:57:03
Let me know when you're there. 17:57:03
A I'm there. 17:57:05
Q Okay. 17:57:05
The Question 13 is presented. 17:57:06
This is part of the example survey that 17:57:09

Dr. Singer presented, right? 17:57:13
That's correct? 17:57:18
A I'm sorry, I think I saw -- so I see Question 13, which I understand was part of the survey. 17:57:20 17:57:25 17:57:28
Is that what you -- 17:57:29
Q That was the question. 17:57:30
A Okay. 17:57:32
Q And the first part of that says: "For the remainder of this survey, please assume you are considering enrolling at BU for an upcoming undergraduate semester." 17:57:33 17:57:35 17:57:37 17:57:40
Did I see that correctly? 17:57:43
A Yes. 17:57:46
Q So this is asking the respondents to locate themselves in the context of enrolling in the first semester at BU, right? 17:57:47 17:57:49 17:57:51
A Yes. 17:57:53
Q So when these attributes are being asked about -- when the respondents are being asked about attributes, these are being asked about in the context of enrollment at BU, right? 17:57:54 17:57:56 17:58:01 17:58:04 17:58:06
A Yes. 17:58:07
Q Okay. 17:58:07

You didn't conduct your own study changing the attributes or moving the weights or values of attributes around to see if that would impact any aspects of Dr. Singer's survey, right? 17:58:07 17:58:24 17:58:31 17:58:32 17:58:34

A As I've said multiple times, I did not make minor modifications to this flawed model and generate my -- 17:58:40 17:58:42 17:58:47

(Reporter clarification.) 17:58:49

A I'm not sure what I said. I think I said and generate conclusions from primary research, maybe. 17:58:49 17:59:13 17:59:22

Does that sound right? Okay. 17:59:22

Q If you go to page 26 of your report -- 17:59:30 17:59:32

A Yes. 17:59:44

Q -- in the middle of the page, there's a sentence that says: "Dr. Singer did not state any basis." 17:59:45 17:59:47 17:59:49

Do you see that? 17:59:51

A I do. 17:59:51

Q And the full sentence there is: "Dr. Singer did not state any basis behind his attribute selection or the values of those attributes." 17:59:52 17:59:54 17:59:56 17:59:59

Did I read that correctly? 18:00:00
A Yes. 18:00:01
Q If we turn to Dr. Singer's report, page 19, paragraph 36. 18:00:02 18:00:05
A Page 19, yes. 18:00:08
Q This paragraph -- I'm on the wrong page. 18:00:24 18:00:26
You know what, I -- sorry. I meant page 36. 18:00:38 18:00:40
(Reporter clarification.) 18:00:41
MS. LEV: When it's a convenient moment, would it be possible to know how long we've been on the record? 18:01:01 18:01:02 18:01:04
MR. McDONOUGH: Yeah. 18:01:05
THE VIDEOGRAPHER: Five hours and 38 minutes. 18:01:32 18:01:33
MS. LEV: Thank you. 18:01:34
BY MR. McDONOUGH: 18:01:34
Q So on page 19 of Dr. Singer's report, paragraph 36 -- 18:01:34 18:01:38
A Okay. 18:01:40
Q Are you there? 18:01:41
A I am. 18:01:46
Q Does that -- it starts: "The respondents were then introduced to the two key 18:01:47 18:01:49

Dr. Singer says in Table 1 -- he classifies it as in-person events, but that in his actual description of values to survey respondents, he does not clarify it as being not access to events. 18:13:16 18:13:24 18:13:32 18:13:36 18:13:42

And so that is something that BU's materials clearly demonstrate that he misdescribed the values of that attribute. 18:13:43 18:13:48 18:13:54

Q So it's your position that Dr. Singer's survey misdescribed in the survey question that responds -- that Dr. Singer misdescribed the campus facilities attribute? 18:14:03 18:14:03 18:14:09 18:14:17

A Yes, Dr. -- as you've talked a lot about, Dr. Singer misdescribed the campus -- the values underlying the campus facilities access attribute. 18:14:27 18:14:29 18:14:33 18:14:36

