UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10827-RGS

IN RE: BOSTON UNIVERSITY
COVID-19 REFUND LITIGATION

MEMORANDUM AND ORDER ON
MOTION TO EXCLUDE, MOTION FOR CLASS
CERTIFICATION, AND CROSS-MOTIONS
FOR SUMMARY JUDGMENT

April 7, 2023

STEARNS, D.J.

Plaintiffs Olivia Bornstein, Shakura Cox, Gabriella Dube, Julia Dutra, Natalie Silulu, and Venus Tran brought this putative class action against defendant Trustees of Boston University (BU), alleging that BU breached its contract with students when it retained tuition and fees collected for the Spring semester of 2020 despite halting in-person instruction and closing on-campus facilities and resources in March of 2020. There are several motions now pending before the court: the parties' cross-motions for summary judgment, plaintiffs' motion to certify a class, and defendant's motion to exclude the expert opinion of Dr. Hal J. Singer. For the following reasons, the court will allow BU's motions on the merits and deny plaintiffs' motions as moot.

## DAUBERT MOTION

Because resolution of the other motions hinges on the admissibility of Dr. Singer's expert opinion, the court will begin with BU's motion to exclude his testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] At the motion to dismiss stage, plaintiffs eluded the educational malpractice bar only to the extent they hewed closely to the terms of their alleged contract with BU, seeking (1) the difference in cost between online course credit and in-person course credit as damages for

---

[1] *Daubert* imposes a duty on federal trial judges to play the role of "gatekeeper," ensuring that the fact-finding process does not become distorted by "expertise that is *fausse* and science that is junky." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring). Two gateposts frame the exercise of a judge's discretion to admit or exclude expert testimony. First, the witness must be shown to be sufficiently qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the Federal Rules of Evidence require that the judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable" (and helpful to the finder of fact). *Daubert*, 509 U.S. at 589. "[C]onclusions and methodology are not entirely distinct from one another. . . . [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Thus, while methodology remains the central focus of a *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions. Rather, trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).

2

BU's breach of the alleged obligation to provide them with in-person instruction; and (2) a refund of at least a portion of the mandatory activity fees as damages for BU's breach of the alleged obligation to provide them with unfettered access to campus facilities. *See* Order on Mot. to Dismiss (Dkt # 63) at 6-8. The issue now before the court is whether Dr. Singer's computation methodology (and his related analysis) adequately captures each measure such that his opinion would aid the jury in calculating damages.

Having considered the parties' briefing and the arguments put forward during the March 30, 2023 hearing, the court determines that Dr. Singer's opinion does not survive scrutiny under *Daubert*. Following the instructions of plaintiffs' attorneys, Dr. Singer calculated the net reduction in the value of "semester cost" (the sum of tuition and fees) caused by the switch from an "on-campus experience" (the combination of in-person instruction *and* access to campus facilities) to an "online experience" (the combination of online instruction *and* no access to campus facilities). Specifically, he averaged the preferences of hypothetical BU students[2] regarding class

---

[2] Dr. Singer did not survey the actual population of affected BU students. Instead, he engaged Qualtrics to provide "an internet-based sample of U.S. residents over the age of" eighteen "who could plausibly attend or have attended BU's in-person, on campus" graduate and undergraduate programs and "who had already selected (or intend to select)

3

modality and campus access to determine the overall discount rate that his student sample would have required as compensation for the loss of an "on-campus experience." He then applied that averaged discount rate to his calculation of a "semester cost."

The problem is this: BU did not make an open-ended promise to provide an "on-campus experience" in exchange for a "semester cost" (and to the extent plaintiffs now wish to reframe their injury, any claim premised on breach of such a promise would undoubtedly fall within the scope of the educational malpractice bar). Valuation of an "experience" inherently entails a high degree of subjectivity, especially where, as here, plaintiffs attempt to dissociate that valuation from the nominal costs of each component. The "on-campus experience" is the combination of two *other* distinct and separate promises: in-person instruction in exchange for tuition and access to certain campus facilities in exchange for certain fees. *Compare* Opp'n to Mot. to Exclude (Dkt # 144) at 15 (linking "the availability of in-person instruction" to specific representations "in the registration system and Bulletin"), *and* Opp'n to Mot. to Dismiss (Dkt # 62) at 15 (arguing that students "accept" the alleged offer of in-person instruction "by paying tuition