Q And -- so what words would you use to accurately describe that attribute? 18:14:40 18:14:41

A Well, at a minimum, I'd sit there and say -- I wouldn't say, as he does, you will not have access to things that they had access to. That's a minimum. 18:14:48 18:14:50 18:14:53 18:14:54

Q Like what kind of things are you talking about? 18:15:04 18:15:05

A So it's -- as I went and described in 18:15:10

my report, students had access to groups, events, opportunities, activities and other similar things. They had access to it. 18:15:12 18:15:17 18:15:19
Q Not in person, correct? 18:15:25
A That's not what Dr. Singer says. Dr. Singer says you have no access, period. That's what he says. 18:15:28 18:15:30 18:15:36
Q And you didn't do your own study to see what would happen if you had included a different description for this particular attribute, correct? 18:15:37 18:15:40 18:15:44 18:15:46
A Same answer as I've said before when you've asked me such hypotheticals. 18:15:48 18:15:50
Q Which is no, you didn't? 18:15:52
A I did not do it because I think this is a flawed analysis generally, and making minor tweaks to it would not resuscitate it. 18:15:57 18:15:59 18:16:02
Q So ultimately, whether you agree or not with the way Dr. Singer described these attributes or values of these attributes, he did in fact state the reasons that he selected them, and he did describe where the source material came for the attribute descriptions, correct? 18:16:16 18:16:18 18:16:20 18:16:24 18:16:27 18:16:29 18:16:31
A So first, we've only talked about two 18:16:34

of the attributes. Secondly, what -- what I cite to, and if you want I can find the quote in my papers, is that you need detailed analyses in order to properly describe the attributes. 18:16:36 18:16:46 18:16:48 18:16:50 18:16:54

For example, one conjoint expert said, as I've said before, that because conjoint analyses are so sensitive to words, that it is vital for someone to have deep experience within an industry before the results of a conjoint are -- can be relied opinion. 18:16:56 18:17:00 18:17:03 18:17:08 18:17:13 18:17:17 18:17:24

And so just by going and using your example before, of just because someone read some marketing materials or saw Apollo 13 doesn't make them an expert. 18:17:25 18:17:28 18:17:32 18:17:39

Q So is there no survey that you believe could be done to assess damages in this case? 18:17:47 18:17:49 18:17:52

A That's not something I've contemplated. 18:17:54 18:17:55

I know what he did is wrong. 18:17:56

Q What do you understand this case to be about? 18:18:01 18:18:02

A My understanding is that because of 18:18:08

the COVID-19 pandemic and government orders, BU made the decision to go and change the educational environment for many of the -- its students, and some students and parents were unhappy with that decision and are suing the university. 18:18:13 18:18:28 18:18:32 18:18:39 18:18:44 18:18:47

Q And what is your understanding, if any, of what the alleged damages are in the case? 18:18:51 18:18:54 18:18:57

A What I understand is that in general, the plaintiffs allege that the payment for that learning environment over the entire semester should have been less. 18:19:05 18:19:11 18:19:27 18:19:31

Q Do you believe that Dr. Singer conducted a rank-based conjoint survey? 18:20:08 18:20:10

A I'd have to -- I have to think about that more, about specifically that exact terminology. 18:20:20 18:20:22 18:20:27

Q Okay. 18:20:28

What about -- we were talking -- I was going back to damages. 18:20:28 18:20:31

Do you understand what the theory of the damages is? 18:20:35 18:20:36

Do you understand why the students are alleging that tuition should be 18:20:42 18:20:44