---

an On-campus Experience in real life." Singer Rep. (Dkt # 135-35) ¶¶ 31-33, 48 (emphasis removed).

and registering for in-person courses"), *with* Opp'n to Mot. to Exclude at 15 (linking "the availability of . . . access to campus facilities" to specific representations "in disclosures concerning mandatory fees"), *and* Opp'n to Mot. to Dismiss at 19 ("BU also promised Plaintiffs (and the Class) that it would provide physical access to various campus facilities and services in exchange for payment of mandatory fees."). And while these promises may have gone hand-in-hand — students allegedly had to purchase tuition and fees as a package — the fact remains that the contractual obligation to provide in-person instruction allegedly arose from a different source (and allegedly was accepted by payment of a different price) than the contractual obligation to provide access to on-campus facilities.³ Any appropriate measure of damages accordingly would require separately addressing the breach of each alleged promise, measuring the net reduction in the value of tuition associated with the transition to online instruction and giving different consideration to the net reduction in the value of campus fees associated with the loss of access to campus facilities.

---

³ Arguably, each fee entailed a separate promise, such that the contractual obligation to provide access to on-campus facilities is actually made up of smaller contractual obligations to provide access to *certain* on-campus facilities in exchange for payment of *certain* fees.

5

Plaintiffs attempt to avoid the *Daubert* issue by arguing that Dr. Singer's raw data can be used to calculate the correct figures, as demonstrated by the analysis of BU's expert witness, Dr. Benjamin Wilner. But Dr. Singer did not opine on isolated damages in his expert report and thus may not testify as to isolated damages during trial.

In any event, even if plaintiffs could overcome the isolated damages hurdle, the court is not convinced that the Choice-Based Conjoint (CBC) Analysis used by Dr. Singer appropriately calculates damages for the type of breach alleged in this case. CBC Analysis is typically used to inform a seller's pricing strategy by determining what consumers would be willing to pay (or not to pay) for a specific feature of a particular product. A simple example would be the value a consumer would assign to the inclusion of air conditioning or a pair of Styrofoam dice in a new car. CBC Analysis is not normally used to compare consumer valuations of wholly differentiated product choices, say a new car as opposed to a mountain bike. Thus, in this context, CBC Analysis may be appropriate to measure the value that a prospective student would give to a course in coding included in her tuition charge. It would not, however, be useful to ask her to assign a comparative value to a tuition package that came with a free ocean cruise, which in essence is the way Dr. Singer framed the questions.

In concluding that Dr. Singer's opinion should be excluded, the court does not mean to impugn the thoroughness or reasonableness of Dr. Singer's exposition of CBC Analysis or to imply that he does not accurately calculate what he set out to measure.[4] The court also does not mean to question the validity of CBC Analysis as an accepted statistical methodology. All the court questions here is its applicability to the problem Dr. Singer was tasked to solve.

**BU'S MOTION FOR SUMMARY JUDGMENT**

BU moves for reconsideration of the court's denial of summary judgment as to its defense of impossibility. Having reviewed the Supreme Judicial Court's decision in *Le Fort Enterprises, Inc. v. Lantern 18, LLC*, 491 Mass. 144 (2023), which clarified that summary judgment may be appropriate if "the material facts" underlying the defense of impossibility

---

[4] The court does, however, have some concerns with his description of the "no access" level for the campus facilities feature. Dr. Singer instructed students to assume that they "will not have access to any of the campus facilities, groups, opportunities, or events described above," which include "the opportunity to socialize in various campus buildings, quads, parks, and study areas"; "the opportunity to be a part of various sports teams and clubs"; and "access to BU-sponsored events, such as sporting events, concerts and performances, club events, parties, festivals, and social, networking and wellbeing events." Singer Rep. ¶ 42. But BU did not prevent students from accessing *all* promised services. Students could still participate in clubs after closure of BU's on-campus facilities, and BU appears to have hosted remote events for students and to have provided telehealth services.