I understand what certain payors to BU have alleged, yes. 18:22:22 18:22:29
Q What is the theory that's alleged, as you understand it? 18:22:34 18:22:36
A That there was an overpayment. 18:22:37
Q And why was there an overpayment? 18:22:40
MS. LEV: Objection. Foundation. Speculation. 18:22:44 18:22:45
A Again, I believe that -- again, I'd have to look at the words. Again, I don't have it memorized, but I believe in general these certain individuals who are behind the complaint alleged that they didn't get what they thought they were getting. 18:22:49 18:22:55 18:22:57 18:23:06 18:23:07 18:23:09
Q So talking about the real-world behavior, you're referring to the students who, having experienced the 2020 -- the spring of 2020 shift from in-person to online instruction and the campus closure, that those students nonetheless reenrolled in fall of 2020 while COVID was still ongoing, is that -- is that -- is that accurate? 18:23:48 18:23:49 18:23:51 18:23:55 18:24:06 18:24:09 18:24:13 18:24:16
A Amongst other things, yes. 18:24:17
Q So would you -- is it fair to say that you believe that the choice to attend in 18:24:19 18:24:21

the fall of 2020 was effectively the same set of choices made in the spring of 2020? 18:24:22 18:24:27

A As we talked about before, I believe that the choices that were made in the fall of 2020 are consistent with my conclusions. Obviously there are some differences but I believe the fall 2020 is a conservative benchmark, and that fall 2020 that you've described is one of many reasons why I believe actual real-world data is inconsistent with the plaintiffs' and Dr. Singer's theory. 18:24:34 18:24:35 18:24:38 18:24:43 18:24:46 18:24:48 18:24:51 18:24:55 18:24:59

Q So just -- just to make sure I understand. Is it your opinion that the -- the choices about enrolling -- reenrolling for the fall of 2020 are the same set of choices that these students made when enrolling for the spring of 2020? 18:25:05 18:25:06 18:25:08 18:25:10 18:25:15 18:25:17

A I believe that the choices that were made in the fall of 2020 provide a very good guide about what choices would have been made in a hypothetical world that Dr. Singer and the plaintiffs are trying to construct. 18:25:26 18:25:28 18:25:32 18:25:37 18:25:41

Q You said fall of 2020 choices. You mean in the fall of 2020 -- I guess I want to make sure I'm using the language carefully 18:25:47 18:25:49 18:25:51

here. 18:25:53

Is it your opinion that the choices that students made at the time they were reenrolling for fall of 2020 were effectively the same as the choices they were faced with and made when choosing to enroll for the spring of 2020? 18:25:56 18:25:57 18:25:59 18:26:03 18:26:06 18:26:10

A No, because again, you're confusing the actual and but-for worlds in your hypothetical, in your question. 18:26:15 18:26:17 18:26:19

Q And what am I confusing? 18:26:21

A The one I went and said -- so it's in general, when calculating damages, what one does is one compares the actual and but-for worlds. 18:26:31 18:26:33 18:26:36 18:26:40

And that we know the actual decisions that plaintiffs -- that BU students made in the actual world of spring 2020, but we need to go and construct what would have happened in the but-for world. And what I am saying is that, amongst other things, the named plaintiffs' and BU students' actions in the fall 2020 provide a great guide to what their actions would have been in the but-for world in spring 2020. And because their actual 18:26:49 18:26:50 18:26:52 18:26:58 18:27:03 18:27:07 18:27:15 18:27:19 18:27:24 18:27:28

decisions in both the spring 2020 and fall 2020 were relatively consistent, I believe that there are no damages. 18:27:33 18:27:38 18:27:41

Q So is it then the case that the most effective -- the most appropriate but-for comparison world is the enrollment decisions the students were making for fall of 2020? 18:27:46 18:27:48 18:27:51 18:27:55

A I think we went over this before. What I went and I believe is that the fall 2020 is a great benchmark. I'm not saying that it's the best or most effective or whatever words that you use. I'm saying -- 18:28:04 18:28:07 18:28:09 18:28:12 18:28:14

Q I believe it was an appropriate benchmark. I'm not trying -- 18:28:16 18:28:17

A An appropriate -- so it's that I believe it is appropriate, yes. 18:28:19 18:28:25

Q Okay. 18:28:26

Is it among -- as between the choices that Dr. Singer used as a but-for world and fall of 2020, is it your testimony that the fall of 2020 enrollment decisions are the best of those two options as compared? 18:28:26 18:28:31 18:28:34 18:28:38 18:28:43

A Well, I think by definition when you do compare two things, it's "better," not "best." 18:28:50 18:28:51 18:28:54

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.