7

"are not in dispute," *see id.* at 149, the court agrees that it misconstrued Massachusetts law on the issue and thus will reconsider the merits. *See also UMNV 205-207 Newbury, LLC v. Caffe Nero Ams. Inc.*, 2021 WL 956069, at *5 (Mass. Super. Ct. Feb. 8, 2021).

"The doctrine of impossibility – often referred to, perhaps more accurately, as the doctrine of impracticability – excuses performance of a contract where (1) an event occurring after the execution of the contract makes the contract's performance impossible or impracticable; (2) nonoccurrence of the event was a basic assumption on which the contract was made; and (3) the party who seeks to have his or her performance excused did not cause the event." *Martorella v. Rapp*, 2021 WL 3234312, at *3 (Mass. App. Ct. 2021), citing *Chase Precast Corp. v. John J. Paonessa Co.*, 409 Mass. 371, 373 (1991). Here, plaintiffs appear not to dispute that the first and third prongs are met. *See* Pls.' Counterstatement of Facts (Dkt # 148) ¶¶ 3, 5, 8. They focus their challenge only on whether BU has established that nonoccurrence of the event was a basic assumption on which the contract was made, arguing that there is a genuine dispute of material fact as to whether BU assumed the risk of a pandemic.

The court finds plaintiffs' argument unconvincing. Plaintiffs concede that "COVID's effects were unforeseen." *See* Opp'n to Mot. to Exclude at 7;

8

*see also* Pls.' Counterstatement of Facts ¶ 8. The logical corollary of that concession is that, not having contemplated a pandemic, the parties did not allocate the risk associated with it. *Cf. UMNV*, 2021 WL 956069, at *5. In any event, something more than the pandemic was in play in March of 2020 when BU closed its campus and switched to online learning. As plaintiffs admit, Governor Baker's emergency orders rendered continued performance of the alleged contract *illegal*, not just unsafe. It is not clear that an absolute obligation to perform could ever exist under such circumstances. *See Bos. Plate & Window Glass Co. v. John Bowen Co.*, 335 Mass. 697, 699-700 (1957) ("It is settled by our decisions that one who has bound himself by an absolute agreement for the performance of *something not in itself unlawful* is not released from his obligation by the mere fact that in consequence of unforeseen accidents the performance of his contract has become impossible; he must respond in damages for the breach of his agreement.") (emphasis added). But assuming that it could, none of the statements cited by plaintiffs can plausibly be construed to promise continued performance even where such performance becomes illegal. Thus, under the circumstances, no jury could find that students *reasonably* believed that BU "undertook an absolute obligation to perform" according to the terms of the

9

alleged contract and assumed the risk should continued performance become unlawful. Opp'n to Mot. for Summ. J. (Dkt # 147) at 17.

Although BU has shown entitlement to the impossibility defense as a matter of law, the court's inquiry is not at an end. Plaintiffs correctly note that, even if performance is excused, BU must still provide restitution for the difference in value between what they were promised and what they received. *See Omori v. Brandeis Univ.*, 2022 WL 10511039, at *7 (D. Mass. Oct. 18, 2022) ("Even if impossibility and/or frustration of purpose were to excuse Brandeis' non-performance, the doctrines forgive performance by both parties to a contract. If one party has performed, as the plaintiffs here did by paying full tuition, the non-performing party may owe it restitution."), citing Restatement (Second) of Contracts § 377, cmt. A.

Here, plaintiffs offer only the opinion of Dr. Singer to establish the amount of any possible restitution damages. The court, however, has already concluded that Dr. Singer's opinion does not adequately measure damages for breach of the alleged contractual provisions asserted here. His testimony thus is insufficient to create a genuine dispute of material fact as to the existence or amount of any restitution damages. The court accordingly will enter summary judgment in BU's favor.

10

## ORDER

For the foregoing reasons, defendant's Motion to Exclude and Motion for Summary Judgment are <u>ALLOWED</u> and plaintiffs' Motion for Class Certification and Motion for Summary Judgment are <u>DENIED AS MOOT</u>.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE